**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

KENEXA TECHNOLOGY, INC.,     )
A Pennsylvania corporation,     )
    )
          Plaintiff,     )
    )
         v.     )   C.A. No. 07-27-GMS
    )
BLUELINX CORPORATION,     )   **JURY TRIAL DEMANDED**
A Georgia corporation,     )
    )
         Defendant.     )

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM
OF BLUELINX CORPORATION TO THE AMENDED COMPLAINT**

     Defendant, BlueLinx Corporation ("BlueLinx"), by its attorneys, hereby responds

and answers plaintiff Kenexa Technology, Inc.'s ("Kenexa") Amended Complaint as

follows:

### Parties

    1.     Admitted upon information and belief.

    2.     Admitted.

### Jurisdiction and Venue

    3.     The allegations of this paragraph state legal conclusions to which no

response is required.

    4.     The allegations of this paragraph state legal conclusions to which no

response is required.

### Background

    5.     BlueLinx is without sufficient knowledge or information to admit or deny

the allegations of this paragraph.

6.    Admitted.

7.    Denied as stated. Admitted that BlueLinx and Kenexa entered into an agreement (the "Master Service Agreement") on or about May 30, 2006. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.

8.    Denied as stated. Admitted that the Master Service Agreement commenced on or about May 30, 2006. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.

9.    Denied as stated. Admitted that BlueLinx and Kenexa entered into the Master Service Agreement on or about May 30, 2006. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, Kenexa failed to fulfill its obligations under the Master Service Agreement and was obligated under Attachment #6 to the Master Service Agreement to negotiate adjusted levels of service according to BlueLinx' needs.

10.    Denied as stated. Admitted that BlueLinx and Kenexa entered into the Master Service Agreement on or about May 30, 2006. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, BlueLinx disputed Kenexa's invoices, and Kenexa failed to fulfill its obligations under the Master Service Agreement.

11.    Denied as stated.  Admitted that Kenexa sent invoices to BlueLinx.  To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.  By way of further response, BlueLinx disputed Kenexa's invoices, and Kenexa failed to fulfill its obligations under the Master Service Agreement.

12.    Denied as stated.  To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.  By way of further response, Kenexa failed to fulfill its obligations under the Master Service Agreement.

13.    Denied.  To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.  By way of further response, Kenexa failed to fulfill its obligations under the Master Service Agreement.

14.    Denied as stated.  To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.  By way of further response, Kenexa failed to fulfill its obligations under the Master Service Agreement.

15.    Admitted that BlueLinx terminated the Master Service Agreement on November 1, 2006.

16.    Denied as stated.  To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.  By way of further response, Kenexa failed to fulfill

3

its obligations under the Master Service Agreement and failed to communicate with BlueLinx in a timely and professional manner.

17.    Denied as stated. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, Kenexa failed to fulfill its obligations under the Master Service Agreement. Admitted that Lovelace and Podsiad were two of Kenexa's on-site employees on the BlueLinx program.

18.    BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

19.    BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph. To the extent the allegations of this paragraph purport to characterize the terms of a written agreement, BlueLinx refers to that agreement, which speaks for itself.

20.    BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph. To the extent the allegations of this paragraph purport to characterize the terms of a written agreement, BlueLinx refers to that agreement, which speaks for itself.

21.    Admitted that Lovelace and Podsiad were Kenexa employees assigned to BlueLinx. BlueLinx is without sufficient knowledge or information to admit or deny the remaining allegations of this paragraph.

22.    Admitted.

23.    Admitted.

24. Denied as stated. Admitted that after Kenexa's repeated breaches of its obligations to provide the required services in a professional and workmanlike manner, BlueLinx properly terminated the Master Service Agreement via letter from Robert Penman dated November 1, 2006. Admitted that Lovelace and Podsiad's employment at Kenexa ended after BlueLinx' rightful termination of the Master Service Agreement.

25. BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

26. BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

27. BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

28. Denied as stated. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.

29. Denied as stated. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.

30. Admitted that BlueLinx hired Lovelace and Podsiad on or about November 20, 2006. Denied that BlueLinx needed Kenexa's consent to hire either.

31. Admitted that BlueLinx hired Lovelace and Podsiad on or about November 20, 2006. Denied that BlueLinx solicited Lovelace and Podsiad. By way of further response, the remaining allegations of this paragraph state legal conclusions to which no response is required.

5

32.    To the extent the allegations of this paragraph purport to characterize the terms of the a written agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

33.    To the extent the allegations of this paragraph purport to characterize the terms of the a written agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

a.    To the extent the allegations of this paragraph purport to characterize the terms of the a written agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

b.    To the extent the allegations of this paragraph purport to characterize the terms of the a written agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

c.    To the extent the allegations of this paragraph purport to characterize the terms of the a written agreement, BlueLinx refers to that agreement, which speaks for itself. By way of further response, BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

d.    To the extent the allegations of this paragraph purport to characterize the terms of the a written agreement, BlueLinx refers to that agreement,

6

which speaks for itself. By way of further response, BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

34.    Denied as stated.

## Count I

### (Breach of Contract)

35.    BlueLinx realleges each of the foregoing paragraphs as if fully set forth herein.

36.    Admitted that BlueLinx and Kenexa entered into the Master Service Agreement on or about May 30, 2006. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.

37.    Denied.

38.    Denied.

39.    Denied.

40.    Denied.

41.    Denied.

## Count II

### (Declaratory Judgment)

42.    BlueLinx realleges each of the foregoing paragraphs as if fully set forth herein.

43.    Denied as stated. Admitted that BlueLinx and Kenexa entered into the Master Service Agreement on or about May 30, 2006. To the extent the allegations of

this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.

44.    Admitted that Kenexa asserts that BlueLinx breached the Master Service Agreement, all of which BlueLinx disputes.

45.    Admitted that Kenexa seeks a declaration that BlueLinx breached the Master Service Agreement. Denied that BlueLinx breached, anticipatorily breached, or improperly terminated the Master Service Agreement. To the extent the allegations of this paragraph purport to characterize the terms of the Master Service Agreement, BlueLinx refers to that agreement, which speaks for itself.

46.    The allegations of this paragraph state legal conclusions to which no response is required.

## Count III

### (Intentional Interference with Contractual Relations)

47.    BlueLinx realleges each of the foregoing paragraphs as if fully set forth herein.

48.    Denied.

49.    BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph. By way of further response, the allegations of this paragraph state legal conclusions to which no response is required.

50.    Denied.

51.    Denied.

## Count IV

### (Misappropriation of Trade Secrets)

52.    BlueLinx realleges each of the foregoing paragraphs as if fully set forth herein.

53.    BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

54.    BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

55.    Denied as stated.  The Master Service Agreement provided consent and permission.  By way of further response, the remaining allegations of this paragraph state legal conclusions to which no response is required.  As to Lovelace and Podsiad, BlueLinx is without sufficient knowledge or information to admit or deny the allegations of this paragraph.

56.    Denied.

57.    Denied.

58.    Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Failure to State a Claim)

The Amended Complaint fails to state a claim against BlueLinx upon which relief may be granted.

### Second Affirmative Defense
### (Breach of Contract)

The claims asserted in the Amended Complaint are barred because Kenexa has violated material terms of the Master Supply Agreement.

9

### Third Affirmative Defense
### (Failure to Mitigate Damages)

To the extent that Kenexa failed to mitigate, minimize or avoid any losses allegedly sustained, any recovery against BlueLinx must be reduced.

### Fourth Affirmative Defense
### (Set-off/Recoupment)

BlueLinx is entitled to set off or recoup from Kenexa all damages suffered by BlueLinx as a result of Kenexa's breaches of the Master Supply Agreement and/or Kenexa's other wrongful conduct.

### Fifth Affirmative Defense
### (BlueLinx' Commercially Reasonable Conduct)

The alleged actions of BlueLinx were justified under the facts and circumstances of this case, because they were commercially reasonable.

### Sixth Affirmative Defense
### (Kenexa's Failure to Satisfy Contractual Conditions Precedent)

The Amended Complaint is barred, in whole or in part, by Kenexa's failure to satisfy contractual conditions precedent.

### Seventh Affirmative Defense
### (Right to Amend)

BlueLinx hereby gives notice of its intent to rely on such other and further affirmative and separate defenses as may appear applicable through discovery proceedings in this litigation, and hereby reserves the right to amend its answer to reflect any such defenses.

**WHEREFORE,** BlueLinx respectfully requests that the Amended Complaint be dismissed with prejudice; that BlueLinx be awarded its costs in this action; and that BlueLinx be awarded such other and further relief, as is appropriate, by this Court.

## COUNTERCLAIM

### Jurisdiction and Venue

1.      Jurisdiction is proper pursuant to 28 U.S.C.A. § 1332(a)(1).

2.      Venue is proper pursuant to 28 U.S.C.A. § 1391(a)(3).

### Background

3.      BlueLinx and Kenexa entered into the Master Service Agreement (*see* Exhibits A and B (legible copies of selected pages) hereto) on or about May 30, 2006.

4.      The Master Service Agreement required that Kenexa provide employment process outsourcing services to BlueLinx.

5.      The services were to be provided in a competent, timely and professional manner according to the terms of the Master Service Agreement and related attachments and amendments thereto.

6.      In October 2006, BlueLinx and Kenexa agreed to amend the service level provided to BlueLinx, in accordance with Attachment #6 of the Master Service Agreement.

7.      Thereafter, Kenexa, through Mr. John Holvay, agreed to provide an initial draft of the amendment.

8.      On at least four separate occasions, Mr. Holvay provided dates for delivery of the draft amendment; none of Mr. Holvay's self-selected deadlines were met.

9.      When the promised draft amendment finally did arrive on October 30, 2006, it varied substantially from the terms previously conveyed to BlueLinx.

10.      A telephone call was scheduled by Mr. Holvay to discuss the material discrepancies contained in the draft amendment.  However, the call was cancelled by Mr. Holvay and was never rescheduled.

11.     After Kenexa's repeated breaches of its obligations to provide the required services in a professional and workmanlike manner BlueLinx terminated the Master Service Agreement via letter from Robert Penman dated November 1, 2006.

12.     After the termination, Kenexa continued to act as if the Master Service Agreement was still in place. Kenexa invoiced BlueLinx for services and/or software that were never used (*see, e.g.,* the November 30, 2006 invoice (Exhibit C hereto) reflecting fees associated with certain software and/or services) and informed its Atlanta employees that BlueLinx had executed the service level amendment to the Master Service Agreement, despite clear evidence to the contrary.

### Count 1 – Breach of Contract

13.     BlueLinx realleges each of the allegations of Paragraphs 1 through 12 of the Counterclaim and incorporates the same by this reference as if fully set forth herein.

14.     Under the Master Service Agreement, Kenexa was obligated to provide to BlueLinx employment process outsourcing services.

15.     Kenexa breached the Master Service Agreement by failing to fulfill its obligations under the Master Service Agreement in a timely and professional manner.

16.     As a direct and proximate result of Kenexa's breach of the Master Service Agreement, BlueLinx has sustained and will sustain actual damages, including, but not limited to, lost profits, the cost of replacement services, lost opportunities, harm to reputation, and legal fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, BlueLinx respectfully requests that the Court enter judgment against Kenexa and award damages to be determined, together with pre-judgment and

post-judgment interest, attorneys' fees, costs and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

BlueLinx requests a jury trial of any issues triable by jury.

POTTER ANDERSON & CORROON LLP

By:   /s/ David E. Moore
       Donald J. Wolfe, Jr. (#285)
       Philip A. Rovner (#3215)
       David E. Moore (#3983)
       Hercules Plaza
       P. O. Box 951
       Wilmington, Delaware 19899
       (302) 984-6000
       dwolfe@potteranderson.com
       provner@potteranderson.com
       dmoore@potteranderson.com

Dated: May 17, 2007                    *Attorneys for Defendant*
793836v2 / 31137

13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on May 17, 2007, the attached document

was electronically mailed and hand delivered to the following persons and was

electronically filed with the Clerk of the Court using CM/ECF which will send

notification to the registered attorney(s) of record that the document has been filed and is

available for viewing and downloading:

> Robert Karl Hill, Esq.
> Seitz, Van Ogtrop & Green, P.A.
> 222 Delaware Avenue, Suite 1500
> P.O. Box 68
> Wilmington, DE 19899
> khill@svglaw.com

By:   */s/ David E. Moore*
      Donald J. Wolfe, Jr.
      Philip A. Rovner
      David E. Moore
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19899-0951
      (302) 984-6000
      dwolfe@potteranderson.com
      provner@potteranderson.com
      dmoore@potteranderson.com

778742

# EXHIBIT A

## MASTER SERVICES AGREEMENT

This **MASTER SERVICES AGREEMENT** ("Agreement") is made as of the 30<u>th</u> day of <u>May</u>, 2006 (the "Effective Date"), by and between **BLUELINX CORPORATION**, a Georgia corporation, having its principal place of business at 4100 Wildwood Parkway, Atlanta, Georgia 30339 ("BlueLinx"), and **KENEXA TECHNOLOGY, INC.**, a Pennsylvania corporation, having its principal place of business at 650 East Swedesford Road, Second Floor, Wayne, Pennsylvania 19087 ("Kenexa"). The terms and conditions under which Kenexa will provide services and products for BlueLinx are set forth below.

**1. SERVICES/PRODUCTS.** This is a master agreement to which signed exhibits ("Exhibit(s)") will be attached by the parties from time to time. Kenexa shall provide, on a non-exclusive basis, the services ("Services") or products ("Products") as set forth in the Statement(s) of Work ("Statement(s)"), attached hereto from time to time as Exhibit(s) A. Each Statement, together with the terms of this Agreement, is a separate contract, which will be effective as of the date it is signed by authorized representatives of both Kenexa and BlueLinx. If any term of an Exhibit conflicts with the terms of this Agreement, the terms of the Exhibit will control. Kenexa will commence Services or delivery of Products upon receipt of the initial payment set forth in the applicable Exhibit B Payment Schedule attached hereto.

**2. PAYMENT.**

**2.1 Rates.** Kenexa's performance obligations and BlueLinx' rights to receive performance under this Agreement are conditioned upon BlueLinx' payment of the charges set forth in this Agreement and the Exhibit(s). Kenexa's rates for the Products and Services are set forth in Exhibit(s) B attached hereto. BlueLinx shall pay Kenexa for Products and Services in accordance with the Exhibit(s) B and this Agreement.

**2.2 Expenses.** BlueLinx shall reimburse Kenexa for expenses pre-approved in writing (including travel and living expenses) incurred in the performance of Services and delivery of Products hereunder.

**2.3 Payment.** BlueLinx shall pay all undisputed invoices submitted to BlueLinx to Kenexa at P.O. Box 827674, Philadelphia, Pennsylvania 19182-7674 within thirty (30) days after receipt thereof, unless a different date is specified in the Exhibit. If BlueLinx reasonably and in good faith disputes all or any portion of any invoice, BlueLinx shall notify Kenexa in writing of its objection within ten (10) days from the date of BlueLinx' receipt of the invoice, provide a detailed description of the reasons for the objection, and pay the portion of the invoice which is not in dispute. Any undisputed amounts not paid within the period set forth above shall bear interest at the rate of one (1%) percent per month. If BlueLinx fails to pay invoices within the period set forth above, then (a) BlueLinx shall be liable for any collection costs including reasonable attorney fees incurred by Kenexa; and (b) Kenexa shall be entitled to pursue its available remedies and protect its security interests granted herein.

**2.4 Taxes.** BlueLinx shall be responsible and shall reimburse Kenexa for all sales, use, excise and other similar types of taxes (excluding tax on income) on the Services or Products.

**2.5 Purchase Order.** If BlueLinx requires a purchase order for payment of invoices submitted hereunder, a copy of its form has been attached to this Agreement as Attachment "5". If the purchase order must be fully funded, Company certifies that it has been fully funded by the time of issuance. This Agreement supersedes any terms or conditions of the purchase order.

**3. PERSONNEL.**

**3.1 Personnel Assigned.** All employees engaged to perform Services shall be employees or agents of Kenexa and shall be fully qualified to perform the tasks assigned to them. Whenever present on BlueLinx' premises, Kenexa's personnel and representatives will comply with all BlueLinx policies and procedures governing on-site work, including BlueLinx' safety and security, and data protection policies and procedures provided to Kenexa, and all reasonable instructions and directions issued by BlueLinx.

**3.2 Equal Opportunity Employer.** Kenexa represents that it is an Equal Opportunity Employer and that it will, in the performance of this Agreement, comply with all applicable laws and regulations, including those prohibiting employment discrimination.

**3.3 Responsibility.** Each party shall remain responsible and liable for its employees at all times, regardless of whether the employees are on the other party's premises at the time. Notwithstanding the foregoing, Kenexa shall be responsible and liable for the actions or inactions of its agents or subcontractors.

**4. WARRANTIES.**

**4.1 Services Warranty.** All Services provided hereunder shall be performed in a professional and workmanlike manner; shall be provided by Kenexa personnel having the appropriate skill level, experience and training; and shall meet any plans and specifications set forth in this Agreement or any exhibit hereto.

**4.2 Product Warranty.** All Kenexa Products provided by Kenexa hereunder shall, if not altered by BlueLinx or a third party, when used with properly-functioning equipment, perform substantially in accordance with their Documentation for a period of



ninety (90) days from delivery. Kenexa shall promptly correct any Product errors or malfunctions at no charge to BlueLinx during the warranty term.

**4.3    No Violation.** Kenexa represents and warrants that Kenexa's performance of the Services does not violate any contracts with third parties.

**4.4    Disclaimer.** The warranties set forth in this Agreement are made to and for the benefit of BlueLinx exclusively. THE WARRANTIES SPECIFICALLY SET FORTH IN THIS AGREEMENT ARE IN LIEU OF ALL OTHERS, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY EXCLUDED.

**5.    INTELLECTUAL PROPERTY INFRINGEMENT.** At Kenexa's expense, Kenexa will indemnify and defend BlueLinx against any claim that Kenexa's Services or Products infringe upon the rights of third parties, including any United States trademark, copyright, or patent right. To qualify for such defense and payment, BlueLinx must (a) give Kenexa prompt written notice of such claim; and (b) allow Kenexa to control, and fully cooperate with Kenexa in, the defense and all related negotiations provided that BlueLinx is not subject to monetary charges. Kenexa's obligations under this Section are conditional upon BlueLinx' agreement that, if a Product or Service is likely to become the subject of such a claim, BlueLinx shall permit Kenexa, at Kenexa's option and expense, either to procure the right for BlueLinx to continue to use the Product or Service or to replace or modify it so that it becomes non-infringing and retains substantially comparable function or return and receive a refund of any prepaid fees. Kenexa shall have no obligation with respect to any claim based on (i) BlueLinx' use of the Products or Services in violation of this Agreement; or (ii) modifications of or addition of material to the Products or Services by or at the request of BlueLinx. This Section sets forth Kenexa's entire obligation to BlueLinx regarding intellectual property infringement.

**6.    CONFIDENTIAL INFORMATION.** Both parties shall maintain as confidential and shall not disclose, copy, nor use for purposes other than the performance of this Agreement or as required by law, any information which relates to the other party's business affairs, trade secrets, technology, research and development, pricing, employee information or the terms of this Agreement ("Confidential Information") and each agrees to protect the Confidential Information with the same degree of care that it exercises to protect its own confidential information but in no event with less than reasonable care. Confidential Information shall not include information, (a) previously known by a party without restriction, (b) was acquired by a party from a third party which was not, under an obligation to not to disclose such information, or (c) which is or becomes publicly available through no breach by a party of this Agreement. Upon expiration or termination of this Agreement or upon the request of the other party, each party agrees to return (or destroy as evidenced

in writing by an officer of receiving party's company) the other's Confidential Information. Breach of confidentiality may cause irreparable damage and, therefore, the injured party shall have the right to equitable and injunctive relief and to recover damages (including attorney's fees and costs) incurred in connection with any violation hereof. The provisions of this Section shall survive the termination or expiration of this Agreement.

**7.    LIMITATION OF LIABILITY.** Kenexa will indemnify, defend and hold harmless BlueLinx from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs, and expenses, including reasonable attorney's fees and court costs, arising out of (i) any negligent act or omission or willful misconduct of Kenexa its employees, contractors or agents; (ii) any breach of a warranty or representation in this Agreement by Kenexa, its employees, contractors or agents; or (iii) any personal injury (including death) or damage to property resulting from the negligent acts or omissions of Kenexa, its employees, contractors or agents up to the amount of fees paid or payable to Kenexa under this Agreement during the then current calendar year.

BlueLinx will indemnify, defend and hold harmless Kenexa from any and all losses, costs, expenses, claims, damages, liabilities, suits, actions, recoveries, or judgments ("Claims") caused by acts or omissions (including, without limitation, unlawful employment practices) of BlueLinx, its agents or employees up to the amount of fees paid or payable to Kenexa under this Agreement during the then current calendar year. IN NO EVENT SHALL EITHER OF THE PARTIES HERETO BE LIABLE TO THE OTHER FOR THE PAYMENT OF ANY LOSS OF USE, LOSS OF PROFITS, BUSINESS INTERRUPTION, COST OF COVER OR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES. BlueLinx' exclusive remedy for any cause whatsoever, regardless of the form of action, whether in contract or in tort, and Kenexa's entire liability to BlueLinx is set forth in this Section. In all events, BlueLinx shall remain fully responsible for the operation of its business and its hiring decisions. Kenexa shall not be responsible to third parties (including BlueLinx' employees or applicants) for claims, damages, liability or expenses arising out of use of the Products or Services. BlueLinx agrees to indemnify, defend and hold Kenexa harmless from all such claims, damages, liability and expenses. The foregoing limitation of liability shall not apply to claims brought under Section 5 or 6 hereof or for gross negligence or willful misconduct. Kenexa's obligations under this section will not be in effect if BlueLinx is in breach of its payment obligations under this Agreement or a Statement.

**8.    OWNERSHIP OF INTELLECTUAL PROPERTY.** Except as expressly set forth in any Statements attached hereto, it is understood and agreed that to the extent that Kenexa shall have created, developed or used software, data, programs, materials, content

2

Confidential
Kenexa® Master Services Agreement                              05/15/06

. or other intellectual property in connection with providing the Services and Products to BlueLinx, then Kenexa shall have and retain exclusive ownership and other rights therein, including, without limitation possession. Notwithstanding the foregoing, Kenexa shall have no ownership rights in any BlueLinx proprietary software, data, programs, materials or other intellectual property.

**9.    SECURITY INTEREST.** To secure the payment and performance of BlueLinx' obligations under this Agreement, BlueLinx grants to Kenexa a security interest in, (a) any software, data, programs, materials, content or other intellectual property that is owned or licensed by BlueLinx and contained or hosted by Kenexa on its servers or on third party servers utilized by Kenexa, and (b) any software, data, programs, materials, content or other intellectual property created or developed by Kenexa for BlueLinx (collectively, the "Collateral"). Kenexa shall be authorized by BlueLinx, without further action, to file UCC-1 Financing Statements against all or any portion of the Collateral, provided that Kenexa shall provide notice to BlueLinx within three (3) business days after it has filed any such UCC-1 Financing Statement.

**10. FORCE MAJEURE.**    Neither Kenexa nor BlueLinx shall be responsible for any delay or failure of performance resulting from causes beyond its control and without its fault or negligence, including, without limitation, acts of God, nature, riots, acts of war, fire, earthquake, interruption in utilities or other disasters, and the time for performance hereunder shall be extended for the period of the delay.

**11.  INSURANCE.** Kenexa shall maintain, throughout the performance of its obligations under this Agreement, a policy of Worker's Compensation Insurance with coverage limits as may be required by the law of the states in which Services are to be performed.    Kenexa further agrees to maintain general liability insurance, providing coverage against contractual liability and liability for bodily injury, death, and property damage in the amount of One Million ($1,000,000) Dollars per occurrence, which may arise out of or be based upon any act or omission by Kenexa or any employee, agent, or subcontractor under this Agreement.    In addition, Kenexa will maintain professional liability insurance in the amount of Five Million ($5,000,000) Dollars. Upon written request, Kenexa shall provide certificate(s) from the insurer indicating the amount of insurance coverage, the nature of such coverage, and expiration date of the policy.

**12.  TERM.**  This Agreement shall commence on the Effective Date and shall terminate as provided in Section 13 hereof. Each Exhibit A Statement of Work shall specify a commencement and termination date for that Statement.

**13.  DEFAULT; TERMINATION; REMEDIES.**

**13.1    Termination By BlueLinx.**  BlueLinx may after thirty (30) days' written notice to Kenexa of a material default hereunder (an "Event of Default") as set forth below and Kenexa's failure to remedy such Event of Default terminate this Agreement or any Exhibit hereunder. An Event of Default by Kenexa shall have occurred if:

(a) Kenexa fails to perform any of its material obligations hereunder or under the Exhibits;

(b) Kenexa commences a voluntary case or a petition is filed against Kenexa (i) seeking reorganization, arrangement, adjustment or composition of or in respect of Kenexa under the Federal Bankruptcy Code as now or hereafter constituted, or under any other applicable Federal or state bankruptcy, insolvency, reorganization or other similar law, (ii) seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of Kenexa for any part of its property, or (iii) seeking the winding up or liquidation of its affairs; or

(c) Kenexa makes any assignment for the benefit of creditors.

**13.2    Termination By Kenexa.** Kenexa may, following thirty (30) days' written notice to BlueLinx of a material default hereunder ("Event of Default") as set forth below and BlueLinx' failure to remedy same, terminate this Agreement, or any Exhibit hereunder. An Event of Default by BlueLinx shall have occurred if:

(a) BlueLinx fails to perform any of its material obligations hereunder or under the Exhibits;

(b) BlueLinx commences a voluntary case or a petition is filed against BlueLinx (i) seeking reorganization, arrangement, adjustment or composition of or in respect of BlueLinx under the Federal Bankruptcy Code as now or hereafter constituted, or under any other applicable Federal or state bankruptcy, insolvency, reorganization or other similar law, (ii) seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of BlueLinx for any · part of its property, or (iii) seeking the winding up or liquidation of its affairs; or

(c) BlueLinx makes any assignment for the benefit of creditors.

**13.3    Rights    Upon    Non-Payment    by BlueLinx.**    In the event that BlueLinx fails to pay any past due invoices (which have not been disputed in good faith) within five (5) business days after written notice to BlueLinx, then Kenexa shall be entitled to (i) limit or suspend BlueLinx' access to all personal property or Collateral then in Kenexa's possession or control, whether or not owned by BlueLinx, and (ii) reduce or suspend the Services and Products being provided to BlueLinx hereunder or in any Statement.

**13.4    By Mutual Agreement.**  The parties may mutually agree in writing to terminate this Agreement at any time.

**13.5    Remedies.**  Upon the occurrence of an uncured Event of Default hereunder, except as otherwise may be limited by this Agreement, either party shall be entitled to exercise any and all remedies available at law or in equity or otherwise.



**14. NON-HIRING.** Kenexa and BlueLinx agree not to directly solicit the other party's employees (or individuals who were employees of the other party within the preceding thirty (30) days) with whom it came into contact as a result of this Agreement without the express written consent of the other party for a period of one (1) year from the last date of delivery of Services or Product under this Agreement.

**15. PUBLICITY.** Neither party shall use the other's name, trade name, trademarks or service marks in any publication, advertisement or promotional material without either party's prior written consent. Notwithstanding the foregoing, upon BlueLinx' prior written consent, Kenexa may issue one (1) press release announcing this Agreement. The press release shall be provided to BlueLinx for review prior to any release. Any use of BlueLinx' name, trade name, trademarks or service marks shall be in BlueLinx sole determination.

**16. GENERAL.**

16.1     **Governing     Law;     Consent     to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the Delaware, without giving effect to conflicts of law principles. The parties hereto consent to the jurisdiction and venue of the courts of Delaware. The prevailing party in any lawsuit brought relating to this Agreement and all related Statements of Work shall be awarded reasonable attorneys' fees and costs.

16.2     **Notice.** All written notices required under this Agreement shall be sent by registered or certified mail, return receipt requested, postage prepaid or by overnight courier, to the addresses listed in this Agreement or to such other address as a party shall have designated in writing.

16.3     **Relationship     of     Parties.** The relationship of the parties shall at all times be one of independent contractor, and neither party shall be nor represent itself to be an employee, agent, representative, partner or joint venture partner of the other, nor shall either party have the right or authority to assume or create any obligation on behalf of or in the name of the other or to otherwise act on behalf of the other.

16.4     **Survival of Provisions.** The terms and provisions of this Agreement that, by their sense and context, are intended to survive the completion or termination of this Agreement shall so survive the completion of performance and termination of this Agreement, including, without limitation, the indemnification, confidentiality and non-hiring obligations and the obligation to make any and all payments due hereunder.

16.5     **Assignment.** Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's prior written consent.

16.6     **Entire Agreement; Amendments; and Waivers.** This Agreement, including the Exhibits hereto, constitutes the entire understanding and agreement between the parties relative to the subject matter hereof. Any amendment to this Agreement must be in writing and signed by an authorized representative of each party. The failure of any party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of the provision, nor in any way shall it affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

16.7     **Partial Invalidity.** In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein, unless the deletion of the provision or provisions would result in such a material change as to cause completion of the transactions contemplated herein to be unreasonable.

16.8     **Execution     in     Counterparts/ Facsimiles.** This Agreement may be executed by facsimile and/or the parties hereto may sign the same instrument, or each party hereto may sign a separate counterpart or counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

16.9     **Section     Headings.** Section and subsection headings in this Agreement are for convenience of reference only, do not constitute a part of this Agreement, and shall not affect its interpretation.

16.10     **Exhibits.** There are attached to this Agreement at the time of execution hereof the following Exhibits which have been agreed to by the parties:

Exhibit A-1 Employment Process Outsourcing Statement of Work
Exhibit B-1 Employment Process Outsourcing Payment Schedule
Exhibit C-1 Kenexa Recruiter® Enterprise Applicant Tracking System Statement of Work and Service Level Statement
Attachment #5 BlueLinx Purchase Order
Attachment #6 Kenexa letter dated April 28, 2006.

**IN WITNESS WHEREOF,** intending to be legally bound, the parties have caused this Agreement to be executed by their authorized representatives as of the day and year first above written.

KENEXA TECHNOLOGY, INC.

By: _____
 Kenexa Authorized Representative

Printed Name:    Elliot H. Clark

Title:        Chief Operating Officer

_____
Date

BLUELINX CORPORATION

By: _____
 BlueLinx Authorized Representative

DEAN ADELMAN
Printed Name

V.P. - HUMAN RESOURCES
Title

5.26.06
Date



**EXHIBIT A-1**
**TO MASTER SERVICES AGREEMENT**
**EMPLOYMENT PROCESS OUTSOURCING**
**STATEMENT OF WORK**

This Exhibit A-1 to Master Services Agreement ("Agreement") between **BLUELINX CORPORATION** ("BlueLinx") and **KENEXA TECHNOLOGY, INC.** ("Kenexa"), dated May 3 0, _____, 2006, sets forth the employment process outsourcing services to be performed by Kenexa ("Services"), and the timing, cost and payment schedule with respect to such Services.

Kenexa has designed a program that will allow BlueLinx to guarantee the successful hiring of individuals while achieving cost control and establishing a reporting system that can be used as a roadmap for future hiring. BlueLinx will be able to assess the effectiveness of each stage of the process while measuring the return on investment for every step in the hiring lifecycle. These steps have been identified as: Position Requisition, Market Analysis and Program Plan Kick-Off; Integrated Sourcing Solutions; Program Management, Measurement and Reporting; Kenexa Program Director; Kenexa Recruiter® System; Screening and Selection; Interview, Offer, Hire and On-boarding; and Program Reporting, Validation and Review.

1.    <u>Scope of Services.</u>

A. **Position Requisition, Market Analysis and Program Plan Kick-Off:**

To build a foundation for future hiring Kenexa will design and implement standard operating procedures for BlueLinx to utilize in implementing and measuring the hiring effort. Any Kenexa proposed operating procedures to be implemented will be done so upon BlueLinx sole determination.   One of the key components of managing the process effectively will be the collection and analysis of data. To assist in this effort BlueLinx will have access to Kenexa's applicant tracking database system, the Kenexa Recruiter® System, as the platform on which to run the Program.   This will offer full scale applicant tracking and talent management capabilities for use by internal HR and hiring managers as well as a private label Web based career center for BlueLinx candidates.

*Step 1* – Requisition process
     The hiring plan will commence when a requisition is opened in the Kenexa Recruiter® System by a designated BlueLinx hiring manager. This requisition will be filtered to the appropriate staffing resource through access in Kenexa Recruiter®.

*Step 2* – Manager Meetings and Market Evaluations
     Kenexa will contact the appropriate hiring manager to confirm the requisition, evaluate the market, and discuss Program milestones, roles and responsibilities, timeline, *etc.*

*Step 3* – Initiate Sourcing Process.

B.    **Integrated Sourcing Solutions:**

Kenexa's Integrated Sourcing Solutions will allow BlueLinx to build a multi-channel sourcing program to address the challenges unique to diverse geographies and hiring managers. Kenexa will build a scaleable sourcing approach that is designed to deliver a targeted message to BlueLinx's audience and tied to BlueLinx's hiring timeline and training schedule. Due to Kenexa's diverse methods of candidate generation including advertising, internet sourcing, employee referrals and direct recruiting, Kenexa will significantly lower costs while guaranteeing results. Kenexa ensures this by employing more cost-

effective methods such as advertising on the front end while reserving the ability to guarantee interviews with a direct sourcing team tied to an interview time line.

*Advertising:*

Combining traditional print, direct mail and community advertising with internet, website and Kenexa's own proprietary email advertising technology; Kenexa reaches its intended demographic in a shortened time frame. Kenexa's use of technology gives Kenexa the ability to incorporate the look and feel of its clients and to transmit the data directly to its applicant tracking technology. Kenexa will manage the advertising vendor(s) and place job postings, as needed.

*Direct Recruiting:*

Kenexa will deploy a team of experienced research and recruiting professionals to identify and recruit directly from BlueLinx's competitors. This scaleable solution will enable BlueLinx to attract a pool of candidates beyond those that respond to traditional sourcing and advertising efforts.

*Employee Referral Program:*

Kenexa will integrate the employee referrals directly into the applicant process that will give Kenexa the ability to use the same basis of screening and assessment of external applicants while reducing BlueLinx's administrative time and expense.

*Community and Industry Based Sourcing:*

Kenexa will work with BlueLinx to identify alternative sources of candidates such as universities and colleges, vocational schools, military personnel, industry groups and career events that include candidates with targeted abilities. Kenexa will then develop a methodology to attract and enter these candidates into the hiring process.

Using a multiple sourcing methodology will allow Kenexa and BlueLinx to identify the most effective candidate sources and apply our resources appropriately, while guaranteeing the desired end result. Kenexa will also proactively source on an ongoing basis to create "Talent Pools" in key job families to have candidates who are available to interview on an as needed basis greatly reducing the time to fill.

### C. Program Management, Measurement and Reporting:

Kenexa believes that clear channels of communication and reporting will form the foundation of any engagement. The success of this effort will rest upon accuracy of information, consistency of measurement and the ability to forecast challenges and address them proactively. To address these issues, Kenexa will take a balanced approach between the use of people and technology. By using this methodology, Kenexa will be able to accurately report utilization and effectiveness of resources, usage and validity of tools and technology and the level of responsiveness and hiring expertise in the information technology vertical.

### D. Kenexa Program Director:

Kenexa will assign a senior Program manager who will be accountable to Kenexa and BlueLinx to maintain a current understanding of the hiring effort and be able to address both tactical and strategic issues. This individual will be the primary interface with the BlueLinx management and human resource teams and will guide the delivery resources of Kenexa. The person assigned by Kenexa will have experience in the information technology vertical and will have experience managing an integrated solution to successful completion. Kenexa will ensure that such Program Manager will be dedicated to the BlueLinx initiative and Kenexa will not add employees to, or remove onsite employees from,

performing the Services without the express written consent of BlueLinx. At BlueLinx' reasonable request, Kenexa will promptly replace personnel providing Services under this Exhibit.

### E. Kenexa Recruiter® System:

Kenexa will utilize the Kenexa Recruiter System to provide the process automation and reporting for this Program. The Kenexa Recruiter® System is described in Exhibit C-2. The Applicant Tracking System Standard Operating Procedure is attached hereto as Attachment # 1.

### F. Screening and Selection:

A critical component of this hiring plan will be the ability to provide a complete candidate evaluation balanced between experience, skills and behaviors. Kenexa will work with BlueLinx to develop candidate screening questionnaires to be used for high volume job families as well as custom questionnaires on key assignments. Kenexa will present this "in depth" technical questionnaire and phone interview profile with all candidate resumes.

Kenexa will license and make available to the Kenexa Program Team the Kenexa Prove It!® skill tests (includes 800 standard tests) and four (4) to six (6) Kenexa Selector™ behavioral assessments ("Selectors") to be used for BlueLinx Sales, Material Handlers, Distribution Managers/Supervisors and Drivers positions and others to be determined only for the term hereof.
- The Selectors will be in English. If BlueLinx chooses to have the Selectors translated into other languages, Kenexa will charge BlueLinx the direct translation fees.
- Facilities and/or locations where the Selectors may be used: all BlueLinx U.S. locations. BlueLinx agrees that Kenexa will administer the Selectors to all qualified applicants for the positions (internal and external) and to follow Kenexa's recommended cutoff scores.
- The development of the customized Selectors will be completed under the following guidelines and methodologies:
    1.a. Stakeholder interviews (up to 30).
    1.b. Four (4) to six (6) Focus Groups – one (1) with outstanding Sales personnel, one (1) with outstanding Material Handlers, one (1) with outstanding Distribution Managers/Supervisors and one (1) with outstanding Drivers and others to be determined.
    1.c. Job Analysis Questionnaire, completed by the stakeholders and Focus Group participants (up to 75).
    1.d. Concurrent study with 300 incumbents in each position.
    1.e  Executive Summary of results
    1.f    Utility Study of Assessment ROI as well as Fairness study beginning year 2 of the term.
1) Initial set up, including:
    Web-based access to the Selectors for job candidates for the four (4) to six (6) positions and to the Prove It! tests, 24 hours a day, 7 days a week.
2) Candidates will be able to complete and submit the Selectors via the Web and have their results scored on the Web. Completed Selectors will be automatically scored.
3) Results of the Selectors will be available to the Kenexa Team.

Should an EEOC, state or local human relations agency or OFCCP charge or lawsuit be filed challenging the fairness of the Selector or the Selector process, Kenexa will provide an affidavit of support and testimony regarding the development of the Selector, the Selector process and methodologies used. Notwithstanding the foregoing, this support shall be in addition to Kenexa's indemnification obligations under the Agreement.

The parties agree that all information, drawings, documents, designs, models, patents, inventions, copyrightable material, and other tangible and intangible materials authored or prepared, in whole or in part, by Kenexa in the course of providing the Services or Products, including without limitation computer

programs, computer systems, customizations, specifications, the Selectors, Prove It! tests, website and documentation, are the sole and exclusive property of Kenexa and shall not be considered works made for hire.

### G. Interview, Offer, Hire and On-Boarding:

Kenexa has designed an integrated process that will allow BlueLinx to efficiently move qualified applicants through its interview process while reducing BlueLinx's burden of administrative, management and human resources.

#### Notification and Scheduling:

All qualifying candidates will be contacted by a Kenexa representative and scheduled for a live interview. BlueLinx managers will be given access to the applicant tracking system so that they can remotely view their interview calendar and all associated candidate data including test scores, behavioral assessments and resumes. The managers will also receive an interview packet containing all relevant candidate data prior to the interview.

#### Candidate Packets:

Kenexa will mail qualified applicants an interview packet that will include BlueLinx brochures, position descriptions, interview time, location and directions.

#### Live Interview:

BlueLinx managers will interview candidates at designated locations in each geographical location. Kenexa will work with each manager to identify and coordinate appropriate interview sites in each geographical location. After each candidate interview, Kenexa will contact managers and candidates for appropriate feedback and track the data in the applicant tracking system.

#### Background Checks:

Kenexa will notify and schedule appropriate candidates for a background check in conjunction with the vendor designated by BlueLinx.

#### Offer:

Kenexa will notify BlueLinx Human Resources when a candidate has successfully completed the interview and background checking process so that BlueLinx may extend an offer.

#### Hire:

This process has been designed to quickly move candidates through the interview process and accelerate BlueLinx's ability to deploy the new employee into the field. This is also a component of the process in which the applicant tracking system is highly visible. It will allow both BlueLinx and Kenexa to easily transmit data such as scheduling and candidate information with minimum manpower, thereby reducing costs and human error.

### H. Program Reporting, Validation and Review:

Kenexa will comprehensively analyze each step of the hiring plan and assess the cost and quality effectiveness of the process. This will build a platform that Kenexa can use as a model for the anticipated growth of the organization. The results will be broken down to assess each phase of the process and the results of the solutions used in each step.

Position Requisition, Posting and Approval
- Was the process seamless?
- Were the expectations and timelines realistic?
- Did this process occur in a timely manner?

Sourcing Analysis
- Time and cost effectiveness of sourcing mechanisms
- Market penetration

Cost Analysis
- Accurate reporting of cost for each step and entire process
- Cost benefit analysis on modular and aggregate basis
- True cost per hire

This summary will be used as a planning mechanism for BlueLinx as the company looks to implement a long-term staffing strategy. Kenexa feels confident that this analysis will allow Kenexa to effectively partner with BlueLinx for an ongoing hiring solution. In order to facilitate the implementation of process and quality improvements demonstrated by this ongoing review, Kenexa recommends the formation of a "Steering Committee". Kenexa and BlueLinx will both designate key stakeholders to attend this monthly review meeting.

2.    **BlueLinx Responsibilities.**

BlueLinx agrees to be responsible for the following:
- Attending start-up meetings and identifying Kenexa specific Position requirements, number of open positions, and priority in filling of specific open positions
- Making hiring decisions after providing feedback and results to Kenexa, and formulating and extending job offers within the agreed upon timeframe in Attachment #2
- Providing executive support for the Program
- Attending quarterly steering committee meetings and monthly management committee meetings
- Making management available to be trained on the process
- Providing all necessary information including but not limited to hiring manager contact information, position descriptions, compensation and benefit information, BlueLinx policy information, and information regarding retention and turnover
- Providing sufficient BlueLinx brochures and applications for the applicant interview packets
- Providing sufficient materials, including BlueLinx letterhead, for generating offer letters
- Coordinating national advertising efforts with recruitment campaign
- Paying compensation for the positions that is competitive in the market, and
- Providing adequate office space, if needed, in BlueLinx headquarters and providing laptop computers.

Additional detail on the parties' responsibilities is included in the Process Map and Service Level Agreement attached to this Exhibit as Attachments #2 and 3. Services not included above are outside of the scope of this Statement of Work and will be performed at additional cost. In addition, BlueLinx's deviation from the Process Map and Client Responsibilities can impact the Program cost and Kenexa's service level commitments.

BlueLinx will deliver all job titles, complete position descriptions and salary ranges to Kenexa for the 125 assigned positions within thirty (30) days of Agreement execution. Positions designated as assigned to Kenexa are exclusive to Kenexa and any candidate sourced indirectly or from another channel will be credited to Kenexa for the purpose of determining the number of assigned positions that are filled. Failure to make this delivery deadline could impact the delivery schedule, fees and resources availability.

3.    **Estimated Resource Levels**

Kenexa's estimated resource levels for the Program shall be as follows:



Job Descriptions for the positions and an organization chart are attached as Attachments #3 and 4

Actual resources will vary based upon BlueLinx's needs. On-site resources assigned to perform special Programs will be subject to additional fees and costs.

4.    **Term.**

After execution of the Agreement by the parties, BlueLinx and Kenexa will schedule Program Start-up Meetings. The Scope and Agenda for such meetings will be distributed prior to the scheduled date and time. This Statement of Work will commence on the date hereof and continue for sixty (60) months ("term") after the Program go live date unless sooner terminated as provided in the Agreement, with hiring volume forecast proactively on a quarterly basis.

5.    **Dispute Resolution.**

If in the opinion of either party, the other party has failed to resolve a reported problem or to comply with the requirements of the Agreement, or to perform its obligations in a satisfactory manner, then the problem resolution procedure identified below shall be invoked prior to either party availing itself of any legal or equitable remedies (except for injunctive relief) against the other party. The following table lists the levels of escalation, the duration within a level, and the associated parties at each level. In the event that a problem has not been resolved, or a corrective plan of action has not been mutually agreed upon within the specified duration, either party may choose to escalate the problem to the next level.

| Escalation Level | Calendar Days Duration | BlueLinx | Kenexa |
|---|---|---|---|
| 1 | 15 | Program Manager | Program Manager |
| 2 | 30 | [Vice President] | Chief Operating Officer |

If the problem has not been resolved, or a corrective plan of action has not been mutually agreed upon within forty-five (45) days of the initiation of the dispute resolution process, the parties agree to submit the dispute for a non-binding resolution to a mediator jointly selected by the parties or their counsel.

CONFIDENTIAL
Exhibits to Master Services Agreement

May 15, 2006

**Attachment #1**

**Applicant Tracking System Client Standard Operating Procedure**

1. All data will be considered Confidential Information.

2. All Kenexa employees already sign a confidentiality agreement as a condition of employment. This agreement legally protects the client. Kenexa will not discontinue this practice without notifying the client of such change.

3. All data housed in the client database will only be used for the benefit of the client.

4. Any individual assigned to client with system access will be fully dedicated to the client.

5. Upon termination of the Exhibit between Kenexa and the client, all data files housed on behalf of the client will be destroyed or turned over to the client at client's discretion.

6. In the event a Kenexa employee with password access to the system terminates from employment with Kenexa, Kenexa will remove access for terminated Kenexa employee within one (1) business day.

7. No Kenexa employees will use the system to represent themselves as client employees unless specifically agreed upon in the statement of work and authorized by the client to do so. For example, the client may elect to have the On-Site resources use the system for this purpose.

**Attachment #2**
**Process Map**

**[To Be Developed]**

**Attachment #3**

**Service Level Agreement**
**[To be developed by the parties]**

**Attachment #4**

**Job Descriptions**

**Position Description: Program Director**

**Department:** Talent Acquisition Practice

**Job Title:** Program Director

**Reports To:** Client Services Managing Partner

**Description:** The Program Director manages all aspects of recruiting and staffing Programs for clients, providing strategic guidance and leadership. Creates and maintains budgets, creates Program metrics, oversees resource allocation, builds and maintains client relationships. The Program Director also provides leadership, personnel management and mentoring for Lead Recruiters.

**Essential Duties and Responsibilities:**
- Establish standards of performance and excellence
- Work with client on strategy design, staffing plan and implementation process
- Management of the day-to-day tactical delivery activities to insure that the performance milestones are being met and client expectations upheld
- Development and utilization of engagement reporting procedures to communicate current status of the engagement to key client stakeholders and Kenexa executive management
- Monitor the quality of candidates (or other services) being provided to the client to insure both quantity and quality expectations are being met on a timely basis
- Daily / weekly communication of engagement status to Kenexa executive management using agreed upon reporting procedures and metrics
- Track remediation efforts to ensure that identified Program (engagement) problems are dealt with expeditiously so that Program deliverables are maintained and accomplished
- Organize business strategy and teams on significant Programs within the engagement
- Financial management of engagement

**Qualifications:**
- Positive attitude
- Outstanding oral and written communication skills
- Outstanding client relationship skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated ability to mentor and manage
- 10 years prior management experience in a corporate staffing or recruitment services firm
- Financial management experience
- Outstanding work ethic with a commitment to results

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of ten years relevant (sales, consulting, recruiting/staffing) industry experience

## Position Description: On-Site Consultant

**Department:** Talent Acquisition Practice

**Job Title:**    On-Site Consultant

**Reports To:** Program Director or Lead Recruiter

**FLSA Status:** Exempt

**Description:**  The On-Site Support Professional provides in-house support at a customer facility to assist internal HR staffing resources with achievement of staffing goals. Their work is client directed and in-house management sets their priorities. They provide flexible resources for corporate staffing organizations during peak activity periods and are experienced in corporate human resource practices, employment laws and prevalent software platforms.

**Essential Duties and Responsibilities:**
- Coordinate with internal hiring managers to identify openings and assist in the creation of job descriptions
- Evaluate staffing strategies and plans
- Manage advertising and web posting response
- Screen candidates
- Submit candidates to hiring authorities
- Assist in the management of agency referrals and relationships
- Coordinate interview schedules
- Greet and interview candidates coming in for site visit
- Enter relevant candidate data into client databases
- Insure that offer letters are processed and properly filed
- Support the closure of candidates in receipt of offers
- Provide EEO compliance reporting data
- Represent the client with the highest standards of ethics and professionalism
- Interface and provide feedback to operations center staff

**Qualifications:**
- Positive attitude
- Outstanding oral and written communication skills
- Outstanding sourcing and client/candidate relationship skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated ability to mentor
- Excellent customer service skills
- Minimum 5 years experience in a corporate staffing function or recruiting service firm
- Outstanding work ethic

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of two years relevant (sales, consulting, recruiting/staffing) industry experience

**Position Description: Lead Recruiter**

**Department:** Talent Acquisition Practice

**Job Title:**    Lead Recruiter (On- and Off-site)

**Reports To:** Program Director

**FLSA Status:** Exempt

**Description:** The Lead Recruiter provides tactical leadership, management and mentoring for the engagement and staff (either on-site or in the operations center).  Assigns roles and responsibilities for the engagement team.

**Essential Duties and Responsibilities:**
- Provides tactical leadership around recruiting Program goals
- Functions as a team player, exhibiting consistent positive attitude and ability to motivate team members
- Participates on Program teams as a strong performer, demonstrating consistent production on concurrent Programs or tasks
- Demonstrates ability to multitask; perform on multiple recruiting Programs simultaneously.
- Staff management
- Impacts business through commitment to completion of Program goals for client expansion
- Assists in the development of Program reports
- Solicits, collects and implements Program improvement initiatives
- Supports career development of subordinate team members through mentorship
- Tactical interface with the client (both HR and line management)
- Collect all relevant materials for the Client Book/Talent Acquisition Guide
- Lead team and client meetings
- Development and maintenance of engagement documentation

**Qualifications:**
- Positive attitude
- Outstanding oral and written communication skills
- Outstanding sourcing and client/candidate relationship skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated ability to mentor
- Previous client and staff management experience
- Outstanding work ethic with a commitment to results

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of five years relevant (sales, consulting, recruiting/staffing) industry experience.

### Position Description: Recruiter

**Department:** Talent Acquisition Practice

**Job Title:** Recruiter

**Reports To:** Lead Recruiter

**FLSA Status:** Exempt

**Description:**   Recruiter is responsible for sourcing, screening and eventually closing candidates for their respective client(s).   Recruiter will also demonstrate the ability to research various industries and geographic locations using a variety of methods.

**Essential Duties and Responsibilities:**
- Contacts requisite number of candidates to assure engagement success
- Develops creative methods to source candidates
- Creates letters, emails, memo's and faxes that engender interest in opportunities from targeted Program candidate groups
- Screens, evaluates and recommends candidates for submittal to client
- Selects and closes qualified candidates for respective assignments / team Programs
- Assists in the development of Program reports
- Develop  initial client interaction skills
- Solicits, collects and implements Program improvement initiatives
- Executes a personal time management plan

**Qualifications:**
- Outstanding oral and written communication skills
- Outstanding sourcing and candidate relationship building skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated time management and personal organization skills
- The ability to use diverse software in the identification / contacting of potential candidates.
- Comfortable with cold-call prospecting, networking, marketing, sourcing and recruiting.
- Focused / aggressive work ethic
- Positive attitude
- Outstanding work ethic with a commitment to results
- Team player

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of one to 2 years relevant (sales, consulting, recruiting/staffing) experience.

CONFIDENTIAL
Exhibits to Master Services Agreement

13

May 15, 2006

### Position Description: Researcher

**DEPARTMENT:** Talent Acquisition Practice

**JOB TITLE:** Researcher

**REPORTS TO:** Lead Recruiter

**FLSA STATUS:** Exempt

**Description:** The Researcher is responsible for creating targeted information for multiple Programs. The Researcher understands Program requirements and independently gathers requisite amounts of research to support the Recruiters / Program Team in their candidate acquisition efforts.

**Essential Duties and Responsibilities:**
- Searches online databases, websites and industry directories for appropriate candidates
- Network with the appropriate companies to source potential candidates
- Daily review of industry news / information sources while retaining and recording pertinent information or articles
- Monitor job boards of competing company postings
- Work closely with staff to understand client requirements and source candidates appropriately
- Ability to use desktop software to develop search lists and reports
- Ability to create new methodologies /directions to use in the identification of potential candidates

**Qualifications:**
- Outstanding written communication skills
- Ability to manage multiple priorities successfully
- Demonstrated time management and personal organization skills
- Systems experience (MS Office, ATSs, Internet search tools, etc.)
- Flexible work schedule
- A demonstrated understanding of the construction of Boolean expressions
- Aggressive work ethic
- Positive attitude
- Outstanding work ethic and commitment to results

**Education:**
- Bachelor's degree (BA) or an equivalent combination of education and experience

**Position Description: Program Coordinator**

**Department:** Talent Acquisition Practice

**Job Title:**   Program Coordinator (or On-site Lead Recruiter)

**Reports To:** Program Director

**FLSA Status:** Exempt

**Description:** The Program coordinator supports all aspects of the employment process with the client. Manages the database(s), report development and execution, and acts a liaison between internal staff and the client.

**Essential Duties and Responsibilities:**
- Support Program Director, Onsite Consultants, and Recruiters on all aspects of the outsourced engagement with the client
- Responsible for updating metrics, creating reports, creating Power Point presentation documents, and organizing and coordinating efforts around hiring and staffing activities
- Coordinate candidate activities which may include travel, candidate packets, offer, etc.
- Coordinates the Recruiter applicant tracking system reporting and functionality
- Develop and disseminate daily, weekly and monthly communications to team and client audiences related to overall Program progress, milestones and challenges
- Create and manage daily, weekly and monthly reports to internal and external audiences around Program and individual progress
- Serves as daily communications liaison to client related to candidate submission and candidate feedback when necessary
- Participate in daily and weekly staff meetings to discuss Program process
- Serve as internal Program communications lead when needed between Program leadership and recruiting staff, ensuring that Program team is informed of Program goals, process flow and other information necessary to enable successful recruiting and meet client goals
- Assist in the development of market research to support the recruitment efforts
- Coordinate travel itineraries (both candidate/internal) including flights, hotels and ground transportation if necessary.
- Arranging the calendars/agendas for Program team management when necessary.

**Qualifications:**
- Outstanding oral and written communication skills
- Strong computer skills, specifically in Microsoft Excel, Word and Power Point; familiarity working with databases
- Strong business acumen and demonstrated track record of working and reporting to executive management teams
- Demonstrated record of working effectively as part of a Program team
- Experience in human resources or recruiting field preferred
- Demonstrated ability to manage multiple priorities successfully
- Demonstrated time management and personal organization skills
- Ability to interact successfully with internal and external customers
- Ability to work independently and with minimal supervision
- Ability to provide leadership
- Positive attitude
- Outstanding work ethic and commitment to results
- Team player

**Education:**
- Bachelor's degree preferred

**Attachment #5**

**Blue Linx Purchase Order**

**Attachment #6**

**Kenexa Letter**

April 28, 2006

Dean Adelman
Senior Vice President, Human Resources
BlueLinx Corporation
4300 Wildwood Parkway
Atlanta, GA 30339

Re: Kenexa – BlueLinx Employment Process Outsourcing

It was a pleasure speaking to you on Thursday, April 20 2006. As we discussed on the call, the essence of a successful engagement is partnership and a willingness to recognize that we need to operate in a way that is mutually beneficial to both Kenexa and BlueLinx. In addition, Kenexa must bear the responsibility to function, always, in the best interest of BlueLinx as if we were your in-house staffing department. It is that value proposition that has allowed Kenexa to have the extraordinary results and client retention that we have experienced in our employment process outsourcing practice.

I wanted to reiterate in written form, and we will memorialize in our agreement that we will work with you during due diligence to verify key productivity assumptions that we used in arriving at our pricing. If we discover that the data available suggests that we can be more aggressive in our assumptions, we will adjust pricing to reflect a lower cost to BlueLinx.

We will also create a process where we will meet once a year with BlueLinx to review your anticipated workforce plan for the year to come. We recommend we meet no later than 90 days prior to the turn of the fiscal year. After receipt of this review information, if the workforce plan indicates that you are going to hire less than 50% of the projected volume in our 5 year budget or that volumes will be more than 50% higher we will adjust our billing structure to reflect the new volumes.

Of course, if during the term of the agreement, a "disruptive" event occurs that substantially and adversely impacts BlueLinx and its hiring assumptions we will meet with you in partnership to reassess the proper levels of services to be provided.

I have also revised the scenario where your first year hiring is at 500 but rises back to the level of 1000 in years two through five. The budget is shown below.

As you can see the overall cost per hire, rises a small amount to reflect the loss of a small amount of economy of scale in year one. This is unavoidable due to how the infrastructure is conceived and we can explain further if you wish to discuss.

The billing structure is shown below. We have 224 jobs in the committed run rate in year one just so that the assignment and completion fees are static over the life of the engagement. This will make the accounting of positions opened in year one and closed in year two much easier. The quarterly run rate would be $377,852 so that your committed costs in year one would be $816,528 lower that in the original pricing we provided.

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Quarterly Run Rate | $377,652 | $594,734 | $594,734 | $594,734 | $594,734 |
| Requisition Fees Committed in the Run Rate | 224 | 400 | 400 | 400 | 400 |
| Requisition Fees Above Committed in Run Rate | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |
| Completion Fees | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |

Please review and contact me with any comments or questions.  Once, again, Kenexa appreciates the opportunity to partner with BlueLinx.

Sincerely,

Elliot H. Clark
Chief Operating Officer

EXHIBIT B-1
TO MASTER SERVICES AGREEMENT
EMPLOYMENT PROCESS OUTSOURCING PROGRAM
PAYMENT SCHEDULE

This Exhibit B-1 to Master Services Agreement between **BlueLinx Corporation** ("BlueLinx") and **Kenexa Technology, Inc.** ("Kenexa"), dated _____May 30_____, 2006, sets forth the fees and payment schedule with respect to the Services in Exhibit A-1.

## 1. Fees

Kenexa has developed a solution that offers far more service to BlueLinx over a five (5) year period than is found in the current model. The Kenexa solution is for Employment Process Outsourcing where Kenexa will seamlessly integrate with the BlueLinx Human Resource group to provide staffing services.

The Kenexa solution is based upon a series of assumptions. These assumptions are shown below. The assumptions include metrics around workforce planning, and candidates needed to fill positions based upon the challenges currently being faced by the existing staffing department. If more than one hundred fifty (150) assignments (during year 1) or three hundred (300) assignments thereafter occur in any one quarter, there may be additional charges due Kenexa subject to mutual agreement of the parties for on-site support.

The Kenexa solution utilizes a dedicated resource team that varies depending upon the workload. This flexibility is far greater than internally managed resources. The Kenexa solution can manage all aspects of the hiring process.

**Assumptions**

| Category | Assumption | Source of Data |
|---|---|---|
|  | 500 |  |
|  | 1000 |  |
|  | 1000 |  |
|  | 1000 |  |
|  | 1000 |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | 17% |  |
|  |  |  |
|  | 10% |  |

May 15, 2006

Below is the budget including Kenexa fees as projected over the next five (5) years based upon the estimated levels of hiring for the next five (5) years. This estimate examined historical attrition and very conservative minimal levels of growth. This budget does not include relocation, background checking fees or candidate travel or Kenexa expenses, advertising, employee referral fees, reference checking, courier fees, travel, and travel and living expenses for the on-sites.

**Budget Detail by Year**

Please note that the overall cost of the program will remain flat over a five (5) year period. Typically, Kenexa estimates a reduction due to the assumption that better hiring practices will lead to efficiencies in future years. Kenexa will need to study available data and analyze what savings may be available prior to committing to a level of savings. However, Kenexa will commit to passing on whatever savings are achieved to BlueLinx as a reduction in overall costs. While the financial model may or may not decline in cost, Kenexa's billing system below is based on the five year average.

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

The above average CPH is based on an annual hiring of 500 in year 1 and 1000 per year thereafter and, therefore, represents full utilization. The actual billing model will offer flexibility and is not based upon a flat fee scenario. The average cost per hire shown above as $3,607 per hire for Kenexa costs will be higher, if the hiring levels are substantially below estimates. Conversely, the cost per hire will be substantially lower, if hiring is above the projected levels. Please note this model will offer BlueLinx the flexibility to instantly increase resources for a short term increase in hiring volume and reduce instantly when that activity ends, thereby optimizing utilization and reducing costs.

The above budget also assumes that the distribution will be a total of 500 hires in year 1 and 1,000 hires each year thereafter of which all are external. Internal transfers without external sourcing are provided at no extra charge. If external sourcing is required, then Kenexa will charge the assignment and completion fees. Therefore, Kenexa recommends that internal transfers be processed prior to external sourcing.

Kenexa will manage any external agencies at the request of BlueLinx. If an agency fills a position assigned to Kenexa, Kenexa will receive the assignment and completion fees for that position.

Kenexa will also manage other vendor costs such as conferences, job fairs or other similar hiring events. These costs are not included in the Kenexa budget and will be passed through at no mark up to BlueLinx.

In addition, new and robust reporting capabilities will allow the combined Kenexa-BlueLinx team to make informed decisions about the level of resources and expenditures facilitating rapid response to staffing needs and continuous process improvement. The resource level estimates the need for six (6) On-Site consultants in Atlanta, Georgia and Denver, Colorado and any modification of that resource level would be reflected in a pricing adjustment.

A portion of the fees are based upon the services of the committed resource team and the technology license. All other fees are based upon utilization.

Positions must be assigned and then filled by Kenexa to realize the billing level shown on the prior page. The billing level and structure may change if assumptions change or based upon discussions and guidance from BlueLinx.

The fee structure will be based upon a minimal annual run rate of $1,511,408 in year 1 and $2,378,935 thereafter tied to the conservative level of 250 and 500 external hires per year, respectively. There will be a charge for each additional hire above that threshold. The quarterly payments of $377,852 each in year 1 and $594,734 each thereafter will be payable in advance and within thirty (30) days from receipt of an invoice from Kenexa.

## 2. Costs

Kenexa's fees do not include employee referral or assessment costs, background checking, drug testing employment brochures, letterhead, office expenses at BlueLinx sites or employment brand marketing. BlueLinx agrees to budget $200 per position that is sourced externally for external employment advertising during the term. All employment advertising which is a pass through expense shall have prior approval of BlueLinx. Kenexa will invoice BlueLinx for any billable expenses, including reasonable travel and lodging for Program-related travel, which will have been pre-approved by BlueLinx. Expense invoices are payable within thirty (30) days from receipt of the invoice.

## 3. Payment

| Year | 1 | 2 | 3 | 4 | 5 |
|------|---|---|---|---|---|
| Quarterly Run Rate | $377,852 | $594,734 | $594,734 | $594,734 | $594,734 |
| Requisition Fees Committed in the Run Rate | 224 | 400 | 400 | 400 | 400 |
| Requisition Fees Above Committed in Run Rate | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |
| Completion Fees | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |

Requisition Fees are due when the positions (in excess of those included in the Run Rate above) are assigned. Completion Fees are due at the end of the month in which the candidate starts.

All invoices related to this Statement of Work will be sent to:

BlueLinx Corporation
Attention: Accounts Payable

———————————
——————— .

**EXHIBIT C-1-1**
**To Master Services Agreement**
**Statement of Work and Service Level Statement**
**Number: KRE_____**
**Kenexa Recruiter® Enterprise Applicant Tracking System**

1. **Statement of Intent:**

    Kenexa (as defined below) strives to provide a high level of service. This Statement of Work and Service Level Statement ("SOW") outlines the services, site availability, and user support provided to System (as defined below) customers.

2. **License; Term**

    Pursuant to the terms hereof, Kenexa grants Customer a non-exclusive, non-transferable license to use the System on a remote computing basis for the term of Exhibit A-1. The fees for the license and services in this Exhibit C-1 are included in the fees in Exhibit B-1

3. **Time Conventions.**

    This SOW uses the following conventions to refer to times:

    A. Times expressed in the format "hours: minutes" reflect a 24-hour clock in the Central Time zone.
    B. Times expressed as a number of "business days" include business hours, Monday through Friday, excluding Designated Holidays.
    C. The symbol "—" indicates that no time applies in a category (for example, no outages are scheduled for a day).

4. **Definitions**

    The following terms shall have the definitions given below:

    A. **Customer** – BlueLinx Corporation.
    B. **Customization** – Any code change to the System, which is made by Kenexa at the request of and in accordance with individual specifications of Customer and will be listed on Exhibit C-1-2 or on a Change Request Form (a form of which is attached hereto as Exhibit C-1-2-1)
    C. **Designated Holidays** – New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving, Christmas Day (These days are subject to change if the Holiday falls on a Saturday or Sunday).
    D. **Kenexa** – Kenexa Technology, Inc.
    E. **System** – the Kenexa Recruiter® Applicant Tracking System.
    F. **Upgrade** – Any revision or addition to the System developed and offered by Kenexa to its Customers on a general basis without charge unless a customization is requested by Customer.
    G. **Career Center** – Portion of the System that is accessible through the Internet facing, is used by employees and candidates to apply for jobs and is linked with and branded like Customer's website.
    H. **Recruiting Center** – Portion of the System that is used by Customer's hiring personnel to post jobs and track candidates.

5. **System Requirements.**

**Career Center Users**

The System requires that the Career Center user have, at a minimum, the following computer configuration:

- A. **Processor Speed**
  Minimum 233MHz Pentium Processor or equivalent, 500MHz recommended
- B. **Operating System**
  Windows 98, Windows NT 4.0, Windows ME, Windows 2000 or Windows XP
  Macintosh systems with OS 7.6 and newer
- C. **Memory**
  Minimum 128 MB of RAM, 256 MB of RAM Recommended
- D. **Web Browser**
  Microsoft Internet Explorer 4.0 and greater
  Netscape Navigator 4.7 and greater excluding 6.0
- E. **Internet Connection**
  56.6 kbps or faster

**Recruiting Center Users**

The System requires that the Recruiting Center user have, at a minimum, the following computer configuration:

- A. **Processor Speed**
  Minimum 233MHz Pentium Processor or equivalent, 500MHz recommended
- B. **Operating System**
  Windows 98, Windows NT 4.0, Windows ME, Windows 2000 or Windows XP
  Macintosh systems with OS 7.6 and newer
- C. **Memory**
  Minimum 128 MB of RAM, 256 MB of RAM Recommended
- D. **Web Browser**
  Microsoft Internet Explorer 5.0 and greater
  Netscape Navigator 6.1 and greater
- E. **Internet Connection**
  56.6 kbps, Cable, DSL or T1 connection recommended

Future enhancements to the System may result in slightly different requirements. When possible, Customer will be notified of any new System requirements before Upgrades are made.

6. **Services Provided.**

   Under this SOW, for the fees provided in Exhibit B-1 Kenexa will provide implementation and support services as outlined in 6.1 and 6.2 below.

   **6.1 Commencement of Work**

   Work on Customer's System will commence upon completion of Program planning. Program planning will be scheduled after Kenexa receives the signed Agreement and SOW and the initial payment outlined in Exhibit B. Implementation of the System and/or its modular solutions/services shall include the following:

   A. **Implementation Materials and Staff**
      1) Program management staff and consultative support from Program design through completion of implementation, as agreed to by the parties.
      2) Two (2) days of training for each Recruiter/System Administrator User.
      3) Implementation Manual for Customer Program Team.

4) One User Guide for each Customer Recruiting Center User.
5) One (1) standard Quick Reference Guide for each Recruiter/System Administrator user.
6) Help Desk support as detailed under User Support.
7) Core System Software Upgrades as developed by Kenexa.
8) Kenexa Technical representative as needed

B. **Overall Configurations**
1) Career Center Branding
2) Configuration of System Settings
3) Unique User ID and secure Password for each Recruiting Center User
4) Field label changes
5) Addition of Searchable/Reportable Custom Fields for the Jobs, Candidate, Contacts and Activities Modules
    I. Maximum 5 date Fields per Module
    II. Maximum 20 List (dropdown) Fields per Module
    III. Maximum 10 Integer (number) Fields per Module
    IV. Maximum 25 String (alphanumeric) Fields per Module
6) User Group / Access Configuration
7) Email Templates and Correspondence Templates
8) Field Sequence for Activities, Candidates and Jobs
9) Configuration of column headers on the following pages:
    I. Career Center -- Job Search Results (addition of job fields)
    II. Recruiting Center -- Candidate Activities (addition of candidate fields)
    III. Recruiting Center -- Candidate Results (addition of candidate fields)
    IV. Recruiting Center -- Job Activities (addition of job fields)
    V. Recruiting Center -- Job Results (addition of job fields)
    VI. Recruiting Center -- Show Applicants (addition of candidate fields)
10) Drop down lists (creation of custom lists and configuration of lists that are standard in the System)
11) Job Templates
12) Job Questions
13) Job Approval Processes
14) Job Workflow
15) Configuration of Driven Job Fields (Recommended Maximum of 3)
16) On Screen Messaging

## 6.2 Optional Services

A. **Kenexa Job Posting**
Kenexa will make the following boards available to Customer at no additional charge for automated job posting:

1. America's Job Bank
2. Monster
3. HotJobs
4. CareerBuilder

Customer must create, maintain and is responsible for all payments for fee sites (*i.e.*, Monster). Kenexa will make best efforts to monitor the job boards for changes, but as they change, it should be expected that there will be periods where some job boards will be unavailable. Kenexa's responsibility is to transfer the data to the job boards, any delays in posting will not be the responsibility of Kenexa.

**B. Resume Scanning**

Kenexa guarantees all legible resumes received in a valid format will be uploaded to the System within two (2) business days of receipt. Kenexa only supports resumes that are either computer or typewriter generated; Kenexa will not scan hand written resumes, hand written remarks on resumes or other forms or certificates that are included with the resumes. Kenexa does not maintain formatting of the resume. Any special characters will be lost in the conversion. All forms sent to Kenexa will be treated as text and the format will not be maintained.

**C. File Uploads**

The sum of all files uploaded to the System excluding resumes may not exceed 50 megabytes.

It is possible that files uploaded and downloaded via the System will contain viruses. This should not affect Customer's System, but could affect the Customer's workstation. Kenexa has implemented software to minimize this risk, but is not liable in the event an infected file is uploaded or downloaded.

**7. Kenexa Certified Partners' Services**

Kenexa partners' services are optionally enabled on a Customer's System. Kenexa will pass through the warranties and service level guaranties offered by such partners to Customer for the selected services.

| Partner | Service | Description |
|---------|---------|-------------|
| eQuest | Job Posting | eQuest provides job posting services that enable customers to post a single job to numerous sites simultaneously. |
| ARRIN Systems | HireHelper.com (Background Checking) | Arrin Systems provides background checking services. |

**8. Delivery Dates**

Kenexa will work with Customer to establish a live date for the System once Kenexa is in receipt of approval of the Program plan and specifications.

**9. License to use the Marks**

Customer hereby grants Kenexa a limited, nonexclusive license to use and display Customer's trademarks, service marks, trade names, logos and other commercial designations (the "Marks") for the purpose of creating content directories and indices for the System site created by Kenexa for Customer hereunder. Any such use shall be in a manner as solely determined by Customer. This authorization shall be deemed revoked upon the termination of the Agreement or this SOW. Title to and ownership of Customer's Marks will remain with Customer. Customer shall provide hard copy and electronic files of the Marks in such forms and formats as Kenexa may reasonably specify. Kenexa will not take any action inconsistent with Customer's ownership of the Marks. Customer warrants and represents that it owns and has the right to license the Marks and that the use and presentation thereof in accordance with this Agreement will not infringe or constitute unfair competition with respect to, or otherwise violate the rights of, any third party.

**10. Backups**

The primary purpose for a System data backup to magnetic media is to help Kenexa provide its Customers with timely disaster recovery should the System be rendered inoperative due to hardware or environmental impacts. System restoration will be performed as a recovery procedure after a disaster and is included as a Kenexa service. Customers may request (through their primary point-of-contact) restoration of individual data file(s); however, file restoration is a labor intensive process and completion of the restoration cannot be guaranteed within a specific time frame.

Kenexa's formal data backup procedures include full System backup either once (1) weekly or when a System modification is made as the result of a Customization. Differential backups are performed each day of the calendar week until the next full System backup. (NOTE: Is once a week sufficient? yes)

Full System backups include the System and Customer data. Data backups are written to a local backup device with sufficient capacity to handle the data. Backup tapes are rotated off-site as part of a disaster recovery plan.

**11. Encryption**

The core System does not utilize encryption when transmitting data back and forth to the user. Therefore, Kenexa will implement Verisign SSL technology at Customer request at a cost of $1,500.00 per year. Kenexa will not be responsible for performance issues caused by the encryption. (NOTE: Need to discuss encryption criteria and responsibilities further. We will make ourselves available to discuss).

**12. System Customization**

**Kenexa does not recommend that any customer make Customizations to the Core System. If Customizations are requested, the following is mutually understood:**

A. Customers who choose to make Customizations will not receive free Upgrades, Help Desk support, or training materials as it relates to the Customization. In the event Customizations are made, Upgrades, Help Desk support, and training materials may be purchased.
B. Customizations will increase implementation timelines and the probability that the Customer will experience errors in its System. Customizations will result in extended programming time for development, testing and error fixes. Any Customization will be performed pursuant to a mutually-agreed-to plan.
C. All changes that take more than the allotted Scheduled Outage time to implement or that impact user workflow are reviewed by the Kenexa Recruiter team for approval and prioritization. Once approved, implementation will be scheduled.
D. Customizations that do not require a service outage and that do not impact user workflow are implemented upon completion.
E. Any Customer-requested Customization will be made in writing. Requests will be sent to the Customer's Implementation Consultant at Kenexa. Customizations, costs, and ramifications will be documented in a Change Request Form (a form of which is attached hereto as Attachment C-1) each time a Customization is requested.

**13. Availability**

The availability of the System is outlined below.

**13.1    Normal System Availability Schedule**

The System is scheduled to be available 24 hours a day, 7 days a week excluding scheduled downtime. Scheduled downtime is used for routine maintenance and occurs

every Sunday from 6:00 a.m. to 9:00 a.m. ET and every Wednesday from 12:01 a.m. to 3:00 a.m. ET. Scheduled downtime is only used as needed.

### 13.2 Service Level Guarantee

Kenexa shall use commercially reasonable efforts to ensure that the System will be available ninety-eight and six/tenths (98.6%) percent of the time excluding scheduled downtime as calculated on a monthly basis). The remaining percent of the time (as calculated on a monthly basis) shall be deemed the "Permitted Downtime." If the System is_unavailable in excess of the Permitted Downtime, Kenexa shall credit Customer's account by the actual percentage decrease in System availability against the monthly equivalent of the Quarterly Fee set forth in Exhibit B-1, provided Customer notifies Kenexa in writing of any such unavailability. For example, if in one month the System is only available ninety-eight (98%) percent of the time as described above, Kenexa will give Customer a .6% percent credit against a monthly equivalent of the Quarterly Fee. However, Kenexa will not be responsible for issuing credits for any unavailability which is scheduled in accordance with Section 12.1 above.

## 14. User Support

Kenexa provides the following support to all customers:

### 14.1 Help Desk

Kenexa provides user support by way of a fully trained Help Desk. In order to contact the Help Desk the user must either be a candidate or a certified System user. The intent of the Help Desk is to resolve end user issues and not to entertain System enhancements or modifications. The Kenexa Help Desk is staffed from Monday through Friday, 6:00 a.m. to 8:00 p.m. Central Time, excluding Designated Holidays. If a Customer requires support outside of normal operating hours, it can contact an on-call Help Desk representative via pager. Customer will be billed $50.00/call for all off-hour support calls.

### 14.2 Escalation Support Process

Kenexa has a comprehensive set of support procedures designed to resolve the majority of known Customer support situations. Each procedure has associated activities and response requirements designed to resolve those situations in a timely manner. At times, a response to Customer's question or issue may exceed the time frames set forth in the standard support procedures, and is therefore a candidate for an Escalated Support Process. The Escalation Support Process is the application of increased expertise and/or resources to assure a timely resolution to a customer's issue.

### 14.3 Criteria of Escalation

Calls handled by Kenexa's Help Desk are given priority upon receipt that dictates the time frame in which the call requires resolution. Escalation occurs when the current process flow does not meet Customer's expectation or requirement in one or more of the following areas.

A. The Customer is experiencing a problem which cannot be resolved in the designated time frame.
B. Either the Customer or a Kenexa employee determines that additional resources or expertise are required to restore the System operation to normal.

### 14.4 Problem Severity Description

Table A.3 outlines problem severity descriptions:

### Table A.3 Problem Severity Descriptions

| Severity | Description |
|---|---|
| Critical | All end users have lost connectivity and all or most of the System functionality is lost. The System is not operational and there is no workaround. |
| High | More than one end user has lost connectivity and much of the System's operation is lost but some functions are active. A Critical problem with a reasonable workaround may be reduced to High. |
| Medium | Some System functionality is lost. A High problem can be reduced to Medium if an acceptable workaround is found. |
| Low | No outage of the System is experienced. A Medium problem can be reduced to Low if an acceptable workaround is found. |
| Information | A request for information about Products or Services. |

14.5    **Problem Escalation Process**
Table A.4 outlines Kenexa's problem escalation process.

### Table A.4 Problem Escalation Process

| Severity | Description |
|---|---|
| Critical | Response from Help Desk representative within 15 minutes. Implementation Consultant notified if Service is not restored within thirty (30) minutes. Problem escalated to Programming if Service is not restored within one (1) hour. Implementation Manager notification within one (1) hour. Senior VP notified within four (4) hours. |
| High | Response from Help Desk representative within thirty (30) minutes. Implementation Consultant notified within one (1) hour. Implementation Manager notification within eight (8) hours. Senior VP notified next business day. |
| Medium | Response from Help Desk representative within one (1) hour. Implementation Consultant notified same business day. Programming Team notified same business day. Implementation Manager notified within three (3) business days if solution or acceptable workaround has not been found. |
| Low | Response from Help Desk representative within one (1) day. Implementation Manager notified after ten (10) business days. |

14.6    **Call Resolution**
When Kenexa's Help Desk is informed of a problem the following actions are taken:

**A. Call Logging**
The Customer contact is logged in Kenexa's call log database and Kenexa's knowledge database is searched for similar problem reports, thus enabling fast responses to known problems or frequently asked questions.

**B. Problem Reproduction**
Kenexa's Customer Support Department will attempt reproduce the problem. The Customer will be required to provide a clear description of the circumstances under which the problem occurred.

**C. Defect Logging**
When the problem has been duplicated by Kenexa's Customer Support Department; it will be logged as a defect in Kenexa's defect database.

**D. Defect Investigation**
Kenexa's product development team will investigate the cause of the problem.
**E. Workaround**
When, in the course of the investigation, alternative ways are found to obtain the design goal while avoiding the interruptive symptoms of the defect, these workarounds will be communicated as a temporary solution to the problem while Kenexa continues to work on a permanent solution.

### 15. Upgrades.

Kenexa will provide Customer upgrades at no extra charge to a non-Customized System. The frequency of the upgrades will be determined by the Kenexa Implementation Consultant assigned to the Program and the Customer Program lead.

If Customer elects to Upgrade a Customized System, upgrade charges will be determined based upon the number of additional hours required to implement the Customizations. All such charges will be presented to Customer for preapproval.

System upgrades will require recertification of Customer end-users and/or certified trainers. Training will be provided at the cost outlined in Exhibit D.

### 16. Termination.

Data will be returned to Customer within thirty (30) days after termination upon receipt of payment for service and expenses through the date of termination. Customer will be billed for any time, preparation, and materials required for the data transfer. All such charges will be presented to Customer for preapproval.

### 17. Ownership

Kenexa and Customer agree that all information, drawings, documents, designs, models, patents, inventions, copyrightable material, and other tangible and intangible materials authored or prepared, in whole or in part, by Kenexa in the course of providing the Services or Products, including without limitation software, computer programs, computer systems, Customizations, specifications, documentation and the website created by Kenexa hereunder, are the sole and exclusive property of Kenexa and shall not be considered works made for hire. Customer shall at all times remain the owner of the data.

**Exhibit C-1-2**
**To Master Services Agreement**
**Customization Schedule**
**Number: KRE _____**
Kenexa Recruiter® Enterprise Applicant Tracking System

| STANDARD RATES: | COST |
|---|---|
| Custom Programming, Training, Documentation Charges | $250.00 per hour |
|  |  |
| SPECIFIC CUSTOMIZATIONS: |  |
|  |  |
|  |  |
|  |  |

Signing this Exhibit signifies the agreement of both Kenexa and the Customer to the above fees for the above Customizations, if any. If, at the signing of this Exhibit, Kenexa and Customer agree that there are no known Customizations, the words: "NO KNOWN CUSTOMIZATIONS AT THIS TIME" should be listed in the section titled "Specific Customizations". If Customer subsequently requests a System Customization, a Change Request Form will be completed by the Kenexa Implementation Consultant and sent to the Customer Program Manager for approval prior to beginning Customization work (a sample Change Request form is attached as Attachment C-1-2-1).

Major Customizations, as determined by Kenexa, may result in the elimination of free System Upgrades, Help Desk support, training, and/or System-specific user manuals (if requested by Customer). In the event Customizations are made, System Upgrades, Help Desk support, training, and user manuals will be available at additional cost. The total Fees for Customizations are in addition to the Total Initial Payment outlined in Exhibit B-1 and are due upon the signing of the Agreement.

## ATTACHMENT C-1- 2-1

**Change Request Form**
This document is to be used to record and confirm that both Customer and the Kenexa team members are in agreement as to any changes to be made to the implementation process and/or to the System as Customizations.

***Customer***
DATE:

DETAIL OF REQUEST:

RAMIFICATIONS:

The above list will require custom programming. This will take a total of approximately x hours of Customization work (this includes design, development, and quality assurance testing).

Major Customizations, as determined by Kenexa, may result in the elimination of free System Upgrades, Help Desk support, training, and/or System-specific user manuals (if requested by Customer). If Customizations are implemented, System Upgrades, Help Desk support, training, and user manuals will be available at additional cost.

x hours of custom programming @ $250/hr                                    $xxx

I have thoroughly reviewed this Change Request Form and authorize Kenexa to proceed as indicated above.

**Kenexa Technology, Inc.**                          **Customer**

_____                    _____
Implementation Consultant Signature            Authorized Signature & Date
& Date

_____                    _____
Please Print\Type Name                         Please Print\Type Name

**Exhibit C-1-3**
**To Master Services Agreement**
**Training and Documentation Schedule**
**Number: KRE _____**
**Kenexa Recruiter® Enterprise Applicant Tracking System**
**Training and Documentation Schedule**

| Seminar Purchased | Number of Days/Hours | Cost per Day | Total Number of Participants | Fee Per Participant | Total Cost of Seminar | Materials to be Provided |
|---|---|---|---|---|---|---|
| User Acceptance Testing Training | 2 Hours | Included in set up fee | Up to 10 participants | $0.00 | Included in fee | User Acceptance Testing Documentation |
| Kenexa Recruiter Power User/System Administrator | 2 Days of training for every 15 user licenses purchased in the initial Exhibits. | Included in set up fee | The total number of participants may equal the total number of Power User/System Admin licenses purchased by Customer with the initial Exhibits. (Maximum class size is 15 per class) | Included in set up fee for initial licenses purchased | Included in Exhibits for initial licenses purchased | • User/Training Guide<br><br>• Quick Reference Guide |

| Documentation Purchased | Number of Hours | Cost per Hour | Cost Per Copy | Total Number of Copies | **Total Cost |
|---|---|---|---|---|---|
|  |  | $250.00 per hour |  |  |  |

**Cost for customized materials is based upon ESTIMATED time. Customer will be billed only for hours worked. Cost may vary more or less than estimated cost.

1. **Payment Schedule:**

   The total cost of training and documentation as listed in this Exhibit C-1-3 is: $__. Training and documentation will be invoiced as each service is delivered. Payment is due upon receipt of the invoice.

2. **Additional Participants:**

   If additional participants are added to a training seminar, Customer will be billed a per-participant fee for each additional participant. Additional participants may be added up to the maximum class size for that particular seminar. Additional days of training may also be purchased at a cost of $1,500 per day or portion thereof.

CONFIDENTIAL
Exhibits to Master Services Agreement                                    May 15, 2006

3. **Documentation:**

The materials to be provided with each training seminar are based upon the core System. Kenexa will provide customized training materials to Customer upon request at a rate of $250 per hour. Customer may not reproduce or amend documentation provided by Kenexa without the express written consent of Kenexa. Additional copies of documentation are available to Customer upon request. Cost will vary according to documentation purchased. Reproducible, electronic copies of documentation may also be purchased at the request of Customer.

4. **Cancellation:**

Customer shall use reasonable efforts to provide Kenexa with at least two (2) weeks' notice in order to cancel a training seminar.    Failure to provide Kenexa at least two (2) weeks' notice of a cancellation will result in Customer being billed $1,000.00 per cancelled day.
Cancellation of any customized documentation will result in Customer's being billed $250 per hour for any hours worked on the Program up to the date of receipt by Kenexa of the cancellation notice.

5. **Travel Expenses:**

All pre-approved travel and other expenses incurred by Kenexa hereunder shall be the responsibility of Customer.

## EXHIBIT C-1-4

## TO MASTER SERVICES AGREEMENT

## PROCESS AND FORMAT FOR A DATA DUMP REQUEST

The steps for the data delivery process

1) An FTP account will be created.
   a. If FTP is on Kenexa Server
      i. IC needs to notify Network Engineer for the account (See FTPSiteRequestForm.xls for details)
      ii. Network Engineer will contact the client and give them the account information
   b. If FTP is on Client Server
      i. IC will need to contact the client for the FTP information.
      ii. IC needs to contact the developer or DBA with the FTP information. This need to be done at least 5 days before the delivery date.
   c. Developer Or DBA will place the files into this account on the predetermined date.
2) If the data is on Kenexa Server, data dump will be available to the client for 10 days from the day it was generated.

The data dump can be given in two **formats**

1) Oracle Dump
2) CSV file

The approximate **time and details** for the two formats are:

**Oracle Dump**

This file will need to be imported into Oracle before it can be used.  This format will take approximate *17 to 20 hr (depending on client size)* to generate.

**CSV file**

This is a flat file which can be opened in notepad or excel. If the data is viewed in notepad the columns will be separated by predetermined delimiter. This format will take approximate *27 to 50 hr (depending on client size)* to generate.  The resumes and the job description would be generated as separate file for every candidate and job.  The candidate and job ID would determine the file name. These set of files would be zipped before delivering.

The data structure of the two formats remains the same. There will be four **tables**.

1) Candidate
2) Job
3) Activity
4) Activity_Note

**Design and limitations** of the three tables

**Candidate**

The table will have all the fields that are there in the candidate profile page. It will also have the Create User Name for that candidate. There will be no information of the contacts related to those candidates.

**Job**

The table will have all the fields that are there in the job add page. It will have the primary contacts (Hiring Manager and Recruiter).



**Activity**

All activity will be shown. The relation with job and candidate will be visible under this table.

**Activity Note**

This would include the activity Note and would relate to the Activity table

This **structure** of these tables may change a little based on the client's customizations. Below is the basic structure of the these tables

**Candidate**

CANDID, (This is the unique identifier for this table. This will be referenced in Activity)
FIRSTNAME,
MIDDLENAME,
LASTNAME,
COUNTRY,
ADDR1,
ADDR2,
CITY,
STATE,
ZIP,
PHONE1,
PHONE2,
EMAIL,
CURRENT_EMPLOYEE,
SALARY_EXPECTATIONS,
CURRENT_COMPENSATION,
SOURCE,
SPECIFIC_SOURCE,
RELOCATE,
EDUCATION,
EEO_CATEGORY,
ETHNIC,
GENDER,
SSN,
STATUS,
CREATEDATE,
CREATEUSERID,
UPDATEDATE,
RESUME

**Job**

JOBREQ, (This is the unique identifier for this table. This will be referenced in Activity)
JOB_TITLE,
JOBCODE,
ORIGINALOPENING,
OPENING,
PAY_RATE,
SAL_MIN,
SAL_MAX,
ADDITIONAL_COMPENSATION,
COMPENSATION_AMMOUNT,
COUNTRY,
JOBADDR1,
JOBCITY,
STATE,
JOBZIP,
EMPLOYEE_STATUS,



SECTOR_DEV_CODE,
CHARGE_TYPE,
DIVISION,
DEPARTMENT,
REASON_OPENING,
POST_DATE,
JOBSTATUS,
NOTES,
CREATEUSERID,
UPDATEUSERID,
RECRUITER,
HIRING_MANAGER,
JOBSPEC

**Activity**

ACTIVITYID, (This is the unique identifier for this table.)
ACTIVITY_TYPE,
COST,
DUE_DATE,
DURATION,
RELATED_ CANDID,
RELATED_JOBREQ,
RELATED_CONTACT,
ACTIVITY_STATUS,
DATE_CREATED,
CREATED_BY,
DATE_UPDATED,
UPDATED_BY,
DATE_COMPLETED,
START_DATE,
REJECTION_REASON

**Activity_Note**

ACTIVITY_ID (This will be referenced in Activity)
NOTES

# EXHIBIT B

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| External Hires Per Year | 500 | 1000 | 1000 | 1000 | 1000 |
| Internal Hires Per Year | 0 | 0 | 0 | 0 | 0 |
| Total Number of Hires | 500 | 1000 | 1000 | 1000 | 1000 |
| | | | | | |
| Category of Cost | | | | | |
| | | | | | |
| Labor | | | | | |
| Client Services Team | $ 967,200 | $ 1,445,600 | $ 1,445,600 | $ 1,445,600 | $ 1,445,600 |
| Direct Sourcing | $ 312,000 | $ 624,000 | $ 468,000 | $ 468,000 | $ 468,000 |
| Screening and Processing | $ 624,000 | $ 1,262,000 | $ 1,262,000 | $ 1,262,000 | $ 1,268,800 |
| Research | $ 101,400 | $ 185,900 | $ 169,000 | $ 169,000 | $ 169,000 |
| Administration | $ 75,300 | $ 148,100 | $ 148,100 | $ 148,100 | $ 148,100 |
| Total Kenexa Labor Fees | $ 2,079,900 | $ 3,665,600 | $ 3,492,700 | $ 3,492,700 | $ 3,499,500 |
| | | | | | |
| Technology | | | | | |
| ATS License Fee | $ 80,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ 160,000 |
| Assessment Fees | $ 30,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| Total Kenexa Fees Technology | $ 110,000 | $ 220,000 | $ 220,000 | $ 220,000 | $ 220,000 |
| | | | | | |
| Total Kenexa Fees Service & Technology | $ 2,189,900 | $ 3,885,600 | $ 3,712,700 | $ 3,712,700 | $ 3,719,500 |
| | | | | | |
| Non Kenexa Expense Budget | | | | | |
| Employee Referral Fees | | | | | |
| Advertising | $ 100,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 |
| Drug Testing/Background Checking | | | | | |
| Total Pass Through Expenses | $ 100,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 |
| | | | | | |
| Total Costs | $ 2,289,900 | $ 4,085,600 | $ 3,912,700 | $ 3,912,700 | $ 3,919,500 |
| Cost Per Hire | $ 4,580 | $ 4,086 | $ 3,913 | $ 3,913 | $ 3,920 |
| | | | | | |
| Total Costs | $ 18,120,400 | | | | |
| CPH Average 5 Year Total Costs | $ 4,027 | | | | |
| | | | | | |
| Kenexa Fees | $ 16,230,400 | | | | |
| Kenexa Average 5 Year CPH | $ 3,607 | | | | |

As you can see the overall cost per hire, rises a small amount to reflect the loss of a small amount of economy of scale in year one. This is unavoidable due to how the infrastructure is conceived and we can explain further if you wish to discuss.

The billing structure is shown below. We have 224 jobs in the committed run rate in year one just so that the assignment and completion fees are static over the life of the engagement. This will make the accounting of positions opened in year one and closed in year two much easier. The quarterly run rate would be $377,852 so that your committed costs in year one would be $816,528 lower that in the original pricing we provided.

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Quarterly Run Rate | $377,852 | $594,734 | $594,734 | $594,734 | $594,734 |
| Requisition Fees Committed in the Run Rate | 224 | 400 | 400 | 400 | 400 |
| Requisition Fees Above Committed in Run Rate | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |
| Completion Fees | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |

Please review and contact me with any comments or questions. Once, again, Kenexa appreciates the opportunity to partner with BlueLinx.

Sincerely,

Elliot H. Clark
Chief Operating Officer

**EXHIBIT B-1**
**TO MASTER SERVICES AGREEMENT**
**EMPLOYMENT PROCESS OUTSOURCING PROGRAM**
**PAYMENT SCHEDULE**

This Exhibit B-1 to Master Services Agreement between **BlueLinx Corporation** ("BlueLinx") and **Kenexa Technology, Inc.** ("Kenexa"), dated _____, 2006, sets forth the fees and payment schedule with respect to the Services in Exhibit A-1.

## 1. Fees

Kenexa has developed a solution that offers far more service to BlueLinx over a five (5) year period than is found in the current model. The Kenexa solution is for Employment Process Outsourcing where Kenexa will seamlessly integrate with the BlueLinx Human Resource group to provide staffing services.

The Kenexa solution is based upon a series of assumptions. These assumptions are shown below. The assumptions include metrics around workforce planning, and candidates needed to fill positions based upon the challenges currently being faced by the existing staffing department. If more than one hundred fifty (150) assignments (during year 1) or three hundred (300) assignments thereafter occur in any one quarter, there may be additional charges due Kenexa subject to mutual agreement of the parties for on-site support.

The Kenexa solution utilizes a dedicated resource team that varies depending upon the workload. This flexibility is far greater than internally managed resources. The Kenexa solution can manage all aspects of the hiring process.

## Assumptions

| Category | Assumption | Source of Data |
|---|---|---|
| Workforce Planning | | |
| External Hires Year 1 | 500 | BlueLinx Estimate |
| External Hires Year 2 | 1000 | BlueLinx Estimate |
| External Hires Year 3 | 1000 | BlueLinx Estimate |
| External Hires Year 4 | 1000 | BlueLinx Estimate |
| External Hires Year 5 | 1000 | BlueLinx Estimate |
| Sourcing Channels | | |
| Database Mining | 25% | Kenexa Estimate based upon current job listings |
| Employee Referrals | 20% | Kenexa Estimate based upon current job listings |
| Media Advertising | 25% | Kenexa Estimate based upon current job listings |
| Web Postings | 65% | Kenexa Estimate based upon current job listings |
| Direct Sourcing | 17% | Kenexa Estimate based upon current job listings |
| Efficiency Gains | | |
| Direct Sourcing Reduction as Database grows | 10% | Kenexa best practice target |

Below is the budget including Kenexa fees as projected over the next five (5) years based upon the estimated levels of hiring for the next five (5) years. This estimate examined historical attrition and very conservative minimal levels of growth. This budget does not include relocation, background checking fees or candidate travel or Kenexa expenses, advertising, employee referral fees, reference checking, courier fees, travel, and travel and living expenses for the on-sites.

**Budget Detail by Year**

Please note that the overall cost of the program will remain flat over a five (5) year period. Typically, Kenexa estimates a reduction due to the assumption that better hiring practices will lead to efficiencies in future years. Kenexa will need to study available data and analyze what savings may be available prior to committing to a level of savings. However, Kenexa will commit to passing on whatever savings are achieved to BlueLinx as a reduction in overall costs. While the financial model may or may not decline in cost, Kenexa's billing system below is based on the five year average.

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| External Hires Per Year | 500 | 1000 | 1000 | 1000 | 1000 |
| Internal Hires Per Year | 0 | 0 | 0 | 0 | 0 |
| Total Number of Hires | 500 | 1000 | 1000 | 1000 | 1000 |
| | | | | | |
| **Category of Cost** | | | | | |
| | | | | | |
| **Labor** | | | | | |
| Client Services Team | $ 967,200 | $ 1,445,600 | $ 1,445,600 | $ 1,445,600 | $ 1,445,600 |
| Direct Sourcing | $ 312,000 | $ 624,000 | $ 468,000 | $ 468,000 | $ 468,000 |
| Screening and Processing | $ 624,000 | $ 1,262,000 | $ 1,262,000 | $ 1,262,000 | $ 1,268,800 |
| Research | $ 101,400 | $ 185,900 | $ 169,000 | $ 169,000 | $ 169,000 |
| Administration | $ 75,300 | $ 148,100 | $ 148,100 | $ 148,100 | $ 148,100 |
| Total Kenexa Labor Fees | $ 2,079,900 | $ 3,665,600 | $ 3,492,700 | $ 3,492,700 | $ 3,499,500 |
| | | | | | |
| **Technology** | | | | | |
| ATS License Fee | $ 80,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ 160,000 |
| Assessment Fees | $ 30,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| Total Kenexa Fees Technology | $ 110,000 | $ 220,000 | $ 220,000 | $ 220,000 | $ 220,000 |
| | | | | | |
| Total Kenexa Fees Service & Technology | $ 2,189,900 | $ 3,885,600 | $ 3,712,700 | $ 3,712,700 | $ 3,719,500 |
| | | | | | |
| **Non Kenexa Expense Budget** | | | | | |
| Employee Referral Fees | | | | | |
| Advertising | $ 100,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 |
| Drug Testing/Background Checking | | | | | |
| Total Pass Through Expenses | $ 100,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 |
| | | | | | |
| Total Costs | $ 2,289,900 | $ 4,085,600 | $ 3,912,700 | $ 3,912,700 | $ 3,919,500 |
| Cost Per Hire | $ 4,580 | $ 4,086 | $ 3,913 | $ 3,913 | $ 3,920 |
| | | | | | |
| Total Costs | $ 18,120,400 | | | | |
| BPH Average 5 Year Total Costs | $ 4,027 | | | | |
| | | | | | |
| Kenexa Fees | $ 16,230,400 | | | | |
| Kenexa Average 5 Year CPH | $ 3,607 | | | | |

The above average CPH is based on an annual hiring of 500 in year 1 and 1000 per year thereafter and, therefore, represents full utilization. The actual billing model will offer flexibility and is not based upon a flat fee scenario. The average cost per hire shown above as $3,607 per hire for Kenexa costs will be higher, if the hiring levels are substantially below estimates. Conversely, the cost per hire will be substantially lower, if hiring is above the projected levels. Please note this model will offer BlueLinx the flexibility to instantly increase resources for a short term increase in hiring volume and reduce instantly when that activity ends, thereby optimizing utilization and reducing costs.

The above budget also assumes that the distribution will be a total of 500 hires in year 1 and 1,000 hires each year thereafter of which all are external. Internal transfers without external sourcing are provided at no extra charge. If external sourcing is required, then Kenexa will charge the assignment and completion fees. Therefore, Kenexa recommends that internal transfers be processed prior to external sourcing.

Kenexa will manage any external agencies at the request of BlueLinx. If an agency fills a position assigned to Kenexa, Kenexa will receive the assignment and completion fees for that position.

Kenexa will also manage other vendor costs such as conferences, job fairs or other similar hiring events. These costs are not included in the Kenexa budget and will be passed through at no mark up to BlueLinx.

In addition, new and robust reporting capabilities will allow the combined Kenexa-BlueLinx team to make informed decisions about the level of resources and expenditures facilitating rapid response to staffing needs and continuous process improvement. The resource level estimates the need for six (6) On-Site consultants in Atlanta, Georgia and Denver, Colorado and any modification of that resource level would be reflected in a pricing adjustment.

A portion of the fees are based upon the services of the committed resource team and the technology license. All other fees are based upon utilization.

Positions must be assigned and then filled by Kenexa to realize the billing level shown on the prior page. The billing level and structure may change if assumptions change or based upon discussions and guidance from BlueLinx.

The fee structure will be based upon a minimal annual run rate of $1,511,408 in year 1 and $2,378,935 thereafter tied to the conservative level of 250 and 500 external hires per year, respectively. There will be a charge for each additional hire above that threshold. The quarterly payments of $377,852 each in year 1 and $594,734 each thereafter will be payable in advance and within thirty (30) days from receipt of an invoice from Kenexa.

## 2. Costs

Kenexa's fees do not include employee referral or assessment costs, background checking, drug testing employment brochures, letterhead, office expenses at BlueLinx sites or employment brand marketing. BlueLinx agrees to budget $200 per position that is sourced externally for external employment advertising during the term. All employment advertising which is a pass through expense shall have prior approval of BlueLinx. Kenexa will invoice BlueLinx for any billable expenses, including reasonable travel and lodging for Program-related travel, which will have been pre-approved by BlueLinx. Expense invoices are payable within thirty (30) days from receipt of the invoice.

## 3. Payment

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Quarterly Run Rate | $377,852 | $594,734 | $594,734 | $594,734 | $594,734 |
| Requisition Fees Committed in the Run Rate | 224 | 400 | 400 | 400 | 400 |
| Requisition Fees Above Committed in Run Rate | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |
| Completion Fees | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |

Requisition Fees are due when the positions (in excess of those included in the Run Rate above) are assigned. Completion Fees are due at the end of the month in which the candidate starts.

All invoices related to this Statement of Work will be sent to:

BlueLinx Corporation
Attention: Accounts Payable
_____
_____.

# EXHIBIT C

 **Kenexa**
Technology, Inc.



Invoice #: 182130
Date     : 30-NOV-06
Your A/C : 46689
Project #: Vent2980BlueLinx
Tax ID # : 23-3024256

**BILL TO:**
Accounts Payable
BlueLinx Corporation
4300 Wildwood Pkwy
Atlanta GA 30339
United States

**SHIP TO:**
Darlene Rogers
BlueLinx Corporation
4300 Wildwood Pkwy
Atlanta GA 30339
United States

| TERMS | DUE DATE | PURCHASE ORDER # | |
|---|---|---|---|
| 30 NET | 30-Dec-06 | | |

Invoice Description

| | |
|---|---|
| Development of a Third Career Center for Hourly Field Positions | $2,500.00 |
| One Time Load of BlueLinx Candidate Information from Ceridian to KRE | $6,000.00 |
| Creation and Set Up of a Daily Hire Feed | $10,000.00 |

| SPECIAL INSTRUCTIONS | SUBTOTAL | TAX | TOTAL |
|---|---|---|---|
| * For billing information or payment by credit card, please call Acccounts Receivable at (610)971-9171 | $18,500.00 | $0.00 | $18,500.00 |

There will be a 1.5% per month late charge added to all past due accounts

**REMIT TO:**

Kenexa Technology, Inc.
P.O. Box 827674
Philadelphia PA 19182-7674

Pages: 1 of 1