# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENEXA TECHNOLOGY, INC., <br> A Pennsylvania corporation, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | C.A. No.  07-27-GMS |
| BLUELINX CORPORATION, <br> A Georgia corporation, | ) <br> ) <br> ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## DEFENDANT BLUELINX CORPORATION'S OPENING BRIEF
### IN SUPPORT OF ITS MOTION TO TRANSFER

Donald J. Wolfe, Jr. (#285)
Philip A. Rovner (#3215)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P. O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
dwolfe@potteranderson.com
provner@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*

Dated:  May 21, 2007
795933 / 31137

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

I.    NATURE AND STAGE OF THE PROCEEDING ............................................. 1

II.   SUMMARY OF ARGUMENT ........................................................................ 2

III.  STATEMENT OF FACTS .............................................................................. 3

      A.   The Parties and the Master Service Agreement Lack Significant
           Connections to Delaware ........................................................................ 3

      B.   This Litigation has No Relevant Connection to Delaware ......................... 4

      C.   Related Litigation in Georgia ................................................................. 5

IV.   ARGUMENT ................................................................................................ 6

      A.   The Standard for Transfer is a Balancing Test ........................................ 6

      B.   The Relevant Factors Favor Transfer ...................................................... 7

           1.   This Action Could Have Been Brought in the Northern
                District of Georgia [Atlanta Division] .......................................... 7

           2.   Private Factors Favor Transfer to the Northern District of
                Georgia [Atlanta Division] ........................................................... 8

                a.   The Convenience and Locations of the Parties
                     Favor Transfer to the Northern District of Georgia
                     [Atlanta Division] ............................................................. 8

                     i.     The Locations of the Parties Favor Transfer ................. 8

                     ii.    Kenexa's Choice of Venue Should Be
                            Assigned Little Weight ............................................. 9

                     iii.   The Convenience of Litigating Related
                            Matters in One District .......................................... 10

                b.   The Convenience and Location of the Witnesses
                     and Documents Favor Transfer to the Northern
                     District of Georgia [Atlanta Division] ............................. 11

           3.   Public Factors Favor Transfer to the Northern District of
                Georgia [Atlanta Division] ......................................................... 12

           a.     Georgia Law Applies to the Newly-Added Counts
                  of the Amended Complaint ............................................................ 12

           b.     The Northern District of Georgia has a Strong
                  Interest in Resolving this Dispute ................................................. 14

           c.     Judicial Efficiencies Favor Transfer ............................................. 15

V.     CONCLUSION ................................................................................................ 16

# TABLE OF AUTHORITIES

**CASES**

*3Com Corp v. D-Link Sys., Inc.,*
    C.A. No. 03-14-GMS, 2003 WL 1966438 (D. Del. Apr. 25, 2003) ........................................11

*ACCU Pers., Inc. v. Accustaff, Inc.,*
    846 F. Supp. 1191 (D. Del. 1994)........................................................................................13

*Affymetrix, Inc. v. Synteni, Inc.,*
    28 F. Supp. 2d 192 (D. Del. 1998).....................................................................................7, 8

*Alloc, Inc. v. Unilin Décor N.V.,*
    C.A. No. 03-253-GMS, C.A. No. 05-587-GMS,
    2006 WL 3050815 (D. Del. Oct. 26, 2006) ..........................................................................7

*APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.,*
    295 F. Supp. 2d 393 (D. Del. 2002)......................................................................................9

*Arrow Commc'n Labs., Inc. v. John Mezzalingua Assocs., Inc.,*
    C.A. No. 05-357-SLR, 2005 WL 2786691 (D. Del. Oct. 26, 2005)........................................9

*Citigroup Inc. v. City Holding Co.,*
    97 F. Supp. 2d 549 (S.D.N.Y. 2000).....................................................................................15

*Glickenhaus v. Lytton Fin. Corp.,*
    205 F. Supp. 102 (D. Del. 1962)............................................................................................11

*IBM v. Comdisco, Inc.,*
    C.A. No. 91-C-07-199, 1991 WL 269965 (Del. Super. Dec. 4, 1991) ...................................13

*Inter-City Prods. Corp. v. Ins. Co. of North America,*
    C.A. No. 90-717-SLR, 1993 WL 18948 (D. Del. Jan. 16, 1993) ...........................................12

*Jahncke Serv., Inc. v. OKC Corp.,*
    301 F. Supp. 866 (D. Del. 1969)............................................................................................11

*Jumara v. State Farm Ins. Co.,*
    55 F.3d 873 (3d Cir. 1995).............................................................................................6, 7, 8

*Lony v. E.I. Du Pont de Nemours & Co.,*
    886 F.2d 628 (3d Cir. 1989)..................................................................................................14

*Millet v. Truelink, Inc.,*
    C.A. No. 05-599-SLR, 2006 WL 2583100 (D. Del. Sept. 7, 2006) .......................................14

*Nilssen v. Osram Sylvania, Inc.,*
    C.A. No. 00-695-JJF, 2001 WL 34368395 (D. Del. May 1, 2001) .........................................11

*Omnicom Group, Inc. v. Employers Reinsurance Corp.,*
    C.A. No. 01-839-GMS, 2002 WL 109346 (D. Del. Jan. 28, 2002).........................................10

*Paragon-Revolute Corp. v. C.F. Pease Co.,*
    120 F. Supp. 488 (D. Del. 1954).................................................................................................9

*Plum Tree, Inc. v. Stockment,*
    488 F.2d 754 (3d Cir. 1973)........................................................................................................6

*Saint-Gobain Calmar, Inc. v. Nat'l Prods. Corp.,*
    230 F. Supp. 2d 655 (E.D. Pa. 2002) ......................................................................................14

*Spiegelberg v. Collegiate Licensing Co.,*
    402 F. Supp. 2d 786 (S.D. Tex. 2005) ...............................................................................14, 15

*Stewart Org., Inc. v. Ricoh Corp.,*
    487 U.S. 22 (1988)......................................................................................................................6

*Suchomajcz v. Hummel Chem. Co.,*
    524 F.2d 19 (3d Cir. 1975).................................................................................................12, 13

*Travelers Indemnity Co. v. Lake,*
    594 A.2d 38 (Del. 1991) ...........................................................................................................13

*Van Dusen v. Barrack,*
    376 U.S. 612 (1964)....................................................................................................................6

*Weisler v. Barrows,*
    C.A. No. 06-362-GMS, 2006 WL 3201882 (D. Del. Nov. 6, 2006) .....................................6, 7

## STATUTES, RULES & REGULATIONS

28 U.S.C. § 1404(a) .....................................................................................................1, 6, 11

28 U.S.C.A. § 1332(a)(1).....................................................................................................7

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws 145(1) ...........................................................13

Defendant BlueLinx Corporation ("BlueLinx") moves the Court pursuant to 28 U.S.C. § 1404(a) for an order transferring this commercial dispute to the U.S. District Court for the Northern District of Georgia [Atlanta Division].

## I.    NATURE AND STAGE OF THE PROCEEDING

Plaintiff Kenexa Technology, Inc. ("Kenexa") is a Pennsylvania corporation with its principal place of business in Wayne, Pennsylvania. BlueLinx is incorporated in Georgia with its principal place of business in Atlanta, Georgia. Kenexa'a original Complaint, filed on January 12, 2007 (D.I. 1), contained two counts, a breach of contract claim and a claim for declaratory judgment of breach of contract and anticipatory breach, both arising out of a May 30, 2006 agreement under which Kenexa was to provide employment process outsourcing services to BlueLinx at its corporate headquarters and sales center in Georgia (the "Master Service Agreement" (Ex. A hereto)) and its other sales center in Denver, Colorado. *See generally* (D.I. 1). Notwithstanding that neither Kenexa nor BlueLinx was a Delaware corporation, the Master Service Agreement provided for the application of Delaware law and contained a consent to jurisdiction provision providing that an action arising out of the Master Service Agreement could, but was not required to, be brought in the "courts of Delaware." *See generally* (D.I. 1).

BlueLinx answered the original Complaint on February 2, 2007, denying the allegations therein, asserting affirmative defenses, and counter-claiming for breach of the Master Service Agreement. (D.I. 5). Thereafter, on April 9, 2007, Kenexa moved to amend its original Complaint to add two individual defendants, former Kenexa employees Leslie Lovelace ("Lovelace") and Susan Podsiad ("Podsiad"), and three new claims (intentional interference with contractual relations (against BlueLinx), misappropriation of trade secrets (against all defendants), and breach of contract (against Lovelace and Podsiad)) (D.I. 8). However, after BlueLinx raised jurisdictional defects relating to the inclusion of Lovelace and Podsiad during

the initial scheduling conference with the Court, Kenexa, at the Court's urging, agreed to reconsider its proposed amended pleading. *See* 4/19/2007 Transcript (D.I. 13). After Kenexa agreed to remove the newly-added individual defendants and any claims against them, the parties agreed upon an acceptable, though disputed, form of Kenexa's amended pleading. On May 3, 2007, Kenexa's Amended Complaint was filed and served via electronic filing. (D.I. 17). BlueLinx answered the Amended Complaint on May 17, 2007, denying the allegations therein, asserting affirmative defenses, and counter-claiming for breach of the Master Service Agreement. (D.I. 18).

This is BlueLinx' opening brief in support of its motion to transfer this litigation to the U.S. District Court for the Northern District of Georgia [Atlanta Division].

## II.    SUMMARY OF ARGUMENT

While venue in Delaware is not improper, this matter, pursuant to the applicable standard for a motion to transfer, is more appropriately lodged in the Northern District of Georgia [Atlanta Division]. Namely, the relevant case-specific factors weigh decidedly in favor of transfer. The allegations of the Amended Complaint have no connection whatsoever to the State of Delaware. First, neither party is incorporated or resides in Delaware. Second, all events relevant to the claims and defenses alleged in the pleadings occurred outside of Delaware, primarily in the State of Georgia. Third, all services provided pursuant to the Master Service Agreement were provided to BlueLinx in Georgia and Colorado. Fourth, all witnesses to the events alleged in the pleadings reside outside of Delaware, with at least one non-party witness in Georgia. Fifth, the newly-added tort claims will require the application of Georgia law.[1] Finally, the newly-added

---

[1] While the Master Service Agreement contains a Delaware choice of law provision, as the Court noted during the April 19 teleconference, a United States District Court sitting in Georgia is no less capable than this Court in dealing with issues of Delaware law. *See* 4/19/2007 Transcript (D.I. 13), at p. 11.

counts in the Amended Complaint relate to the same subject matter as two actions pending in the Superior Court of Fulton County, State of Georgia, which were filed on March 29, 2007 by former Kenexa employees and which predate both Kenexa's original motion to amend and the filing of its Amended Complaint (D.I. 17).

## III.    STATEMENT OF FACTS

### A.    The Parties and the Master Service Agreement Lack Significant Connections to Delaware

BlueLinx is a Georgia corporation with corporate headquarters located in Atlanta, Georgia. *See Declaration of Robert A. Penman In Support Of Motion To Transfer* (Ex. B hereto). BlueLinx sells building products to industrial manufacturers, home improvement retailers, and manufactured home builders. Ex. B, at ¶ 3. In addition to its headquarters in Atlanta, BlueLinx maintains a western sales office in Denver, Colorado and warehouse distribution sites throughout the United States. Ex. B, at ¶ 5. BlueLinx does not maintain any offices or warehouses in Delaware. Ex. B, at ¶ 6.

Kenexa is a Pennsylvania corporation with corporate headquarters located in Wayne, Pennsylvania. *See* D.I. 17, at ¶ 1. Kenexa provides employment services and products to human resource departments. *Id.* Kenexa maintains domestic (Pennsylvania, Nebraska, Massachusetts, Colorado, Minnesota, California) and international offices (Europe and Asia) and, upon information and belief, has no offices in Delaware. *See* Kenexa Website (Ex. C hereto).

These two non-Delaware corporations entered into the Master Service Agreement on or about May 30, 2006. *See* Ex. A, at p. 5; Ex. B, at ¶ 9. The Master Service Agreement was negotiated by representatives of Kenexa and BlueLinx in the spring of 2006. *See id.*; Ex. B. at 8. Negotiations were completed via correspondence and telephone calls between Kenexa's Chief

Operating Officer Elliot Clark in Wayne, BlueLinx' Vice President for Human Resources Dean
Adelman in Atlanta, and the parties' respective legal departments at these locations. *Id.*

The Master Service Agreement required that Kenexa provide employment process
outsourcing services to BlueLinx in Georgia and Colorado. *See* Ex. A, at Exhibit A-1 (Statement
of Work); Ex. B, at ¶ 7. In essence, Kenexa was to assist BlueLinx by designing a program to
improve BlueLinx' hiring processes. *Id.* Delivery of the services and products pursuant to the
Master Service Agreement was supposed to occur at BlueLinx' headquarters/sales center in
Atlanta and its sales center in Denver. *Id.* In addition to assigning employees located in
Pennsylvania and India to the BlueLinx program, Kenexa installed four on-site employees at
BlueLinx' headquarters/eastern sales office in Atlanta and one on-site employee at BlueLinx'
western sales office in Colorado. Ex. B, at ¶ 10. The aforementioned on-site employees were
BlueLinx' primary contacts with Kenexa and the persons through whom services were supposed
to be delivered. Notably, no services originated from or were delivered to Delaware. Ex. B, at
¶ 17.

The Master Service Agreement provided that the it would be governed by and construed
in accordance with the laws of Delaware and contained a provision consenting to jurisdiction and
venue in the Delaware courts. Ex. A, at ¶ 16.1. The consent to jurisdiction and venue in
Delaware, however, was not exclusive. *Id.* That is, the parties did not limit themselves to
jurisdiction and/or venue in Delaware.

**B.    This Litigation has No Relevant Connection to Delaware**

Other than the choice of law provision contained in the Master Service Agreement, which
provides for the application of Delaware law to Kenexa's contract claim, this litigation has no
connection to Delaware.

4

Neither party is incorporated or maintains its principal place of business in Delaware. *See* D.I. 17; Ex. B, at ¶ 6, Ex. C. Moreover, the events alleged in Kenexa's newly-added tort claims relate solely to Georgia. D.I. 17. In Count III of the Amended Complaint, Kenexa alleges that BlueLinx intentionally interfered with Kenexa's contractual relations with its former, Georgia-based employees Lovelace (Kenexa's On-site Staffing Consultant) and Podsiad (Kenexa's Program Coordinator). *Id.* at ¶¶ 17-34, 47-51. In Count IV of the Amended Complaint, Kenexa again implicates its former, Georgia-based employees Lovelace and Podsiad when it alleges a misappropriation of trade secrets claim against BlueLinx. *Id.* at ¶¶ 17-34, 52-58. While BlueLinx denies that it intentionally interfered with contractual relations or misappropriated trade secrets, there is no escaping the fact that Kenexa's own allegations have placed the situs of these disputed claims squarely in Georgia.

Finally, upon information and belief,[2] and based upon the parties' respective business locations, no relevant witnesses, party or otherwise, reside in Delaware. *See* Ex. B, at ¶¶ 6, 17. More significantly, at least one former Kenexa employee and potential witness, Jackie Hawkins, is located in Georgia. Ex. B, at ¶ 14. Other potential witnesses include, but are not limited to, those party witnesses that worked on the BlueLinx program at the parties' respective locations, all of which were outside of Delaware. Of these party witnesses, Kenexa's project supervisor John Holvay is notable as he made numerous on-site visits to BlueLinx in Georgia. *See* Ex. B, at ¶ 16.

## C.    Related Litigation in Georgia

Prior to Kenexa's March 29, 2007 effort (later aborted) to add individual defendants to this litigation, former Georgia-based Kenexa employees, Lovelace and Podsiad, filed respective actions against Kenexa in the Superior Court of Fulton County, State of Georgia seeking

---

[2] The parties have yet to file their respective Rule 26 disclosures.

declaratory judgments and injunctive relief. (Exs. D, E hereto). These actions arise out of the disputes between Kenexa and its former employees regarding the terms of the former employees' employment contracts with Kenexa - contracts which figure prominently in the newly-added allegations of the Amended Complaint. *See* D.I. 17, at ¶¶ 17-34, 47-58; *see also* Exs. C, D hereto. Specifically, the disputes relate to the enforceability of the confidentiality, non-competition and non-solicitation provisions of the former employees' employment contracts with Kenexa. *See* Exs. C, D, at ¶¶ 12-14. Pursuant to O.C.G.A. § 9-11-65, both Lovelace and Podsiad are seeking to enjoin Kenexa from enforcing or attempting to enforce the confidentiality, non-competition, and non-solicitation provisions of their respective employment contracts. *See* Exs. C, D, at ¶ 16.

## IV.    ARGUMENT

### A.    The Standard for Transfer is a Balancing Test

Section 1404(a) of Title 28 of the United States Code provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Whether to grant a requested transfer of venue is at the discretion of the trial judge. *See, e.g., Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756 (3d Cir. 1973). The determination is an individualized, case-by-case consideration of convenience and fairness. *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964). Thus, a court must weigh a number of relevant case-specific factors to determine whether the litigation would proceed more conveniently and the interests of justice would be better served by the transfer. *See, e.g., Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995); *Weisler v. Barrows*, C.A. No. 06-362-GMS, 2006 WL 3201882 (D. Del. Nov. 6, 2006) (Ex. F hereto). While it is the movant's burden to establish the need to transfer, "the moving party is not required to show truly

compelling circumstances for the change of venue, but rather that all relevant things considered, the case would be better off transferred to another district." *Weisler*, 2006 WL 3201882, at *2.

The Third Circuit has noted that "there is no definitive formula or list of the factors to consider" yet nevertheless has identified factors and divided them into private and public categories. *Jumara*, 55 F.3d at 879. The private factors include: (1) the plaintiff's forum preference, (2) the defendant's forum preference, and (3) where the claim arose, which first three factors collapse into other portions of the *Jumara* analysis; (4) the convenience of the parties; (5) the convenience of the witnesses to the extent they may be unavailable for trial; and (6) the location of records and other documents to the extent they could not be produced in the alternate forum. *See, e.g., Alloc, Inc. v. Unilin Décor N.V.*, C.A. No. 03-253-GMS, C.A. No. 05-587-GMS, 2006 WL 3050815, at * 2 (D. Del. Oct. 26, 2006) (Ex. G hereto); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 197-202 (D. Del. 1998) (citing *Jumara*). The public factors include: (1) the enforceability of the judgment; (2) practical considerations that could make trial easy, expeditious, or inexpensive; (3) the relative administrative difficulties in the two fora due to court congestion; (4) the local interest in deciding local controversies; and (5) the public policies of the fora. *Id.* (citing *Jumara*).

**B.     The Relevant Factors Favor Transfer**

> **1.     This Action Could Have Been Brought in the Northern District of Georgia [Atlanta Division]**

As a threshold matter, it is clear that this matter could have been brought in the Northern District of Georgia, or a state court in Georgia for that matter. With regard to federal jurisdiction, diversity jurisdiction applies in this matter because the matter involves citizens of different states and the alleged amount in dispute is greater than $75,000. 28 *U.S.C.A.* § 1332(a)(1).

    **2.**    **Private Factors Favor Transfer to the Northern District of Georgia [Atlanta Division]**

The private convenience factors, namely (1) plaintiff's forum preference, (2) defendant's forum preference; and (3) where the claim arose, which first three factors collapse into other portions of the *Jumara* analysis; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the location of books and records, strongly favor transfer to the Northern District of Georgia [Atlanta Division]. *See Affymetrix*, 28 F. Supp. 2d at 197-202 (citing *Jumara*, 55 F.3d at 879).

    **a.**    **The Convenience and Locations of the Parties Favor Transfer to the Northern District of Georgia [Atlanta Division]**

    **i.**    **The Locations of the Parties Favor Transfer**

Neither party is incorporated in Delaware. Neither party maintains offices in Delaware. Further, and not surprisingly, none of the claims alleged in the pleadings arose in Delaware.

Defendant BlueLinx, maintains its headquarters/east coast sales office in Atlanta, Georgia, the location of the intended transferee court and the site of the acts complained of in Kenexa's Amended Complaint.

Kenexa, though headquartered much closer to this Court (Wayne, Pennsylvania) than BlueLinx, will need to cross state lines regardless of the outcome of this motion – presumably by car, if the case is not transferred, and by plane, if it is. For an international company practiced at dispatching employees on client visits around the globe, including visits in Georgia, and providing on-site support and employees at customer locations, including in Georgia, the additional travel time hardly seems problematic.

On balance, this factor favors transfer.

ii. **Kenexa's Choice of Venue Should Be Assigned Little Weight**

In making its determination, the Court will need to consider what weight to assign to Kenexa's choice of forum based on "the particular facts and circumstances" of this case. *Paragon-Revolute Corp. v. C.F. Pease Co.*, 120 F. Supp. 488, 490 (D. Del. 1954). Typically, when a plaintiff, such as Kenexa, is not a resident of its chosen forum, or if the forum is not the site of any act giving rise to the lawsuit, that plaintiff's forum choice is entitled to less deference from the district judge. *See, e.g., Arrow Commc'n Labs., Inc. v. John Mezzalingua Assocs., Inc.*, C.A. No. 05-357-SLR, 2005 WL 2786691, at *2-*3 (D. Del. Oct. 26, 2005) (Ex. H hereto) (noting this district's prior recognition that "[w]hen the plaintiff has chosen to bring suit in a district that is not plaintiff's 'home turf' and that has no connection to any acts giving rise to the lawsuit, convenience to the plaintiff is not as great as it would be were plaintiff litigating at or near plaintiff's principal place of business or at the site of activities at issue in the lawsuit." (alteration in original) (quotation marks and citations omitted)); *APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.*, 295 F. Supp. 2d 393, 398-99 (D. Del. 2002) (finding it "appropriate to give the plaintiff's choice of forum less deference" in circumstances where "[both parties] are Delaware corporations[] [but] neither conducts business or has facilities in Delaware" and "[w]here an alternative forum is more convenient and has more substantial connections with the litigation").

Here, Delaware is neither party's home turf. Neither party has facilities in Delaware and Delaware is not the site of any acts at issue in the lawsuit. Kenexa undoubtedly will respond that the choice of venue provision in the Master Service Agreement weights in favor of denial of the instant motion. Such an argument, however, ignores both the non-exclusive nature of the

9

consent to venue provision and the nature and location of the acts Kenexa saw fit to add to its Amended Complaint.

In the Master Service Agreement, BlueLinx consented to the jurisdiction and venue of the "courts of Delaware." BlueLinx did not consent to jurisdiction and venue in the "courts of Delaware" to the exclusion of all other proper jurisdictions and venues, particularly with respect to tort claims governed by the laws of other states. *See infra.* As drafted, the tort claims in the Amended Complaint reveal Georgia to be the locus of operative facts at issue in this litigation and the venue with the greatest interest in determining the outcome of this dispute. In essence, with its amendments, Kenexa succeeded in transforming a simple contract case into a complex affair that is most appropriately situated in another venue – the Northern District of Georgia.

### iii.    The Convenience of Litigating Related Matters in One District

As mentioned in the Statement of Facts, there are two related pieces of litigation pending in the in the Superior Court of Fulton County State of Georgia. These cases involve Kenexa and the former employees, Lovelace and Podsiad, that figure so prominently in Kenexa's Amended Complaint. The burden on Kenexa of litigating in both Delaware and Atlanta at the same time could be alleviated by transfer of this matter to the Northern District of Georgia. *Cf. Omnicom Group, Inc. v. Employers Reinsurance Corp.*, C.A. No. 01-839-GMS, 2002 WL 109346, at *1, fn 1 (D. Del. Jan. 28, 2002) (granting motion to transfer and reasoning that it was "more convenient to try the cases [one in state court and one in federal court] in one district, rather than across state lines.") (Ex. I hereto).

10

**b.      The Convenience and Location of the Witnesses and Documents Favor Transfer to the Northern District of Georgia [Atlanta Division]**

Courts are significantly more likely to grant a motion to transfer under § 1404(a) in cases like this one, where the proposed forum will serve the convenience of witnesses better than the original forum. *See, e.g., Jahncke Serv., Inc. v. OKC Corp.*, 301 F. Supp. 866, 868 (D. Del. 1969). The convenience of witnesses is not weighed from consideration of the qualitative value of the testimony of particular witnesses. *Glickenhaus v. Lytton Fin. Corp.*, 205 F. Supp. 102, 106 (D. Del. 1962). Most significant is the convenience of non-party witnesses who are important to the resolution of the case, particularly if they are not subject to compulsory process in Delaware. *Nilssen v. Osram Sylvania, Inc.*, C.A. No. 00-695-JJF, 2001 WL 34368395, at *2-*3 (D. Del. May 1, 2001) (Ex. J hereto) ("A party need not allege that a witness definitely will be unavailable for trial; rather, it is sufficient for purposes of venue transfer analysis if the witness is not subject to a court's subpoena power."); *see also 3Com Corp v. D-Link Sys., Inc.*, C.A. No. 03-14-GMS, 2003 WL 1966438, at *2 (D. Del. Apr. 25, 2003) (Ex. K hereto) (observing that "[e]ven if these witnesses were willing to travel to Delaware to testify in this court, it is certainly very inconvenient for them to do so, especially compared to traveling to a court in the state of their residence and employment")

Upon information and belief, no relevant witnesses are located in Delaware. For its part, the majority of BlueLinx' party witnesses are located in Georgia, and, more importantly, at least one non-party witness Jackie Hawkins is located in Georgia. Upon information and belief, Kenexa's party witnesses are located primarily in Pennsylvania, with additional party witnesses located in Florida, and possibly India. With the exception of those party witnesses located in Pennsylvania, traveling to Atlanta is likely more, and certainly no less, convenient than travel to Delaware. Yet, another factor favoring transfer.

11

Though modern technology obviates somewhat the need to consider the location of documents as a factor, it is worth noting that there is little chance that any relevant documents are located in Delaware; yet further proof that Delaware has not connection to this case. By way of further argument, the overwhelming majority of BlueLinx' relevant documents are located in Atlanta, Georgia. Regarding Kenexa's documents, the majority of which are presumed to exist in Wayne, Pennsylvania, mandatory interstate shipping will be required regardless of where this litigation proceeds. In any event, at least the bulk of one party's documents are located in Georgia, which is more Kenexa can say about Delaware.

### 3. Public Factors Favor Transfer to the Northern District of Georgia [Atlanta Division]

#### a. Georgia Law Applies to the Newly-Added Counts of the Amended Complaint

Kenexa's newly-added tort claims will require application of Georgia law. Although a choice of law argument alone is not sufficient to warrant transfer of this matter, such an argument is relevant to the Court's determination of BlueLinx' motion. *See Inter-City Prods. Corp. v. Ins. Co. of North America*, C.A. No. 90-717-SLR, 1993 WL 18948 (D. Del. Jan. 16, 1993) (Ex. L hereto). When considered in conjunction with the overwhelming showing on the other convenience and fairness factors, the choice of law argument below leaves little doubt that transfer of this matter is appropriate.

When confronted with questions of purely state law – intentional interference with contractual relations and misappropriation of trade secrets – this Court must follow the choice of law principles of the forum state, Delaware, to determine which State's law of decision should apply. *Suchomajcz v. Hummel Chem. Co.*, 524 F.2d 19 (3d Cir. 1975) ("a federal district court adjudicating a state law issue must apply the law of the forum state, including that state's choice

of law rules") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S. Ct. 1020 (1941));

*see also ACCU Pers., Inc. v. Accustaff, Inc.*, 846 F. Supp. 1191, 1212 (D. Del. 1994).

In *Travelers Indemnity Co. v. Lake*, the Delaware Supreme Court adopted the "most

significant relationship" test of the Restatement (Second) of Conflict of Laws 145(1).  594 A.2d

38, 40 (Del. 1991).  The Restatement considers a number of factors in determining the "most

significant relationship, the relative importance of which depends on the nature of the tort

involved."  These factors are as follows:

> (1)    the place where the injury occurred;
>
> (2)    the place where the conduct causing the injury occurred;
>
> (3)    the domicile, residence, nationality, place of incorporation and place of business of the parties; and
>
> (4)    the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws 145(1); *see IBM v. Comdisco, Inc.*, C.A. No. 91-C-07-

199, 1991 WL 269965 (Del. Super. Dec. 4, 1991) (applying the Restatement (Second), court

concluded that the substantive law of Illinois would apply to claim for tortious interference, as

Illinois was where the allegedly wrongful business negotiations had occurred) (Ex. M hereto).

Here, the analysis is simple.  BlueLinx is alleged to have committed tortious acts in

Atlanta involving and/or affecting Kenexa's Atlanta-based, on-site employees and operations.

BlueLinx is headquartered in Atlanta, and the relationship between BlueLinx and Kenexa was

centered in Atlanta, as evidenced by Kenexa's on-site presence and the periodic on-site visits by

Kenexa's Program Director John Holvay.  Even if Kenexa were able to persuade the Court that

the location of the injury is not Georgia, which BlueLinx disputes, Kenexa's victory would be

short-lived as the remaining factors so overwhelmingly favor application of Georgia law to the

tort claims in the Amended Complaint.

13

Further, even where, as here, a contract contains a Delaware "governing law" provision, the law applicable to tort claims involving parties to a related contract dispute will not be Delaware law if, as here, "(1) Delaware lacks a substantial relationship to the parties or the transaction or (2) the application of Delaware law would offend the public policy of the state whose law would apply…." *Millet v. Truelink, Inc.*, C.A. No. 05-599-SLR, 2006 WL 2583100 (D. Del. Sept. 7, 2006) (Ex. N hereto).

Here again the analysis is simple; Delaware lacks any, let alone a substantial, relationship to the parties or events at issue in this litigation. Georgia law, therefore, will apply to Kenexa's newly-added tort claims.

### b. The Northern District of Georgia has a Strong Interest in Resolving this Dispute

Courts have observed that justice is served more efficiently when an action is litigated in the forum that more clearly encompasses the locus of operative facts and consequently has a particular local interest in deciding the controversy at home. *E.g.*, *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 640 (3d Cir. 1989) (considering the "locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to plaintiff's chosen forum" as part of the public interest analysis); *Saint-Gobain Calmar, Inc. v. Nat'l Prods. Corp.*, 230 F. Supp. 2d, 655, 662 (E.D. Pa. 2002) (finding the district with the strongest interest in resolving the dispute was "where Defendant maintains its sole place of business" and finding "no reason why this Court or jurors from this community should bear the burden of overseeing the resolution of this potentially lengthy and complex patent dispute between corporations from [elsewhere]"); *see also Spiegelberg v. Collegiate Licensing Co.*, 402 F. Supp. 2d 786, 792 (S.D. Tex. 2005) (finding this factor strongly favored transfer because of the transferee district's

14

"interest in adjudicating the claims of its residents" and "because the case arises out of events occurring [therein]").

Here, Georgia is the forum with the strongest local interest in deciding this controversy. BlueLinx is incorporated there. BlueLinx has headquarters there. The Master Service Agreement was negotiated, in part, there. The breaches of contract alleged in the Amended Complaint and/or Counterclaim occurred there. The tortious acts alleged in the Amended Complaint purportedly occurred there. Kenexa maintained on-site employees there. Party and non-party witnesses are located there. Related litigation between Kenexa and the former Kenexa employees implicated in Kenexa's Amended Complaint is pending there. Furthermore, Georgia law will apply to the Kenexa's pending tort claims.

While Kenexa may argue that this Court has a substantial interest in this litigation because Delaware law will apply to the pending contract claim, Kenexa would be well-advised to reconsider and review the transcript from the April 19, 007 Scheduling Conference with the Court. D.I. 13, at p. 11. There, this Court, recognizing that its jurisdiction is premised on the diversity of the parties, rather than on the determination of a federal question, stated, "It seems to me that a Georgia district judge is equally able to interpret Delaware law as this Court." *Id.*

### c.    Judicial Efficiencies Favor Transfer[3]

According to the Court Statistics published by the Federal Judiciary on its official web site at www.uscourts.gov (Ex. O hereto), the median time from filing to disposition by any

---

[3] In the event Kenexa argues that BlueLinx' decision to file a counterclaim to the Amended Complaint weighs against transfer, it is worth noting that courts tend to view transfer more favorably from an interest of justice/efficiency standpoint when, as here, a defendant files a counterclaim in the original court rather than filing a related action in its preferred forum. *See, e.g.*, *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 563 (S.D.N.Y. 2000) (filing a counterclaim shows "real[] . . . concern[] with judicial efficiency'" in contrast to filing a new action elsewhere, which "'seems tactical'"; denying transfer).

means and from filing to disposition by trial in the Northern District of Georgia are on average

faster than in the District of Delaware:

| Court Statistics | 12-Month Period Ending March 31, 2006 | |
| --- | --- | --- |
| | D. Del. | N.D. Ga. |
| Median time (months) Filing to Disposition - Civil | 15.4 | 9.1 |
| Median time (months) from Filing to Trial - Civil | 29.0 | 24.8 |

Therefore, if considered, the speed of litigation statistics further favor transfer of this case to the

Northern District of Georgia [Atlanta Division].

## V.    CONCLUSION

Because the balance of convenience and the interests of justice lay strongly in favor of

transfer to the Northern District of Georgia [Atlanta Division], defendant BlueLinx respectfully

requests this Court to transfer this action to the U.S. District Court for the Northern District of

Georgia [Atlanta Division].


POTTER ANDERSON & CORROON LLP


By:    /s/ Philip A. Rovner
        Donald J. Wolfe, Jr. (#285)
        Philip A. Rovner (#3215)
        David E. Moore (#3983)
        Hercules Plaza
        P. O. Box 951
        Wilmington, Delaware 19899
        (302) 984-6000
        dwolfe@potteranderson.com
        provner@potteranderson.com
        dmoore@potteranderson.com

Dated:  May 21, 2007
795933 / 31137    *Attorneys for Defendant*

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 21, 2007, the attached document

was electronically mailed and hand delivered to the following persons and was

electronically filed with the Clerk of the Court using CM/ECF which will send

notification to the registered attorney(s) of record that the document has been filed and is

available for viewing and downloading:

> Robert Karl Hill, Esq.
> Seitz, Van Ogtrop & Green, P.A.
> 222 Delaware Avenue, Suite 1500
> P.O. Box 68
> Wilmington, DE 19899
> khill@svglaw.com

> By:  /s/ Philip A. Rovner
> Donald J. Wolfe, Jr.
> Philip A. Rovner
> David E. Moore
> Hercules Plaza, 6th Floor
> 1313 N. Market Street
> Wilmington, Delaware 19899-0951
> (302) 984-6000
> dwolfe@potteranderson.com
> provner@potteranderson.com
> dmoore@potteranderson.com

778742

# EXHIBIT A

## MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT ("Agreement") is made as of the 30th day of May , 2006 (the "Effective Date"), by and between BLUELINX CORPORATION, a Georgia corporation, having its principal place of business at 4100 Wildwood Parkway, Atlanta, Georgia 30339 ("BlueLinx"), and KENEXA TECHNOLOGY, INC., a Pennsylvania corporation, having its principal place of business at 650 East Swedesford Road, Second Floor, Wayne, Pennsylvania 19087 ("Kenexa"). The terms and conditions under which Kenexa will provide services and products for BlueLinx are set forth below.

**1. SERVICES/PRODUCTS.** This is a master agreement to which signed exhibits ("Exhibit(s)") will be attached by the parties from time to time. Kenexa shall provide, on a non-exclusive basis, the services ("Services") or products ("Products") as set forth in the Statement(s) of Work ("Statement(s)"), attached hereto from time to time as Exhibit(s) A. Each Statement, together with the terms of this Agreement, is a separate contract, which will be effective as of the date it is signed by authorized representatives of both Kenexa and BlueLinx. If any term of an Exhibit conflicts with the terms of this Agreement, the terms of the Exhibit will control. Kenexa will commence Services or delivery of Products upon receipt of the initial payment set forth in the applicable Exhibit B Payment Schedule attached hereto.

**2. PAYMENT.**

2.1 Rates. Kenexa's performance obligations and BlueLinx' rights to receive performance under this Agreement are conditioned upon BlueLinx' payment of the charges set forth in this Agreement and the Exhibit(s). Kenexa's rates for the Products and Services are itemized in Exhibit(s) B attached hereto. BlueLinx shall pay Kenexa for Products and Services in accordance with the Exhibit(s) B and this Agreement.

2.2 Expenses. BlueLinx shall reimburse Kenexa for expenses pre-approved in writing (including travel and living expenses) incurred in the performance of Services and delivery of Products hereunder.

2.3 Payment. BlueLinx shall pay all undisputed invoices submitted to BlueLinx to Kenexa at P.O. Box 827674, Philadelphia, Pennsylvania 19182-7674 within thirty (30) days after receipt thereof, unless a different date is specified in the Exhibit. If BlueLinx reasonably and in good faith disputes all or any portion of any invoice, BlueLinx shall notify Kenexa in writing of its objection within ten (10) days from the date of BlueLinx' receipt of the invoice, provide a detailed description of the reasons for the objection, and pay the portion of the invoice which is not in dispute. Any undisputed amounts not paid within the period set forth above shall bear interest at the rate of one (1%) percent per month. If BlueLinx fails to pay invoices within the period set forth above, then (a) BlueLinx shall be liable for any collection costs including reasonable attorney fees incurred by Kenexa; and (b) Kenexa shall be entitled to pursue its available remedies and protect its security interests granted herein.

2.4 Taxes. BlueLinx shall be responsible and shall reimburse Kenexa for all sales, use, excise and other similar types of taxes (excluding tax on income) on the Services or Products.

2.5 Purchase Order. If BlueLinx requires a purchase order for payment of invoices submitted hereunder, a copy of its form has been attached to this Agreement as Attachment "5". If the purchase order must be fully funded, Company certifies that it has been fully funded by the time of issuance. This Agreement supersedes any terms or conditions of the purchase order.

**3. PERSONNEL.**

3.1 Personnel Assigned. All employees engaged to perform Services shall be employees or agents of Kenexa and shall be fully qualified to perform the tasks assigned to them. Whenever present on BlueLinx' premises, Kenexa's personnel and representatives will comply with all BlueLinx policies and procedures governing on-site work, including BlueLinx' safety and security, and data protection policies and procedures provided to Kenexa, and all reasonable instructions and directions issued by BlueLinx.

3.2 Equal Opportunity Employer. Kenexa represents that it is an Equal Opportunity Employer and that it will, in the performance of this Agreement, comply with all applicable laws and regulations, including those prohibiting employment discrimination.

3.3 Responsibility. Each party shall remain responsible and liable for its employees at all times, regardless of whether the employees are on the other party's premises at the time. Notwithstanding the foregoing, Kenexa shall be responsible and liable for the actions or inactions of its agents or subcontractors.

**4. WARRANTIES.**

4.1 Services Warranty. All Services provided hereunder shall be performed in a professional and workmanlike manner, shall be provided by Kenexa personnel having the appropriate skill level, experience and training; and shall meet any plans and specifications set forth in this Agreement or any exhibit hereto.

4.2 Product Warranty. All Kenexa Products provided by Kenexa hereunder shall, if not altered by BlueLinx or a third party, when used with properly-functioning equipment, perform substantially in accordance with their Documentation for a period of

ninety (90) days from delivery. Kenexa shall promptly correct any Product errors or malfunctions at no charge to BlueLinx during the warranty term.

4.3    **No Violation.** Kenexa represents and warrants that Kenexa's performance of the Services does not violate any contracts with third parties.

4.4    **Disclaimer.** The warranties set forth in this Agreement are made to and for the benefit of BlueLinx exclusively. THE WARRANTIES SPECIFICALLY SET FORTH IN THIS AGREEMENT ARE IN LIEU OF ALL OTHERS, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY EXCLUDED.

5.    **INTELLECTUAL PROPERTY INFRINGEMENT.** At Kenexa's expense, Kenexa will indemnify and defend BlueLinx against any claim that Kenexa's Services or Products infringe upon the rights of third parties, including any United States trademark, copyright, or patent right. To qualify for such defense and payment, BlueLinx must (a) give Kenexa prompt written notice of such claim; and (b) allow Kenexa to control, and fully cooperate with Kenexa in, the defense and all related negotiations provided that BlueLinx is not subject to monetary charges. Kenexa's obligations under this Section are conditional upon BlueLinx' agreement that, if a Product or Service is likely to become the subject of such a claim, BlueLinx shall permit Kenexa, at Kenexa's option and expense, either to procure the right for BlueLinx to continue to use the Product or Service or to replace or modify it so that it becomes non-infringing and retains substantially comparable function or return and receive a refund of any prepaid fees. Kenexa shall have no obligation with respect to any claim based on (i) BlueLinx' use of the Products or Services in violation of this Agreement; or (ii) modifications of or addition of material to the Products or Services by or at the request of BlueLinx. This Section sets forth Kenexa's entire obligation to BlueLinx regarding intellectual property infringement.

6.    **CONFIDENTIAL INFORMATION.** Both parties shall maintain as confidential and shall not disclose, copy, nor use for purposes other than the performance of this Agreement or as required by law, any information which relates to the other party's business affairs, trade secrets, technology, research and development, pricing, employee information or the terms of this Agreement ("Confidential Information") and each agrees to protect the Confidential Information with the same degree of care that it exercises to protect its own confidential information but in no event with less than reasonable care. Confidential Information shall not include information, (a) previously known by a party without restriction, (b) was acquired by a party from a third party which was not, under an obligation to not to disclose such information, or (c) which is or becomes publicly available through no breach by a party of this Agreement.. Upon expiration or termination of this Agreement or upon the request of the other party, each party agrees to return (or destroy as evidenced

Confidential
Kenexa® Master Services Agreement

in writing by an officer of receiving party's company) the other's Confidential Information. Breach of confidentiality may cause irreparable damage and, therefore, the injured party shall have the right to equitable and injunctive relief and to recover damages (including attorney's fees and costs) incurred in connection with any violation hereof. The provisions of this Section shall survive the termination or expiration of this Agreement.

7.    **LIMITATION OF LIABILITY.** Kenexa will indemnify, defend and hold harmless BlueLinx from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs, and expenses, including reasonable attorney's fees and court costs, arising out of (i) any negligent act or omission or willful misconduct of Kenexa its employees, contractors or agents; (ii) any breach of a warranty or representation in this Agreement by Kenexa, its employees, contractors or agents; or (iii) any personal injury (including death) or damage to property resulting from the negligent acts or omissions of Kenexa, its employees, contractors or agents up to the amount of fees paid or payable to Kenexa under this Agreement during the then current calendar year.

BlueLinx will indemnify, defend and hold harmless Kenexa from any and all losses, costs, expenses, claims, damages, liabilities, suits, actions, recoveries, or judgments ("Claims") caused by acts or omissions (including, without limitation, unlawful employment practices) of BlueLinx, its agents or employees up to the amount of fees paid or payable to Kenexa under this Agreement during the then current calendar year. IN NO EVENT SHALL EITHER OF THE PARTIES HERETO BE LIABLE TO THE OTHER FOR THE PAYMENT OF ANY LOSS OF USE, LOSS OF PROFITS, BUSINESS INTERRUPTION, COST OF COVER OR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES. BlueLinx' exclusive remedy for any cause whatsoever, regardless of the form of action, whether in contract or in tort, and Kenexa's entire liability to BlueLinx is set forth in this Section. In all events, BlueLinx shall remain fully responsible for the operation of its business and its hiring decisions. Kenexa shall not be responsible to third parties (including BlueLinx' employees or applicants) for claims, damages, liability or expenses arising out of use of the Products or Services. BlueLinx agrees to indemnify, defend and hold Kenexa harmless from all such claims, damages, liability and expenses. The foregoing limitation of liability shall not apply to claims brought under Section 5 or 6 hereof or for gross negligence or willful misconduct. Kenexa's obligations under this section will not be in effect if BlueLinx is in breach of its payment obligations under this Agreement or a Statement.

8.    **OWNERSHIP OF INTELLECTUAL PROPERTY.** Except as expressly set forth in any Statements attached hereto, it is understood and agreed that to the extent that Kenexa shall have created, developed or used software, data, programs, materials, content

2

05/15/06

or other intellectual property in connection with providing the Services and Products to BlueLinx, then Kenexa shall have and retain exclusive ownership and other rights therein, including, without limitation possession. Notwithstanding the foregoing, Kenexa shall have no ownership rights in any BlueLinx proprietary software, data, programs, materials or other intellectual property.

**9. SECURITY INTEREST.** To secure the payment and performance of BlueLinx' obligations under this Agreement, BlueLinx grants to Kenexa a security interest in, (a) any software, data, programs, materials, content or other intellectual property that is owned or licensed by BlueLinx and contained or hosted by Kenexa on its servers or on third party servers utilized by Kenexa, and (b) any software, data, programs, materials, content or other intellectual property created or developed by Kenexa for BlueLinx (collectively, the "Collateral"). Kenexa shall be authorized by BlueLinx, without further action, to file UCC-1 Financing Statements against all or any portion of the Collateral, provided that Kenexa shall provide notice to BlueLinx within three (3) business days after it has filed any such UCC-1 Financing Statement.

**10. FORCE MAJEURE.** Neither Kenexa nor BlueLinx shall be responsible for any delay or failure of performance resulting from causes beyond its control and without its fault or negligence, including, without limitation, acts of God, nature, riots, acts of war, fire, earthquake, interruption in utilities or other disasters, and the time for performance hereunder shall be extended for the period of the delay.

**11. INSURANCE.** Kenexa shall maintain, throughout the performance of its obligations under this Agreement, a policy of Worker's Compensation insurance with coverage limits as may be required by the law of the states in which Services are to be performed. Kenexa further agrees to maintain general liability insurance, providing coverage against contractual liability and liability for bodily injury, death, and property damage in the amount of One Million ($1,000,000) Dollars per occurrence, which may arise out of or be based upon any act or omission by Kenexa or any employee, agent, or subcontractor under this Agreement. In addition, Kenexa will maintain professional liability insurance in the amount of Five Million ($5,000,000) Dollars. Upon written request, Kenexa shall provide certificate(s) from the insurer indicating the amount of insurance coverage, the nature of such coverage, and expiration date of the policy.

**12. TERM.** This Agreement shall commence on the Effective Date and shall terminate as provided in Section 13 hereof. Each Exhibit A Statement of Work shall specify a commencement and termination date for that Statement.

**13. DEFAULT; TERMINATION; REMEDIES.**

**13.1    Termination By BlueLinx.** BlueLinx may after thirty (30) days' written notice to Kenexa of a material default hereunder (an "Event of Default") as set forth below and Kenexa's failure to remedy such Event of Default terminate this Agreement or any Exhibit hereunder. An Event of Default by Kenexa shall have occurred if:

(a) Kenexa fails to perform any of its material obligations hereunder or under the Exhibits;

(b) Kenexa commences a voluntary case or a petition is filed against Kenexa (i) seeking reorganization, arrangement, adjustment or composition of or in respect of Kenexa under the Federal Bankruptcy Code as now or hereafter constituted, or under any other applicable Federal or state bankruptcy, insolvency, reorganization or other similar law, (ii) seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of Kenexa for any part of its property, or (iii) seeking the winding up or liquidation of its affairs; or

(c) Kenexa makes any assignment for the benefit of creditors.

**13.2    Termination By Kenexa.** Kenexa may, following thirty (30) days' written notice to BlueLinx of a material default hereunder ("Event of Default") as set forth below and BlueLinx' failure to remedy same, terminate this Agreement, or any Exhibit hereunder. An Event of Default by BlueLinx shall have occurred if:

(a) BlueLinx fails to perform any of its material obligations hereunder or under the Exhibits;

(b) BlueLinx commences a voluntary case or a petition is filed against BlueLinx (i) seeking reorganization, arrangement, adjustment or composition of or in respect of BlueLinx under the Federal Bankruptcy Code as now or hereafter constituted, or under any other applicable Federal or state bankruptcy, insolvency, reorganization or other similar law, (ii) seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of BlueLinx for any part of its property, or (iii) seeking the winding up or liquidation of its affairs; or

(c) BlueLinx makes any assignment for the benefit of creditors.

**13.3    Rights Upon Non-Payment by BlueLinx.** In the event that BlueLinx fails to pay any past due invoices (which have not been disputed in good faith) within five (5) business days after written notice to BlueLinx, then Kenexa shall be entitled to (i) limit or suspend BlueLinx' access to all personal property or Collateral then in Kenexa's possession or control, whether or not owned by BlueLinx, and (ii) reduce or suspend the Services and Products being provided to BlueLinx hereunder or in any Statement.

**13.4    By Mutual Agreement.** The parties may mutually agree in writing to terminate this Agreement at any time.

**13.5    Remedies.** Upon the occurrence of an uncured Event of Default hereunder, except as otherwise may be limited by this Agreement, either party shall be entitled to exercise any and all remedies available at law or in equity or otherwise.



**14.  NON-HIRING.** Kenexa and BlueLinx agree not to directly solicit the other party's employees (or individuals who were employees of the other party within the preceding thirty (30) days) with whom it came into contact as a result of this Agreement without the express written consent of the other party for a period of one (1) year from the last date of delivery of Services or Product under this Agreement.

**15.  PUBLICITY.** Neither party shall use the other's name, trade name, trademarks or service marks in any publication, advertisement or promotional material without either party's prior written consent. Notwithstanding the foregoing, upon BlueLinx' prior written consent, Kenexa may issue one (1) press release announcing this Agreement. The press release shall be provided to BlueLinx for review prior to any release. Any use of BlueLinx' name, trade name, trademarks or service marks shall be in BlueLinx sole determination.

**16.  GENERAL.**

16.1    Governing    Law;    Consent    to Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the Delaware, without giving effect to conflicts of law principles.   The parties hereto consent to the jurisdiction and venue of the courts of Delaware. The prevailing party in any lawsuit brought relating to this Agreement and all related Statements of Work shall be awarded reasonable attorneys' fees and costs.

16.2    Notice.   All written notices required under this Agreement shall be sent by registered or certified mail, return receipt requested, postage prepaid or by overnight courier, to the addresses listed in this Agreement or to such other address as a party shall have designated in writing.

16.3    Relationship    of    Parties.    The relationship of the parties shall at all times be one of independent contractor, and neither party shall be nor represent itself to be an employee, agent, representative, partner or joint venture partner of the other, nor shall either party have the right or authority to assume or create any obligation on behalf of or in the name of the other or to otherwise act on behalf of the other.

16.4    Survival of Provisions. The terms and provisions of this Agreement that, by their sense and context, are intended to survive the completion or termination of this Agreement shall so survive the completion of performance and termination of this Agreement, including, without limitation, the indemnification, confidentiality and non-hiring obligations and the obligation to make any and all payments due hereunder.

16.5    Assignment. Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's prior written consent.

16.6    Entire Agreement; Amendments; and Waivers.   This Agreement, including the Exhibits hereto, constitutes the entire understanding and agreement between the parties relative to the subject matter hereof.  Any amendment to this Agreement must be in writing and signed by an authorized representative of each party. The failure of any party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of the provision, nor in any way shall it affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

16.7    Partial Invalidity.   In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein, unless the deletion of the provision or provisions would result in such a material change as to cause completion of the transactions contemplated herein to be unreasonable.

16.8    Execution    in    Counterparts/ Facsimiles. This Agreement may be executed by facsimile and/or the parties hereto may sign the same instrument, or each party hereto may sign a separate counterpart or counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

16.9    Section    Headings.    Section    and subsection headings in this Agreement are for convenience of reference only, do not constitute a part of this Agreement, and shall not affect its interpretation.

16.10    Exhibits. There are attached to this Agreement at the time of execution hereof the following Exhibits which have been agreed to by the parties:

Exhibit A-1 Employment Process Outsourcing Statement of Work
Exhibit B-1 Employment Process Outsourcing Payment Schedule
Exhibit C-1 Kenexa Recruiter® Enterprise Applicant Tracking System Statement of Work and Service Level Statement
Attachment #5 BlueLinx Purchase Order
Attachment #6 Kenexa letter dated April 28, 2006.

IN WITNESS WHEREOF, intending to be legally bound, the parties have caused this Agreement to be executed by their authorized representatives as of the day and year first above written.

KENEXA TECHNOLOGY, INC.

By: _____
    Kenexa Authorized Representative

Printed Name:   Elliot H. Clark

Title:          Chief Operating Officer

_____
Date            5/30/06

BLUELINX CORPORATION

By: _____
    BlueLinx Authorized Representative

Dean Adelman
Printed Name

V.P. - Human Resources
Title

5.26.06
Date



**EXHIBIT A-1**
**TO MASTER SERVICES AGREEMENT**
**EMPLOYMENT PROCESS OUTSOURCING**
**STATEMENT OF WORK**

This Exhibit A-1 to Master Services Agreement ("Agreement") between BLUELINX CORPORATION ("BlueLinx") and KENEXA TECHNOLOGY, INC. ("Kenexa"), dated _May 30,_____, 2006, sets forth the employment process outsourcing services to be performed by Kenexa ("Services"), and the timing, cost and payment schedule with respect to such Services.

Kenexa has designed a program that will allow BlueLinx to guarantee the successful hiring of individuals while achieving cost control and establishing a reporting system that can be used as a roadmap for future hiring. BlueLinx will be able to assess the effectiveness of each stage of the process while measuring the return on investment for every step in the hiring lifecycle. These steps have been identified as: Position Requisition, Market Analysis and Program Plan Kick-Off; Integrated Sourcing Solutions; Program Management, Measurement and Reporting; Kenexa Program Director; Kenexa Recruiter® System; Screening and Selection; Interview, Offer, Hire and On-boarding; and Program Reporting, Validation and Review.

1.    <u>Scope of Services.</u>

A. **Position Requisition, Market Analysis and Program Plan Kick-Off:**

To build a foundation for future hiring Kenexa will design and implement standard operating procedures for BlueLinx to utilize in implementing and measuring the hiring effort. Any Kenexa proposed operating procedures to be implemented will be done so upon BlueLinx sole determination.   One of the key components of managing the process effectively will be the collection and analysis of data. To assist in this effort BlueLinx will have access to Kenexa's applicant tracking database system, the Kenexa Recruiter® System, as the platform on which to run the Program.   This will offer full scale applicant tracking and talent management capabilities for use by internal HR and hiring managers as well as a private label Web based career center for BlueLinx candidates.

*Step 1 –* Requisition process
    The hiring plan will commence when a requisition is opened in the Kenexa Recruiter® System by a designated BlueLinx hiring manager. This requisition will be filtered to the appropriate staffing resource through access in Kenexa Recruiter®.

*Step 2 –* Manager Meetings and Market Evaluations
    Kenexa will contact the appropriate hiring manager to confirm the requisition, evaluate the market, and discuss Program milestones, roles and responsibilities, timeline, *etc.*

*Step 3 –* Initiate Sourcing Process.

B.    **Integrated Sourcing Solutions:**

Kenexa's Integrated Sourcing Solutions will allow BlueLinx to build a multi-channel sourcing program to address the challenges unique to diverse geographies and hiring managers. Kenexa will build a scaleable sourcing approach that is designed to deliver a targeted message to BlueLinx's audience and tied to BlueLinx's hiring timeline and training schedule. Due to Kenexa's diverse methods of candidate generation including advertising, internet sourcing, employee referrals and direct recruiting, Kenexa will significantly lower costs while guaranteeing results. Kenexa ensures this by employing more cost-

effective methods such as advertising on the front end while reserving the ability to guarantee interviews with a direct sourcing team tied to an interview time line.

*Advertising:*

Combining traditional print, direct mail and community advertising with internet, website and Kenexa's own proprietary email advertising technology; Kenexa reaches its intended demographic in a shortened time frame. Kenexa's use of technology gives Kenexa the ability to incorporate the look and feel of its clients and to transmit the data directly to its applicant tracking technology. Kenexa will manage the advertising vendor(s) and place job postings, as needed.

*Direct Recruiting:*

Kenexa will deploy a team of experienced research and recruiting professionals to identify and recruit directly from BlueLinx's competitors. This scaleable solution will enable BlueLinx to attract a pool of candidates beyond those that respond to traditional sourcing and advertising efforts.

*Employee Referral Program:*

Kenexa will integrate the employee referrals directly into the applicant process that will give Kenexa the ability to use the same basis of screening and assessment of external applicants while reducing BlueLinx's administrative time and expense.

*Community and Industry Based Sourcing:*

Kenexa will work with BlueLinx to identify alternative sources of candidates such as universities and colleges, vocational schools, military personnel, industry groups and career events that include candidates with targeted abilities. Kenexa will then develop a methodology to attract and enter these candidates into the hiring process.

Using a multiple sourcing methodology will allow Kenexa and BlueLinx to identify the most effective candidate sources and apply our resources appropriately, while guaranteeing the desired end result. Kenexa will also proactively source on an ongoing basis to create "Talent Pools" in key job families to have candidates who are available to interview on an as needed basis greatly reducing the time to fill.

**C. Program Management, Measurement and Reporting:**

Kenexa believes that clear channels of communication and reporting will form the foundation of any engagement. The success of this effort will rest upon accuracy of information, consistency of measurement and the ability to forecast challenges and address them proactively. To address these issues, Kenexa will take a balanced approach between the use of people and technology. By using this methodology, Kenexa will be able to accurately report utilization and effectiveness of resources, usage and validity of tools and technology and the level of responsiveness and hiring expertise in the information technology vertical.

**D. Kenexa Program Director:**

Kenexa will assign a senior Program manager who will be accountable to Kenexa and BlueLinx to maintain a current understanding of the hiring effort and be able to address both tactical and strategic issues. This individual will be the primary interface with the BlueLinx management and human resource teams and will guide the delivery resources of Kenexa. The person assigned by Kenexa will have experience in the information technology vertical and will have experience managing an integrated solution to successful completion. Kenexa will ensure that such Program Manager will be dedicated to the BlueLinx initiative and Kenexa will not add employees to, or remove onsite employees from,

performing the Services without the express written consent of BlueLinx. At BlueLinx' reasonable request, Kenexa will promptly replace personnel providing Services under this Exhibit.

### E. Kenexa Recruiter® System:

Kenexa will utilize the Kenexa Recruiter System to provide the process automation and reporting for this Program. The Kenexa Recruiter® System is described in Exhibit C-2. The Applicant Tracking System Standard Operating Procedure is attached hereto as Attachment # 1.

### F. Screening and Selection:

A critical component of this hiring plan will be the ability to provide a complete candidate evaluation balanced between experience, skills and behaviors. Kenexa will work with BlueLinx to develop candidate screening questionnaires to be used for high volume job families as well as custom questionnaires on key assignments. Kenexa will present this "in depth" technical questionnaire and phone interview profile with all candidate resumes.

Kenexa will license and make available to the Kenexa Program Team the Kenexa Prove It!® skill tests (includes 800 standard tests) and four (4) to six (6) Kenexa Selector™ behavioral assessments ("Selectors") to be used for BlueLinx Sales, Material Handlers, Distribution Managers/Supervisors and Drivers positions and others to be determined only for the term hereof.
- The Selectors will be in English. If BlueLinx chooses to have the Selectors translated into other languages, Kenexa will charge BlueLinx the direct translation fees.
- Facilities and/or locations where the Selectors may be used: all BlueLinx U.S. locations. BlueLinx agrees that Kenexa will administer the Selectors to all qualified applicants for the positions (internal and external) and to follow Kenexa's recommended cutoff scores.
- The development of the customized Selectors will be completed under the following guidelines and methodologies:
    - 1.a. Stakeholder interviews (up to 30).
    - 1.b. Four (4) to six (6) Focus Groups – one (1) with outstanding Sales personnel, one (1) with outstanding Material Handlers, one (1) with outstanding Distribution Managers/Supervisors and one (1) with outstanding Drivers and others to be determined.
    - 1.c. Job Analysis Questionnaire, completed by the stakeholders and Focus Group participants (up to 75).
    - 1.d. Concurrent study with 300 incumbents in each position.
    - 1.e Executive Summary of results
    - 1.f     Utility Study of Assessment ROI as well as Fairness study beginning year 2 of the term.
1) Initial set up, including:
    Web-based access to the Selectors for job candidates for the four (4) to six (6) positions and to the Prove It! tests, 24 hours a day, 7 days a week.
2) Candidates will be able to complete and submit the Selectors via the Web and have their results scored on the Web. Completed Selectors will be automatically scored.
3) Results of the Selectors will be available to the Kenexa Team.

Should an EEOC, state or local human relations agency or OFCCP charge or lawsuit be filed challenging the fairness of the Selector or the Selector process, Kenexa will provide an affidavit of support and testimony regarding the development of the Selector, the Selector process and methodologies used. Notwithstanding the foregoing, this support shall be in addition to Kenexa's indemnification obligations under the Agreement.

The parties agree that all information, drawings, documents, designs, models, patents, inventions, copyrightable material, and other tangible and intangible materials authored or prepared, in whole or in part, by Kenexa in the course of providing the Services or Products, including without limitation computer

programs, computer systems, customizations, specifications, the Selectors, Prove It! tests, website and documentation, are the sole and exclusive property of Kenexa and shall not be considered works made for hire.

### G. Interview, Offer, Hire and On-Boarding:

Kenexa has designed an integrated process that will allow BlueLinx to efficiently move qualified applicants through its interview process while reducing BlueLinx's burden of administrative, management and human resources.

### Notification and Scheduling:

All qualifying candidates will be contacted by a Kenexa representative and scheduled for a live interview. BlueLinx managers will be given access to the applicant tracking system so that they can remotely view their interview calendar and all associated candidate data including test scores, behavioral assessments and resumes. The managers will also receive an interview packet containing all relevant candidate data prior to the interview.

### Candidate Packets:

Kenexa will mail qualified applicants an interview packet that will include BlueLinx brochures, position descriptions, interview time, location and directions.

### Live Interview:

BlueLinx managers will interview candidates at designated locations in each geographical location. Kenexa will work with each manager to identify and coordinate appropriate interview sites in each geographical location. After each candidate interview, Kenexa will contact managers and candidates for appropriate feedback and track the data in the applicant tracking system.

### Background Checks:

Kenexa will notify and schedule appropriate candidates for a background check in conjunction with the vendor designated by BlueLinx.

### Offer:

Kenexa will notify BlueLinx Human Resources when a candidate has successfully completed the interview and background checking process so that BlueLinx may extend an offer.

### Hire:

This process has been designed to quickly move candidates through the interview process and accelerate BlueLinx's ability to deploy the new employee into the field. This is also a component of the process in which the applicant tracking system is highly visible. It will allow both BlueLinx and Kenexa to easily transmit data such as scheduling and candidate information with minimum manpower, thereby reducing costs and human error.

### H. Program Reporting, Validation and Review:

Kenexa will comprehensively analyze each step of the hiring plan and assess the cost and quality effectiveness of the process. This will build a platform that Kenexa can use as a model for the anticipated growth of the organization. The results will be broken down to assess each phase of the process and the results of the solutions used in each step.

Position Requisition, Posting and Approval
- Was the process seamless?
- Were the expectations and timelines realistic?
- Did this process occur in a timely manner?

Sourcing Analysis
- Time and cost effectiveness of sourcing mechanisms
- Market penetration

Cost Analysis
- Accurate reporting of cost for each step and entire process
- Cost benefit analysis on modular and aggregate basis
- True cost per hire

This summary will be used as a planning mechanism for BlueLinx as the company looks to implement a long-term staffing strategy. Kenexa feels confident that this analysis will allow Kenexa to effectively partner with BlueLinx for an ongoing hiring solution. In order to facilitate the implementation of process and quality improvements demonstrated by this ongoing review, Kenexa recommends the formation of a "Steering Committee". Kenexa and BlueLinx will both designate key stakeholders to attend this monthly review meeting.

2.    **BlueLinx Responsibilities.**

BlueLinx agrees to be responsible for the following:
➤ Attending start-up meetings and identifying Kenexa specific Position requirements, number of open positions, and priority in filling of specific open positions
➤ Making hiring decisions after providing feedback and results to Kenexa, and formulating and extending job offers within the agreed upon timeframe in Attachment #2
➤ Providing executive support for the Program
➤ Attending quarterly steering committee meetings and monthly management committee meetings
➤ Making management available to be trained on the process
➤ Providing all necessary information including but not limited to hiring manager contact information, position descriptions, compensation and benefit information, BlueLinx policy information, and information regarding retention and turnover
➤ Providing sufficient BlueLinx brochures and applications for the applicant interview packets
➤ Providing sufficient materials, including BlueLinx letterhead, for generating offer letters
➤ Coordinating national advertising efforts with recruitment campaign
➤ Paying compensation for the positions that is competitive in the market, and
➤ Providing adequate office space, if needed, in BlueLinx headquarters and providing laptop computers.

Additional detail on the parties' responsibilities is included in the Process Map and Service Level Agreement attached to this Exhibit as Attachments #2 and 3. Services not included above are outside of the scope of this Statement of Work and will be performed at additional cost. In addition, BlueLinx's deviation from the Process Map and Client Responsibilities can impact the Program cost and Kenexa's service level commitments.

BlueLinx will deliver all job titles, complete position descriptions and salary ranges to Kenexa for the 125 assigned positions within thirty (30) days of Agreement execution. Positions designated as assigned to Kenexa are exclusive to Kenexa and any candidate sourced indirectly or from another channel will be credited to Kenexa for the purpose of determining the number of assigned positions that are filled. Failure to make this delivery deadline could impact the delivery schedule, fees and resources availability.

CONFIDENTIAL                                      5
Exhibits to Master Services Agreement                                    May 15, 2006

3. **Estimated Resource Levels**

Kenexa's estimated resource levels for the Program shall be as follows:



Job Descriptions for the positions and an organization chart are attached as Attachments #3 and 4

Actual resources will vary based upon BlueLinx's needs. On-site resources assigned to perform special Programs will be subject to additional fees and costs.

4. **Term.**

After execution of the Agreement by the parties, BlueLinx and Kenexa will schedule Program Start-up Meetings. The Scope and Agenda for such meetings will be distributed prior to the scheduled date and time. This Statement of Work will commence on the date hereof and continue for sixty (60) months ("term") after the Program go live date unless sooner terminated as provided in the Agreement, with hiring volume forecast proactively on a quarterly basis.

5. **Dispute Resolution.**

If in the opinion of either party, the other party has failed to resolve a reported problem or to comply with the requirements of the Agreement, or to perform its obligations in a satisfactory manner, then the problem resolution procedure identified below shall be invoked prior to either party availing itself of any legal or equitable remedies (except for injunctive relief) against the other party. The following table lists the levels of escalation, the duration within a level, and the associated parties at each level. In the event that a problem has not been resolved, or a corrective plan of action has not been mutually agreed upon within the specified duration, either party may choose to escalate the problem to the next level.

| Escalation Level | Calendar Days Duration | BlueLinx | Kenexa |
|---|---|---|---|
| 1 | 15 | Program Manager | Program Manager |
| 2 | 30 | [Vice President] | Chief Operating Officer |

If the problem has not been resolved, or a corrective plan of action has not been mutually agreed upon within forty-five (45) days of the initiation of the dispute resolution process, the parties agree to submit the dispute for a non-binding resolution to a mediator jointly selected by the parties or their counsel.

CONFIDENTIAL
Exhibits to Master Services Agreement

6

May 15, 2006

**Attachment #1**

**Applicant Tracking System Client Standard Operating Procedure**

1. All data will be considered Confidential Information.

2. All Kenexa employees already sign a confidentiality agreement as a condition of employment. This agreement legally protects the client. Kenexa will not discontinue this practice without notifying the client of such change.

3. All data housed in the client database will only be used for the benefit of the client.

4. Any individual assigned to client with system access will be fully dedicated to the client.

5. Upon termination of the Exhibit between Kenexa and the client, all data files housed on behalf of the client will be destroyed or turned over to the client at client's discretion.

6. In the event a Kenexa employee with password access to the system terminates from employment with Kenexa, Kenexa will remove access for terminated Kenexa employee within one (1) business day.

7. No Kenexa employees will use the system to represent themselves as client employees unless specifically agreed upon in the statement of work and authorized by the client to do so. For example, the client may elect to have the On-Site resources use the system for this purpose.

**Attachment #2**
**Process Map**

**[To Be Developed]**

**Attachment #3**

**Service Level Agreement**
**[To be developed by the parties]**

**Attachment #4**

**Job Descriptions**

**Position Description: Program Director**

**Department:** Talent Acquisition Practice

**Job Title:** Program Director

**Reports To:** Client Services Managing Partner

**Description:** The Program Director manages all aspects of recruiting and staffing Programs for clients, providing strategic guidance and leadership. Creates and maintains budgets, creates Program metrics, oversees resource allocation, builds and maintains client relationships. The Program Director also provides leadership, personnel management and mentoring for Lead Recruiters.

**Essential Duties and Responsibilities:**
- Establish standards of performance and excellence
- Work with client on strategy design, staffing plan and implementation process
- Management of the day-to-day tactical delivery activities to insure that the performance milestones are being met and client expectations upheld
- Development and utilization of engagement reporting procedures to communicate current status of the engagement to key client stakeholders and Kenexa executive management
- Monitor the quality of candidates (or other services) being provided to the client to insure both quantity and quality expectations are being met on a timely basis
- Daily / weekly communication of engagement status to Kenexa executive management using agreed upon reporting procedures and metrics
- Track remediation efforts to ensure that identified Program (engagement) problems are dealt with expeditiously so that Program deliverables are maintained and accomplished
- Organize business strategy and teams on significant Programs within the engagement
- Financial management of engagement

**Qualifications:**
- Positive attitude
- Outstanding oral and written communication skills
- Outstanding client relationship skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated ability to mentor and manage
- 10 years prior management experience in a corporate staffing or recruitment services firm
- Financial management experience
- Outstanding work ethic with a commitment to results

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of ten years relevant (sales, consulting, recruiting/staffing) industry experience

### Position Description: On-Site Consultant

**Department:** Talent Acquisition Practice

**Job Title:** On-Site Consultant

**Reports To:** Program Director or Lead Recruiter

**FLSA Status:** Exempt

**Description:** The On-Site Support Professional provides in-house support at a customer facility to assist internal HR staffing resources with achievement of staffing goals. Their work is client directed and in-house management sets their priorities. They provide flexible resources for corporate staffing organizations during peak activity periods and are experienced in corporate human resource practices, employment laws and prevalent software platforms.

**Essential Duties and Responsibilities:**
- Coordinate with internal hiring managers to identify openings and assist in the creation of job descriptions
- Evaluate staffing strategies and plans
- Manage advertising and web posting response
- Screen candidates
- Submit candidates to hiring authorities
- Assist in the management of agency referrals and relationships
- Coordinate interview schedules
- Greet and interview candidates coming in for site visit
- Enter relevant candidate data into client databases
- Insure that offer letters are processed and properly filed
- Support the closure of candidates in receipt of offers
- Provide EEO compliance reporting data
- Represent the client with the highest standards of ethics and professionalism
- Interface and provide feedback to operations center staff

**Qualifications:**
- Positive attitude
- Outstanding oral and written communication skills
- Outstanding sourcing and client/candidate relationship skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated ability to mentor
- Excellent customer service skills
- Minimum 5 years experience in a corporate staffing function or recruiting service firm
- Outstanding work ethic

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of two years relevant (sales, consulting, recruiting/staffing) industry experience

**Position Description: Lead Recruiter**

**Department:** Talent Acquisition Practice

**Job Title:**   Lead Recruiter (On- and Off-site)

**Reports To:** Program Director

**FLSA Status:** Exempt

**Description:** The Lead Recruiter provides tactical leadership, management and mentoring for the engagement and staff (either on-site or in the operations center).  Assigns roles and responsibilities for the engagement team.

**Essential Duties and Responsibilities:**
- Provides tactical leadership around recruiting Program goals
- Functions as a team player, exhibiting consistent positive attitude and ability to motivate team members
- Participates on Program teams as a strong performer, demonstrating consistent production on concurrent Programs or tasks
- Demonstrates ability to multitask; perform on multiple recruiting Programs simultaneously.
- Staff management
- Impacts business through commitment to completion of Program goals for client expansion
- Assists in the development of Program reports
- Solicits, collects and implements Program improvement initiatives
- Supports career development of subordinate team members through mentorship
- Tactical interface with the client (both HR and line management)
- Collect all relevant materials for the Client Book/Talent Acquisition Guide
- Lead team and client meetings
- Development and maintenance of engagement documentation

**Qualifications:**
- Positive attitude
- Outstanding oral and written communication skills
- Outstanding sourcing and client/candidate relationship skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated ability to mentor
- Previous client and staff management experience
- Outstanding work ethic with a commitment to results

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of five years relevant (sales, consulting, recruiting/staffing) industry experience.

### Position Description: Recruiter

**Department: Talent Acquisition Practice**

**Job Title: Recruiter**

**Reports To: Lead Recruiter**

**FLSA Status: Exempt**

**Description:**   Recruiter is responsible for sourcing, screening and eventually closing candidates for their respective client(s).   Recruiter will also demonstrate the ability to research various industries and geographic locations using a variety of methods.

**Essential Duties and Responsibilities:**
- Contacts requisite number of candidates to assure engagement success
- Develops creative methods to source candidates
- Creates letters, emails, memo's and faxes that engender interest in opportunities from targeted Program candidate groups
- Screens, evaluates and recommends candidates for submittal to client
- Selects and closes qualified candidates for respective assignments / team Programs
- Assists in the development of Program reports
- Develop  initial client interaction skills
- Solicits, collects and implements Program improvement initiatives
- Executes a personal time management plan

**Qualifications:**
- Outstanding oral and written communication skills
- Outstanding sourcing and candidate relationship building skills
- Effective interpersonal skills
- Demonstrated leadership skills
- Ability to manage multiple priorities successfully
- Demonstrated time management and personal organization skills
- The ability to use diverse software in the identification / contacting of potential candidates.
- Comfortable with cold-call prospecting, networking, marketing, sourcing and recruiting.
- Focused / aggressive work ethic
- Positive attitude
- Outstanding work ethic with a commitment to results
- Team player

**Education:**
- Bachelor's degree or equivalent work experience with a minimum of one to 2 years relevant (sales, consulting, recruiting/staffing) experience.

**Position Description: Researcher**

**DEPARTMENT:** Talent Acquisition Practice

**JOB TITLE:** Researcher

**REPORTS TO:** Lead Recruiter

**FLSA STATUS:** Exempt

**Description:** The Researcher is responsible for creating targeted information for multiple Programs. The Researcher understands Program requirements and independently gathers requisite amounts of research to support the Recruiters / Program Team in their candidate acquisition efforts.

**Essential Duties and Responsibilities:**
- Searches online databases, websites and industry directories for appropriate candidates
- Network with the appropriate companies to source potential candidates
- Daily review of industry news / information sources while retaining and recording pertinent information or articles
- Monitor job boards of competing company postings
- Work closely with staff to understand client requirements and source candidates appropriately
- Ability to use desktop software to develop search lists and reports
- Ability to create new methodologies /directions to use in the identification of potential candidates

**Qualifications:**
- Outstanding written communication skills
- Ability to manage multiple priorities successfully
- Demonstrated time management and personal organization skills
- Systems experience (MS Office, ATSs, Internet search tools, etc.)
- Flexible work schedule
- A demonstrated understanding of the construction of Boolean expressions
- Aggressive work ethic
- Positive attitude
- Outstanding work ethic and commitment to results

**Education:**
- Bachelor's degree (BA) or an equivalent combination of education and experience

**Position Description: Program Coordinator**

**Department:** Talent Acquisition Practice

**Job Title:**   Program Coordinator (or On-site Lead Recruiter)

**Reports To:** Program Director

**FLSA Status:** Exempt

**Description:** The Program coordinator supports all aspects of the employment process with the client. Manages the database(s), report development and execution, and acts a liaison between internal staff and the client.

**Essential Duties and Responsibilities:**
- Support Program Director, Onsite Consultants, and Recruiters on all aspects of the outsourced engagement with the client
- Responsible for updating metrics, creating reports, creating Power Point presentation documents, and organizing and coordinating efforts around hiring and staffing activities
- Coordinate candidate activities which may include travel, candidate packets, offer, etc.
- Coordinates the Recruiter applicant tracking system reporting and functionality
- Develop and disseminate daily, weekly and monthly communications to team and client audiences related to overall Program progress, milestones and challenges
- Create and manage daily, weekly and monthly reports to internal and external audiences around Program and individual progress
- Serves as daily communications liaison to client related to candidate submission and candidate feedback when necessary
- Participate in daily and weekly staff meetings to discuss Program process
- Serve as internal Program communications lead when needed between Program leadership and recruiting staff, ensuring that Program team is informed of Program goals, process flow and other information necessary to enable successful recruiting and meet client goals
- Assist in the development of market research to support the recruitment efforts
- Coordinate travel itineraries (both candidate/internal) including flights, hotels and ground transportation if necessary.
- Arranging the calendars/agendas for Program team management when necessary.

**Qualifications:**
- Outstanding oral and written communication skills
- Strong computer skills, specifically in Microsoft Excel, Word and Power Point; familiarity working with databases
- Strong business acumen and demonstrated track record of working and reporting to executive management teams
- Demonstrated record of working effectively as part of a Program team
- Experience in human resources or recruiting field preferred
- Demonstrated ability to manage multiple priorities successfully
- Demonstrated time management and personal organization skills
- Ability to interact successfully with internal and external customers
- Ability to work independently and with minimal supervision
- Ability to provide leadership
- Positive attitude
- Outstanding work ethic and commitment to results
- Team player

**Education:**
- Bachelor's degree preferred

**Attachment #5**

**Blue Linx Purchase Order**

Attachment #6

Kenexa Letter

April 28, 2006

Dean Adelman
Senior Vice President, Human Resources
BlueLinx Corporation
4300 Wildwood Parkway
Atlanta, GA 30339

Re: Kenexa – BlueLinx Employment Process Outsourcing

It was a pleasure speaking to you on Thursday, April 20 2006.  As we discussed on the call, the essence of a successful engagement is partnership and a willingness to recognize that we need to operate in a way that is mutually beneficial to both Kenexa and BlueLinx.  In addition, Kenexa must bear the responsibility to function, always, in the best interest of BlueLinx as if we were your in-house staffing department.  It is that value proposition that has allowed Kenexa to have the extraordinary results and client retention that we have experienced in our employment process outsourcing practice.

I wanted to reiterate in written form, and we will memorialize in our agreement that we will work with you during due diligence to verify key productivity assumptions that we used in arriving at our pricing.  If we discover that the data available suggests that we can be more aggressive in our assumptions, we will adjust pricing to reflect a lower cost to BlueLinx.

We will also create a process where we will meet once a year with BlueLinx to review your anticipated workforce plan for the year to come.  We recommend we meet no later than 90 days prior to the turn of the fiscal year.  After receipt of this review information, if the workforce plan indicates that you are going to hire less than 50% of the projected volume in our 5 year budget or that volumes will be more than 50% higher we will adjust our billing structure to reflect the new volumes.

Of course, if during the term of the agreement, a "disruptive" event occurs that substantially and adversely impacts BlueLinx and its hiring assumptions we will meet with you in partnership to reassess the proper levels of services to be provided.

I have also revised the scenario where your first year hiring is at 500 but rises back to the level of 1000 in years two through five.  The budget is shown below.

CONFIDENTIAL
Exhibits to Master Services Agreement

18

May 15, 2006

[Table illegible]

As you can see the overall cost per hire, rises a small amount to reflect the loss of a small amount of economy of scale in year one. This is unavoidable due to how the infrastructure is conceived and we can explain further if you wish to discuss.

The billing structure is shown below. We have 224 jobs in the committed run rate in year one just so that the assignment and completion fees are static over the life of the engagement. This will make the accounting of positions opened in year one and closed in year two much easier. The quarterly run rate would be $377,852 so that your committed costs in year one would be $816,528 lower that in the original pricing we provided.

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Quarterly Run Rate | $377,852 | $594,734 | $594,734 | $594,734 | $594,734 |
| Requisition Fees Committed in the Run Rate | 224 | 400 | 400 | 400 | 400 |
| Requisition Fees Above Committed in Run Rate | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |
| Completion Fees | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |

Please review and contact me with any comments or questions. Once, again, Kenexa appreciates the opportunity to partner with BlueLinx.

Sincerely,

Elliot H. Clark
Chief Operating Officer

**EXHIBIT B-1**
**TO MASTER SERVICES AGREEMENT**
**EMPLOYMENT PROCESS OUTSOURCING PROGRAM**
**PAYMENT SCHEDULE**

This Exhibit B-1 to Master Services Agreement between **BlueLinx Corporation ("BlueLinx") and Kenexa Technology, Inc. ("Kenexa")**, dated _____May 30_____, 2006, sets forth the fees and payment schedule with respect to the Services in Exhibit A-1.

### 1. Fees

Kenexa has developed a solution that offers far more service to BlueLinx over a five (5) year period than is found in the current model. The Kenexa solution is for Employment Process Outsourcing where Kenexa will seamlessly integrate with the BlueLinx Human Resource group to provide staffing services.

The Kenexa solution is based upon a series of assumptions. These assumptions are shown below. The assumptions include metrics around workforce planning, and candidates needed to fill positions based upon the challenges currently being faced by the existing staffing department. If more than one hundred fifty (150) assignments (during year 1) or three hundred (300) assignments thereafter occur in any one quarter, there may be additional charges due Kenexa subject to mutual agreement of the parties for on-site support.

The Kenexa solution utilizes a dedicated resource team that varies depending upon the workload. This flexibility is far greater than internally managed resources. The Kenexa solution can manage all aspects of the hiring process.

### Assumptions

| Category | Assumption | Source of Data |
|---|---|---|
| | 500 | |
| | 1000 | |
| | 1000 | |
| | 1000 | |
| | 1000 | |
| | | |
| | | |
| | 17% | |
| | 10% | |

Below is the budget including Kenexa fees as projected over the next five (5) years based upon the estimated levels of hiring for the next five (5) years. This estimate examined historical attrition and very conservative minimal levels of growth. This budget does not include relocation, background checking fees or candidate travel or Kenexa expenses, advertising, employee referral fees, reference checking, courier fees, travel, and travel and living expenses for the on-sites.

**Budget Detail by Year**

Please note that the overall cost of the program will remain flat over a five (5) year period. Typically, Kenexa estimates a reduction due to the assumption that better hiring practices will lead to efficiencies in future years. Kenexa will need to study available data and analyze what savings may be available prior to committing to a level of savings. However, Kenexa will commit to passing on whatever savings are achieved to BlueLinx as a reduction in overall costs. While the financial model may or may not decline in cost, Kenexa's billing system below is based on the five year average.

The above average CPH is based on an annual hiring of 500 in year 1 and 1000 per year thereafter and, therefore, represents full utilization. The actual billing model will offer flexibility and is not based upon a flat fee scenario. The average cost per hire shown above as $3,607 per hire for Kenexa costs will be higher, if the hiring levels are substantially below estimates. Conversely, the cost per hire will be substantially lower, if hiring is above the projected levels. Please note this model will offer BlueLinx the flexibility to instantly increase resources for a short term increase in hiring volume and reduce instantly when that activity ends, thereby optimizing utilization and reducing costs.

The above budget also assumes that the distribution will be a total of 500 hires in year 1 and 1,000 hires each year thereafter of which all are external. Internal transfers without external sourcing are provided at no extra charge. If external sourcing is required, then Kenexa will charge the assignment and completion fees. Therefore, Kenexa recommends that internal transfers be processed prior to external sourcing.

Kenexa will manage any external agencies at the request of BlueLinx. If an agency fills a position assigned to Kenexa, Kenexa will receive the assignment and completion fees for that position.

Kenexa will also manage other vendor costs such as conferences, job fairs or other similar hiring events. These costs are not included in the Kenexa budget and will be passed through at no mark up to BlueLinx.

In addition, new and robust reporting capabilities will allow the combined Kenexa-BlueLinx team to make informed decisions about the level of resources and expenditures facilitating rapid response to staffing needs and continuous process improvement. The resource level estimates the need for six (6) On-Site consultants in Atlanta, Georgia and Denver, Colorado and any modification of that resource level would be reflected in a pricing adjustment.

A portion of the fees are based upon the services of the committed resource team and the technology license. All other fees are based upon utilization.

Positions must be assigned and then filled by Kenexa to realize the billing level shown on the prior page. The billing level and structure may change if assumptions change or based upon discussions and guidance from BlueLinx.

The fee structure will be based upon a minimal annual run rate of $1,511,408 in year 1 and $2,378,935 thereafter tied to the conservative level of 250 and 500 external hires per year, respectively. There will be a charge for each additional hire above that threshold. The quarterly payments of $377,852 each in year 1 and $594,734 each thereafter will be payable in advance and within thirty (30) days from receipt of an invoice from Kenexa.

2. **Costs**

Kenexa's fees do not include employee referral or assessment costs, background checking, drug testing employment brochures, letterhead, office expenses at BlueLinx sites or employment brand marketing. BlueLinx agrees to budget $200 per position that is sourced externally for external employment advertising during the term. All employment advertising which is a pass through expense shall have prior approval of BlueLinx. Kenexa will invoice BlueLinx for any billable expenses, including reasonable travel and lodging for Program-related travel, which will have been pre-approved by BlueLinx. Expense invoices are payable within thirty (30) days from receipt of the invoice.

3. **Payment**

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Quarterly Run Rate | $377,852 | $594,734 | $594,734 | $594,734 | $594,734 |
| Requisition Fees Committed in the Run Rate | 224 | 400 | 400 | 400 | 400 |
| Requisition Fees Above Committed in Run Rate | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |
| Completion Fees | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 | $ 1,003 |

Requisition Fees are due when the positions (in excess of those included in the Run Rate above) are assigned. Completion Fees are due at the end of the month in which the candidate starts.

All invoices related to this Statement of Work will be sent to:

BlueLinx Corporation
Attention: Accounts Payable

_____
_____

**EXHIBIT C-1-1**
**To Master Services Agreement**
**Statement of Work and Service Level Statement**
**Number: KRE_____**
**Kenexa Recruiter® Enterprise Applicant Tracking System**

1. **Statement of Intent:**

   Kenexa (as defined below) strives to provide a high level of service. This Statement of Work and Service Level Statement ("SOW") outlines the services, site availability, and user support provided to System (as defined below) customers.

2. **License; Term**

   Pursuant to the terms hereof, Kenexa grants Customer a non-exclusive, non-transferable license to use the System on a remote computing basis for the term of Exhibit A-1. The fees for the license and services in this Exhibit C-1 are included in the fees in Exhibit B-1

3. **Time Conventions.**

   This SOW uses the following conventions to refer to times:

   A. Times expressed in the format "hours: minutes" reflect a 24-hour clock in the Central Time zone.
   B. Times expressed as a number of "business days" include business hours, Monday through Friday, excluding Designated Holidays.
   C. The symbol "—" indicates that no time applies in a category (for example, no outages are scheduled for a day).

4. **Definitions**

   The following terms shall have the definitions given below:

   A. **Customer** – BlueLinx Corporation.
   B. **Customization** – Any code change to the System, which is made by Kenexa at the request of and in accordance with individual specifications of Customer and will be listed on Exhibit C-1-2 or on a Change Request Form (a form of which is attached hereto as Exhibit C-1-2-1)
   C. **Designated Holidays** – New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving, Christmas Day (These days are subject to change if the Holiday falls on a Saturday or Sunday).
   D. **Kenexa** – Kenexa Technology, Inc.
   E. **System** – the Kenexa Recruiter® Applicant Tracking System.
   F. **Upgrade** – Any revision or addition to the System developed and offered by Kenexa to its Customers on a general basis without charge unless a customization is requested by Customer.
   G. **Career Center** – Portion of the System that is accessible through the Internet facing, is used by employees and candidates to apply for jobs and is linked with and branded like Customer's website.
   H. **Recruiting Center** – Portion of the System that is used by Customer's hiring personnel to post jobs and track candidates.

5. **System Requirements.**

**Career Center Users**
The System requires that the Career Center user have, at a minimum, the following computer configuration:

    A. **Processor Speed**
        Minimum 233MHz Pentium Processor or equivalent, 500MHz recommended
    B. **Operating System**
        Windows 98, Windows NT 4.0, Windows ME, Windows 2000 or Windows XP
        Macintosh systems with OS 7.6 and newer
    C. **Memory**
        Minimum 128 MB of RAM, 256 MB of RAM Recommended
    D. **Web Browser**
        Microsoft Internet Explorer 4.0 and greater
        Netscape Navigator 4.7 and greater excluding 6.0
    E. **Internet Connection**
        56.6 kbps or faster

**Recruiting Center Users**
The System requires that the Recruiting Center user have, at a minimum, the following computer configuration:

    A. **Processor Speed**
        Minimum 233MHz Pentium Processor or equivalent, 500MHz recommended
    B. **Operating System**
        Windows 98, Windows NT 4.0, Windows ME, Windows 2000 or Windows XP
        Macintosh systems with OS 7.6 and newer
    C. **Memory**
        Minimum 128 MB of RAM, 256 MB of RAM Recommended
    D. **Web Browser**
        Microsoft Internet Explorer 5.0 and greater
        Netscape Navigator 6.1 and greater
    E. **Internet Connection**
        56.6 kbps, Cable, DSL or T1 connection recommended

Future enhancements to the System may result in slightly different requirements. When possible, Customer will be notified of any new System requirements before Upgrades are made.

6. **Services Provided.**

Under this SOW, for the fees provided in Exhibit B-1 Kenexa will provide implementation and support services as outlined in 6.1 and 6.2 below.

**6.1 Commencement of Work**

Work on Customer's System will commence upon completion of Program planning. Program planning will be scheduled after Kenexa receives the signed Agreement and SOW and the initial payment outlined in Exhibit B. Implementation of the System and/or its modular solutions/services shall include the following:

    A. **Implementation Materials and Staff**
        1) Program management staff and consultative support from Program design through completion of implementation, as agreed to by the parties.
        2) Two (2) days of training for each Recruiter/System Administrator User.
        3) Implementation Manual for Customer Program Team.

    4) One User Guide for each Customer Recruiting Center User.
    5) One (1) standard Quick Reference Guide for each Recruiter/System Administrator user.
    6) Help Desk support as detailed under User Support.
    7) Core System Software Upgrades as developed by Kenexa.
    8) Kenexa Technical representative as needed

**B. Overall Configurations**
    1) Career Center Branding
    2) Configuration of System Settings
    3) Unique User ID and secure Password for each Recruiting Center User
    4) Field label changes
    5) Addition of Searchable/Reportable Custom Fields for the Jobs, Candidate, Contacts and Activities Modules
        I. Maximum 5 date Fields per Module
        II. Maximum 20 List (dropdown) Fields per Module
        III. Maximum 10 integer (number) Fields per Module
        IV. Maximum 25 String (alphanumeric) Fields per Module
    6) User Group / Access Configuration
    7) Email Templates and Correspondence Templates
    8) Field Sequence for Activities, Candidates and Jobs
    9) Configuration of column headers on the following pages:
        I. Career Center – Job Search Results (addition of job fields)
        II. Recruiting Center – Candidate Activities (addition of candidate fields)
        III. Recruiting Center – Candidate Results (addition of candidate fields)
        IV. Recruiting Center – Job Activities (addition of job fields)
        V. Recruiting Center – Job Results (addition of job fields)
        VI. Recruiting Center – Show Applicants (addition of candidate fields)
    10) Drop down lists (creation of custom lists and configuration of lists that are standard in the System)
    11) Job Templates
    12) Job Questions
    13) Job Approval Processes
    14) Job Workflow
    15) Configuration of Driven Job Fields (Recommended Maximum of 3)
    16) On Screen Messaging

**6.2 Optional Services**

**A. Kenexa Job Posting**
Kenexa will make the following boards available to Customer at no additional charge for automated job posting:

    1. America's Job Bank
    2. Monster
    3. HotJobs
    4. CareerBuilder

Customer must create, maintain and is responsible for all payments for fee sites (*i.e.*, Monster). Kenexa will make best efforts to monitor the job boards for changes, but as they change, it should be expected that there will be periods where some job boards will be unavailable. Kenexa's responsibility is to transfer the data to the job boards, any delays in posting will not be the responsibility of Kenexa.

**B. Resume Scanning**

Kenexa guarantees all legible resumes received in a valid format will be uploaded to the System within two (2) business days of receipt. Kenexa only supports resumes that are either computer or typewriter generated; Kenexa will not scan hand written resumes, hand written remarks on resumes or other forms or certificates that are included with the resumes. Kenexa does not maintain formatting of the resume. Any special characters will be lost in the conversion. All forms sent to Kenexa will be treated as text and the format will not be maintained.

**C. File Uploads**

The sum of all files uploaded to the System excluding resumes may not exceed 50 megabytes.

It is possible that files uploaded and downloaded via the System will contain viruses. This should not affect Customer's System, but could affect the Customer's workstation. Kenexa has implemented software to minimize this risk, but is not liable in the event an infected file is uploaded or downloaded.

**7. Kenexa Certified Partners' Services**

Kenexa partners' services are optionally enabled on a Customer's System. Kenexa will pass through the warranties and service level guaranties offered by such partners to Customer for the selected services.

| Partner | Service | Description |
|---------|---------|-------------|
| eQuest | Job Posting | eQuest provides job posting services that enable customers to post a single job to numerous sites simultaneously. |
| ARRIN Syste ms | HireHelper.com (Background Checking) | Arrin Systems provides background checking services. |

**8. Delivery Dates**

Kenexa will work with Customer to establish a live date for the System once Kenexa is in receipt of approval of the Program plan and specifications.

**9. License to use the Marks**

Customer hereby grants Kenexa a limited, nonexclusive license to use and display Customer's trademarks, service marks, trade names, logos and other commercial designations (the "Marks") for the purpose of creating content directories and indices for the System site created by Kenexa for Customer hereunder. Any such use shall be in a manner as solely determined by Customer. This authorization shall be deemed revoked upon the termination of the Agreement or this SOW. Title to and ownership of Customer's Marks will remain with Customer. Customer shall provide hard copy and electronic files of the Marks in such forms and formats as Kenexa may reasonably specify. Kenexa will not take any action inconsistent with Customer's ownership of the Marks. Customer warrants and represents that it owns and has the right to license the Marks and that the use and presentation thereof in accordance with this Agreement will not infringe or constitute unfair competition with respect to, or otherwise violate the rights of, any third party.

**10. Backups**

The primary purpose for a System data backup to magnetic media is to help Kenexa provide its Customers with timely disaster recovery should the System be rendered inoperative due to hardware or environmental impacts. System restoration will be performed as a recovery procedure after a disaster and is included as a Kenexa service. Customers may request (through their primary point-of-contact) restoration of individual data file(s); however, file restoration is a labor intensive process and completion of the restoration cannot be guaranteed within a specific time frame.

Kenexa's formal data backup procedures include full System backup either once (1) weekly or when a System modification is made as the result of a Customization. Differential backups are performed each day of the calendar week until the next full System backup. (NOTE: Is once a week sufficient? yes)

Full System backups include the System and Customer data. Data backups are written to a local backup device with sufficient capacity to handle the data. Backup tapes are rotated off-site as part of a disaster recovery plan.

**11. Encryption**

The core System does not utilize encryption when transmitting data back and forth to the user. Therefore, Kenexa will implement Verisign SSL technology at Customer request at a cost of $1,500.00 per year. Kenexa will not be responsible for performance issues caused by the encryption. (NOTE: Need to discuss encryption criteria and responsibilities further. We will make ourselves available to discuss).

**12. System Customization**

**Kenexa does not recommend that any customer make Customizations to the Core System. If Customizations are requested, the following is mutually understood:**

    A. Customers who choose to make Customizations will not receive free Upgrades, Help Desk support, or training materials as it relates to the Customization. In the event Customizations are made, Upgrades, Help Desk support, and training materials may be purchased.

    B. Customizations will increase Implementation timelines and the probability that the Customer will experience errors in its System. Customizations will result in extended programming time for development, testing and error fixes. Any Customization will be performed pursuant to a mutually-agreed-to plan.

    C. All changes that take more than the allotted Scheduled Outage time to implement or that impact user workflow are reviewed by the Kenexa Recruiter team for approval and prioritization. Once approved, implementation will be scheduled.

    D. Customizations that do not require a service outage and that do not impact user workflow are implemented upon completion.

    E. Any Customer-requested Customization will be made in writing. Requests will be sent to the Customer's Implementation Consultant at Kenexa. Customizations, costs, and ramifications will be documented in a Change Request Form (a form of which is attached hereto as Attachment C-1) each time a Customization is requested.

**13. Availability**

The availability of the System is outlined below.

    **13.1**    **Normal System Availability Schedule**

        The System is scheduled to be available 24 hours a day, 7 days a week excluding scheduled downtime. Scheduled downtime is used for routine maintenance and occurs

every Sunday from 6:00 a.m. to 9:00 a.m. ET and every Wednesday from 12:01 a.m. to 3:00 a.m. ET. Scheduled downtime is only used as needed.

**13.2    Service Level Guarantee**
Kenexa shall use commercially reasonable efforts to ensure that the System will be available ninety-eight and six/tenths (98.6%) percent of the time excluding scheduled downtime as calculated on a monthly basis). The remaining percent of the time (as calculated on a monthly basis) shall be deemed the "Permitted Downtime." If the System is unavailable in excess of the Permitted Downtime, Kenexa shall credit Customer's account by the actual percentage decrease in System availability against the monthly equivalent of the Quarterly Fee set forth in Exhibit B-1, provided Customer notifies Kenexa in writing of any such unavailability. For example, if in one month the System is only available ninety-eight (98%) percent of the time as described above, Kenexa will give Customer a .6% percent credit against a monthly equivalent of the Quarterly Fee. However, Kenexa will not be responsible for issuing credits for any unavailability which is scheduled in accordance with Section 12.1 above.

## 14. User Support

Kenexa provides the following support to all customers:

**14.1    Help Desk**
Kenexa provides user support by way of a fully trained Help Desk. In order to contact the Help Desk the user must either be a candidate or a certified System user. The intent of the Help Desk is to resolve end user issues and not to entertain System enhancements or modifications. The Kenexa Help Desk is staffed from Monday through Friday, 6:00 a.m. to 8:00 p.m. Central Time, excluding Designated Holidays. If a Customer requires support outside of normal operating hours, it can contact an on-call Help Desk representative via pager. Customer will be billed $50.00/call for all off-hour support calls.

**14.2    Escalation Support Process**
Kenexa has a comprehensive set of support procedures designed to resolve the majority of known Customer support situations. Each procedure has associated activities and response requirements designed to resolve those situations in a timely manner. At times, a response to Customer's question or issue may exceed the time frames set forth in the standard support procedures, and is therefore a candidate for an Escalated Support Process. The Escalation Support Process is the application of increased expertise and/or resources to assure a timely resolution to a customer's issue.

**14.3    Criteria of Escalation**
Calls handled by Kenexa's Help Desk are given priority upon receipt that dictates the time frame in which the call requires resolution. Escalation occurs when the current process flow does not meet Customer's expectation or requirement in one or more of the following areas.

A. The Customer is experiencing a problem which cannot be resolved in the designated time frame.
B. Either the Customer or a Kenexa employee determines that additional resources or expertise are required to restore the System operation to normal.

**14.4    Problem Severity Description**
Table A.3 outlines problem severity descriptions:

### Table A.3 Problem Severity Descriptions

| Severity | Description |
|---|---|
| Critical | All end users have lost connectivity and all or most of the System functionality is lost. The System is not operational and there is no workaround. |
| High | More than one end user has lost connectivity and much of the System's operation is lost but some functions are active. A Critical problem with a reasonable workaround may be reduced to High. |
| Medium | Some System functionality is lost. A High problem can be reduced to Medium if an acceptable workaround is found. |
| Low | No outage of the System is experienced. A Medium problem can be reduced to Low if an acceptable workaround is found. |
| Information | A request for information about Products or Services. |

14.5 **Problem Escalation Process**

Table A.4 outlines Kenexa's problem escalation process.

### Table A.4 Problem Escalation Process

| Severity | Description |
|---|---|
| Critical | Response from Help Desk representative within 15 minutes. Implementation Consultant notified if Service is not restored within thirty (30) minutes. Problem escalated to Programming if Service is not restored within one (1) hour. Implementation Manager notification within one (1) hour. Senior VP notified within four (4) hours. |
| High | Response from Help Desk representative within thirty (30) minutes. Implementation Consultant notified within one (1) hour. Implementation Manager notification within eight (8) hours. Senior VP notified next business day. |
| Medium | Response from Help Desk representative within one (1) hour. Implementation Consultant notified same business day. Programming Team notified same business day. Implementation Manager notified within three (3) business days if solution or acceptable workaround has not been found. |
| Low | Response from Help Desk representative within one (1) day. Implementation Manager notified after ten (10) business days. |

14.6 **Call Resolution**

When Kenexa's Help Desk is informed of a problem the following actions are taken:

**A. Call Logging**

The Customer contact is logged in Kenexa's call log database and Kenexa's knowledge database is searched for similar problem reports, thus enabling fast responses to known problems or frequently asked questions.

**B. Problem Reproduction**

Kenexa's Customer Support Department will attempt reproduce the problem. The Customer will be required to provide a clear description of the circumstances under which the problem occurred.

**C. Defect Logging**

When the problem has been duplicated by Kenexa's Customer Support Department, it will be logged as a defect in Kenexa's defect database.

**D. Defect Investigation**
Kenexa's product development team will investigate the cause of the problem.

**E. Workaround**
When, in the course of the investigation, alternative ways are found to obtain the design goal while avoiding the interruptive symptoms of the defect, these workarounds will be communicated as a temporary solution to the problem while Kenexa continues to work on a permanent solution.

### 15. Upgrades.

Kenexa will provide Customer upgrades at no extra charge to a non-Customized System. The frequency of the upgrades will be determined by the Kenexa Implementation Consultant assigned to the Program and the Customer Program lead.

If Customer elects to Upgrade a Customized System, upgrade charges will be determined based upon the number of additional hours required to implement the Customizations. All such charges will be presented to Customer for preapproval.

System upgrades will require recertification of Customer end-users and/or certified trainers. Training will be provided at the cost outlined in Exhibit D.

### 16. Termination.

Data will be returned to Customer within thirty (30) days after termination upon receipt of payment for service and expenses through the date of termination. Customer will be billed for any time, preparation, and materials required for the data transfer. All such charges will be presented to Customer for preapproval.

### 17. Ownership

Kenexa and Customer agree that all information, drawings, documents, designs, models, patents, inventions, copyrightable material, and other tangible and intangible materials authored or prepared, in whole or in part, by Kenexa in the course of providing the Services or Products, including without limitation software, computer programs, computer systems, Customizations, specifications, documentation and the website created by Kenexa hereunder, are the sole and exclusive property of Kenexa and shall not be considered works made for hire. Customer shall at all times remain the owner of the data.

**Exhibit C-1-2**
**To Master Services Agreement**
**Customization Schedule**
**Number: KRE _____**
**Kenexa Recruiter® Enterprise Applicant Tracking System**

| STANDARD RATES: | COST |
|---|---|
| Custom Programming, Training, Documentation Charges | $250.00 per hour |
| | |
| SPECIFIC CUSTOMIZATIONS: | |
| | |
| | |
| | |
| | |

Signing this Exhibit signifies the agreement of both Kenexa and the Customer to the above fees for the above Customizations, if any. If, at the signing of this Exhibit, Kenexa and Customer agree that there are no known Customizations, the words: "NO KNOWN CUSTOMIZATIONS AT THIS TIME" should be listed in the section titled "Specific Customizations". If Customer subsequently requests a System Customization, a Change Request Form will be completed by the Kenexa Implementation Consultant and sent to the Customer Program Manager for approval prior to beginning Customization work (a sample Change Request form is attached as Attachment C-1-2-1).

Major Customizations, as determined by Kenexa, may result in the elimination of free System Upgrades, Help Desk support, training, and/or System-specific user manuals (if requested by Customer). In the event Customizations are made, System Upgrades, Help Desk support, training, and user manuals will be available at additional cost. The total Fees for Customizations are in addition to the Total Initial Payment outlined in Exhibit B-1 and are due upon the signing of the Agreement.

ATTACHMENT C-1- 2-1

**Change Request Form**
This document is to be used to record and confirm that both Customer and the Kenexa team members
are in agreement as to any changes to be made to the implementation process and/or to the System as
Customizations.

*Customer*
DATE:

DETAIL OF REQUEST:

RAMIFICATIONS:

The above list will require custom programming. This will take a total of approximately x hours of
Customization work (this includes design, development, and quality assurance testing).

Major Customizations, as determined by Kenexa, may result in the elimination of free System Upgrades,
Help Desk support, training, and/or System-specific user manuals (if requested by Customer). If
Customizations are implemented, System Upgrades, Help Desk support, training, and user manuals will
be available at additional cost.

x hours of custom programming @ $250/hr                                        $xxx

I have thoroughly reviewed this Change Request Form and authorize Kenexa to proceed as indicated
above.

**Kenexa Technology, Inc.**                    **Customer**

_____          _____
Implementation Consultant Signature        Authorized Signature & Date
& Date

_____          _____
Please Print\Type Name                     Please Print\Type Name

**Exhibit C-1-3**
**To Master Services Agreement**
**Training and Documentation Schedule**
**Number: KRE _____**
**Kenexa Recruiter® Enterprise Applicant Tracking System**
**Training and Documentation Schedule**

| Seminar Purchased | Number of Days/Hours | Cost per Day | Total Number of Participants | Fee Per Participant | Total Cost of Seminar | Materials to be Provided |
|---|---|---|---|---|---|---|
| User Acceptance Testing Training | 2 Hours | Included in set up fee | Up to 10 participants | $0.00 | Included in fee | User Acceptance Testing Documentation |
| Kenexa Recruiter Power User/System Administrator | 2 Days of training for every 15 user licenses purchased in the initial Exhibits. | Included in set up fee | The total number of participants may equal the total number of Power User/System Admin licenses purchased by Customer with the initial Exhibits. (Maximum class size is 15 per class) | Included in set up fee for initial licenses purchased | Included in Exhibits for initial licenses purchased | • User/Training Guide<br>• Quick Reference Guide |

| Documentation Purchased | Number of Hours | Cost per Hour | Cost Per Copy | Total Number of Copies | **Total Cost |
|---|---|---|---|---|---|
|  |  | $250.00 per hour |  |  |  |

**Cost for customized materials is based upon ESTIMATED time. Customer will be billed only for hours worked. Cost may vary more or less than estimated cost.

1. **Payment Schedule:**

   The total cost of training and documentation as listed in this Exhibit C-1-3 is: $___. Training and documentation will be invoiced as each service is delivered. Payment is due upon receipt of the invoice.

2. **Additional Participants:**

   If additional participants are added to a training seminar, Customer will be billed a per-participant fee for each additional participant. Additional participants may be added up to the maximum class size for that particular seminar. Additional days of training may also be purchased at a cost of $1,500 per day or portion thereof.

CONFIDENTIAL
Exhibits to Master Services Agreement

May 15, 2006

3. **Documentation:**

The materials to be provided with each training seminar are based upon the core System. Kenexa will provide customized training materials to Customer upon request at a rate of $250 per hour. Customer may not reproduce or amend documentation provided by Kenexa without the express written consent of Kenexa. Additional copies of documentation are available to Customer upon request. Cost will vary according to documentation purchased. Reproducible, electronic copies of documentation may also be purchased at the request of Customer.

4. **Cancellation:**

Customer shall use reasonable efforts to provide Kenexa with at least two (2) weeks' notice in order to cancel a training seminar. Failure to provide Kenexa at least two (2) weeks' notice of a cancellation will result in Customer being billed $1,000.00 per cancelled day.
Cancellation of any customized documentation will result in Customer's being billed $250 per hour for any hours worked on the Program up to the date of receipt by Kenexa of the cancellation notice.

5. **Travel Expenses:**

All pre-approved travel and other expenses incurred by Kenexa hereunder shall be the responsibility of Customer.

# EXHIBIT C-1-4

## TO MASTER SERVICES AGREEMENT

## PROCESS AND FORMAT FOR A DATA DUMP REQUEST

The steps for the data delivery process

1) An FTP account will be created.
   a. If FTP is on Kenexa Server
      i. IC needs to notify Network Engineer for the account (See FTPSiteRequestForm.xls for details)
      ii. Network Engineer will contact the client and give them the account information
   b. If FTP is on Client Server
      i. IC will need to contact the client for the FTP information.
      ii. IC needs to contact the developer or DBA with the FTP information. This need to be done at least 5 days before the delivery date.
   c. Developer Or DBA will place the files into this account on the predetermined date.
2) If the data is on Kenexa Server, data dump will be available to the client for 10 days from the day it was generated.

The data dump can be given in two formats

1) Oracle Dump
2) CSV file

The approximate time and details for the two formats are:

**Oracle Dump**

This file will need to be imported into Oracle before it can be used. This format will take approximate 17 to 20 hr (depending on client size) to generate.

**CSV file**

This is a flat file which can be opened in notepad or excel. If the data is viewed in notepad the columns will be separated by predetermined delimiter. This format will take approximate 27 to 50 hr (depending on client size) to generate. The resumes and the job description would be generated as separate file for every candidate and job. The candidate and job ID would determine the file name. These set of files would be zipped before delivering.

The data structure of the two formats remains the same. There will be four tables.

1) Candidate
2) Job
3) Activity
4) Activity_Note

**Design and limitations of the three tables**

**Candidate**

The table will have all the fields that are there in the candidate profile page. It will also have the Create User Name for that candidate. There will be no information of the contacts related to those candidates.

**Job**

The table will have all the fields that are there in the job add page. It will have the primary contacts (Hiring Manager and Recruiter).

**Activity**

All activity will be shown. The relation with job and candidate will be visible under this table.

**Activity Note**

This would include the activity Note and would relate to the Activity table

This structure of these tables may change a little based on the client's customizations. Below is the basic structure of the these tables

**Candidate**

CANDID, (This is the unique identifier for this table. This will be referenced in Activity)
FIRSTNAME,
MIDDLENAME,
LASTNAME,
COUNTRY,
ADDR1,
ADDR2,
CITY,
STATE,
ZIP,
PHONE1,
PHONE2,
EMAIL,
CURRENT_EMPLOYEE,
SALARY_EXPECTATIONS,
CURRENT_COMPENSATION,
SOURCE,
SPECIFIC_SOURCE,
RELOCATE,
EDUCATION,
EEO_CATEGORY,
ETHNIC,
GENDER,
SSN,
STATUS,
CREATEDATE,
CREATEUSERID,
UPDATEDATE,
RESUME

**Job**

JOBREQ, (This is the unique identifier for this table. This will be referenced in Activity)
JOB_TITLE,
JOBCODE,
ORIGINALOPENING,
OPENING,
PAY_RATE,
SAL_MIN,
SAL_MAX,
ADDITIONAL_COMPENSATION,
COMPENSATION_AMMOUNT,
COUNTRY,
JOBADDR1,
JOBCITY,
STATE,
JOBZIP,
EMPLOYEE_STATUS,

SECTOR_DEV_CODE,
CHARGE_TYPE,
DIVISION,
DEPARTMENT,
REASON_OPENING,
POST_DATE,
JOBSTATUS,
NOTES,
CREATEUSERID,
UPDATEUSERID,
RECRUITER,
HIRING_MANAGER,
JOBSPEC

**Activity**

ACTIVITYID, (This is the unique identifier for this table.)
ACTIVITY_TYPE,
COST,
DUE_DATE,
DURATION,
RELATED_CANDID,
RELATED_JOBREQ,
RELATED_CONTACT,
ACTIVITY_STATUS,
DATE_CREATED,
CREATED_BY,
DATE_UPDATED,
UPDATED_BY,
DATE_COMPLETED,
START_DATE,
REJECTION_REASON

**Activity_Note**

ACTIVITY_ID (This will be referenced in Activity)
NOTES

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KENEXA TECHNOLOGY, INC.,       )
A Pennsylvania corporation,        )
                                   )
              Plaintiff,        )
                                   )
              v.          )     C.A. No. 07-27-GMS
                                   )
BLUELINX CORPORATION,       )     **JURY TRIAL DEMANDED**
A Georgia corporation,           )
                                   )
              Defendant.     )

## DECLARATION OF ROBERT PENMAN IN SUPPORT OF MOTION TO

## TRANSFER

I, Robert Penman, declare and state as follows:

1.     My name is Robert Penman. I am above the age of eighteen and am competent to attest to the matters stated herein. I have personal knowledge of the facts in this Declaration, and they are true and correct.

2.     I am Senior Counsel at BlueLinx Corporation, and I offer this declaration in support of BlueLinx' Motion to Transfer the above-captioned litigation to the U.S. District Court for the Northern District of Georgia [Atlanta Division].

3.     BlueLinx Corporation is a distributor of building products with customers nationwide, including dealers, industrial manufacturers, manufactured housing producers and home improvement retailers.

4.     BlueLinx' corporate headquarters and eastern sales office is located at 4300 Wildwood Parkway, Atlanta, Georgia 30339.

5.      In addition to its headquarters in Atlanta, BlueLinx maintains a western sales office in Denver, Colorado and warehouse distribution sites throughout the United States.

6.      BlueLinx does not maintain any offices or warehouses in Delaware.

7.      In the spring of 2006, BlueLinx and plaintiff Kenexa Technology, Inc. ("Kenexa") began negotiations on an agreement under which Kenexa was to provide employment process outsourcing services to BlueLinx at its offices in Georgia and Colorado.

8.      Negotiations concerning the agreement were conducted via correspondence and telephone calls among Kenexa's Chief Operating Officer Elliot Clark in Wayne, Pennsylvania, BlueLinx' Vice President for Human Resources Dean Adelman in Atlanta, Georgia, and the parties' respective legal departments at these locations.

9.      On or about May 30, 2006, BlueLinx and Kenexa Technology, Inc. entered into an agreement entitled "Master Service Agreement."

10.     Pursuant to the Master Service Agreement, Kenexa utilized employees in Pennsylvania and India and installed four on-site employees at BlueLinx' headquarters/eastern sales office in Atlanta and one on-site employee at BlueLinx' western sales office in Colorado.

11.     Kenexa's on-site employees and John Holvay were BlueLinx' primary business contacts with Kenexa and the persons through whom most services were supposed to be delivered.

12.     In Atlanta, the following persons served as on-site Kenexa employees for the BlueLinx program: Leslie Lovelace (On-site Staffing Consultant); Susan Podsiad

(Kenexa's Program Coordinator); Ava Artis (On-site Staffing Consultant); and Jackie Hawkins (On-site Staffing Consultant).

13.    Currently, Ms. Lovelace and Ms. Podsiad are BlueLinx employees working at BlueLinx' offices in Atlanta.

14.    Ms. Hawkins no longer works for Kenexa and is located in the Atlanta, Georgia metro area.

15.    In Denver, Kenexa's only on-site employee for the BlueLinx program was Alana Johnson (On-site Staffing Cosultant).

16.    Kenexa's Program Director for the BlueLinx program was John Holvay located in Wayne, Pennsylvania. During the course of his work, Mr. Holvay made at least six trips to BlueLinx' offices in Atlanta, Georgia where he spent significant time.

17.    No services or products provided pursuant to the Master Service Agreement originated from or were delivered to Delaware.

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed on this _18th_ day of May, 2007.

_____
Robert Penman
BlueLinx Corporation

796229/31137

3

# EXHIBIT C



search

**About Us    Solutions    Industries    Careers    Learning Center    Investor Relations    Kenexa Global**



About Us

# Locations

### About Us

>> **Overview**

>> **History**

>> **Diversity**

>> **Investor Relations**

>> **Locations**

>> **Press Room**

>> **Events**

>> **Industry Recognition**

>> **Contact Us**

## North America
### USA

**Corporate Headquarters**
**Pennsylvania | Wayne**
650 East Swedesford Road
2nd Floor
Wayne, PA 19087
Phone: 877-971-9171
Fax: 610-971-9181

**Directions to Corporate Headquarters**

**Employee Research Center**
**Nebraska | Lincoln**
2930 Ridge Line Road, Suite 200
Lincoln, NE 68516
Phone: 402-434-2660
Fax: 402-434-2661

**Pennsylvania | Philadelphia**
The Wolf Building
340 North 12th Street
Suite #309
Philadelphia, PA 19107
Phone: 215-546-7330
Fax: 215-546-7331

**Massachusetts | Waltham**
343 Winter Street
Waltham, MA 02451
Phone: 781-530-5000
Fax: 781-530-5500

**Colorado | Englewood**
116 Inverness Drive East
Suite 103
Englewood, CO 80112
Phone: 303-925-7500
Fax: 303-790-1663

**Minnesota | Minneapolis**
901 Marquette Avenue, Suite 1900
Minneapolis, MN 55402 USA
Phone: 612-332-6383

**California | San Francisco**
425 Market Street Center, Ste. 2200
San Francisco, CA 94105
Phone: 415-381-3500

Canada

## Europe
### United Kingdom

**European Headquarters**
**United Kingdom | London**
33 Glasshouse Street
Piccadilly Circus
London W1B 5DG, UK.
Tel: +44 (0) 20 7851 8120
Fax: +44 (0) 20 7851 8121

**United Kingdom | Middlesex**
66-68 College Road
Harrow
Middlesex HA1 1BE, UK.
Tel: +44 (0) 20 8585 2345
Fax: +44 (0) 20 8585 2346

### The Netherlands

**The Netherlands | Amsterdam**
Amstel Business Park
Joop Geesinkweg 999
1096 AZ Amsterdam
The Netherlands
Tel: +31 (0)20 561 6019
Fax: +31 (0)20 561 6666

### Germany

**Germany | Munich**
Bahnhofplatz 4A
D-85540 Haar b. München
Germany
Tel: +49 (0)89 530 731 0
Fax: +49 (0)89 530 731 11

## Asia
### India

**Asian Headquarters**
**India | Hyderabad**
8-2-502/1AG, 3rd Floor
Uma Aishwarya House
Road no. 7
Banjara Hills , Hyderabad 500 034
Phone : 011-91-402-335-1270/71
Fax : 011-91-402-335-1844

**Toronto**
802-220 Bay Street
Toronto, Ontario
Canada M5J 2W4
Tel: 416-364-3799
Fax: 416-364-4189

Taiwan

**Taiwan | Taipei**
10F, 76, Sec 2, Nanjing E. Road
Taipei, Taiwan, R.O.C.
Phone: 886-955-616-819

Hong Kong

**Hong Kong | Hong Kong**
45/F The Lee Garden
33 Hysan Avenue
Causeway Bay
Hong Kong
Tel: (852) 3180 2366
Fax: (852) 3180 2299
or
Tel: +1 852 3180 2366
Fax: +1 852 3180 2299

Contact Us | Demos | Site Map | Privacy Policy

# EXHIBIT D



IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

MAR 29 2007

Deputy Clerk Superior Court
Fulton County, Georgia

LESLIE LOVELACE,                              )
                                             )
            Plaintiff,                       )
                                             )        Civil Action File No.
v.                                           )
                                             )
KENEXA TECHNOLOGY, INC.                      )
                                             )
            Defendant.                       )

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

Plaintiff Leslie Lovelace hereby files this Complaint against defendant Kenexa

Technology, Inc. ("Kenexa") and allege as follows:

1.    Plaintiff Leslie Lovelace is a resident citizen of Paulding County, Georgia

residing at 431 Vine Creek Drive, Acworth, Georgia 30101.

2.    Defendant Kenexa Technology, Inc. is a multi-national corporation organized and

existing under the laws of the State of Pennsylvania having its principal place of business at 650

East Swedesford Road, Floor 2, Wayne, Pennsylvania 19087.    Kenexa regularly conducts

business in the State of Georgia.    Kenexa's registered agent in the State of Georgia is CT

Corporation System, 1201 Peachtree Street, N.E., Atlanta, Fulton County, Georgia 30361.

3.    Defendant Kenexa is subject to the jurisdiction of this Court and venue is proper.

### Factual Allegations

4.    Kenexa is engaged in the business of providing services to enable its customers to

recruit and retain employees.    Kenexa has various lines of business, including Human Capital

Management Software Licenses Service; Personnel Search, Recruitment and Recruitment

Management; Retention Consulting Survey Administration; and Personnel Assessment and Testing.

5.    On or about August 21, 2006, plaintiff Lovelace was employed by Kenexa and entered into an Employment Agreement Relating to Business Information, Trade Secrets and Non-Competition. ("Lovelace Employment Agreement")   A true and correct copy of the Employment Agreement is attached hereto as Exhibit "A."

6.    The Lovelace Employment Agreement provides, in pertinent part, that:

    a.    Kenexa would employ Lovelace in its Personnel Search line of business;

    b.    Lovelace's employment was "at-will" (¶1); and

    c.    Lovelace was bound by certain post-employment non-competition and non-solicitation covenants. (¶ 3).

7.    From early September 2006 until November 10, 2006, Lovelace was engaged in the Personnel Search line of business for Kenexa and provided administrative services to other Kenexa employees who provided Personal Search services to Bluelinx, a Kenexa customer. Specifically, Lovelace was engaged in the following customer services while employed by Kenexa:

- Obtained and reviewed requisition order for Bluelinx hiring.

- Processed interviewee referred by Kenexa.

- Coordinate and conduct debriefing sessions with Bluelinx following interviews.

- Coordinate offer letters and collection of pre-employment information.8.

8.    On or about November 10, 2006, Lovelace terminated her employment with Kenexa.

9.    On or about November 20, 2006, Bluelinx employed Lovelace in its human resources department to assist in recruiting employees.

10.    By letters dated March 9, 2007, Kenexa asserted that plaintiff Lovelace was violating the non-competition and non-solicitation terms of the Lovelace Employment Agreement. (A true and correct copy of the Kenexa demand letter is attached hereto as Exhibit "B.") Kenexa asserted in its demand letter that: (a) the non-competition and non-solicitation provisions of the Employment Agreement were enforceable; (b) the confidentiality provision of the Employment Agreement was enforceable; (c) Lovelace was required to "immediately cease [her] employment with Bluelinx"; and (d) pay $20,000 in alleged liquidated damages.

## COUNT I

### Declaratory Judgment

11.    Plaintiff realleges and incorporate by reference the allegations of paragraphs 1 through 10 of the Complaint.

12    There exists an actual controversy between plaintiff Lovelace and defendant Kenexa with respect to the enforceability of the confidentiality, non-competition and non-solicitation provisions of the Lovelace Employment Agreement. In addition, the ends of justice require that this Court declare the legal rights of the parties to the Lovelace Employment Agreement. Therefore, this Court has the jurisdiction and power, pursuant to O.C.G.A. § 9-4-2, to declare the legal rights of the parties under the Lovelace Employment Agreement.

13.    Plaintiff requests this Court to declare that the non-competition, non-solicitation and non-disclosure provisions of the Lovelace Employment Agreement are illegal and unenforceable as a matter of law for the following reasons, among others:

3

A.      Paragraph 3(b) of the Lovelace Employment Agreement purport to prohibit Lovelace from competing "in any way" with Kenexa "in any aspect of the business of Kenexa within one hundred (100) miles of any existing Kenexa location." It further purports to prohibit Lovelace from having "any interest" in any business that provides the same or similar services as Kenexa. Moreover, Kenexa is defined in the Employment Agreement as including "any business entities owned, controlled, operated or otherwise affiliated with, related to, or a subsidiary of Kenexa. This provision is illegal and unenforceable under Georgia law because: (1) the scope of the conduct to be restricted ("in any way") is overly broad; (2) the geographic area of the non-compete is based on where Kenexa does business, not where Lovelace performed services: (3) the scope of the non-compete being defined by "existing" Kenexa locations cannot be determined until the termination of the Lovelace's employment; and (4) the scope of the definition of Kenexa to include subsidiaries and affiliates is overly broad.

B.      Paragraph 8(c) and (d) of the Lovelace Employment Agreement purport to prohibit Lovelace from competing "in any way" with Kenexa for periods of 18 months and two (2) years, respectively,  These provisions are illegal and unenforceable under Georgia law because they contain no territorial restriction on the covenants and do not define the type of activities that are prohibited.

C.      Paragraph 3(c) of the  Lovelace Employment Agreement further provides that Lovelace shall not solicit "any client or candidate of Kenexa . . . with whom Kenexa dealt, contacted or solicited within two (2) years preceding Employee's termination of employment with Kenexa." This provision is illegal and unenforceable under Georgia law because a non-solicitation covenant cannot prohibit an employee from soliciting "any" client of the employer unless the covenant has an express territorial limitation.

4

    D.    Paragraph 2 of the Employment Agreement provides that Lovelace shall not disclose or use any confidential information of Kenexa, "during employment or any time thereafter," except as may be required by employee's duties. This non-disclosure covenant is illegal and unenforceable under Georgia law because it contains no time limitation.

14.    In claiming that the non-competition, non-solicitation and non-disclosure provisions of the Employment Agreement would be enforced against Lovelace, Kenexa has acted in bad faith, has been stubbornly litigious, or has caused plaintiff unnecessary trouble and expense. Plaintiff is entitled to an award of the expenses of litigation, including reasonable attorneys' fees, as provided in O.C.G.A. § 13-6-1.

WHEREFORE, the premises considered, plaintiff Leslie Lovelace requests this Court to enter a declaratory judgment providing that:

    A.    Paragraphs 2 and 3 of the Employment Agreement are illegal and unenforceable as a matter of law;

    B.    Plaintiff shall recover the litigation expenses, including reasonable attorneys' fee; and

    C.    Such other, further, or different relief to which plaintiff may be entitled.

### COUNT II

#### Injunctive Relief

15.    Plaintiff reallege and incorporate by reference the allegations of paragraphs 1 through 14 of the Complaint.

16.    Pursuant to O.C.G.A.§ 9-11-65, plaintiff is entitled to a temporary restraining order and interlocutory and permanent injunction enjoining Kenexa from enforcing or attempting

to enforce the provisions of the Employment Agreement relating to non-competition, non-solicitation and non-disclosure of confidential information.

WHEREFORE, the premises considered, plaintiff Leslie Lovelace request that defendant Kenexa Technology, Inc. be temporarily and permanently enjoined and barred from enforcing or attempting to enforce the non-competition, non-solicitation and non-disclosure provisions set forth in paragraphs 2 and 3 of the Employment Agreement and that this Court order such other, further, or different relief to which plaintiff may be entitled.

This 28th day of March, 2007.

Respectfully submitted,

CHOREY, TAYLOR & FEIL,
A Professional Corporation

Thomas J. Gallo
Georgia Bar No. 283048
The Lenox Building, Suite 1700
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326-1148
Telephone: (404) 841-3200
Facsimile: (404) 841-3221

Counsel for Plaintiff Leslie Lovelace

# EXHIBIT A

**EMPLOYMENT AGREEMENT RELATING TO
BUSINESS INFORMATION, TRADE
SECRETS AND NON-COMPETITION**

THIS AGREEMENT was made and entered into the 21st day of August, 2006 by and between KENEXA TECHNOLOGY, INC., a Pennsylvania corporation (the "Corporation"), including business entities owned, controlled, operated, or otherwise affiliated with, related to, or a subsidiary of the Corporation (hereinafter collectively referred to as "Kenexa") and Leslie Lovelace (hereinafter referred to as "Employee").

**RECITALS**

Kenexa is in the business of:

| Line of Business | Check Appropriate Categories | Employee Initials | Hiring Manager Initials |
|---|---|---|---|
| Human Capital Management Software Licenses and Service | ☐ | | |
| Personnel Search, Recruitment and Recruitment Management | ☒ | | |
| Retention Consulting, Survey Administration | ☐ | | |
| Personnel Assessment and Testing | ☐ | | |

and desires to employ Employee in connection with such business activity. Kenexa and its customers have expended substantial amounts of time, money and expertise in developing, perfecting and maintaining its and their confidential and proprietary information and trade secrets and desires to impart such information to Employee, but only on the condition that such information be used solely for Kenexa's or its customers benefit and not in competition with or to the detriment of Kenexa or its customers.

In connection with Employee's duties, Employee will receive training and will have access to and/or be provided with and, in some circumstances, will prepare and create confidential and proprietary business information and trade secrets belonging to Kenexa and its customers.

As a precondition to Employee's initial employment or promotion or a change in compensation, Kenexa has required assurances by Employee that Kenexa's and its customers confidential and proprietary business information and trade secrets will be fully protected as hereinafter provided and that, both during and after employment, Employee will not compete against Kenexa, except as hereinafter permitted; and Employee is desirous of accepting the offer of employment or promotion or a change in compensation with Kenexa and the substantial benefits to Employee flowing therefrom, and, as a condition thereof, Employee is willing and has agreed to abide by and faithfully observe the obligations of Employee set forth herein.

THEREFORE, in consideration of the mutual promises and covenants provided, Kenexa and Employee hereby promise and agree as follows:

1.    **Acknowledgments of Employee.**    Employee acknowledges that, in connection with Employee's employment and in consideration of this Agreement, Employee will receive substantial consideration, including, but not limited to, training, salary and employee benefits, and the opportunity for future advancement in Kenexa. Employee further acknowledges that all benefits and potential benefits to Employee from employment are conferred by Kenexa upon Employee on condition of Employee's willingness to commit Employee's best efforts and loyalty to Kenexa, including abiding by the confidentiality, non-competition and other provisions hereof. Employee also acknowledges that any breach by Employee of this Agreement will constitute a violation of the terms and conditions of the employment relationship between Employee and Kenexa and may result in the immediate termination by Kenexa of the employment relationship which is "at-will", including salary, benefits, and unpaid commissions. Employee further acknowledges that, in the event of any violation of this Agreement by Employee, monetary damages alone will be inadequate to compensate Kenexa, and Kenexa shall be entitled to injunctive relief against Employee in addition to any other remedies provided by law or in equity.

2.    **Confidential Business Information and Trade Secrets.**

a.    Employee recognizes and acknowledges that, during the term of employment with Kenexa, Employee will have access to, learn, be provided with and, in some cases, prepare and create certain confidential and proprietary business information and trade secrets of Kenexa and/or its customers, including, but not limited to, business methods; client and candidate information; client and candidate lists; prospective client and candidate lists and information; the terms of client contracts and proposals; product technology and product development strategies; pricing policies, methods of delivering services and products, marketing and sales methods and strategies; identities of Kenexa and its customers employees, agents, and representatives; employment and payroll information; forecasts, budgets and other non-public financial information; information about the internal organization and business structure of Kenexa and its customers and the work assignments or capabilities of Kenexa's employees and officers; and expansion plans, management policies and other business strategies and policies, software configurations, computer codes and instructions, computer inputs and outputs (regardless of the media on which stored or located), and computer processing systems, techniques, designs, architecture, and interfaces, all of which are of substantial value to Kenexa and/or its customers (the "Confidential Information").

b.    Employee understands and agrees that if, during employment or at any time thereafter, Employee discloses to third parties, uses for Employee's own benefit or for the benefit of third parties, or copies or makes notes of any of the Confidential Information except as may be required by Employee's duties with Kenexa, such conduct shall constitute a breach of the confidence and trust bestowed upon Employee by Kenexa, and Employee expressly agrees that injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate.

c.    Employee agrees not to use or cause to be used for Employee's own benefit or for the benefit of any third parties or to disclose to any third party in any manner, directly or indirectly, any Confidential Information, except that which is public knowledge, about or relating to the business of Kenexa or its customers at any time during or after Employee's employment with Kenexa without the express prior written consent of Kenexa.

d.    Employee agrees to return to Kenexa, either before or immediately upon the termination of Employee's employment with Kenexa, any and all written information, materials or equipment which constitutes, contains or relates in any way to the Confidential Information and any and all other documents, equipment and materials of any kind relating in any way to the business of Kenexa which are or may be in the possession, custody or control of Employee and which are or may be the property of Kenexa, whether confidential or not, including any and all copies thereof.

3.    **Non-competition.**

Employee agrees that:

a.    During Employee's employment with Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not consult with or have any interest in any business, firm, person, partnership, corporation or other entity ("Business"), whether as an employee, officer, director, shareholder, agent, security holder, creditor, consultant or otherwise ("Interested Person"), which engages in the performance of or provides the same or similar services or products as provided by Kenexa to any individual or entity, or which competes with Kenexa, directly or indirectly, in any aspect of Kenexa's business.

b.    For a period of one (1) year after Employee is no longer employed by Kenexa, Employee, without the express prior written consent of Kenexa, will not compete in any way with Kenexa, directly or indirectly, and will not consult with, accept employment with, or have any interest in any Business, whether alone or as an Interested Person, which engages in the performance of or provides the same or similar services as provided by Kenexa to any individual or entity or which competes with Kenexa, directly or indirectly, in any aspect of the business of Kenexa within one hundred (100) miles of any existing Kenexa location. Employee specifically agrees to this geographic restriction, since the principal means by which Kenexa's business is conducted is through e-mail, telephonic and mail communications.

c.    For a period of eighteen (18) months after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an Interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective client or candidate of Kenexa with whom Kenexa dealt, contacted or solicited within two (2) years preceding Employee's termination of employment with Kenexa.

d. For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an Interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective client or candidate of Kenexa with whom Employee dealt, contacted or solicited on behalf of Kenexa within three (3) years preceding Employee's termination of employment with Kenexa.

e. For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not influence or attempt to influence, either directly or indirectly, any of Kenexa's clients, candidates or personnel not to do business with Kenexa.

4. <u>Representations of Employee.</u> Employee hereby represents that Employee has read and fully understands Employee's duties and obligations as set forth herein and that such duties and obligations would not unduly restrict or curtail Employee's legitimate efforts to earn a livelihood following any termination of Employee's employment with Kenexa. Employee also warrants that he is not a party to any other restrictive agreement limiting his activities in the field of his employment with Kenexa, and Employee will hold Kenexa harmless from any and all suits and claims arising out of any breach of such restrictive agreements or contracts.

5. <u>Remedies.</u> The parties hereto agree to the reasonableness of the restrictions, duties and obligations set forth above and acknowledge that they have obtained all professional advice that they deem necessary for full understanding of the consequences hereof and that, thereafter, they voluntarily executed and entered into this Agreement. In the event of a breach of this Agreement, Employee agrees that Kenexa shall be entitled, in addition to any other available remedies, to temporary and permanent injunctive relief without the necessity of posting a bond and to expedited discovery. Notwithstanding the foregoing, if any court shall determine such restrictions to be unreasonable, the parties agree to the reformation of such restrictions by the court to limits that it finds to be reasonable, and Employee will not assert that such restrictions should be eliminated in their entirety by such court. In addition, in the event that Employee breaches Paragraph 2 and/or Paragraph 3 of this Agreement pertaining to Confidential Business Information, Trade Secrets and Non-competition, or violates or fails to fulfill and perform any term or condition of those paragraphs, Employee agrees that the damages arising as a consequence of each violation or breach may be difficult to ascertain and that, therefore, Kenexa shall be entitled to liquidated damages in the amount of Twenty Thousand ($20,000.00) Dollars or shall be entitled to its actual or real damages, as Kenexa may elect at any time. Employee further agrees to indemnify and hold Kenexa harmless from all damages, expenses and costs, including reasonable attorney's fees, relating to the enforcement of this Agreement. Furthermore, in the event of a breach of this Agreement, Kenexa may offset its estimated damages against any payments required to be made to Employee. Furthermore, if Kenexa enforces any of the above-mentioned provisions that has a fixed term, then such term will be extended for a period of time equal to the duration of the breach and the damages resulting therefrom.

6. <u>Assignment of Intellectual Property Rights.</u> Employee hereby assigns to Kenexa all rights to own, patent, trademark, or copyright any items developed during his employment with Kenexa.

7. <u>General.</u>

a. No failure on the part of any party to exercise and no delay in exercising any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

b. This Agreement sets forth the entire understanding and agreement of the parties with respect to the subject matter hereof, and supersedes all previous agreements and representations, whether oral or written.

c. This Agreement shall not be modified, supplemented or terminated orally, but only by an agreement in writing signed by all of the parties hereto.

d. Any headings preceding the text of the several paragraphs and sub-paragraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

e. If any term or provision of this Agreement shall be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby.

f. This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, and Employee hereby consents to exclusive personal jurisdiction and venue within

the Commonwealth of Pennsylvania, County of Montgomery or the United States District Court for the Eastern District of Pennsylvania.

g. This Agreement shall be binding upon Employee and all of Employee's heirs and legal representatives and shall be binding upon and inure to the benefit of Kenexa and its successors and assigns.

h. Any notices required or permitted pursuant to this Agreement shall be sufficient if hand-delivered or, if sent by Kenexa, by certified mail, postage prepaid, to Employee's then-current residential address as shown in the employment records of Kenexa, and, if sent by Employee, by certified mail, postage prepaid, to the headquarters of Kenexa. All notices given hereunder shall be deemed given on the day of hand-delivery or three (3) days after being sent by certified mail. Either party may change its address and must give the other party written notice of said change.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement as of the day and year first written above.

KENEXA TECHNOLOGY, INC.

By: _____    Date 8/7/06
Joy M. Durie

_____    Date 8/21/06
Leslie Lovelace

# EXHIBIT B

650 East Swedesford Road
Second Floor
Wayne, PA 19087

(t) 610-971-9171
(f) 610-971-9181
www.kenexa.com



**VIA DHL EXPRESS**
**770-974-4578**

March 9, 2007

Ms. Leslie Lovelace
431 Vine Creek Drive
Acworth, GA 30101

Dear Ms. Lovelace:

As you know, you entered into an *Employment Agreement Relating to Business Information, Trade Secrets and Non-competition* ("Agreement") with Kenexa Technology, Inc. dated August 21, 2006.

Section 2 <u>Confidential Business Information and Trade Secrets</u> of the Agreement provides as follows:

    a. Employee recognizes and acknowledges that during the term of employment with Kenexa, Employee will have access to, learn, be provided with and, in some cases, will prepare and create certain confidential and proprietary business information and trade secrets of Kenexa and/or its customers, including but not limited to business methods; client and candidate information; client and candidate lists; prospective client and candidate lists and information; the terms of client contracts and proposals; product technology and product development strategies; pricing policies, methods of delivering services and products, marketing and sales methods and strategies; identities of Kenexa and its customers' employees, agents, and representatives; employment and payroll information; forecasts, budgets and other non-public financial information; information about the internal organization and business structure of Kenexa and its customers and the work assignments or capabilities of Kenexa's employees and officers; and expansion plans, management policies and other business strategies and policies, software configurations, computer codes and instructions, computer inputs and outputs (regardless of the media on which stored or located), and computer processing systems, techniques, designs, architecture, and interfaces, all of which are of substantial value to Kenexa and/or its customers (the "Confidential Information").

    b. Employee understands and agrees that if, during employment or at any time thereafter, Employee discloses to third parties, uses for Employee's own benefit or for the benefit of third parties, or copies or makes notes of any of the Confidential Information except as may be required by Employee's duties with Kenexa, such

Letter to Ms. Lovelace
March 9, 2007
Page 2

conduct shall constitute a breach of the confidence and trust bestowed upon Employee by Kenexa, and Employee expressly agrees that injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate.

c. Employee agrees not to use or cause to be used for Employee's own benefit or for the benefit of any third parties or to disclose to any third party in any manner, directly or indirectly, any Confidential Information, except that which is public knowledge, about or relating to the business of Kenexa or its customers at any time during or after Employee's employment with Kenexa without the express prior written consent of Kenexa.

d. Employee agrees to return to Kenexa, either before or immediately upon the termination of Employee's employment with Kenexa, any and all written information, materials or equipment which constitutes, contains or relates in any way to the Confidential Information and any and all other documents, equipment and materials of any kind relating in any way to the business of Kenexa which are or may be in the possession, custody or control of Employee and which are or may be the property of Kenexa, whether confidential or not, including any and all copies thereof.

Section 3  Non-competition of the Agreement provides as follows:

Employee agrees that:

a. During Employee's employment with Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not consult with or have any interest in any business, firm, person, partnership, corporation or other entity ("Business"), whether as an employee, officer, director, shareholder, agent, security holder, creditor, consultant or otherwise ("Interested Person"), which engages in the performance of or provides the same or similar services or products as provided by Kenexa to any individual or entity, or which competes with Kenexa, directly or indirectly, in any aspect of Kenexa's business.

b. For a period of one (1) year after Employee is no longer employed by Kenexa, Employee, without the express prior written consent of Kenexa, will not compete in any way with Kenexa, directly or indirectly, and will not consult with, accept employment with, or have any interest in any Business, whether alone or as an Interested Person, which engages in the performance of or provides the same or similar services as provided by Kenexa to any individual or entity or which competes with Kenexa, directly or indirectly, in any aspect of the business of Kenexa within one hundred (100) miles of any existing Kenexa location. Employee specifically agrees to this geographic restriction, since the principal means by which Kenexa's business is conducted is through e-mail, telephonic and mail communications.

c. For a period of eighteen (18) months after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an Interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective

Letter to Ms. Lovelace
March 9, 2007
Page 3

client or candidate of Kenexa with whom Kenexa dealt, contacted or solicited within two (2) years preceding Employee's termination of employment with Kenexa.

d.  For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective client or candidate of Kenexa with whom Employee dealt, contacted or solicited on behalf of Kenexa within three (3) years preceding Employee's termination of employment with Kenexa.

e.  For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not influence or attempt to influence, either directly or indirectly, any of Kenexa's clients, candidates or personnel not to do business with Kenexa.

Section 5 Remedies of the Agreement provides as follows:

The parties hereto agree to the reasonableness of the restrictions, duties and obligations set forth above and acknowledge that they have obtained all professional advice that they deem necessary for full understanding of the consequences hereof and that, thereafter, they voluntarily executed and entered into this Agreement.  In the event of a breach of this Agreement, Employee agrees that Kenexa shall be entitled, in addition to any other available remedies, to temporary and permanent injunctive relief without the necessity of posting a bond and to expedited discovery.  Notwithstanding the foregoing, if any court shall determine such restrictions to be unreasonable, the parties agree to the reformation of such restrictions by the court to limits that it finds to be reasonable, and Employee will not assert that such restrictions should be eliminated in their entirety by such court.  In addition, in the event that Employee breaches Paragraph 2 and/or Paragraph 3 of this Agreement pertaining to Confidential Business Information, Trade Secrets and Non-competition, or violates or fails to fulfill and perform any term or condition of those paragraphs, Employee agrees that the damages arising as a consequence of each violation or breach may be difficult to ascertain and that, therefore, Kenexa shall be entitled to liquidated damages in the amount of Twenty Thousand ($20,000.00) Dollars or shall be entitled to its actual or real damages, as Kenexa may elect at any time.  Employee further agrees to indemnify and hold Kenexa harmless from all damages, expenses and costs, including reasonable attorney's fees, relating to the enforcement of this Agreement.  Furthermore, in the event of a breach of this Agreement, Kenexa may offset its estimated damages against any payments required to be made to Employee.  Furthermore, if Kenexa enforces any of the above-mentioned provisions that has a fixed term, then such term will be extended for a period of time equal to the duration of the breach and the damages resulting therefrom.

Kenexa requires compliance with its employment agreements. We understand that you have become employed by BlueLinx Corporation, the Kenexa customer to which you were assigned while employed with Kenexa, in clear violation of your Agreement.

Please be advised that Kenexa vigorously will enforce the Agreement and has successfully enforced the terms of the Agreement.

Letter to Ms. Lovelace
March 9, 2007
Page 4

Accordingly, you must immediately cease your employment with BlueLinx, remit the $20,000 liquidated damages required by the Agreement to Kenexa and return all Kenexa confidential information in your possession, custody and control, including all records, correspondence and notes generated during your employment with Kenexa to me. Please send a letter confirming the date of resignation of your employment with BlueLinx, the confidential information detailed above and your check made payable to Kenexa Technology, Inc. to my attention prior to Friday, March 16, 2007. If we do not receive these items by March 16, 2007, Kenexa will be forced to institute legal action against you for violations of the Agreement.

Very truly yours,

Cynthia Pyle Dixon
General Counsel

cc:    Robert Penman, Esq.
       R. Karl Hill, Esq.

# EXHIBIT E



IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

SUSAN PODSIAD,                    )
                                  )
        Plaintiff,                )
                                  )         Civil Action File No.
v.                                )
                                  )         FILED IN OFFICE
KENEXA TECHNOLOGY, INC.           )
                                  )         MAR 29 2007
        Defendant.                )
                                            Deputy Clerk Superior Court
                                            Fulton County, Georgia

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF

Plaintiff Susan Podsiad hereby files this Complaint against defendant Kenexa

Technology, Inc. ("Kenexa") and allege as follows:

    1.    Plaintiff Susan Podsiad is a resident citizen of Cobb County, Georgia residing at

4032 Maxanne Drive, Kennesaw, Georgia 30144.

    2.    Defendant Kenexa Technology, Inc. is a multi-national corporation organized and

existing under the laws of the State of Pennsylvania having its principal place of business at 650

East Swedesford Road, Floor 2, Wayne, Pennsylvania 19087.   Kenexa regularly conducts

business in the State of Georgia.   Kenexa's registered agent in the State of Georgia is CT

Corporation System, 1201 Peachtree Street, N.E., Atlanta, Fulton County, Georgia 30361.

    3.    Defendant Kenexa is subject to the jurisdiction of this Court and venue is proper.

Factual Allegations

    4.    Kenexa is engaged in the business of providing services to enable its customers to

recruit and retain employees.   Kenexa has various lines of business, including Human Capital

Management Software Licenses Service; Personnel Search, Recruitment and Recruitment

Management; Retention Consulting Survey Administration; and Personnel Assessment and Testing.

5.    On or about August 24, 2006, plaintiff Podsiad was employed by Kenexa and entered into an Employment Agreement Relating to Business Information, Trade Secrets and Non-Competition. ("Podsiad Employment Agreement")   A true and correct copy of the Employment Agreement is attached hereto as Exhibit "A."

6.    The Podsiad Employment Agreement provides, in pertinent part, that:

a.    Kenexa would employ Podsiad in its Personnel Search line of business;

b.    Podsiad's employment was "at-will" (¶1); and

c.    Podsiad was bound by certain post-employment non-competition and non-solicitation covenants. (¶ 3).

7.    From early September 2006 until November 10, 2006, Podsiad was engaged in the Personnel Search line of business for Kenexa and provided administrative services to other Kenexa employees who provided Personal Search services to Bluelinx, a Kenexa customer. Specifically, Podsiad was engaged in the following administrative activities while employed by Kenexa:

- Scheduled candidates for live interviews in coordination with Kenexa's On-Site Staffing Consultant.

- Coordinated interview logistics including overseeing travel arrangements, reserving interview space and emailing candidate pre-interview packet.

- Ensured offer packet, inclusive of hard copy offer letter is generated within 1 business day of confirmation of offer.

- Initiated background check and pre-employment drug screening process.

- Ensured all required candidate pre-employment information is collected (i.e. drug screen, background check, more ...) completed and passed (if necessary) before the candidate started work.

8.     On or about November 10, 2006, Podsiad terminated her employment with Kenexa.

9.     On or about November 20, 2006, Bluelinx employed Podsiad in its human resources department to assist in recruiting employees.

10.     On March 9, 2007, Kenexa asserted that plaintiff Podsiad was violating the non-competition and non-solicitation terms of the Podsiad Employment Agreement.  (A true and correct copy of the Kenexa demand letter is attached hereto as Exhibit "B.")  Kenexa asserted in its demand letter that:    (a) the non-competition and non-solicitation provisions of the Employment Agreement were enforceable; (b) the confidentiality provision of the Employment Agreement was enforceable; (c) Podsiad was required to "immediately cease [her] employment with Bluelinx"; and (d) pay $20,000 in alleged liquidated damages.

## COUNT I

### Declaratory Judgment

11.     Plaintiff reallege and incorporate by reference the allegations of paragraphs 1 through 10 of the Complaint.

12     There exists an actual controversy between plaintiff Podsiad and defendant Kenexa with respect to the enforceability of the confidentiality, non-competition and non-solicitation provisions of the Podsiad Employment Agreement.  In addition, the ends of justice require that this Court declare the legal rights of the parties to the Podsiad Employment Agreement.  Therefore, this Court has the jurisdiction and power, pursuant to O.C.G.A. § 9-4-2, to declare the legal rights of the parties under the Podsiad Employment Agreement.

13.    Plaintiff requests this Court to declare that the non-competition, non-solicitation and non-disclosure provisions of the Podsiad Employment Agreement are illegal and unenforceable, as a matter of law for the following reasons, among others:

A.    Paragraph 3(b) of the Podsiad Employment Agreement purports to prohibit Podsiad from competing "in any way" with Kenexa "in any aspect of the business of Kenexa within one hundred (100) miles of any existing Kenexa location." It further purports to prohibit Podsiad from having "any interest" in any business that provides the same or similar services as Kenexa. Moreover, Kenexa is defined in the Employment Agreement as including "any business entities owned, controlled, operated or otherwise affiliated with, related to, or a subsidiary of" Kenexa. This provision is illegal and unenforceable under Georgia law because: (1) the scope of the conduct to be restricted ("in any way") is overly broad; (2) the geographic area of the non-compete is based on where Kenexa does business, not where Podsiad performed services: (3) the scope of the non-compete being defined by "existing" Kenexa locations cannot be determined until the termination of the Podsiad's employment; and (4) the scope of the definition of Kenexa to include subsidiaries and affiliates is overly broad.

B.    Paragraphs 3(c) and (d) purport of the Podsiad Employment Agreement to prohibit Podsiad from competing "in any way" with Kenexa for periods of 18 months and two (2) years, respectively, These provisions are illegal and unenforceable under Georgia law because they contain no territorial restriction on the covenants and do not define the type of activities that are prohibited.

C.    Paragraph 3(c) of the Podsiad Employment Agreement further provides that the Podsiad shall not solicit "any client or candidate of Kenexa . . . with whom Kenexa dealt, contacted or solicited within two (2) years preceding Employee's termination of employment

with Kenexa." This provision is illegal and unenforceable under Georgia law because a non-solicitation covenant cannot prohibit an employee from soliciting any client of the employer unless the covenant has an express territorial limitation.

      D.    Paragraph 2 of the Employment Agreement provides that Podsiad shall not disclose or use any confidential information of Kenexa, "during employment or any time thereafter," except as may be required by employee's duties. This non-disclosure covenant is illegal and unenforceable under Georgia law because it contains no time limitation.

      14.    In claiming that the non-competition, non-solicitation and non-disclosure provisions of the Employment Agreement would be enforced against Podsiad, Kenexa has acted in bad faith, has been stubbornly litigious, or has caused plaintiff unnecessary trouble and expense. Plaintiff is entitled to an award of the expenses of litigation, including reasonable attorneys' fees, as provided in O.C.G.A. § 13-6-1.

      WHEREFORE, the premises considered, plaintiff Susan Podsiad requests this Court to enter a declaratory judgment providing that:

      A.    Paragraphs 2 and 3 of the Employment Agreement are illegal and unenforceable as a matter of law;

      B.    Plaintiff shall recover the litigation expenses, including reasonable attorneys' fee; and

      C.    Such other, further, or different relief to which plaintiff may be entitled.

## COUNT II

### Injunctive Relief

      15.    Plaintiff reallege and incorporate by reference the allegations of paragraphs 1 through 14 of the Complaint.

16.   Pursuant to O.C.G.A.§ 9-11-65, plaintiff is entitled to a temporary restraining order and interlocutory and permanent injunction enjoining Kenexa from enforcing or attempting to enforce the provisions of the Employment Agreement relating to non-competition, non-solicitation and non-disclosure of confidential information.

WHEREFORE, the premises considered, plaintiff Susan Podsiad request that defendant Kenexa Technology, Inc. be temporarily and permanently enjoined and barred from enforcing or attempting to enforce the non-competition, non-solicitation and non-disclosure provisions set forth in paragraphs 2 and 3 of the Employment Agreement and that this Court order such other, further, or different relief to which plaintiff may be entitled.

This 29th day of March, 2007.

Respectfully submitted,

CHOREY, TAYLOR & FEIL,
A Professional Corporation

Thomas J. Gallo
Georgia Bar No. 283048
The Lenox Building, Suite 1700
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326-1148
Telephone: (404) 841-3200
Facsimile: (404) 841-3221

Counsel for Plaintiff Susan Podsiad

# EXHIBIT A

**EMPLOYMENT AGREEMENT RELATING TO
BUSINESS INFORMATION, TRADE
SECRETS AND NON-COMPETITION**

THIS AGREEMENT was made and entered into the 24th day of August, 2005 by and between KENEXA TECHNOLOGY, INC., a Pennsylvania corporation (the "Corporation"), including business entities owned, controlled, operated, or otherwise affiliated with, related to, or a subsidiary of the Corporation (hereinafter collectively referred to as "Kenexa") and Susan Podsiad (hereinafter referred to as "Employee").

**RECITALS**

Kenexa is in the business of:

| Line of Business | Check Appropriate Categories | Employee Initials | Hiring Manager Initials |
|---|---|---|---|
| Human Capital Management Software Licenses and Service | ☐ | | |
| Personnel Search, Recruitment and Recruitment Management | ☒ | *SP* | |
| Retention Consulting, Survey Administration | ☐ | | |
| Personnel Assessment and Testing | ☐ | | |

and desires to employ Employee in connection with such business activity. Kenexa and its customers have expended substantial amounts of time, money and expertise in developing, perfecting and maintaining its and their confidential and proprietary information and trade secrets and desires to impart such information to Employee, but only on the condition that such information be used solely for Kenexa's or its customers benefit and not in competition with or to the detriment of Kenexa or its customers.

In connection with Employee's duties, Employee will receive training and will have access to and/or be provided with and, in some circumstances, will prepare and create confidential and proprietary business information and trade secrets belonging to Kenexa and its customers.

As a precondition to Employee's initial employment or promotion or a change in compensation, Kenexa has required assurances by Employee that Kenexa's and its customers confidential and proprietary business information and trade secrets will be fully protected as hereinafter provided and that, both during and after employment, Employee will not compete against Kenexa, except as hereinafter permitted; and Employee is desirous of accepting the offer of employment or promotion or a change in compensation with Kenexa and the substantial benefits to Employee flowing therefrom, and, as a condition thereof, Employee is willing and has agreed to abide by and faithfully observe the obligations of Employee set forth herein.

THEREFORE, in consideration of the mutual promises and covenants provided, Kenexa and Employee hereby promise and agree as follows:

1. **Acknowledgments of Employee.** Employee acknowledges that, in connection with Employee's employment and in consideration of this Agreement, Employee will receive substantial consideration, including, but not limited to, training, salary and employee benefits, and the opportunity for future advancement in Kenexa. Employee further acknowledges that all benefits and potential benefits to Employee from employment are conferred by Kenexa upon Employee on condition of Employee's willingness to commit Employee's best efforts and loyalty to Kenexa, including abiding by the confidentiality, non-competition and other provisions hereof. Employee also acknowledges that any breach by Employee of this Agreement will constitute a violation of the terms and conditions of the employment relationship between Employee and Kenexa and may result in the immediate termination by Kenexa of the employment relationship which is "at-will", including salary, benefits, and unpaid commissions. Employee further acknowledges that, in the event of any violation of this Agreement by Employee, monetary damages alone will be inadequate to compensate Kenexa, and Kenexa shall be entitled to injunctive relief against Employee in addition to any other remedies provided by law or in equity.

2.      **Confidential Business Information and Trade Secrets.**

     a.  Employee recognizes and acknowledges that, during the term of employment with Kenexa, Employee will have access to, learn, be provided with and, in some cases, prepare and create certain confidential and proprietary business information and trade secrets of Kenexa and/or its customers, including, but not limited to, business methods; client and candidate information; client and candidate lists; prospective client and candidate lists and information; the terms of client contracts and proposals; product technology and product development strategies; pricing policies, methods of delivering services and products, marketing and sales methods and strategies; identities of Kenexa and its customers employees, agents, and representatives; employment and payroll information; forecasts, budgets and other non-public financial information; information about the internal organization and business structure of Kenexa and its customers and the work assignments or capabilities of Kenexa's employees and officers; and expansion plans, management policies and other business strategies and policies, software configurations, computer codes and instructions, computer inputs and outputs (regardless of the media on which stored or located), and computer processing systems, techniques, designs, architecture, and interfaces, all of which are of substantial value to Kenexa and/or its customers (the "Confidential Information").

     b.  Employee understands and agrees that if, during employment or at any time thereafter, Employee discloses to third parties, uses for Employee's own benefit or for the benefit of third parties, or copies or makes notes of any of the Confidential Information except as may be required by Employee's duties with Kenexa, such conduct shall constitute a breach of the confidence and trust bestowed upon Employee by Kenexa, and Employee expressly agrees that injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate.

     c.  Employee agrees not to use or cause to be used for Employee's own benefit or for the benefit of any third parties or to disclose to any third party in any manner, directly or indirectly, any Confidential Information, except that which is public knowledge, about or relating to the business of Kenexa or its customers at any time during or after Employee's employment with Kenexa without the express prior written consent of Kenexa.

     d.  Employee agrees to return to Kenexa, either before or immediately upon the termination of Employee's employment with Kenexa, any and all written information, materials or equipment which constitutes, contains or relates in any way to the Confidential Information and any and all other documents, equipment and materials of any kind relating in any way to the business of Kenexa which are or may be in the possession, custody or control of Employee and which are or may be the property of Kenexa, whether confidential or not, including any and all copies thereof.

3.      **Non-competition.**

   Employee agrees that:

     a.  During Employee's employment with Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not consult with or have any interest in any business, firm, person, partnership, corporation or other entity ("Business"), whether as an employee, officer, director, shareholder, agent, security holder, creditor, consultant or otherwise ("Interested Person"), which engages in the performance of or provides the same or similar services or products as provided by Kenexa to any individual or entity, or which competes with Kenexa, directly or indirectly, in any aspect of Kenexa's business.

     b.  For a period of one (1) year after Employee is no longer employed by Kenexa, Employee, without the express prior written consent of Kenexa, will not compete in any way with Kenexa, directly or indirectly, and will not consult with, accept employment with, or have any interest in any Business, whether alone or as an Interested Person, which engages in the performance of or provides the same or similar services as provided by Kenexa to any individual or entity or which competes with Kenexa, directly or indirectly, in any aspect of the business of Kenexa within one hundred (100) miles of any existing Kenexa location. Employee specifically agrees to this geographic restriction, since the principal means by which Kenexa's business is conducted is through e-mail, telephonic and mail communications.

     c.  For a period of eighteen (18) months after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an Interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective client or candidate of Kenexa with whom Kenexa dealt, contacted or solicited within two (2) years preceding Employee's termination of employment with Kenexa.

d. For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an Interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective client or candidate of Kenexa with whom Employee dealt, contacted or solicited on behalf of Kenexa within three (3) years preceding Employee's termination of employment with Kenexa.

e. For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not influence or attempt to influence, either directly or indirectly, any of Kenexa's clients, candidates or personnel not to do business with Kenexa.

4. **Representations of Employee.** Employee hereby represents that Employee has read and fully understands Employee's duties and obligations as set forth herein and that such duties and obligations would not unduly restrict or curtail Employee's legitimate efforts to earn a livelihood following any termination of Employee's employment with Kenexa. Employee also warrants that he is not a party to any other restrictive agreement limiting his activities in the field of his employment with Kenexa, and Employee will hold Kenexa harmless from any and all suits and claims arising out of any breach of such restrictive agreements or contracts.

5. **Remedies.** The parties hereto agree to the reasonableness of the restrictions, duties and obligations set forth above and acknowledge that they have obtained all professional advice that they deem necessary for full understanding of the consequences hereof and that, thereafter, they voluntarily executed and entered into this Agreement. In the event of a breach of this Agreement, Employee agrees that Kenexa shall be entitled, in addition to any other available remedies, to temporary and permanent injunctive relief without the necessity of posting a bond and to expedited discovery. Notwithstanding the foregoing, if any court shall determine such restrictions to be unreasonable, the parties agree to the reformation of such restrictions by the court to limits that it finds to be reasonable, and Employee will not assert that such restrictions should be eliminated in their entirety by such court. In addition, in the event that Employee breaches Paragraph 2 and/or Paragraph 3 of this Agreement pertaining to Confidential Business Information, Trade Secrets and Non-competition, or violates or fails to fulfill and perform any term or condition of those paragraphs, Employee agrees that the damages arising as a consequence of each violation or breach may be difficult to ascertain and that, therefore, Kenexa shall be entitled to liquidated damages in the amount of Twenty Thousand ($20,000.00) Dollars or shall be entitled to its actual or real damages, as Kenexa may elect at any time. Employee further agrees to indemnify and hold Kenexa harmless from all damages, expenses and costs, including reasonable attorney's fees, relating to the enforcement of this Agreement. Furthermore, in the event of a breach of this Agreement, Kenexa may offset its estimated damages against any payments required to be made to Employee. Furthermore, if Kenexa enforces any of the above-mentioned provisions that has a fixed term, then such term will be extended for a period of time equal to the duration of the breach and the damages resulting therefrom.

6. **Assignment of Intellectual Property Rights.** Employee hereby assigns to Kenexa all rights to own, patent, trademark, or copyright any items developed during his employment with Kenexa.

7. **General.**

a. No failure on the part of any party to exercise and no delay in exercising any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

b. This Agreement sets forth the entire understanding and agreement of the parties with respect to the subject matter hereof, and supersedes all previous agreements and representations, whether oral or written.

c. This Agreement shall not be modified, supplemented or terminated orally, but only by an agreement in writing signed by all of the parties hereto.

d. Any headings preceding the text of the several paragraphs and sub-paragraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

e. If any term or provision of this Agreement shall be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby.

f. This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, and Employee hereby consents to exclusive personal jurisdiction and venue within

the Commonwealth of Pennsylvania, County of Montgomery or the United States District Court for the Eastern District of Pennsylvania.

g. This Agreement shall be binding upon Employee and all of Employee's heirs and legal representatives and shall be binding upon and inure to the benefit of Kenexa and its successors and assigns.

h. Any notices required or permitted pursuant to this Agreement shall be sufficient if hand-delivered or, if sent by Kenexa, by certified mail, postage prepaid, to Employee's then-current residential address as shown in the employment records of Kenexa, and, if sent by Employee, by certified mail, postage prepaid, to the headquarters of Kenexa. All notices given hereunder shall be deemed given on the day of hand-delivery or three (3) days after being sent by certified mail. Either party may change its address and must give the other party written notice of said change.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement as of the day and year first written above.

KENEXA TECHNOLOGY, INC.

By: _____    Date ___8/24/06___
Joy M. Dunn

_____    Date ___8/24/06___
Susan Podsiad

# EXHIBIT B

650 East Swedesford Road
Second Floor
Wayne, PA 19087

(t) 610-971-9171
(f) 610-971-9181
www.kenexa.com



**VIA DHL EXPRESS**
678-445-4944

March 9, 2007

Ms. Susan L. Podsiad
4032 Maxanne Drive
Kennesaw, GA  30144

Dear Ms. Podsiad:

As you know, you entered into an *Employment Agreement Relating to Business Information, Trade Secrets and Non-competition* ("Agreement") with Kenexa Technology, Inc. dated August 24, 2006.

Section 2  Confidential Business Information and Trade Secrets of the Agreement provides as follows:

   a. Employee recognizes and acknowledges that during the term of employment with Kenexa, Employee will have access to, learn, be provided with and, in some cases, will prepare and create certain confidential and proprietary business information and trade secrets of Kenexa and/or its customers, including but not limited to business methods; client and candidate information; client and candidate lists; prospective client and candidate lists and information; the terms of client contracts and proposals; product technology and product development strategies; pricing policies, methods of delivering services and products, marketing and sales methods and strategies;  identities of Kenexa and its customers' employees, agents, and representatives; employment and payroll information; forecasts, budgets and other non-public financial information; information about the internal organization and business structure of Kenexa and its customers and the work assignments or capabilities of Kenexa's employees and officers; and expansion plans, management policies and other business strategies and policies, software configurations, computer codes and instructions, computer inputs and outputs (regardless of the media on which stored or located), and computer processing systems, techniques, designs, architecture, and interfaces, all of which are of substantial value to Kenexa and/or its customers (the "Confidential Information").

   b. Employee understands and agrees that if, during employment or at any time thereafter, Employee discloses to third parties, uses for Employee's own benefit or for the benefit of third parties, or copies or makes notes of any of the Confidential Information except as may be required by Employee's duties with Kenexa, such

Letter to Ms. Podsiad
March 9, 2007
Page 2

conduct shall constitute a breach of the confidence and trust bestowed upon Employee by Kenexa, and Employee expressly agrees that injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate.

c. Employee agrees not to use or cause to be used for Employee's own benefit or for the benefit of any third parties or to disclose to any third party in any manner, directly or indirectly, any Confidential Information, except that which is public knowledge, about or relating to the business of Kenexa or its customers at any time during or after Employee's employment with Kenexa without the express prior written consent of Kenexa.

d. Employee agrees to return to Kenexa, either before or immediately upon the termination of Employee's employment with Kenexa, any and all written information, materials or equipment which constitutes, contains or relates in any way to the Confidential Information and any and all other documents, equipment and materials of any kind relating in any way to the business of Kenexa which are or may be in the possession, custody or control of Employee and which are or may be the property of Kenexa, whether confidential or not, including any and all copies thereof.

Section 3  Non-competition of the Agreement provides as follows:

Employee agrees that:

a. During Employee's employment with Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not consult with or have any interest in any business, firm, person, partnership, corporation or other entity ("Business"), whether as an employee, officer, director, shareholder, agent, security holder, creditor, consultant or otherwise ("Interested Person"), which engages in the performance of or provides the same or similar services or products as provided by Kenexa to any individual or entity, or which competes with Kenexa, directly or indirectly, in any aspect of Kenexa's business.

b. For a period of one (1) year after Employee is no longer employed by Kenexa, Employee, without the express prior written consent of Kenexa, will not compete in any way with Kenexa, directly or indirectly, and will not consult with, accept employment with, or have any interest in any Business, whether alone or as an Interested Person, which engages in the performance of or provides the same or similar services as provided by Kenexa to any individual or entity or which competes with Kenexa, directly or indirectly, in any aspect of the business of Kenexa within one hundred (100) miles of any existing Kenexa location. Employee specifically agrees to this geographic restriction, since the principal means by which Kenexa's business is conducted is through e-mail, telephonic and mail communications.

c. For a period of eighteen (18) months after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an Interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective

Letter to Ms. Podsiad
March 9, 2007
Page 3

client or candidate of Kenexa with whom Kenexa dealt, contacted or solicited within two (2) years preceding Employee's termination of employment with Kenexa.

d. For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not compete in any way with Kenexa, directly or indirectly, and will not, without the express prior written consent of Kenexa, directly or indirectly, whether alone or as an Interested Person, solicit, induce, divert, take away, do business with or render services to any client or candidate of Kenexa or a prospective client or candidate of Kenexa with whom Employee dealt, contacted or solicited on behalf of Kenexa within three (3) years preceding Employee's termination of employment with Kenexa.

e. For a period of two (2) years after Employee is no longer employed by Kenexa, Employee will not influence or attempt to influence, either directly or indirectly, any of Kenexa's clients, candidates or personnel not to do business with Kenexa.

Section 5 Remedies of the Agreement provides as follows:

The parties hereto agree to the reasonableness of the restrictions, duties and obligations set forth above and acknowledge that they have obtained all professional advice that they deem necessary for full understanding of the consequences hereof and that, thereafter, they voluntarily executed and entered into this Agreement. In the event of a breach of this Agreement, Employee agrees that Kenexa shall be entitled, in addition to any other available remedies, to temporary and permanent injunctive relief without the necessity of posting a bond and to expedited discovery. Notwithstanding the foregoing, if any court shall determine such restrictions to be unreasonable, the parties agree to the reformation of such restrictions by the court to limits that it finds to be reasonable, and Employee will not assert that such restrictions should be eliminated in their entirety by such court. In addition, in the event that Employee breaches Paragraph 2 and/or Paragraph 3 of this Agreement pertaining to Confidential Business Information, Trade Secrets and Non-competition, or violates or fails to fulfill and perform any term or condition of those paragraphs, Employee agrees that the damages arising as a consequence of each violation or breach may be difficult to ascertain and that, therefore, Kenexa shall be entitled to liquidated damages in the amount of Twenty Thousand ($20,000.00) Dollars or shall be entitled to its actual or real damages, as Kenexa may elect at any time. Employee further agrees to indemnify and hold Kenexa harmless from all damages, expenses and costs, including reasonable attorney's fees, relating to the enforcement of this Agreement. Furthermore, in the event of a breach of this Agreement, Kenexa may offset its estimated damages against any payments required to be made to Employee. Furthermore, if Kenexa enforces any of the above-mentioned provisions that has a fixed term, then such term will be extended for a period of time equal to the duration of the breach and the damages resulting therefrom.

Kenexa requires compliance with its employment agreements. We understand that you have become employed by BlueLinx Corporation, the Kenexa customer to which you were assigned while employed with Kenexa, in clear violation of your Agreement.

Please be advised that Kenexa vigorously will enforce the Agreement and has successfully enforced the terms of the Agreement.

Letter to Ms. Podslad
March 9, 2007
Page 4

Accordingly, you must immediately cease your employment with BlueLinx, remit the $20,000 liquidated damages required by the Agreement to Kenexa and return all Kenexa confidential information in your possession, custody and control, including all records, correspondence and notes generated during your employment with Kenexa to me. Please send a letter confirming the date of resignation of your employment with BlueLinx, the confidential information detailed above and your check made payable to Kenexa Technology, Inc. to my attention prior to Friday, March 16, 2007. If we do not receive these items by March 16, 2007, Kenexa will be forced to institute legal action against you for violations of the Agreement.

Very truly yours,

Cynthia Pyle Dixon
General Counsel

cc:    Robert Penman, Esq.
       R. Karl Hill, Esq.

# EXHIBIT F



Slip Copy
Slip Copy, 2006 WL 3201882 (D.Del.)
(Cite as: Slip Copy)

C

Weisler v. Barrows
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Yakov WEISLER, Plaintiff,
v.
Timothy A. BARROWS, et al., Defendants.
**Civil No. 06-362 GMS.**

Nov. 6, 2006.

A. Zachary Naylor, Daniel J. Brown, Pamela S. Tikellis, Chimicles & Tikellis, LLP, Wilmington, DE, for Plaintiff.
William O. Lamotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendants.

*MEMORANDUM*
GREGORY M. SLEET, District Judge.

## I. INTRODUCTION

*1 Yakov Weisler ("Weisler") has brought this shareholder derivative action against various directors and officers of Sycamore Networks, Inc. ("Sycamore"), including its chairman of the board, Gururaj Deshpande ("Deshpande"), chief executive officer and director Daniel E. Smith ("Smith"), directors Timothy A. Barrows ("Barrows"), Paul W. Chisholm ("Chisholm"), Paul J. Ferri ("Ferri"), and John W. Gerdelman ("Gerdelman"), chief financial officer, Richard J. Gaynor ("Gaynor"), former chief financial officer, treasurer and secretary Frances M. Jewels ("Jewels"), and officers Anita Brearton ("Brearton"), Kurt Trampedach ("Trampedach"), Jeffry A. Kiel ("Kiel"), and Kevin J. Oye ("Oye") (collectively, the "defendants"). According to the complaint, "this action seeks redress for the harm done to Sycamore, by certain of its top executives who breached their fiduciary duties of loyalty and good faith to the Company [Sycamore] by intentionally manipulating stock option grant dates between 1999 and 2004, in order to provide certain employees with huge financial windfalls at the expense of Sycamore and by misstating Sycamore's financial results from fiscal year 1999 to

the present." (D.I. 42 ¶ 2.) The complaint consists of six counts: (1) one count against the directors for violations of section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"); (2) one count against Deshpande, Smith, Gaynor, and Jewels for disgorgement under the Sarbanes-Oxley Act of 2002 section 304 ("Sarbanes-Oxley"); (3) one count against the officers, and Chisholm, Gerdelman, Ferri, and Barrows for unjust enrichment; (4) one count against all defendants for breach of fiduciary duty; (5) one count against all defendants for gross mismanagement; and (6) one count against all defendants for waste of corporate assets.

Presently before the court is the defendants' motion to transfer pursuant to 28 U.S.C. § 1404(a). Because the court finds that transfer will convenience the parties and the witnesses while serving the interests of justice, it will grant the motion.

## II. BACKGROUND.

Sycamore is a Delaware corporation with its principal place of business in Chelmsford, Massachusetts. According to the complaint, Sycamore engages in the development and marketing of optical networking products for domestic and international wire line and wireless network service providers, and government entities with private fiber networks. (D.I. 42 ¶ 18.) Sycamore's product portfolio includes optical switching products, network management products, and design and planning tools. (*Id.*)

Weisler accuses the defendants of collective and individual breaches of their fiduciary duties of loyalty, good faith, candor, due care, and their gross negligence in: (1) failing to discover or prevent the improper manipulation of employee stock option grants; (2) failing to discover or prevent the public misreporting of earnings caused by the manipulation of employee stock options, including its effect on stock option expenses and tax liabilities; (3) failing to properly implement, oversee, and maintain appropriate and adequate accounting and internal controls, practices and procedures, namely concerning the administration of Sycamore's stock-based compensation plan;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3201882 (D.Del.)
**(Cite as: Slip Copy)**

Page 2

(4) failing to ensure that Sycamore operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (5) failing to ensure that Sycamore did not engage in any unsafe, unsound, or illegal business practices; and (6) failing to ensure that Sycamore's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). (*Id.*¶ 11.) Weisler claims that this conduct violates Section 14(a) of the Exchange Act and section 304 of Sarbanes-Oxley.

**\*2** Weisler also accuses the defendants of authorizing, modifying, or failing to halt the backdating of six new employee stock options, and canceling and reissuing existing stock option grants to provide a lower exercise price for the options, in both cases, from 1999 to 2004. (*Id.*¶ 5.) Weisler alleges that the employees were unjustly enriched to the detriment of Sycamore and its shareholders as a result of the defendants' actions. Weisler claims that the unlawful conduct occurred while certain defendants were directing the company, and that these defendants were, therefore, breaching their fiduciary duties of care, loyalty, and good faith.

### III. DISCUSSION.

Pursuant to section 1404(a), the court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice, ... to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). It is within the court's discretion whether to transfer a case according to an individualized case-by-case consideration of conveniences and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197 (D.Del.1998). In making its determination under section 1404(a), the court must consider whether transferring this action would convenience the (1) parties and (2) the witnesses while (3) serving the interests of justice. *Affymetrix,* 28 F.Supp.2d at 196. It is the movant's burden to establish the need to transfer, and "the plaintiff's choice of venue [will] not be lightly disturbed." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (internal quotations omitted); *see Truth Hardware*

*Corp. v. Ashland Prods., Inc.,* No C.A. 02-1541 GMS, 2003 WL 118005, at \* 1 (D.Del. Jan. 13, 2003). However, the moving party is not required to show truly compelling circumstances for change of venue, but rather that all relevant things considered, the case would be better off transferred to another district. *Dominy v. CSX Transp., Inc.,* Civ. A. No. 05-487, 2006 WL 573801, \* \* 2-3 (E.D.Pa. Mar. 9, 2006) (citing *In re United States,* 273 F.3d 380, 399 (3d Cir.2001)).

There is no dispute here that Weisler could have brought this action in the District of Massachusetts. Thus, the court will continue with its inquiry as directed by the Third Circuit. *See Jumara,* 55 F.3d at 879. When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Id.* This inquiry requires a "multi-factor balancing test," embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. *Id.* at 875. These private interests include: (1) the plaintiff's choice of forum; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the expected witnesses; and (6) the location of books and records, to the extent that they could not be produced in the alternative forum.[FN1] *Id.* at 879. Among the relevant public interests are: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the public policies of the fora. *Id.* at 879-880.

> FN1. The first three of these private interest factors collapse into other portions of the *Jumara* analysis. Thus, the court will consider them in the context of the entire inquiry only. *See Affymetrix,* 28 F.Supp.2d 192.

**\*3** After having considered the relevant factors, the court finds that the defendants have met their burden of demonstrating that transfer to the District of Mas-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3201882 (D.Del.)
**(Cite as: Slip Copy)**

Page 3

sachusetts is appropriate. The present suit is one of four federal actions commenced in three different districts [FN2] based upon substantially the same transactions and occurrences. As previously mentioned, Sycamore is principally based in Massachusetts. As a result, many of the witnesses with knowledge of the events giving rise to this lawsuit are located there. Indeed, Gaynor submitted a declaration, which states that Sycamore has identified several potential fact witnesses, all current or former employees of Sycamore with knowledge of the facts and circumstances regarding the allegations in the complaint, who reside in Massachusetts. (D.I. 34 ¶ 7.) These individuals would not appear to be subject to compulsory process in Delaware. *See* Fed.R.Civ.P. 45(b)(2) (2006). Additionally, Weisler is a New York resident, and none of the defendants are Delaware residents.[FN3] Moreover, in a shareholder's derivative suit, a plaintiff's choice of forum is entitled to little weight. *Koster v. (American) Lumbermen's Mutual Cas. Co., 330 U . S. 518, 524 (1947).*

> FN2. The following are the names of the federal actions, which have been filed in Delaware, Massachusetts, and New York: *Weisler v. Barrows, et al.,* Civ. A. No. 06-362-GMS (Commenced on May 31, 2006, D. Del.), *Vanpraet v. Deshpande, et al.,* Civ. A. No. 06-11130-RCL (commenced on June 28, 2006, D. Mass.), *Patel v. Deshpande, et al.,* Civ. A. No. 06-11207-RCL (commenced on July 13, 2006, D. Mass.), and *Ariel v. Barrows, et al.,* Civ. A. No. 06-3601(JG)(RLM) (commenced on July 21, 2006, E.D.N.Y.). Additionally, there are two separate actions pending in the Delaware and Massachusetts state courts.

> FN3. Deshpande, Smith, Barrows, Chisholm, Ferri, Gaynor, Jewels, Brearton, Trampedach, Kiel, and Oye are all Massachusetts residents. Gerdelman is a Virginia resident.

Further, there is little connection between Delaware and this action. In fact, the only connection that Weisler points to the fact that Sycamore is incorporated in Delaware. *See APV N. Am., Inc. v. Sig Si-monazzi N. Am., Inc., 295 F. supp.2d 393, 398-99 (D .Del.2002)* (A party's incorporation in Delaware is not dispositive of a motion to transfer. "Where an alternative forum is more convenient and has more substantial connection with the litigation 'incorporation in Delaware will not prevent transfer.' ") On the other hand, Massachusetts is Sycamore's principal place of business, and all aspects of its day-to-day business occur in Chelmsford, Massachusetts. (D.I. 34 ¶ 2.) In addition, the Gaynor declaration states that all press releases and Securities Exchange Commission ("SEC") filings are prepared, reviewed, signed and issued from Sycamore's headquarters. (*Id.*¶ 4.) The financial information that Sycamore reports in the press releases and SEC filings is based on accounting work performed by Sycamore's accountants at its headquarters. (*Id.*) Thus, the locus of the operative facts appears to be Massachusetts. Accordingly, the majority of the events giving rise to this action occurred in Massachusetts, which is the location of the principal offices of Sycamore and, as a result, the location of many of the witnesses. These factors weigh heavily in the court's transfer analysis. As a result, the court concludes that the applicable private interest factors weigh in favor of a transfer.

Likewise, the public interest factors weigh in favor of transfer to Massachusetts. Most relevant to the court's inquiry, is whether there are practical considerations that would make trial "easy, expeditious, or inexpensive." *Jumara, 55 F.3d at 879.* There are two shareholder derivative actions currently pending in the District of Massachusetts, which are based on the same facts and circumstances as the present case. The plaintiffs have moved to consolidate those cases and any subsequently filed shareholder derivative actions because they "involve common questions of law and fact concerning the defendants' alleged breaches of fiduciary duties, statutory violations, and other violations of law." (D.I. 12 ¶ 2, filed in *Vanpraet v. Deshpande, et al.,* Civ. A. No. 06-11130-RCL (D.Mass.)) Transferring the present case will permit the Massachusetts court to consolidate all actions with one lead plaintiff and lead counsel, thereby eliminating some of the expense for individual plaintiffs. Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3201882 (D.Del.)
(Cite as: Slip Copy)

to proceed before one court." *Liggett Group, Inc. v. R .J. Reynolds Tobacco Co.,* 102 F.Supp.2d 518, 537 (D.N.J.2000) (citations omitted); *see In re Amendt,* 169 Fed. Appx. 93, 96 (3d Cir.2006) (non-precedential) ("[T]he most important factor is the avoidance of duplicative litigation: Adjudicating almost identical issues in separate fora would waste judicial resources."). Finally, the court is not persuaded that any disparity in court congestion, to the extent that there is any, will be so great as to weigh against transfer.[FN4] Therefore, the court concludes that, on balance, the public interest factors favor transfer in the instant case.

> FN4. The parties seem to agree that no particular local interests or public policies are implicated by this action.

### ORDER

\*4 For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendants' Motion to Transfer this Case to the United States District Court for the District of Massachusetts (D.I.28) is GRANTED.

2. The above-captioned action is hereby TRANSFERRED to the United States District Court for the District of Massachusetts.

D.Del.,2006.
Weisler v. Barrows
Slip Copy, 2006 WL 3201882 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G



Slip Copy                                                                                                           Page 1
Slip Copy, 2006 WL 3050815 (D.Del.)
(Cite as: Slip Copy)

H

Alloc, Inc. v. Unilin Decor N.V.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ALLOC, INC., Berry Finance, N.V., and Välinge
Aluminum AB, Plaintiffs,
v.
UNILIN DÉCOR N.V., and Quick-Step Flooring,
Inc., Defendants.
ALLOC, INC., Berry Finance, N.V., and Välinge In-
novation AB (f/k/a Välinge Aluminum AB),
Plaintiffs,
v.
QUICK-STEP FLOORING, INC., Defendant.
**No. Civ.A. 03-253GMS, Civ.A. 05-587GMS.**

Oct. 26, 2006.

Francis Digiovanni, Connolly, Bove, Lodge & Hutz,
Wilmington, DE, Daniel J. O'Connor, pro hac vice,
Phoenix, AZ, David I. Roche, pro hac vice, Chicago,
IL, for Plaintiffs.
David Ellis Moore, Richard L. Horwitz, Potter An-
derson & Corroon, LLP, Wilmington, DE, for De-
fendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On March 5, 2003 and December 12, 2005, re-
spectively, Alloc, Inc. ("Alloc"), Berry Finance, N.V.
("Berry"), and Välinge Innovation AB ("Välinge")
(collectively, "Alloc") filed the above-captioned ac-
tions against Unilin Décor N.V. ("Unilin"), Quick-
Step Flooring, Inc. ("Quick-Step"), and Unilin Floor-
ing N.C., LLC ("Unilin NC") (successor to Quick-
Step) (collectively, "Unilin"). In the March 5, 2003
complaint, Alloc alleges that Unilin is infringing
United States Patent No. 6,516, 579 (the " '579 pat-
ent").FN1 In the December 12, 2005 complaint, Al-
loc alleges that Unilin is infringing United States Pat-
ent No. 5,706,621 (the " '621 patent"). These cases
are part of a series of federal actions that Alloc has

filed across the country involving the patents-in-suit
and related patents. Presently before the court is Unil-
in's motion to transfer jurisdiction to the United
States District Court for the Eastern District of Wis-
consin (the "Eastern District of Wisconsin"), pursu-
ant to 28 U.S.C. § 1404(a). For the reasons discussed
below, the court will grant the motion.

FN1. On July 11, 2003, the court stayed the
03-253 action pending resolution of an ap-
peal before the Federal Circuit, and the re-
examination of a parent to the '579 patent.
The appeal was resolved on May 24, 2004,
and the court lifted the stay on March 31,
2006.

II. BACKGROUND

Välinge is the assignee of the '579 and '621 patents,
which relate to a laminate flooring system that can be
connected and installed without the use of glue.
Välinge has licensed its patents to Berry who, in turn,
has sublicensed its patent rights to Alloc. Välinge and
Berry are foreign companies, incorporated and
headquartered in Sweden and Belgium, respectively.
Alloc is a Delaware corporation headquartered in Ra-
cine, Wisconsin.

Unilin Décor is a Belgian corporation, with its princi-
ple place of business in Wielsbeke, Belgium.
Quick-Step    was    a    Delaware    corporation
headquartered in Thomasville, North Carolina. Unilin
NC (successor to Quick-Step) is a North Carolina
limited liability company, with its headquarters in
Thomasville, North Carolina. Unilin, specifically
Unilin NC, sells Uniclic® laminate flooring products,
*i.e.* the disputed products, throughout the United
States.

Alloc has been litigating a case involving the '579
patent in the Eastern District of Wisconsin since
2000. *See Alloc Inc. v. Unilin Décor,* Case No.
2:00CV00999 (E.D.Wis.) (Randa, C.J.) (the
"Wisconsin Action"). On August 17, 2006, Chief
Judge Randa granted Alloc's motion to amend its
complaint to include the '621 patent. As a result, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3050815 (D.Del.)
(Cite as: Slip Copy)

Wisconsin Action involves the same patents that are at issue in the above-captioned cases. Fact discovery is set to close in the Wisconsin Action on November 15, 2006, and claim construction issues are set to be fully briefed by December 20, 2006.

### III. DISCUSSION

Pursuant to section 1404(a), the court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice, ... to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). It is within the court's discretion whether to transfer a case according to an individualized case-by-case consideration of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197 (D.Del.1998). In making its determination under section 1404(a), the court must consider whether transferring these two actions would convenience (1) the parties and (2) the witnesses while (3) serving the interests of justice. *Affymetrix,* 28 F.Supp.2d at 196. It is the movant's burden to establish the need to transfer. See *Truth Hardware corp. v. Ashland Prods., Inc.,* No. C.A. 02-1541 GMS, 2003 WL 118005, at *1 (D.Del. Jan.13, 2003).

\*2 As a threshold matter, the court must first ask whether Alloc could have brought these two actions in the Eastern District of Wisconsin. See *Tuff Torq Corp. v. Hydro-Gear Ltd. Partnership,* 882 F.Supp. 359, 361 (D.Del.1994). If the court answers this question in the negative, then its inquiry ends. See *Camasso v. Dorado Beach Hotel Corp.,* 689 F.Supp. 384, 386 (D.Del.1988) (refusing to transfer the case when the target forum could not exercise personal jurisdiction over one of the defendants).

Alloc contests Unilin's assertion that these two actions could have been brought in the Eastern District of Wisconsin. Alloc also contends that Unilin has failed to make a showing that these cases could have been originally brought in the Eastern District of Wisconsin. The court disagrees. According to Unilin's opening brief in support of its motion, the "[p]laintiffs have already sued Unilin Décor in that district [Eastern District of Wisconsin] and no one

ever questioned venue. Unilin N.C., the successor to Quick-Step, distributes and sells the Uniclic® flooring product in Wisconsin, including in the Milwaukee area in which the District Court for the Eastern District is located." (D.I. 9, at 8 n. 2.) Under 28 U.S.C. § 1391, a corporate defendant resides "in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c). Wisconsin's long-arm statute codifies federal due process requirements. See *Logan Productions, Inc. v. Optibase, Inc.,* 103 F.3d 49, 52 (7th Cir.1996). Therefore, venue is proper in the Eastern District of Wisconsin if Unilin had minimum contacts within the Eastern District at the time the action was commenced, and the exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice. See *id.*

Here, Unilin has submitted the sworn declaration of Unilin Décor's legal counsel, which states that Quick-Step, an indirect subsidiary of Unilin Décor, was selling and distributing the disputed flooring in Milwaukee, Wisconsin as of March 5, 2003. (D.I. 15 ¶ 2.) The declaration further states that Unilin NC (successor to Quick-Step) continues to sell and distribute the disputed flooring in Milwaukee, Wisconsin. (Id.¶ 3.) Moreover, Alloc has already sued Unilin Décor in the Eastern District of Wisconsin without objection to venue. Accordingly, Unilin has demonstrated sufficient minimum contacts in the Eastern District of Wisconsin to confer personal jurisdiction on that court. The court believes this conclusion to be consistent with traditional notions of fair play and substantial justice. Therefore, venue is proper in Unilin's proposed transferee court. The court now turns to an examination of the remaining criteria enumerated in Section 1404(a) in order to determine if transfer is warranted.

When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). This inquiry requires "a multi-factor balancing test," embracing not only the statutory criteria of convenience of the parties and the witnesses and the interest of justice, but all relevant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3050815 (D.Del.)
(Cite as: Slip Copy)

factors, including certain private and public interests. _Id._ at 875. These private interests include: (1) the plaintiff's choice of forum; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the expected witnesses; and (6) the location of books and records, to the extent that they could not be produced in the alternative forum.[FN2] Among the relevant public interests are: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in decided local controversies at home; and (5) the public policies of the fora. _Id._ at 879-80.

> FN2. The first three of these private interest factors collapse into other portions of the _Jumara_ analysis. Thus, the court will consider them in the context of the entire inquiry only. See _Affymetrix, Inc. v. Synteni, Inc._, 28 F.Supp.2d 192 (D.Del.1998).

*3 After having considered the relevant factors, the court finds that Unilin has met its burden of demonstrating that transfer to the Eastern District of Wisconsin is appropriate. First, although Alloc is incorporated in Delaware and Quick-Step was incorporated in Delaware, and should reasonably expect to litigate in this forum, there is little connection between Delaware and this action or the parties. See _APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc._, 295 F.Supp.2d 393, 398-99 (A party's incorporation in Delaware is not dispositive of a motion to transfer. "Where an alternative forum is more convenient and has more substantial connection with the litigation 'incorporation in Delaware will not prevent transfer.' ") Further, none of the parties have facilities in Delaware nor maintain their principal place of business in Delaware. Moreover, Alloc's principal place of business is Racine, Wisconsin, and Alloc, Välinge, and Berry are currently parties to the Wisconsin Action, which involves both the '570 and '621 patents. Thus, it would be more convenient for Alloc to litigate this case in Wisconsin. Additionally, while Unilin Décor is a Belgian corporation and Unilin NC has a principal place of business in North Carolina, both would prefer to litigate this case in Wisconsin, espe-

cially given the fact that Unilin Décor is already a defendant in the Wisconsin Action.[FN3]

> FN3. The convenience of the expected witnesses is not a relevant consideration because neither party has produced witness lists or identified any witness who is a Delaware resident.

With respect to the documentary evidence, Unilin states that many of the relevant documents and other materials have already been produced in the Wisconsin Action, and that it can produce the documents it has as easily in Wisconsin as it can in Delaware. (D.I. 9, at 14.) Bringing relevant documents to only one location, here Wisconsin, minimizes the level of disruption caused to both parties by the litigation. _Omnicom Group, Inc. v. Employers Reinsurance Corp._, C.A. No. 01-839-GMS, 2002 WL 109346, at *2 (D.Del. Jan.28, 2002). In other words, it "is certainly a more economical and efficient result than having each party moving ... documents between two states, depending on which of the[ ] related actions is being litigated at the time." _Omnicom Group, Inc. v. Employers Reinsurance Corp._, C.A. No. 01-839-GMS, 2002 WL 109346, at *2 (D.Del. Jan.28, 2002). Thus, the court finds that this factor weighs in favor of transfer.

Finally, the court finds that the public interest factors weigh in favor of transfer to Wisconsin. Most relevant to the courts inquiry, is whether there are practical considerations that would make trial "easy, expeditious, or inexpensive." _Jumara_, 55 F.3d at 879. Here, there has already been litigation on both the '579 and '621 patents in the Eastern District of Wisconsin. Discovery has already begun in the Wisconsin Action, which was filed before Alloc initiated these lawsuits, and involves the same patents. Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." See _Liggett Group, Inc. v. R.J. Reynolds Tobacco Co._, 102 F.Supp.2d 518, 537 (D.N.J.2000 (citations omitted). Additionally, the court is not persuaded that any disparity in court congestion, to the extent there is any, will be so great as to weigh against transfer. Finally, it is well settled that patent rights are not considered state or local

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3050815 (D.Del.)
(Cite as: Slip Copy)

Page 4

matters, and do not implicate local interests. *Jones Pharma, Inc. v. KV Pharm. Co.,* No. Civ. A. 03-786 JJF, 2004 WL 323109, at *3 (D.Del. Feb.17, 2004). The court, therefore, finds no strong local interest in litigating in either forum. Accordingly, the court concludes that, on balance, the public interest factors favor transfer in the instant case.

### ORDER

**\*4** For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendants' Motion to Transfer Venue to the Eastern District of Wisconsin (D.I.8) is GRANTED.

2. The above-captioned actions are hereby TRANSFERRED to the United States District Court for the Eastern District of Wisconsin.

D.Del.,2006.
Alloc, Inc. v. Unilin Decor N.V.
Slip Copy, 2006 WL 3050815 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H



Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Arrow Communication Laboratories, Inc. v. John
Mezzalingua Associates, Inc.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ARROW COMMUNICATION LABORATORIES,
INC., Plaintiff,
v.
JOHN MEZZALINGUA ASSOCIATES, INC., De-
fendant.
JOHN MEZZALINGUA ASSOCIATES, INC.,
Counterclaim Plaintiff,
v.
ARROW COMMUNICATION LABORATORIES,
INC., and Tresness Irrevocable Patent Trust, Coun-
terclaim Defendants.
**No. Civ. 05-357-SLR.**

Oct. 26, 2005.

Richard D. Kirk, of the Bayard Firm, Wilmington,
Delaware. for Arrow Communication Laboratories,
Inc., and Tresness Irrevocable Patent Trust. R. Ter-
rance Rader, Charles W. Bradley, Glenn E. Forbis,
Linda D. Kennedy, and Shelly L. Hokenstad, of
Rader, Fishman & Grauer PLLC, Bloomfield Hills,
Michigan, and Lawrence P. Trapani, of Manlius,
New York, of Counsel.
Jeffrey B. Bove, and Kevin M. Baird, of Connolly
Bove Lodge & Hutz LLP, Wilmington, Delaware. for
John Mezzalingua Associates, Inc. James R. Mul-
doon, and John A. Wasleff, of Wall, Marjama & Bil-
inski, LLP, Syracuse, New York. of Counsel.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 3, 2005, plaintiff Arrow Communication
Laboratories, Inc. ("plaintiff") filed a complaint in
the United States District Court for the District of
Delaware alleging patent infringement by defendant
John Mezzalingua Associates, Inc. ("defendant").
(D.I.1) Plaintiff claims to be the lawful owner of all

right, title and interest in U.S. Patent No. 5,745,838
("the '838 patent"). (Id.) Plaintiff alleges that defend-
ant is infringing the '838 patent by manufacturing,
selling and offering for sale in the United States, and
by importing into the United States, electronic filters
covered by one or more of the claims of the '838 pat-
ent. (Id.) Plaintiff further alleges that defendant is
actively inducing others to infringe the '838 patent.
(Id.)

On June 6, 2005, defendant filed an action for declar-
atory judgment of patent non-infringement and in-
validity in the United States District Court for the
Northern District of New York. (D.I.9, ex. A) On Au-
gust 11, 2005, plaintiff's infringement suit was re-
ferred to the Magistrate Judge of the District of
Delaware for the purpose of exploring alternative dis-
pute resolution. (D.I.29) Trial is scheduled for
November 2006. (Id.)

II. BACKGROUND

Plaintiff is a corporation organized under the laws of
the State of New York with its principal place of
business in Syracuse, New York. Defendant is a cor-
poration organized under the laws of the State of
Delaware with its principal place of business in East
Syracuse, New York.

III. STANDARD OF REVIEW

Defendant moves the court to transfer this matter,
pursuant to 28 U.S.C. § 1404(a), to the United States
District Court for the Northern District of New York.
(D.I.6) Section 1404(a) provides: "For the conveni-
ence of the parties and witnesses, in the interests of
justice, a district court may transfer any civil action
to any other district or division where it might have
been brought." 28 U.S.C. § 1404(a) (2003). A
plaintiff's choice of forum is to be accorded substan-
tial weight and courts should only transfer venue if
the defendant is truly regional in character. See Berg-
man v. Brainin, 512 F.Supp. 972, 973 (D.Del.1981)
(citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25
(3d Cir.1970)). A defendant has the burden of estab-
lishing that "the balance of convenience of the parties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

and witnesses strongly favors" transfer. *Id.* Accordingly, "defendants brought into suit in Delaware must prove that litigating in Delaware would pose a 'unique or unusual burden' on their operations" for a Delaware court to transfer venue. *See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,* 157 F.R.D. 215 (D.Del.1993). A motion to transfer venue may also be granted if there is a related case which has been first filed or otherwise is the more appropriate venue in which to litigate the issues between the parties. *See American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,* 1999 WL 615175, *5 (D.Del.1999).

*2 In reviewing a motion to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a) (i.e., convenience of parties, convenience of witnesses, and interests of justice). The Third Circuit, in fact, has indicated that the analysis for transfer is very broad and has urged consideration of "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (internal quotations and citation omitted). These factors entail six private and five public interests. Private interests include: (1) the plaintiff's forum preference as manifested by the plaintiff's original forum choice; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records to the extent that the files could not be produced in the alternative forum. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

In considering the private interest factors under *Jumara,* the court, consistent with Third Circuit precedent, adheres to the notion that transfer is not to be lib-

erally granted and plaintiff's choice of forum is a paramount consideration. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* 2001 WL 1617186 (D.Del. Nov. 28, 2001); *Cont'l Cas. Co. v. Am. Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity or injury occurred, the "plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

### IV. DISCUSSION

As an initial matter, the court notes that venue is proper in Delaware as defendant is incorporated under the laws of the State of Delaware. Nevertheless, the District of Delaware is not plaintiff's "home turf," since it maintains its principal place of business in New York. In this sense, it appears to be more convenient to both the plaintiff and defendant to try the instant litigation in the Northern District of New York. Indeed, this court previously recognized that, *3 [w]hen the plaintiff has chosen to bring suit in a district that is not plaintiff's "home turf" and that has no connection to any acts giving rise to the lawsuit, convenience to the plaintiff is not as great as it would be were plaintiff litigating at or near plaintiff's principal place of business or at the site of activities at issue in the lawsuit.

*Burstein v. Applied Extrusion Techs. Inc.,* 829 F.Supp. 106, 110 (D.Del.1992) (citing *Sports Eye, Inc. v. Daily Racing Form, Inc.,* 565 F.Supp. 634, 637 (D.Del.1983) (internal citations omitted)). Moreover, the locus of the alleged infringement occurred in Syracuse, New York. If defendant has infringed the '838 patent, such infringement was done primarily in Syracuse, where the accused products

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

were developed, manufactured and sold. Based on the evidence offered, the majority of the witnesses with discoverable information also are located in and around Syracuse, New York. In addition, most of defendant's documents relating to the production, promotion, marketing and sales of the accused product are maintained in central New York. On this basis, the court concludes that the private factors under *Jumara* weigh in favor of transferring the case at bar to the United States District Court for the Northern District of New York.

One of the public interest factors under *Jumara* involves the administrative considerations of the courts. More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver*, 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second-filed action is usually stayed or transferred to the court where the first-filed action is pending. *Peregrine Corp. v. Peregrine Indus., Inc.*, 769 F.Supp. 169, 171 (E.D.Pa.1991); *Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.*, 2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id.* at 972, 977. Invocation of the rule will usually be the norm, not the exception. Courts presented with exceptional circumstances may exercise their discretion to depart from the first-filed rule. *Id.* at 979. In this case, it is undisputed that the present patent infringement suit in the District of Delaware was first filed and involves the same patent and the same issues as the declaratory judgment action filed thereafter by defendant in the Northern District of New York. Therefore, the burden is on defendant to present some exceptional circumstances why the court should depart from the first-filed rule.

*4 In support of its argument supporting transfer, defendant states that all of its relevant witnesses reside in New York, all the documents and records related to the accused product are in New York, and the subject matter of the lawsuit has significant local interest in New York. (D.I. 7 at 1-3) In contrast, evidence suggests that the District of Delaware has no connection to the subject matter of plaintiff's lawsuit, except that defendant is incorporated there. Defendant contends that pursuing the lawsuit in the District of Delaware will generate "significant expenses and other burdens" to the parties. (*Id.* at 3-4) Given this evidence and noting the regional character of the parties, with the primary business operations of each party located in the Northern District of New York, there are exceptional circumstances present which require the court to depart from the first-filed rule.

In considering the other public interest factors under *Jumara*, the court notes that the parties have taken significant steps to advance the instant litigation in the District of Delaware. The parties have exchanged initial disclosures, are set to explore settlement with the magistrate judge, and have arranged a schedule for litigation, with trial set to occur in about one year. These factors weigh in favor of maintaining the litigation in the District of Delaware. However, factors are also present which weigh in favor of transferring the case to the Northern District of New York. First, defendant's declaratory judgment action, which involves the same subject matter as this case, is currently pending in the United States District Court for the Northern District of New York.[FN1] In addition, both parties are regional in character and operate their businesses out of central New York, suggesting that the Northern District of New York is the most appropriate venue for the parties to litigate. Although a suit in this matter was first filed in Delaware, the public interest factors weighing in favor of keeping the litigation in the District of Delaware are not compelling. The court, therefore, concludes that the public interest factors under *Jumara* favor transferring venue to the Northern District of New York.

> FN1. By stipulation of the parties, that case has been stayed pending this court's decision on defendant's motion to transfer venue. (N.D. N.Y., Case No. 05-CV-703 (NAM/DEP), D.I. 6) The court has no reason to believe that, once the stay is lifted, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

declaratory judgment action in the Northern District of New York will move forward with any less swiftness than that with which the instant case has progressed in the District of Delaware. The familiarity with the parties and subject matter possessed by the Northern District of New York will certainly promote expeditiousness in handling the case.

## V. CONCLUSION

On balance, the court finds that the public interest factors and private interest factors weigh strongly in favor of transferring venue in this case. The court, as a result, concludes that defendant has sufficiently proven that litigating in the District of Delaware would pose a unique burden which merits transfer of venue. For the reasons stated, defendant's motion to transfer is granted. An order consistent with this memorandum opinion shall issue.

## ORDER

At Wilmington this 26th day of October, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. The above-captioned action shall be transferred to the United States District Court for the Northern District of New York.

D.Del.,2005.
Arrow Communication Laboratories, Inc. v. John Mezzalingua Associates, Inc.
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I



Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**c**
Omnicom Group, Inc. v. Employers Reinsurance
Corp.
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
OMNICOM GROUP, INC., and Harrison & Star,
Inc., Plaintiffs,
v.
EMPLOYERS REINSURANCE CORPORATION,
Defendant.
**No. Civ.A. 01-839-GMS.**

Jan. 28, 2002.

*MEMORANDUM AND ORDER*
SLEET, J.

### I. INTRODUCTION

*1 On November 8, 2001, Employers Reinsurance
Corporation ("ERC") filed a declaratory judgment
action against Omnicom Group, Inc. ("Omnicom"),
Harrison & Star ("H & S"), and Merck & Co., Inc.
("Merck"), in the New York State Supreme Court,
New York County. On November 15, 2001, Omni-
com and H & S filed a declaratory judgment action
against ERC in the Delaware Superior Court. ERC
removed the Delaware Superior Court action to the
United States District Court for the District of
Delaware on December 17, 2001.

Presently before the court is ERC's motion to dismiss,
or alternatively, to transfer this case to the Southern
District of New York, or to stay this case pending the
outcome of the state court litigation in New York
County. ERC argues that the court should dismiss or
stay this action because a concurrent similar action
exists in a New York state court. It further argues
that, should the court not dismiss or stay this action,
the case should be transferred to New York pursuant
to 28 U.S.C. § 1404(a). For the reasons that follow,
the court will grant ERC's motion to transfer.<sup>FN1</sup>

> FN1. The court cannot transfer this case to
> the New York state court. Rather, it must
> transfer it to the Southern District of New

York. The court recognizes that such an ac-
tion will not alleviate the burden of having
two identical cases being tried by two
courts. However, the court remains con-
vinced that it is less costly, and more con-
venient, to try the cases in one district, rather
than across state lines. Moreover, while the
court expresses no opinion on the propriety
of such an action, remand of the case from
the Southern District of New York to the
New York State Supreme Court, New York
County, will now be an option.

### II. BACKGROUND

Omnicom is incorporated under the laws of the State
of New York, with its principle place of business in
New York. It is a holding corporation for a number of
other corporations, including its wholly-owned subsi-
diary, H & S. H & S provides marketing and advert-
ising consultation and services. It is also incorporated
under the laws of the State of New York, with its
principle place of business in New York. The defend-
ant insurer, ERC, is incorporated in the State of Mis-
souri, and is licenced to do business in New York.

In May 1996, ERC issued an insurance policy (the
"policy") in favor of Omnicom as the named insured.
ERC also provided coverage to H & S under Omni-
com's policy.

In January 1998, Omnicom notified ERC that "Jane
Doe" had filed a lawsuit against Merck and H & S in
the New York State Supreme Court, Suffolk County
(the "Suffolk County action"). The complaint alleged
various causes of action for libel, fraud, civil rights
violations and intentional infliction of emotional dis-
tress. On September 21, 2001, the jury returned a ver-
dict awarding Jane Doe compensatory and punitive
damages.

On November 8, 2001, ERC filed a declaratory judg-
ment action in the New York State Supreme Court,
New York County, against Omnicom, Merck, H & S
and Jane Doe.<sup>FN2</sup> In the complaint, ERC sought a
declaratory judgment that it is not obligated to pay

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

any portion of the punitive damages award against the named defendants in the Suffolk County action.

> FN2. Jane Doe is a nominal defendant against whom no relief is sought.

Subsequently, on November 15, 2001, Omnicom and H & S filed the present action in the Delaware Superior Court. ERC removed the case to the United States District Court for the District of Delaware on December 17, 2001. In this action, Omnicom and H & S seek a declaratory judgment that ERC is obligated to pay the punitive damages arising from the Suffolk County action.

For the following reasons, the court concludes that the "balance of convenience" tips in favor of granting ERC's motion to transfer. Because it finds that transferring the case is the appropriate outcome, the court need not address the alternative motions to stay or dismiss the Delaware action.

### III. DISCUSSION

*2 ERC seeks to transfer this action pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a). 1.The "First-Filed" Rule

The "first-filed" rule is a judicially-created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. See EEOC v. University of Pennsylvania, 850 F.2d 969, 971-72 (3d Cir.1988). As its name implies, the rule generally provides that a later-filed action should be stayed pending the resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending. See Peregrine Corp. v. Peregrine Indus., Inc., 769 F.Supp. 169, 171 (E.D.Pa.1991).

As this rule only applies to related cases filed in different federal courts, it is not applicable to the present situation where one action is pending in state court. Therefore, the court declines to further address the "first-filed" rule as a basis to transfer this action to New York.FN3

> FN3. Because the court finds other compelling reasons to transfer this case to New

York, it expresses no opinion on whether the first-filed rule should apply to concurrent state and federal cases.

### 2. Section 1404(a)

Transfer to New York is, however, mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). While Omnicom and H & S do not expressly agree that this action could have been filed in the Southern District of New York as a diversity action, there can be little dispute that this is so. The plaintiffs are incorporated in New York, with their principle places of business in the Southern District of New York. The defendant is a Missouri corporation. Further, the amount in controversy is approximately $250,000. Accordingly, the Southern District of New York is an appropriate venue.

Having satisfied the initial section 1404(a) requirement, the court will, therefore, move on with the inquiry as directed by the Third Circuit. See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995).

In Jumara, the Third Circuit provided a list of factors to assist the district court in determining "whether, on balance, the litigation would conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." Id. These factors include six private and five public interests which the court may consider. See id.

#### a. The Private Interests

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent these files cannot be produced in the alternate forum.FN4 See id.

> FN4. For the reasons the court discussed in a previous opinion, it will not afford any

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc.* 28 F.Supp.2d 192, 197-201 (D.Del.1998). In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Western District of North Carolina is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

### 1. The Convenience of the Parties

Geographically, New York is not inconvenient for Omnicom and H & S, both of which are incorporated and headquartered in New York. Furthermore, transfer to New York would reduce the overall inconvenience to all parties involved. The parties must already be prepared to litigate the related case pending in the New York Supreme Court. Bringing witnesses and relevant documents to only one location, here New York, minimizes the level of disruption caused to both parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

### 2. The Convenience of Witnesses

**\*3** Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymevtrix,* 28 F.Supp.2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.*

(internal citations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

Omnicom and H & S argue that ERC has failed to demonstrate that Delaware would be an inconvenient forum for potential non-party witnesses. The court agrees, and notes that ERC's bare allegations of witness inconvenience, without more, are insufficient to tip the balance in its favor. The court notes that all the material witnesses in this dispute, party or otherwise, will be in New York already to litigate the related state court case now pending in New York County. Requiring that they come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence that a non-party witness will be unable to attend trial in Delaware, this factor must weigh against transfer.

### 3. The Location of Records and Other Documents

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. Neither party argues that the records and documents are voluminous in this case. Thus, neither party can claim one forum is better than another forum in this regard. However, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

From a practical standpoint, however, the court notes that any relevant documents will already be in New York for the litigation of the state court case. The court sees no need to require that Omnicom, H & S and ERC move the same documents from state to state. Rather, it would be much more efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra*.

### b. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the factors most relevant to the pending case.

### 1. Administrative Difficulty

Omnicom and H & S argue that the Southern District of New York has many more case filings than the District of Delaware. Moreover, in 2000, Delaware had seventy civil cases that were over three years old, whereas the Southern District had over one-thousand. Thus, they argue that the Delaware court would be more able to expeditiously address this action.

**\*4** The court is mindful of the court congestion that concerns Omnicom and H & S. It thus finds that Delaware's lighter caseload weighs in favor of denying the transfer to New York. However, this is but one factor in the analysis and is not alone determinative of the issue.

### 2. Public Policies of the Fora

The next relevant factor concerns New York and Delaware's public policies. Delaware public policy favors the insurability of punitive damages. *See Whalen v. On-Deck,* 514 A.2d 1072, 1074 (Del.1986). New York's policy favors the uninsurability of punitive damages. *See Home Ins. Co. v. American Home Products Corp.,* 75 N.Y.2d 196, 200 (N.Y.1990).

In this action, a New York insured seeks to enforce its insurance policy against an insurer with its principle place of business in New York, for coverage based on a cause of action arising within New York's borders. New York could thus make a compelling argument that its policy should be applied. Likewise, Omnicom and H & S are within their rights to argue that Delaware's policy should be applied because the insurance policy was allegedly issued in Delaware. However, where the policy was actually issued is a disputed fact and not for the court to decide on this motion. Accordingly, the court finds that, given the equally important policies of the states, and the conflicting evidence regarding the policy in question, this factor must remain neutral.

### 3. Practical Considerations Making Trial Easy, Expeditious or Inexpensive

The parties do not dispute that the issue presented in both of the cases is identical. Specifically, the issue is whether ERC is obligated to insure Omnicom and H & S against punitive damages awards. To have courts in two different states each deciding this issue would not be in the interest of sound judicial administration. Nor would such a result be the most expeditious and inexpensive method of determining the parties' rights and liabilities. The parties are already located in New York, both to litigate the pending case in the New York Supreme Court, and to conduct their daily business.

Accordingly, the court finds that this factor weighs heavily in favor of transferring this case to New York.

### 4. Local Interest in Deciding This Action

Finally, the court finds that Omnicom and H & S have failed to articulate any clear interest that Delaware has in this case. Rather, they briefly allude to the possibility that the insurance contract may have been issued in Delaware. The court finds that this disputed factual issue alone is not enough to conclude that Delaware has a significant interest in this action.

In contrast, New York has a great interest in the outcome of this action. The parties are either New York corporations, or are licensed to do business in New York. Further, the insurance coverage dispute emanates from Jane Doe's original Suffolk County action. As such, the causes of action in the two cases currently at issue arise from alleged wrongful acts in the State of New York.

**\*5** Thus, this factor also weighs heavily in favor of transferring this case to New York.

### IV. CONCLUSION

The court is mindful that there are several factors weighing against transferring this case to New York. However, there are an equal number of factors weighing in favor of transfer that the court finds are deserving of more significant weight. Particularly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

persuasive are the following facts. Delaware has no clear connection to this case. However, all the parties have significant connections to New York, the underlying action arose in New York, and the identical case is currently pending in a New York court. Thus, the court concludes that the "balance of convenience" tips in favor of transferring this action to the Southern District of New York.

For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

1. Employers Reinsurance Corporation's alternative motion to transfer this action to the Southern District of New York (D.I.2) is GRANTED.

2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Southern District of New York.

3. Omnicom Group, Inc. and Harrison and Star, Inc.'s Motion For Leave to File a Sur-Reply Brief (D.I.13) is declared MOOT.

D.Del.,2002.
Omnicom Group, Inc. v. Employers Reinsurance Corp.
Not Reported in F.Supp.2d, 2002 WL 109346 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

c
Nilssen v. Osram Sylvania, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Ole K. NILSSEN and Geo Foundation, Ltd.,
Plaintiffs,
v.
OSRAM SYLVANIA, INC. and Osram Sylvania
Products, Inc., Defendants.
**No. Civ.A. 00-695-JJF.**

May 1, 2001.

Donald F. Parsons, Jr., and Mona A. Lee, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Harry J. Roper, Raymond N. Nimrod, John E. Titus, and Jonathon Hill, of Roper & Quigg, Chicago, Illinois, for Plaintiffs, of counsel.
Richard K. Herrmann, of Blank Rome Comisky & Mccauley LLP, Wilmington, Delaware, Brian D. Sieve, Thomas G. Pasternak, Andrew M. Johnstone, and Kevin J. O'Shea, of Kirkland & Ellis, Chicago, Illinois, for Defendants, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
*1 Presently before the Court is Defendants' Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (D.I.15). For the reasons stated below, the Court will grant the motion.

BACKGROUND

Ole K. Nilssen ("Mr.Nilssen") is a Florida resident with his principal place of business in Chicago, Illinois.$^{FN1}$ (D.I. 1 at ¶ 4). Mr. Nilssen is engaged in the business of "identifying, formulating plans for, developing know-how and technology for, and implementing (via licensing agreements) promising new business opportunities in the field of electronics, including electronic ballasts." (D.I. 1 at ¶ 8). Geo Foundation ("Geo") is a non-profit corporation incorporated in the Cayman Islands, British West Indies. (D.I. 1 at ¶ 5)(Mr. Nilssen and Geo collectively referred to as "Plaintiffs").

FN1. Mr. Nilssen contends that his ongoing business in Illinois, Innovations Center, "is now defunct." (D.I. 24, Exh. 1 at ¶ 8). However, Plaintiffs' Complaint alleges that Mr. Nilssen is currently engaged in "business opportunities." (D.I. 1 at ¶ 4). Further, Mr. Nilssen admits that he still travels to Illinois regularly to "bring closure to [his] other business dealings that take place in Illinois." (D.I. 24, Exh. 1 at ¶ 8). The Court concludes that, for purposes of the instant motion, this record sufficiently establishes that Mr. Nilssen's principal place of business is in Illinois.

OSRAM Sylvania, Inc. and OSRAM Sylvania Products, Inc. (collectively "Defendants") are Delaware corporations with their principal places of business in Danvers, Massachusetts. (D.I. 13 at ¶ 6-7). Defendants are engaged in the business of making and selling electronic ballasts. (D.I. 13 at ¶¶ 11).

Plaintiffs filed the instant action against Defendants on August 1, 2000. In their Complaint, Plaintiffs contend that Defendants wilfully infringe twenty-six patents that were invented and are owned by Mr. Nilssen and of which Geo holds exclusive licenses.$^{FN2}$ (D.I. 1 at ¶¶ 9, 10, 13). On January 24, 2001, Defendants filed the instant motion to transfer the case to the United States District Court for the Northern District of Illinois. (D.I.15).

FN2. These patents include U.S. Patent No. B1 4,667,345; U.S. Patent No. 4,857,806; U.S. Patent No. 4,954,754; U.S. Patent No. 4,983,887; U.S. Patent No. 5,013,974; U.S. Patent No. 5,047,690; U.S. Patent No. 5,164,637; U.S. Patent No. 5,185,560; U.S. Patent No. 5,189,342; U.S. Patent No. 5,191,262; U.S. Patent No. 5,214,356; U.S. Patent No. 5,233,270; U.S. Patent No. 5,341,067; U.S. Patent No. 5,343,123; U.S. Patent No. 5,402,043; U.S. Patent No. 5,416,386; U.S. Patent No. 5,432,409; U.S. Patent No. 5,446,347; U.S. Patent No. 5,471,118; U.S. Patent No. 5,479,074; U.S.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

Patent No. 5,481,160; U.S. Patent No. 5,510,680; U.S. Patent No. 5,510,681; U.S. Patent No. 5,621,279; U.S. Patent No. 5,736,819 and U.S. Patent No. 6,002,210. (D.I. 1 at ¶ 9).

DISCUSSION

Under 28 U.S.C. § 1404(a), "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Since it is undisputed that Plaintiffs could have brought the instant action in the Northern District of Illinois, the Court's only task is to determine whether the factors enumerated in § 1404(a) warrant a transfer under the circumstances.

In determining whether or not to transfer venue under § 1404(a), a district court must consider a number of different factors. These factors include several private interests: (1) the convenience of the parties due to their relative physical and financial conditions, (2) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (3) the location of books and records, to the extent that these books and records could not be produced in a certain forum. *Memminger v. InfoCure Corp.*, C.A. No. 00-707-JJF, slip op. at 4 (D.Del. Nov. 14, 2000)(citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995)).[FN3] These factors also include several public interests:

> FN3. *Jumara* also listed the following private interests that district courts should consider: (1) the plaintiff's choice of forum, (2) the defendant's preferred forum, and (3) whether the claim arose elsewhere. 55 F.3d at 879. Subsequent decisions of this Court, however, have determined that these interests are subsumed by the other *Jumara* factors. *Memminger*, slip op. at 5. Therefore, to avoid considering the same interests twice, the Court will not considered them separately. *Id.*

(1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. *2 Id.* (citing *Jumara*, 55 F.3d at 879-80). When determining whether or not transfer is warranted under the circumstances, district courts must balance all of the relevant factors. *Jumara*, 55 F.3d at 883. "The burden is upon the [moving party] to establish that the balance of the [factors] strongly weighs in favor of the requested transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer." *Memminger*, slip op. at 4-5. Below, the Court will analyze the factors relevant to the instant motion.

A. Convenience of the Parties

The Court concludes that the convenience of the parties due to their relative physical and financial conditions weighs slightly in favor of transfer. Defendants' principal places of business are located in Danvers, Massachusetts. (D.I. 16 at 5). Many of Defendants' accused products are manufactured in Lake Zurich, Illinois, which is within the Northern District of Illinois. (D.I. 16 at 5). Defendants' contacts with Delaware, on the other hand, are minimal: Defendants are incorporated under Delaware law, Defendants have one salesperson who works out of a home office in Delaware, and some of Defendants' accused products are sold in Delaware.[FN4] (D.I. 16 at 5). *See Memminger*, slip op. at 6-7 (recognizing that the mere fact a defendant is incorporated in a given forum does not mean that transfer to another forum is not warranted); *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 11 F.Supp.2d 729, 730-30 (S.D.N.Y.1998)(holding that the Southern District of New York's connection to the litigation was "tenuous" for purposes of venue transfer analysis when the defendant was incorporated in New York and over 100 of the defendant's allegedly infringing products were sold in New York). Also supporting the requested transfer is the fact that Mr. Nilssen's principal place of business is in Illinois, and that several of his current and former employees reside in

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Illinois.

> FN4. Plaintiffs' contention that their "claim arose" in Delaware, because some of Defendants' accused products are sold in Delaware, lacks merit. Defendants' products are sold nationwide; therefore, Delaware does not have any special "connection" to the case that would weigh against the requested transfer.

Based on these considerations, the Court concludes that it would be more convenient to litigate in the Northern District of Illinois rather than in Delaware. However, this factor weighs only slightly in favor of transfer because both Defendants are large companies that are financially capable of litigating in a distant forum. *Motorola Inc. v. PC-Tel, Inc.*, 58 F.Supp.2d 349, 358 (D.Del.1999)(holding that when the party seeking transfer is a multimillion dollar company, unless the company can articulate "some unique or unexpected burden" associated with litigating in a distant forum, this factor only weighs slightly in favor of transfer).

### B. Convenience of the Witnesses

The Court concludes that the convenience of the witnesses weighs strongly in favor of transfer. The convenience of the witnesses is the most important factor in venue transfer analysis. *Mentor Graphics v. Quickturn Design Sys., Inc.*, 77 F.Supp.2d 505, 510 (D.Del.1999). The convenience of a witness is only relevant, however, "to the extent that the witness may actually be unavailable for trial in one of the fora." *Asten Inc. v. Weavexx Corp.*, 2000 WL 1728354, at *4 (D.Del. Feb. 11, 2000)(quoting *Jumara*, 55 F.3d at 879). A party need not allege that a witness definitely will be unavailable for trial; rather, it is sufficient for purposes of venue transfer analysis if the witness is not subject to a court's subpoena power. *Mentor Graphics*, 77 F.Supp.2d at 511. However, witnesses employed by the parties are not considered by a court conducting venue transfer analysis because the parties are obligated to procure the presence of their own employees at trial. *Id.*

**\*3** In the instant case, Defendants contend that no

witnesses reside in Delaware but that a number of principal witnesses reside in the Northern District of Illinois, including: (1) Dale Fiene-an employee of Mr. Nilssen, (2) Robert Schneider-a former employee of Mr. Nilssen, (3) employees of Defendants, (4) employees of Motorola, Inc, and (5) employees of Advance Transformer, Inc. ("Advance"). (D.I. 16 at 10). In response, Plaintiffs contend that Defendants' contentions are unavailing because (1) Defendants have failed to explain the nature of these witnesses' testimony, and in several cases, have even failed to name the witnesses, (2) Defendants have failed to show that the use of videotaped deposition testimony would be an inadequate substitute for live trial testimony, and (3) Defendants have not alleged that any witnesses actually will be unavailable for trial. (D.I. 25 at 11).

The Court concludes that Plaintiffs' second and third arguments can be summarily rejected. As to Plaintiffs' third argument, as previously discussed, a party only needs to establish that witnesses might be unavailable for trial. As to Plaintiffs' second argument, the Court concludes that videotaped depositions are not an adequate substitute for live trial testimony when conducting venue transfer analysis because "[v]ideo depositions ... are unlikely to hold the rapt attention of a jury." *AlliedSignal, Inc. v. Cooper Auto., Inc.*, 1997 U.S. Dist. LEXIS 22902, at *11 n. 4 (D.Del. July 30, 1997).

Plaintiffs' first argument warrants more consideration. One of these witnesses, Dale Fiene, is a current employee of Mr. Nilssen; therefore, the Court concludes that Mr. Fiene should not be considered in the analysis. [FN5] (D.I. 24 at 9). The Court also agrees that Defendants' employees do not weigh into the analysis. However, Mr. Schneider, a former employee of Mr. Nilssen, and employees from Motorola and Advance do warrant consideration because they are potential third party witnesses.

> FN5. To the extent that Mr. Nilssen admits that Mr. Fiene is a current employee, such admission belies Mr. Nilssen's attempt to downplay the extent of his business contacts in Illinois.

Plaintiffs contend that these potential third party wit-

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

nesses do not weigh in favor of transfer because Defendants have failed to specifically identify many of these witnesses by name and/or the content of their testimony. (D.I. 24 at 10-11). However, Defendants specifically identify Mr. Schneider and note that his testimony is relevant because Mr. Schneider has submitted a number of affidavits to the PTO on Mr. Nilssen's behalf. (D.I. 16 at 10). Mr. Schneider's knowledge is relevant to Defendants' affirmative defenses, especially Defendants' allegations of inequitable conduct by Mr. Nilssen during the prosecution of many of the patents in suit.

Defendants' potential witnesses from Motorola and Advance have not been identified by name. However, Defendants indicate that Motorola's employees will testify about Motorola's business dealings with Mr. Nilssen and about prior art to the patents in suit. (D.I. 16 at 10). Defendants also indicate that Advance's employees will provide relevant testimony about a reasonable royalty and about prior art.[FN6] (D.I. 16 at 10). The Court concludes that such identification, especially when fact discovery has yet to take place and when Plaintiffs have yet to specify the specific patent claims and products implicated in the lawsuit, is sufficient for purposes of venue transfer analysis.[FN7] Therefore, the Court concludes that the convenience of the witnesses strongly weighs in favor of transfer.

> FN6. Advance's employees are knowledgeable on such issues because Advance has a license agreement with Mr. Nilssen. (D.I. 16 at 10).

> FN7. The cases cited by Plaintiffs in which the Court refused to afford unnamed witnesses any weight in the analysis involved situations where the movant merely stated that some witnesses existed that would not be available for trial. (D.I. 24 at 10-11)(citing _Motorola, 58 F.Supp.2d at 359; Sunds Defribator, Inc. v. Durametal Corp., 1997 WL 74660, at *3_ (D.Del. Jan. 31, 1997)). Defendants' identification of the witnesses distinguishes the instant case from _Motorola_ and _Sunds Defribator_.

C. Practical Considerations

*4 The Court also concludes that practical considerations regarding the ease, speed, or expense of trial strongly weigh in favor of the requested transfer. If related cases are pending in the district to which transfer is sought, such fact weighs in favor of the transfer. _Affymetrix, Inc. v. Synteni, Inc._, 28 F.Supp.2d 192, 206 (D.Del.1998). In a recent case granting a motion to transfer, the Court relied heavily on the existence of patent litigation in another forum involving "a parent patent of the one at issue" and a patent involving a similar type of product which was arguably "directly related" to the patent at issue. _Brunswick Corp. v. Precor Incorp._, 2000 WL 1876477, at *3, n. 2 (D.Del. Dec. 12, 2000).

In the instant action, Plaintiffs allege infringement of twenty-six patents, at least six of which are also being litigated in the Northern District of Illinois.[FN8] In the Illinois cases, _Markman_ rulings have already been issued and case dispositive motions have already been filed. (D.I. 16 at 4). Therefore, the Court concludes that the waste of judicial resources in requiring two different courts to construe at least six of the same patents,[FN9] and to render _Markman_ rulings on each of these patents, is a factor that strongly weighs in favor of transfer.[FN10]

> FN8. The number of patents in the instant case that overlap with patents involved in cases pending in the Northern District of Illinois is in dispute. Defendants contend that thirteen of the patents in this case are being litigated in _Nilssen v. Motorola, Inc.,_ Case No. 96-5571, and that three of these patents are also being litigated in _Nilssen v. MagneTek, Inc.,_ Case No. 98-2229. (D.I. 16 at 4). Plaintiffs respond that only six patents overlap between the _Motorola_ case and the action presently before the Court. (D.I. 24 at 12 & n. 4). The Court concludes that it is unnecessary to determine exactly how many of the patents overlap and will accept as true, for purposes of this motion, that only six patents overlap.

> FN9. Defendants point out that the file wrapper for one of the overlapping patents consists of over 1,700 pages.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 5
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

FN10. Plaintiffs contend that the doctrine of collateral estoppel will prevent any waste of judicial resources by precluding duplicative litigation. However, collateral estoppel only applies when a final judgment is rendered, so it could take months or years for collateral estoppel to become applicable. If *Markman* rulings are issued in the instant case that conflict with those rendered in the Northern District of Illinois prior to collateral estoppel becoming applicable, this could result in inconsistent judgments virtually guaranteeing that one of the judgments will get reversed on appeal. This judicial waste can be avoided by granting the instant motion to transfer.

### CONCLUSION

In balance, the Court concludes that the relevant factors strongly weigh in favor of a transfer to the Northern District of Illinois. Both the convenience of the witnesses and practical considerations strongly weigh in favor of transfer, and the convenience of the parties weighs slightly in favor of transfer. On the other hand, no factors weigh against the requested transfer. FN11 As a result, the Court concludes that a transfer to the Northern District of Illinois is warranted under the circumstances.

FN11. Plaintiffs contend that they have a legitimate desire to litigate in Delaware in order to quickly resolve the matter, and that this factor weighs in favor of transfer. (D.I. 24 at 12). However, the statistical evidence submitted by Defendants reveal that civil cases are, on average, resolved more quickly in the Northern District of Illinois than in Delaware; however, in cases that ultimately go to trial, Delaware is a more expedient forum. (D.I.16, Exh. H). Furthermore, Plaintiffs have admitted that the slow pace in the cases pending in the Northern District of Illinois is "due to the pace set by the lawyers." (D.I. 25, Exh. B at 2). Plaintiffs nonetheless assert that, because a trial date has already been set in the instant case for February 11, 2002, the instant suit will be re-solved more quickly if tried in Delaware. However, in complex patent cases such as this, the initial trial date is often pushed back as discovery problems arise. Considering the number of patents at issue in this case and that discovery has yet to commence, the February 11, 2002 trial date looks unrealistic.

After the briefing in this matter was completed, Plaintiffs sent two letters to the Court (D.I. 27; D.I. 28) indicating that the summary judgment motions pending in the Northern District of Illinois cases were going to be further delayed because the motions had been referred to a special master. However, the Northern District of Illinois's referral order, which is attached to one of Plaintiffs' letters, highlights the fact that quick resolution of the lawsuit in this District is unlikely. The Order stated that: "the voluminous documents and arguments involved in the case" and "the legal and factual complexity of the case" would be such a drain on judicial resources that the appointment of a special master is warranted. (D.I.28). The Court concludes that requiring two different courts to duplicate much of the same work would be inefficient and would not produce a more expedient resolution in this forum.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this *1* day of May, 2001, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (D.I.15) is *GRANTED*.

D.Del.,2001.
Nilssen v. Osram Sylvania, Inc.
Not Reported in F.Supp.2d, 2001 WL 34368395 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1966438 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**

3Com Corp. v. D-Link Systems, Inc.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
3COM CORPORATION, Plaintiff,
v.
D-LINK SYSTEMS, INC., Defendant.
No. C.A. 03-014 GMS.

April 25, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.

I. INTRODUCTION

*1 On January 7, 2003, the plaintiff, 3Com Corporation ("3Com") filed the instant action alleging infringement of three patents relating to network interface adapters. The defendant, D-Link Systems, Inc. ("D-Link"), moves to transfer this case to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a) (D.I.11). For the following reasons, the court will grant the defendant's motion.

II. DISCUSSION

D-Link moves to transfer this action to the District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or convenience of [the] parties and witnesses, in the interest of justice," the court may transfer a civil action "to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). It is the movant's burden to establish the need for transfer, and 'the plaintiff's choice of venue [will] not be lightly disturbed.' *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995) (citations omitted).

When considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum.' *Id.*. This inquiry requires "a multi-factor balancing test" embracing not only the statutory criteria of

convenience of the parties and the witnesses and the interest of justice, but all relevant factors, including certain private and public interests. *Id.* at 875, 879. These private interests include the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; and the location of books and record, to the extent that they could not be produced in the alternative forum.[FN1] *Id.* at 879. Among the relevant public interests are: "[t]he enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id.* at 879-80 (citations omitted).

> FN1. The first three of these private interest collapse into other portions of the *Jumara* analysis. The court, therefore, will consider them in the context of the entire inquiry only. *See Affymetrix, Inc. v. Synteni, Inc. and Incite Pharmaceuticals, Inc.*, 28 F.Supp.2d 192 (D.Del.1998).

Upon consideration of these factors, the court finds that D-Link has met its burden of demonstrating that transfer is appropriate. First, it is clear that this case could have been brought in the Northern District of California. Any federal district court possesses subject matter jurisdiction over federal patent law claims such as those at issue in the present action. 28 U.S.C. §§ 1331 and 1338. Further, venue is proper in the Northern District of California because the defendant is a California corporation with its sole place of business in that state. 28 U.S.C. § 1400(b) ("Any civil action for patent infringement may be brought in the judicial district where the defendant resides....").

Having determined that the case could be properly heard in the Northern District of California, the court now considers whether it would more conveniently proceed in that forum and whether the interest of justice supports a transfer to that district. Again, the court finds that these criteria are met. First, the court notes that although 3Com is a Delaware corporation, its principal place of business is in Santa Clara, Cali-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1966438 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

fornia. D-Link is a California corporation with its sole place of business in Irvine, California. Although some of D-Link's products, including the accused products, are sold in Delaware, the connection to this forum ends there. Neither 3Com nor D-link maintains or owns any facility, property, or personnel in Delaware. Instead, the headquarters of both parties are located in California. Neither party has any books, records, or other documents in this district. Apparently, none of the acts related to the development of the accused products occurred in this district, while many, if not all, of these acts occurred in California. Clearly, litigating this case there would cause less disruption to business operations of each corporation, while eliminating the cost and time of cross-country transportation of persons and documents. In addition, D-Link would be forced to retain local counsel for purposes of litigating in this district. Were the case transferred to California, this additional expense would not be required.

*2 In addition, none of the anticipated third-party witnesses is subject to compulsory process in Delaware, but they may be compelled to testify in the Northern District of California. These witnesses include individuals involved in the development of the accused products, such as employees of the manufacturers of the products, Realtek Semiconductor Corp. ("Realtek") and Via Technologies, Inc. ("Via"). Realtek and Via are Taiwanese companies with offices and/or agents in northern California. Futhermore, at least one of the inventors of the accused products and one of the prosecuting attorneys could not be compelled to testify in this court. By contrast, each appears to live in northern California, and would be subject to compulsory process there. Finally, at least two witnesses with knowledge of allegedly invalidating prior art are subject to compulsory process in northern California, but not Delaware. Even if these witnesses were willing to travel to Delaware to testify in this court, it is certainly very inconvenient for them to do so, especially compared to traveling to a court in the state of their residence and employment. Convenience, cost, and expediency, then, favor a transfer.

The remaining factors of court congestion, the enforceability of the judgment, and the public polices of the fora neither favor nor counsel against transfer. These factors remain neutral in the court's analysis.

### III. CONCLUSION

In short, Delaware seems to have little interest in the present dispute between these parties, while justice, convenience, cost, and expediency favor a forum in California. The court recognizes that the Northern District of California is not the plaintiff's choice of forum for the present action; however, it is an exceedingly more convenient and appropriate forum than Delaware. In other words, the movant has shown that 'the litigation would more conveniently proceed and the interest of justice be better served by transfer' to California. *Jumara, 55 F.3d at 879* (citations omitted). As such, transfer is appropriate.

For the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendant's Motion to Transfer the case to the United States District Court for the Northern District of California (D.I.11) is GRANTED.

D.Del.,2003.
3Com Corp. v. D-Link Systems, Inc.
Not Reported in F.Supp.2d, 2003 WL 1966438 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

C
Inter-City Products Corp. (USA) v. Insurance Co. of
North America
D.Del.,1993.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
INTER-CITY PRODUCTS CORPORATION
(USA), a Delaware corporation, Plaintiff,
v.
INSURANCE COMPANY OF NORTH AMERICA,
a Pennsylvania corporation; Royal Insurance Com-
pany of America, an Illinois corporation; Certain Un-
derwriters at Lloyd's, London and London Market In-
surance Companies, United Kingdom resident indi-
viduals and corporations; and Harbor Insurance Com-
pany, a California corporation, Defendants.
**Civ. A. No. 90-717-SLR.**

Jan. 26, 1993.

Richard E. Poole, Richard L. Horwitz, and Kathleen
Furey McDonough, Potter Anderson & Corroon,
Wilmington, DE, and Jerold Oshinsky, Robert Mur-
ray D. Sacks, Andrew M. Reidy, Anderson Kill Olick
& Oshinsky, Washington, DC, for Inter-City
Products Corp. (USA).
Bruce C. Herron, Sawyer & Akin, Wilmington, DE,
and John I. Stewart, Jr., Crowell & Moring, Washing-
ton, DC, for Ins. Co. of America.
Henry E. Gallagher, Jr., Connolly, Bove, Lodge &
Hutz, Wilmington, DE, for Royal Ins. Co. Of Coun-
sel: Bradley J. Mortensen, and Lauren E. Remick,
Christie, Pabarue, Mortensen and Young, Phil-
adelphia, PA, and Edward J. Zulkey, Baker & McK-
enzie, Chicago, IL.
Michael B. McCauley, Palmer Biezup & Henderson,
Wilmington, DE, and Alfred J. Kuffler, and Michael
T. McDonnell, Palmer Biezup & Henderson, Phil-
adelphia, PA, for Certain Underwriters at Lloyd's,
London and London Market Ins. Companies.
Barbara J. Gadbois, Ament, Evans, Lynch & Carr,
Wilmington, DE, and Lawrence E. Carr, Esquire, and
Ann T. Dorsett, Carr Goodson & Lee, Washington,
DC, for Habor Ins. Co.

MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

*I. Introduction*

**\*1** This is a declaratory judgment action in which
plaintiff, Inter-City Products Corporation (USA)
("Inter-City"), seeks, *inter alia,* a declaration that the
insurance company defendants [FN1] named in the
Complaint are obligated, under the terms of the re-
spective insurance policies issued to plaintiff, to pay
for defense costs and to indemnify plaintiff for litiga-
tion costs and liability arising from an administrative
enforcement action brought by the Tennessee Depart-
ment of Health and Environment ("TDHE") against
Inter-City. In the underlying environmental law en-
forcement action, the TDHE alleges that Inter-City is
liable for damages to property and natural resources
in connection with environmental conditions, particu-
larly trichloroethylene ("TCE") contamination, al-
legedly existing at or adjacent to Inter-City's manu-
facturing facility in Lewisburg, Tennessee (the
"Lewisburg site"). [FN2] Before the Court is Royal's
motion to transfer venue from this district to the
Middle District of Tennessee. 28 U.S.C. § 1404(a).

*II. Royal's Motion to Transfer Venue*

Title 28, section 1404(a) of the United States Code
provides that "[f]or the convenience of the parties
and witnesses, in the interest of justice, a district
court may transfer any civil action to any other dis-
trict or division where it might have been brought."
The "convenience of the parties and witnesses" and
other factors relevant to a change of venue decision
are to be considered only after the district court
makes the initial determination as to whether the
plaintiff had a right to bring suit in the transferee dis-
trict. In the case at bar, Inter-City concedes "that this
action could have been filed in the Middle District of
Tennessee." [FN3] (D.I. 54 at 13) Accordingly, dispos-
ition of Royal's motion for transfer will turn on
whether "the convenience of the parties and wit-
nesses" and "the interest of justice" strongly favor
transfer of venue from this district to the Middle Dis-
trict of Tennessee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

*A. Convenience to the Parties and Witnesses*

It is well-established that "a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request" and that "the burden is on the moving party to establish that a balancing of proper interests" weighs strongly in favor of transfer. *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3rd Cir.1970). In this district, it is also well-settled that "[w]here ... the [p]laintiff has brought suit in a forum which is not its 'home turf' and which has no connection with the subject matter of the lawsuit, the convenience to the [p]laintiff of litigation in its choice of forum is not as great." *Bell Tel. Laboratories, Inc. v. Int'l Business Machine Corp.*, 630 F.Supp. 373, 375-76 (D.Del.1984); *accord Waste Distillation Technology, Inc. v. Pan American Resources, Inc.*, 775 F.Supp. 759, 764 (D.Del.1991); *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F.Supp. 1429, 1436 (D.Del.1989). In such instances, "it will be easier for the [d]efendant to show that the balance of convenience favors transfer." *Bell Tel. Laboratories, Inc.*, 630 F.Supp. at 376. Nevertheless, "[e]ven in a case where a plaintiff is away from its home turf, its choice of forum is entitled to deference, and should not be upset unless the defendant can 'show that the balance of convenience *strongly* favors transfer.' " *Willemijn Houdstermaatschaapij BV*, 707 F.Supp. at 1436 n. 5 (quoting *Read Corp. v. Portec, Inc.*, Civil Action No. 88-29 JRR, slip op. at p. 2, 1988 WL 125128 (D.Del. Sept. 14, 1988) (emphasis in original). Moreover, "if the plaintiff's choice of forum relates to its legitimate, rational concerns then the plaintiff's choice of forum is still accorded substantial weight." *Waste Distillation Technology*, 775 F.Supp. at 764.

*2 Inter-City does not dispute Royal's contention that Delaware is not its home turf and that no connection exists between Delaware and this litigation, other than the fact that Inter-City is a Delaware corporation. (See D.I. 54 at 15-17) Likewise, Inter-City does not rebut Royal's contention that "the fact that Delaware is plaintiff's state of incorporation [does not] make it plaintiff's 'home turf.' " (D.I. 59 at 27 (citing *Bell Tel. Lab., Inc.*, 630 F.Supp. at 376-77; *Chrysler Capital Corp. v. Woehling*, 663 F.Supp. 478, 482 (D.Del.1987))) Rather, in an effort to demonstrate that Delaware is a convenient venue for Inter-City to litigate this case and to support its contention that its choice of a Delaware forum is entitled to deference, plaintiff contends as follows:

[A]s Judge Latchum explicitly stated in *Waste Distillation [Technology]*, 'if the plaintiff's choice of forum relates to its legitimate, rational concerns then the plaintiff's choice of forum is still accorded substantial weight." 775 F.Supp. at 764. Inter-City has chosen to file this action in its state of incorporation, which is only 25 miles from an international airport, is located on Amtrak's Northeast Corridor with service to all major East Coast cities and thus, is well-suited for travel to the numerous locations where documents and witnesses in this case may be found."

(D.I. 54 at 17)

The record indicates, as discussed in greater detail below, that witnesses apparently needed for resolution of this controversy are located in various places throughout the United States, as well as in the United Kingdom. Thus, Delaware's proximity to different means of transportation indeed might serve the convenience of both parties and witnesses involved in this lawsuit. However, there is no evidence before the Court indicating that the Middle District of Tennessee (Nashville) [FN4] is any less convenient to the parties and witnesses in terms of transportation and accessibility. Indeed, as the Court will discuss below, it appears that Tennessee would be a more convenient forum for many of the potential witnesses, and some of the parties, including Inter-City itself.

It is undisputed that Inter-City has its principal place of business and its corporate headquarters in Tennessee. As mentioned in the foregoing, Inter-City does not contend that Delaware has any connection to this litigation other than the fact that Inter-City is a Delaware corporation. Royal sets forth the following argument in support of its contention that Inter-City enjoys few, if any, advantages and conveniences from litigating this matter in a Delaware venue:

The defendants do not reside in Delaware; their respective headquarters lie elsewhere. Inter-City would have to seek testimony from Royal employees in North Carolina and elsewhere, INA employees in Philadelphia and elsewhere, and employees of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

London market defendants in London and elsewhere in the United Kingdom. Except perhaps for potential Philadelphia-area witnesses, a Delaware venue would be as inconvenient for Inter-City as it would be for defendants. Except for such witnesses, all potential witnesses would be beyond the subpoena power of this Court.

*3 (D.I. 44 at 22)

The Court agrees. There is little, if any, evidence in the court record indicating that Delaware is a convenient forum in which to litigate this case. Other than the INA employees who apparently are located in the Philadelphia area, Inter-City has identified no other potential witnesses who are within the sub-poena power of this Court.[FN5] Similarly, Inter-City offers no basis upon which the Court can conclude that Delaware provides plaintiff with a convenient forum in which to resolve this case, other than its assertion as to Delaware's purported convenience in connection with its proximity to different means of transportation.

Venue in Tennessee, however, would appear to be advantageous and convenient for Inter-City since that is where Inter-City has both its principal place of business and its corporate headquarters. A Middle District of Tennessee forum would enable Inter-City employees and representatives to participate in the trial and pre-trial proceedings in this case with minimal intrusion into their personal and professional lives. Therefore, Inter-City stands to benefit from litigating this case in Tennessee rather than in Delaware since a Tennessee venue would result in the least amount of interference with plaintiff's business operations.

In response to Royal's contention that plaintiff gains little, if any, advantage from trial in a Delaware forum, Inter-City asserts that "in a Section 1404(a) transfer, the moving party 'cannot assert plaintiff's inconvenience in support of a motion to transfer.' " (D.I. 54 at 22 (quoting *American Can Co. v. Crown Cork & Seal Co.*, 433 F.Supp. 333, 338 (E.D.Wis.1977); citing *Hayes v. Chesapeake & O.R. Co.*, 374 F.Supp. 1068, 1069 (S.D. Ohio 1973))) Likewise, Inter-City contends that "if a 'plaintiff has

inconvenienced himself [in his choice of forum], he may do so if he so desires.' " (D.I. 54 at 22 (quoting *James v. Norfolk & W.R. Co.*, 430 F.Supp. 1317, 1319 (S.D. Ohio 1976)))

The Court rejects Inter-City's argument that its convenience or inconvenience is irrelevant to the Court's analysis. The non-binding authorities cited by plaintiff in support of this contention are inconsistent both with the plain language of section 1404(a) and with controlling precedent in this district. The "convenience of the parties" is one of the central factors to be considered by a district court judge in evaluating whether a section 1404(a) transfer request should be granted. Inter-City cites no authority from this circuit, and the Court is aware of none, holding that the plaintiff is not one of the "parties" referred to in section 1404(a). Furthermore, there is ample District of Delaware caselaw indicating that the plaintiff's inconvenience resulting from litigation of the case in the plaintiff's chosen forum, or its convenience resulting from transfer to the proposed transferee district, is a proper factor to be considered in performing the discretionary balancing of interests required by section 1404(a). See, e.g., *Chrysler Capital Corp.*, 663 F.Supp. at 483; *Krupp Int'l, Inc. v. Yarn Indus., Inc.*, 615 F.Supp. 1103, 1108 (D.Del.1985); *General Instrument Corp. v. Mostek Corp.*, 417 F.Supp. 821, 823 (D.Del.1976). "Based on the current record, it appears that there would be little, if any, inconvenience to [plaintiff] in a transfer ... and, in fact, [the transferee forum] may be more convenient." See *Krupp Int'l, Inc.*, 615 F.Supp. at 1108.

*4 As to the convenience of the party-defendants to this case, Royal and Inter-City have given little attention to this issue, other than in connection with availability of witnesses. As noted above, the other defendant-insurers in this action have taken no position on Royal's transfer motion. Indeed, the London defendants and INA both have submitted letters to the Court strenuously protesting Inter-City's efforts to characterize the non-joinder of these parties in Royal's motion as acquiescence in plaintiff's choice of forum.[FN6] Although the Court agrees that the non-joinder of these parties in Royal's motion should not be construed as agreement or disagree-

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 4

ment with the merits of Royal's transfer request, the Court will not disregard the convenience of these defendants in resolving this matter. Again, the plain language of section 1404(a) makes it clear that the "convenience of the parties" is an important factor in determining whether a transfer request should be granted.

Defendants are sophisticated insurers accustomed to travelling to courts distant from their own headquarters and principal places of business in order to defend insurance coverage claims. Royal contends, however, both that the availability of witnesses and defendants' ability to utilize compulsory process to obtain live testimony from witnesses will be compromised by a Delaware forum.[FN7] *See Pennwalt Corp. v. Purex Industries, Inc., 659 F.Supp. 287, 291 (D.Del.1986)* ("[t]he availability of witnesses, in particular the amenability of nonparty witnesses to subpoena, is in the context of this case the most crucial factor in deciding this motion to transfer") (footnote omitted).

More specifically, Royal contends that many of the potential witnesses needed for its defense of this action reside and work in Tennessee. When a party moves for venue transfer pursuant to section 1404(a), it must file affidavits "specifically identifying its witnesses and their residences, and outlining generally the content and relevance of their testimony." *Pennwalt Corp.*, 659 F.Supp. at 291 n. 5. Royal submitted an affidavit largely complying with these requirements and thereby identified those potential witnesses which Royal was aware of at the time it filed this motion.[FN8] (See D.I. 42) The relevance and content of these potential witnesses' testimony, according to Royal, is in connection with Royal's need, and presumably the need of the other defendants as well, to prove its coverage defenses, including its defense that Inter-City's claims are barred by the subject insurance policy's pollution exclusion clause. Royal contends that the testimony of various individuals, including Inter-City employees, Tennessee state environmental officials as well as persons involved in environmental testing and remediation work at the Lewisburg site, is highly relevant to, *inter alia,* Royal's affirmative defenses.

The record indicates, as Royal argues, that many of the witnesses with knowledge of the events underlying the environmental side of this case are employed or residing in Tennessee or somewhere else substantially closer to Tennessee than Delaware. Royal lists five Inter-City employees and avers that these employees "are expected to testify about how any discharges at the plant occurred, who was notified about them and when, and what steps Inter-City took to contain the TCE or remediate the contamination." (D.I. 42 at ¶¶ 6(2), 7(a)) Royal also lists E. Ray Farley, Superintendent of the Water and Sewer Department for the City of Lewisburg, and alleges that he "is expected to testify about the discovery of TCE in the Lewisburg water system in late 1980." Similarly, Royal provides a list of four employees or officials with the Nashville office of the Tennessee Department of Health and Environment and one EPA official who "are expected to testify about communications they have had with Inter-City and its employees concerning the TCE contamination at the Lewisburg plant, and Inter-City's attempts to comply with state and EPA regulations relating to reporting of the contamination and to remediation efforts." (D.I. 42 at ¶ 7(e)) Royal further lists the names of various "engineers and technicians from ERC Environmental and Energy Services and OSCO, Inc. [who] are expected to testify concerning the tests they performed at the Lewisburg site, the test results, conclusions drawn from those tests, any remediation-related work they performed at the site, and the costs of the services they rendered to plaintiff." (D.I. 42 at ¶ 7(c)) In addition, Royal sets forth the names of two employees of Tennessee Oil & Refining who "are expected to testify about the practices and procedures used in removing TCE from the Lewisburg plant." (D.I. 42 at ¶ 7(d))

*5 Royal avers that the testimony of these persons "is expected to relate to a number of Royal's defenses, including but not limited to, notice, the pollution exclusion, whether 'property damage' within the meaning of Royal's policy resulted, whether coverage was triggered under Royal's policy and whether any discharges or alleged damage resulted from an 'occurrence' within the meaning of Royal's policy." (D.I. 42 at ¶ 7(a)) Royal further contends:

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

The testimony of the above witnesses cannot be presented adequately by deposition because their testimony will deal with critical issues, such as whether Inter-City could have 'expected or intended' the TCE contamination in question, that will be vigorously contested. Thus, the actual appearance of the witnesses on the stand will be a crucial factor in the jury's evaluation of the credibility of their testimony.

(D.I. 42 at ¶ 8)

This Court previously has held that "[i]t is desirable to hold trial at a place where the personal attendance of witnesses through the use of the subpoena power can be reasonably assured. The alternative is to force the litigants to use deposition testimony." *Pennwalt Corp., 659 F.Supp. at 291.* The Court further opined in *Pennwalt* that the "problem of securing live witnesses is arguably even more acute in cases, such as this one, in which a jury trial has been demanded." *Id.*[FN9] For these same reasons, the Court here finds that the availability of potential witnesses and the convenience with respect to those witnesses favors a change of venue from this district to the Middle District of Tennessee.[FN10]

In an effort to rebut the obvious force of Royal's argument regarding the availability of witnesses, Inter-City contends that (1) several potential witnesses with knowledge of the environmental facts underlying this litigation are not located in Tennessee (See D.I. 54 at 11-12), and (2) Delaware is a more convenient forum for witnesses with knowledge of the insurance contracts at issue in this case (See D.I. 54 at 19).[FN11]

The former contention fails for at least two reasons. First, although, as Inter-City alleges, it may be true that some potential witnesses are outside of Tennessee, this does not detract from Royal's argument that Tennessee is a more convenient forum in which to litigate this action. According to Inter-City's own averments of fact, said potential witnesses are in locations that are outside of Delaware and that are more convenient to Tennessee than to Delaware.[FN12] Second, there is nothing in the record indicating that these potential witnesses have knowledge of facts surrounding the TCE discharges that is not known to others who still are residing or working in Tennessee. While it may be true, as Inter-City alleges, that "[k]ey witnesses who have knowledge of the 1980 pipe burst at the Lewisburg facility, the activities undertaken in response to the burst, the discovery of TCE damage in 1985, and the investigation and remediation of the Lewisburg site, are no longer in Tennessee" (D.I. 54 at 11-12), this does not mean that other people with that same or similar knowledge or with superior knowledge regarding these facts are no longer in Tennessee. The Court assumes that if this were the case, i.e., that these potential witnesses were the only persons with said knowledge or were the persons with superior knowledge as to these facts, then Inter-City would have supplied such evidence.[FN13]

*6 As to Inter-City's contention that Delaware is a more convenient forum for potential witnesses with knowledge of the insurance contracts at issue in this case, the Court finds this argument equally unpersuasive. This argument is based in part on Inter-City's allegations regarding the location of potential witnesses with knowledge of said insurance agreements. Specifically, Inter-City avers that (1) "the insurance company witnesses are located primarily in North Carolina (Royal), Pennsylvania (INA), California (Harbor), and outside the United States (the London defendants)" (D.I. 54 at 20); and (2) "all potential policyholder and broker witnesses involved in the purchasing of the insurance, and the documents relating to the purchase of insurance, are located in Michigan or Illinois." (D.I. 54 at 10) Inter-City argues that Delaware is a more convenient forum for these witnesses than Tennessee.

The Court disagrees. Although Delaware appears to be a more convenient forum for the INA employee-witnesses in Pennsylvania, the same cannot be said of the Harbor employee-witnesses in California, the Royal employee-witnesses in North Carolina, nor of the potential policyholder and broker witnesses in Illinois and Michigan. Furthermore, it is unclear whether Wilmington, Delaware is significantly more convenient for the London employee-witnesses than Nashville, Tennessee.[FN14]

Inter-City maintains that the convenience of the po-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tential witnesses employed by INA and the London defendants is more significant and is entitled to greater weight in the Court's balancing of interests than the convenience of the potential witnesses employed by Royal and Harbor because, according to Inter-City, "INA and the London Defendants ... face far greater exposure to liability than Royal...." (D.I. 54 at 21) Inter-City's contention in this regard is grounded on the fact that INA and the London defendants provided insurance coverage to plaintiff for substantially longer periods than the other insurers. (D.I. 54 at 21)

Both INA and the London defendants have vigorously objected to this characterization of the relative risks faced by the various defendant insurers and have suggested that there is insufficient record evidence to support this premature conclusion, particularly at this early stage of the proceedings and without the benefit of discovery. (See D.I. 65, 66) The Court agrees.

Inter-City further contends that "because this is an insurance coverage action and not an environmental action, the [Court's] focus [should be] on the witnesses with the most knowledge of the insurance contracts at issue" rather than on the potential witnesses with knowledge of the underlying environmental facts. (See D.I. 54 at 4, 10, 17-22) More specifically, Inter-City asserts that the "key witnesses in this case will be witnesses involved in the drafting [,] purchase, and underwriting of the insurance policies, and those involved in making or responding to Inter-City's claim for insurance coverage." (D.I. 54 at 10)

*7 Despite the purported significance of these potential witnesses' testimony, nowhere has Inter-City set forth the content and relevance of their testimony. Although it appears that some of this testimony would relate to the interpretation of the subject insurance policies and the expectations of the parties with respect to the coverage provided thereby, Inter-City does not assert in its motion papers that ambiguities or other similar aspects of the parties' written agreements will require clarification by the use of parol evidence. (See D.I. 54 at 19) In addition, the Court recognizes that in insurance coverage cases such as this one, the language of the *standard* coverage and

exclusion provisions usually contained in the subject insurance policies and the relevant caselaw interpreting said provisions and exclusions, rather than the testimony of insurance brokers and insurance company employees, typically are of greatest significance in making a coverage determination. *See, e.g., Remington Arms Co. v. Liberty Mutual Ins. Co.,* Civil Action No. 89-420-JLL, slip op. at 3-11 (D.Del. Dec. 23, 1992).[FN15] The Court further recognizes that in actions seeking insurance coverage for defense and remediation costs arising from environmental damage, factual aspects of the underlying environmental incidents frequently are of considerable or greatest significance in determining whether a pollution exclusion clause or other contract provision precludes coverage. *See, e.g., id.* at 23-31.[FN16]

For the reasons discussed above, the Court concludes that the purported significance of these witnesses' testimony is in substantial doubt and, in any event, that the issue of convenience with respect to said witnesses does not support Inter-City's opposition to Royal's transfer request. Based on the foregoing discussion, the Court finds that Royal has satisfied its burden of showing that the convenience of parties and witnesses strongly favors transfer of this action from this district to the Middle District of Tennessee.

### B. Interest of Justice

Section 1404(a) vests the district court with discretion to transfer a case to another venue if transfer is "in the interest of justice." The considerations at issue in evaluating whether transfer is in the interest of justice entail, *inter alia,* factors affecting the convenience of the forum, which include the interest in having local controversies decided at home and the interest in having diversity cases tried in a court familiar with the law to be applied. In weighing whether transfer is in the interest of justice, the district court also considers convenience of potential witnesses, their availability and their amenability to the subpoena power of the court, as well as other factors affecting the convenience of the litigants.[FN17] Finally, the Court must consider whether transfer promotes or undermines the economic and efficient utilization of judicial resources. For reasons explained below, the Court finds that the interest of justice would be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7
Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

served by transfer of this case to the Middle District of Tennessee.

*8 Insofar as this case has a "center of gravity", clearly it is not in Delaware. Rather, the " 'center of gravity' in this case decidedly tends toward the proposed transferee forum." *Pennwalt Corp., 659 F.Supp. at 291*. First, Inter-City has its principal place of business and corporate headquarters in the Middle District of Tennessee, whereas defendants have their corporate headquarters and principal places of business in a variety of locations, none of which are in Delaware. Second, the insurance policies at issue here provided coverage, *inter alia,* for Inter-City's property and operations in Tennessee. There is nothing in the record indicating either that Inter-City conducts business operations in Delaware or that the subject insurance policies provided coverage for any Delaware property or for potential liability arising in connection with any Delaware business operations. Third, the environmental damages and costs as well as the underlying enforcement proceedings for which Inter-City seeks defense and indemnification coverage all arose in the Middle District of Tennessee. "Because transfer will permit an essentially local controversy to be decided locally, consideration of the subject matter of the litigation supports transfer." *Id.*

Choice of law becomes a factor in a transfer request because "it is preferable for a court of the state whose substantive law controls the action to hear the case...." *Davis Constructors v. Dartco Mfg., Inc., 668 F.Supp. 380, 385 (D.Del.1987)*. Royal persuasively contends that Delaware substantive law is unlikely to control in this action. *See, e.g., National Union Fire Ins. Co. v. Rhone-Poulec Basic Chemicals Co.,* Civil Action No. 87C-SE-11-1-CV (WBC), slip op. at 3-13 (Del.Super. Aug. 17, 1992); *Sequa Corp. v. Aetna Casualty & Surety Co.,* Civil Action No. 89C-AP-1, slip op. at 1-4, 1992 WL 179386, 1992 Del.Super. LEXIS 288, *2-*6 (Del Super. July 16, 1992); *Monsanto Co. v. Aetna Casualty & Surety Co.,* Civil Action No. 88C-JA-118, 1991 WL 236936 (Del.Super. Oct. 29, 1991). These cases indicate that Delaware law will not apply in an insurance coverage action, such as this one, where (1) the plaintiff brings suit in a Delaware forum seeking coverage for envir-

onmental damages and defense costs arising from environmental law enforcement proceedings; (2) the only connection to Delaware is that the plaintiff is a Delaware corporation; (3) the insurance contracts were not entered into in Delaware; (4) the subject insurance policies provide coverage for property damage and liability arising from business operations conducted outside of this state and do not cover risks within this state; and (5) the insurance coverage action seeks indemnification, defense costs and other related damages in connection with liability and environmental enforcement proceedings arising outside of Delaware.

Significantly, although Inter-City "does not concede that Delaware substantive law will not apply to this action," it also does not provide the Court with any authority whatsoever supporting the view that Delaware substantive law will apply to this case. (See D.I. 54 at 26 n. 11, 25-27) The Court thus concludes that the choice of law factor does not support retention of this action in the District of Delaware since there is nothing cited in the record, nor any controlling precedent of which the Court is aware, indicating that Delaware substantive law will be applied in this action.[FN18]

*9 Finally, as to Inter-City's contention that "the economic and efficient utilization of judicial resource[s] dictate that this action remain in the District of Delaware" (D.I. 54 at 25), the Court disagrees. This argument is grounded on Inter-City's assertions regarding the purported maturity of this litigation. Specifically, plaintiff asserts, *inter alia,* that "[t]his action is now almost two years old ... [and] the parties [already] have negotiated a comprehensive Case Management Order ... which guarantees Inter-City a prompt adjudication of its claims." (D.I. 54 at 25)

In *Pennwalt Corp.,* Judge Schwartz stated the following with respect to this issue:
[T]his case is in an early phase. The pleadings to date consist of [plaintiff's] complaint; [defendant's] motion to transfer, answer, and counterclaim; and [plaintiff's] answer to the counterclaim. Both parties have made initial requests for discovery. Although [plaintiff] argues that transfer should be denied because the case has "not been dormant," ... it fails to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

show how it will be prejudiced by a transfer at this stage of the proceedings. Thus, timing does not weigh against transfer.

659 F.Supp. at 292.

The same can be said with equal force about the case at bar. In the instant case, Inter-City filed its complaint on December 14, 1990, but this action was stayed by mutual agreement of the parties until August 7, 1992. (D.I. 54 at 2) Since August 7, 1992, the only significant activity in this case was the filing of (1) answers, (2) Royal's transfer motion, (3) initial discovery requests and (4) proposed case management orders. In addition, the Court entered a Scheduling Order which, *inter alia,* set a trial date deadline for April 25, 1994. (D.I. 57) Since this case is still in its early stages, and since Inter-City "fail[ed] to show how it will be prejudiced by a transfer at this stage of the proceedings ..., timing does not weigh against transfer." *Pennwalt Corp., 659 F.Supp. at 292.*

Consistent with the foregoing discussion, the Court concludes that most, if not all, of the "interest of justice" factors weigh heavily in favor of transferring this action to the Middle District of Tennessee.

### III. Conclusion

For the reasons discussed in the foregoing, the Court finds that both the convenience of the parties and potential witnesses to this litigation as well as the interest of justice weigh strongly in favor of transferring this action to the proposed transferee district.FN19 Accordingly, the Court will grant Royal's transfer motion and order transfer of this case to the Middle District of Tennessee.

An Order consistent with this Memorandum Opinion shall issue.

> FN1. The party-defendants named in Inter-City's Complaint are: (1) Certain Underwriters at Lloyd's, London and London Market Insurance Companies (the "London defendants"); (2) Royal Insurance Company of America ("Royal"); (3) Insurance Company of North America ("INA"); and (4) Harbor Insurance Company ("Harbor").

> FN2. "At all relevant times, Inter-City manufactured and sold heating and air-conditioning products. Prior to April 20, 1986, Inter-City was known a Heil-Quaker Corporation, which, in turn, previously was known as Heil-Quaker Home Systems, Inc. Whirlpool Corporation ... sold Heil-Quaker to plaintiff's parent company, Inter-City Products Corporation, on December 19, 1986." (D.I. 54 at 5)

> FN3. The Court notes that the other party-defendants to this litigation have neither joined in nor opposed Royal's transfer motion, nor has any party disputed Royal's contention that the Middle District of Tennessee would have both subject matter jurisdiction over this diversity action and personal jurisdiction over all the parties to this case.

> FN4. The Court notes that Nashville is a reasonably large city with a substantial airport which serves as one of American Airlines' hubs.

> FN5. Under Rule 45, the subpoena power of the district court extends, under most circumstances, to
> any place within the district ..., or [to] any place without the district that is within 100 miles of the place of the deposition, hearing, trial, production, or inspection specified in the subpoena or [to] any place within the state where a state statute or rule of court permits service of a subpoena issued by a state court of general jurisdiction sitting in the place of the deposition, hearing, trial, production, or inspection specified in the subpoena.
> F.R.Civ.P. 45(b)(2) (West 1991). Rule 45, however, further provides as follows:
> On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
> (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 9

transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or ...

(iv) subjects a person to undue burden.

F.R.Civ.P. 45(c)(3)(A) (West 1991). Clause (c)(3)(B)(iii) of Rule 45 provides:

If a subpoena requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to ... the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony ... that cannot be met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance ... only upon specified conditions.

F.R.Civ.P. 45(c)(3)(B)(iii) (West 1991).

FN6. For example, Inter-City asserts without foundation that "probably because they realize that they could not demonstrate that Delaware is a less convenient forum than Tennessee, no other defendant has joined Royal's motion." (D.I. 54 at 4)

FN7. Inter-City devotes considerable effort in its motion papers to bring to the Court's attention that Royal and INA both conduct substantial business activities in Delaware. (See D.I. 54 at 6; D.I. 54, Exhibit A at ¶ 2) Inter-City fails, however, to explain the legal significance of these facts with respect to the transfer motion at bar.

FN8. Inter-City does not contend that Royal failed to comply with this requirement.

FN9. A jury trial was demanded in this action by Royal. (See D.I. 37)

FN10. At one point in its brief, Inter-City makes the cryptic contention that

"compulsory process is available to all parties through the federal court's liberal discovery rules." (D.I. 54 at 27) Inter-City does not specifically contend that Royal, assuming its transfer motion were denied and trial of this case were held here, would be able to use compulsory process to compel for trial in Wilmington the live testimony of potential witnesses, particularly of non-party witnesses, in Tennessee and other places distant from this forum.

FN11. Inter-City contends also that the presence in this case of a contractual "forum-selection decision by plaintiff ... should be afforded substantial weight [in the Court's section 1404(a) decision]." (D.I. 54 at 22) This argument arises from the Supreme Court's statement in *Stewart Organization, Inc. v. Ricoh Corporation,* 487 U.S. 22, 29 (1988), which Inter-City quotes in its brief, that the "presence of a forum-selection clause ... will be a significant factor that figures centrally in the district court's [section 1404(a)] calculus." Clearly if a "forum-selection clause" were present in this case, then it would be entitled to some weight in the Court's analysis.

The contractual provision at issue in the case at bar, however, is not a forum-selection clause since it does not place venue exclusively in a single forum. Rather, the clause at issue here, which provides that the London defendants (the clause apparently is contained only in the insurance contracts issued by the London defendants) shall "at the request of the Assured" "submit to the jurisdiction of any Court of competent jurisdiction within the United States", is more properly characterized as a consent to jurisdiction clause. As such, it clearly is not entitled to the "substantial weight" that should be given when a forum-selection clause is at issue. *See, e.g., Walter E. Heller & Co. v. James Godbe Co.,* 601 F.Supp. 319, 321 (N.D.Ill.1984). The Court finds that the presence of this consent to jurisdiction

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
(Cite as: Not Reported in F.Supp.)

clause in one of the four insurance contracts involved in this case is entitled to some, but little, weight in the Court's balancing of private interests.

FN12. These potential witnesses with knowledge of facts regarding the environmental events relevant to this case, according to Inter-City, reside in Alabama, Georgia, Ohio, Michigan and New Mexico. (D.I. 54 at 12)

FN13. Inter-City asserts in a footnote in its brief that "many of the witnesses identified in Royal's papers have virtually no knowledge of the facts of this case." (D.I. 54 at 21 n. 10) The Court gives little or no weight to this assertion because there is no evidence in the record, and Inter-City cites none, supporting this statement of fact.

FN14. The Court is aware that employees of the London defendants, assuming they were to attend trial of this case in Nashville, would be required to fly from London to New York, Chicago or another large city with an international airport, and then to take a transfer flight from there to Nashville.

FN15. Inter-City correctly contends that " 'in evaluating inconvenience [in a section 1404(a) motion], it is the quality of the proposed testimony-not the quantity of conceivable witnesses which the parties can suggest-which is determinative." (D.I. 54 at 19 (quoting _Mayer v. Development Corp. of America,_ 396 F.Supp. 917, 934 (D.Del.1975)) Yet Inter-City fails to explain how the testimony of insurance brokers and insurance company employees is qualitatively important in this litigation, particularly compared with the clearly important testimony of potential witnesses in Tennessee who possess knowledge of the environmental facts underlying this case.

FN16. Inter-City does not specifically contend, and the Court is aware of nothing in

the record indicating, either that the insurance policies at issue here do not contain standard comprehensive general liability ("CGL") provisions and exclusions, such as the pollution exclusion clause, or that this case will be substantially different from most cases like this one where interpretation of the insurance contract is determined by the terms of the standard CGL provisions and exclusions as well as caselaw interpreting those terms, rather than by the testimony of insurance company employees and representatives with knowledge of the policy terms.

FN17. The Court already discussed at length the issue of whether the convenience of parties and witnesses favors transfer. The Court will not reiterate the grounds upon which it concludes that transfer of this action to the Middle District of Tennessee will promote the convenience of the parties and witnesses involved in this litigation. The Court observes, however, that here, as "[i]n most cases, if the convenience of the parties and witnesses is served by transfer, it usually follows that justice will also be served by transfer." _Cinema Amusements, Inc. v. Loew's Inc.,_ 85 F.Supp. 319, 326 (D.Del.1949).

FN18. Inter-City suggests that the choice of law factor favors retention of this litigation in Delaware because if Royal's "motion is granted, the Middle District of Tennessee will be required to apply Delaware choice of law rules." (D.I. 54 at 26 (citing _Ferens v. John Deere Co.,_ 494 U.S. 516 (1990); _Van Dusen v. Barrack,_ 376 U.S. 612, 639 (1964)))
Although, as Inter-City contends, applicable Supreme Court precedent will require the Tennessee district court to apply Delaware choice of law rules in resolving the choice of law controversy that inevitably will arise in this action, and although it is true that this Court is more familiar with said rules than the court in Tennessee, this factor is entitled

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

to little weight in the instant section 1404(a) analysis because the Tennessee district court obviously is quite competent to make this one-time choice of law determination, particularly given the ample supply of recent Delaware precedent on this issue (some of which the Court cited in the foregoing).

Compared to the interest in retaining an action in a district court where the state substantive law in which the court sits will be applied throughout the litigation, the interest in retaining an action so that the one-time *choice of law determination* will be made by a court familiar with the applicable choice of law rules is relatively insignificant.

FN19. Both Inter-City and Royal submitted letters to the Court requesting oral argument on Royal's transfer motion. (D.I. 67 and 68) The Court will deny the parties' requests since the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process.

D.Del.,1993.
Inter-City Products Corp. (USA) v. Insurance Co. of North America
Not Reported in F.Supp., 1993 WL 18948 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M



Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

◨

International Business Machines Corp. v. Comdisco, Inc.
Del.Super.,1991.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.
      Superior Court of Delaware, New Castle County.
INTERNATIONAL BUSINESS MACHINES CORPOR-
    ATION, a New York Corporation, IBM Credit Corpora-
    tion, a Delaware Corporation, and Greenwhich Liberty
    1985 Limited Partnership, a Delaware Limited Partner-
                ship, Plaintiffs,
                       v.
   COMDISCO, INC., a Delaware Corporation, Defendant.
              **C.A. No. 91-C-07-199.**

                Submitted: Nov. 8, 1991.
                Decided: Dec. 4, 1991.

Defendant Comdisco's Motion to Dismiss.

R. Franklin Balotti, Anne C. Foster of Richards, Layton &
Finger, Paul C. Saunders, Evan R. Chesler of Cravath,
Swaine & Moore, Howard Weber, Morris Waisbrot of
Davis, Markel & Edwards, for plaintiffs.
Donald F. Parsons, Jr., Donald E. Reid of Morris, Nich-
ols, Arsht & Tunnell, and Jerold S. Solovy, Donald R.
Harris, Barbara S. Steiner, Laura A. Kaster of Jenner and
Block, for defendants.

                OPINION AND ORDER
GOLDSTEIN, Judge.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

TABLE OF
CON-
TENTS

PROCED-       .1
URAL
HISTORY.

FACTS.        .2

CHOICE        .11
OF LAW.

MOTION        .19
TO DIS-
MISS.

    DELAWA       .19
RE
STAND-
ARD FOR
MOTION
TO DIS-
MISS.

    GROUND       .20
ONE:
COM-
PLAINT IS
PREMA-
TURE.

    GROUND       .29
TWO: IBM
AND IBM
CREDIT
LACK
STAND-
ING.

        COUNT       .30
THREE.

        COUNT       .31
FOUR.

        COUNT       .31
FIVE.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

| | | |
|---|---|---|
| | COUNT SIX. | .32 |
| | COUNT EIGHT. | .33 |
| | COUNT NINE. | .34 |
| GROUND THREE: COUNTS THREE THROUGH NINE | | |
| | FAIL TO STATE A CLAIM. | .35 |
| | COUNT THREE. | .35 |
| | COUNT FOUR. | .39 |
| | COUNT FIVE. | .41 |
| | COUNT SIX. | .49 |
| | COUNT SEVEN. | .55 |
| | COUNT EIGHT. | .57 |
| | COUNT NINE. | .58 |
| CONCLU-SION. | .63 | |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 4

### PROCEDURAL HISTORY

*1 IBM and IBM Credit Corporation (hereinafter "IBM Credit") filed a complaint against Comdisco, Inc., (hereinafter "Comdisco") in the Delaware Court of Chancery on January 24, 1991. Finding that the Chancery Court lacked jurisdiction to hear the lawsuit, Vice Chancellor Chandler handed down an opinion on July 2, 1991, providing that the complaint would be dismissed unless plaintiffs transferred the case to Superior Court within 20 days of the order. On July 19, 1991, IBM and IBM Credit filed an Amended Complaint against Computer Associates International, Inc. (hereinafter "Computer Associates"), and Comdisco, in nine counts.

Comdisco filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted [FN1] on August 12, 1991. On August 21, 1991, Computer Associates also filed such a motion. On August 22, 1991, plaintiffs filed a motion for leave to file a Second Amended Complaint adding Greenwich Liberty 1985 Limited Partnership (hereinafter "GLLP") as a plaintiff to the action. I granted this motion on September 4, 1991. On October 4, 1991, plaintiffs and defendants entered a stipulation and order dismissing Computer Associates from the action. Therefore I am considering only Comdisco's motion to dismiss in this opinion.

### FACTS

For purposes of a motion to dismiss for failure to state a claim for which relief may be granted, all of the allegations in the complaint must be accepted as true. *State Use of Certain-Teed Products Corp. v. United Pacific Insurance Co.,* Del.Super., 389 A.2d 777, 778 (1978). The following facts, except where otherwise noted, are therefore taken from the Second Amended Complaint.

The parties relevant to this action include the following:
*IBM:* IBM is a New York corporation engaged primarily in the business of developing, manufacturing, marketing, and servicing computers, computer equipment and software. IBM engages in these activities on a world-wide basis in competition with companies located both inside and outside the United States.

*IBM Credit:* IBM Credit is a wholly-owned subsidiary of IBM. It is incorporated under the laws of Delaware, although its principal place of business is in Stamford, Connecticut. IBM Credit "purchases, leases, sells and finances principally IBM-manufactured products that are marketed to ... end users ... and other organizations." (Second Amended Complaint, hereinafter "S.A.C.," at p. 4). In engaging in these activities, IBM Credit competes with other companies, including leasing companies, computer manufacturers, and brokers. IBM Credit is the general partner of GLLP.

*GLLP:* GLLP is a Delaware limited partnership which is the owner of the computer equipment at issue in this lawsuit. As stated above, IBM Credit is the general partner of GLLP. IBM Credit is also attorney-in-fact for the partnership. Pursuant to these authorities IBM Credit has the power to manage and operate the business and affairs of the partnership, the power to execute agreements on behalf of the partnership, and the power to execute documents and pleadings in court proceedings affecting the partnership. IBM Credit has other powers incidental to its status as general partner of GLLP.

*2 *COMPUTER ASSOCIATES:* Computer Associates is incorporated under the laws of Delaware, and has as its principal place of business Garden City, New York. "Computer Associates designs, develops, markets and supports computer software products for use with the computers of a number of different manufacturers." (S.A.C. at p. 5).

*COMDISCO:* Comdisco is also a Delaware corporation, and has as its principal place of business Rosemont, Illinois. Comdisco is engaged in the activity of purchasing, leasing and selling computer equipment such as that manufactured by IBM. These activities are conducted in competition with companies such as IBM and IBM Credit. There are many firms that engage in such activities. Comdisco also provides services and parts necessary to "reconfigure" the IBM equipment it markets. These reconfigurations consist of adding to or removing various components from the equipment to fit the needs of the particular customer.

This lawsuit revolves around one computer system that is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 5

comprised of several modular components. The system is a "3090" model, designed and manufactured by IBM. The specific system at issue in this case has a serial number of 70263.

Initially introduced on the market in 1985, the 3090 product line is a family of high-performance computer equipment that cost billions of dollars to develop, manufacture and market. The 3090 product line was developed in response to consumer demand and strong competition from other computer manufacturers.

The 3090 systems are among the most powerful and advanced computer systems in the world. A 3090 "processor complex" consists of central processors, memory units, channels and 3089 power units. These complexes range in price from approximately $850,000 to over $17,000,000. An entire 3090 system, including auxiliary storage devices, software and other devices, is priced from approximately $2,000,000 to over $100,000,000. Each component of these systems is also very expensive. An expanded storage (memory) increment of 64 megabytes, for example, costs approximately $100,000, and a 3089 power unit costs about $42,000.

The 3090 systems are designed so that expanded memory units and other components and features can be easily added and removed. When features and components are added, this is referred to as "upgrading" the machine, and when items are removed it is called "downgrading."[FN2] Tens of thousands of configurations are possible, and in this way the individual performance needs of each customer may be met. These alterations may easily be performed in the field; the equipment need not be returned to the factory to be reconfigured.

Some time in 1985, the 3090 unit at issue in this case was leased by IBM Credit to Applied Data Research, a New Jersey firm later acquired by Computer Associates.[FN3] The obligations under the lease agreement, or Term Lease Master Agreement (hereinafter "TLMA"), were assumed by Computer Associates after it acquired Applied Data Research. (The TLMA was attached as an exhibit to the Second Amended Complaint and was incorporated therein by reference.)

*3 Several provisions of the TLMA are relevant to this lawsuit. Paragraph 23 provides:

23. ALTERATIONS; MODIFICATIONS; PARTS. Lessee may alter or modify the Equipment only upon written notice to Lessor. Any non-IBM alteration is to be removed and the Equipment restored to its normal, unaltered condition at Lessee's expense prior to its return to Lessor. At Lessee's option, any IBM field installable upgrade, feature addition or accessory added to any item of Equipment (Modification) may be removed. If removed, the Equipment is to be restored at Lessee's expense to its normal, unmodified condition. If not removed, such Modification shall, upon return of the Equipment, become without charge, the property of Lessor free of all encumbrances. Restoration will include replacement of any parts removed in connection with the installation of an alteration or Modification. Any part installed in connection with warranty or maintenance service shall be the property of Lessor.

Paragraph 32 provides:

32. SUBLEASE AND RELOCATION OF EQUIPMENT; ASSIGNMENT BY LESSEE. Upon Lessor's prior written consent, which will not be unreasonably withheld, Lessee may sublet the Equipment or relocate it from the Equipment Location. No sublease or relocation shall relieve Lessee of its obligations under the Lease. In no event shall Lessee remove the Equipment from the United States. Lessee shall not assign, transfer or otherwise dispose of the Lease or Equipment, or any interest therein, or create or suffer any levy, lien or encumbrance thereof except those created by Lessor.

Paragraph 37 provides, in pertinent part:

37. DEFAULT; NO WAIVER. Lessee shall be in default under the Lease upon the occurrence of any of the following events: ... (b) Lessee fails to perform any other provisions under the Lease or violates any of the covenants or representations made by Lessee in the Lease, or Lessee fails to perform any of its obligations under any other Lease entered into pursuant to this Agreement, and such failure or breach shall continue unremedied for a period of 15 days after written notice is received by Lessee from Lessor; ...

Paragraph 40 of the TLMA further provides that "[t]he Equipment under Lease is and shall be the property of Lessor. Lessee shall have no right, title or interest therein

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 6

except as set forth in the Lease."

Thus, pursuant to paragraph 32 of the TLMA, Computer Associates was required to obtain IBM Credit's approval before any of the equipment could be subleased. Between September, 1990, and December, 1990, Computer Associates obtained consent from IBM Credit to sublease certain portions of the 3090 system to three organizations. IBM Credit and Computer Associates entered into three sublease agreements (which were attached to and incorporated into the complaint), allowing for the sublease of: the 3090 processor, the 3092 processor controller and two 3097 coolant distribution units for use by the First National Bank of Omaha in Omaha, Nebraska; two 3089 power units for use by United Technologies in California; and two 3089 power units for use by Brylane, Inc., in Indiana. The sublease agreements were to be valid through the end of the master lease agreement lease period, i.e., until February, 1992.

*4 Pertinent provisions of the sublease agreements provide the following:

IBM Credit Corporation (Lessor) and Computer Associates International Inc. (Lessee) agree that the Term Lease Master Agreement between the parties is hereby modified as follows: ...

The Equipment remains subject to and Lessee remains obligated under all the terms and conditions of the Term Lease Master Agreement during the sublease. In particular, ...

E) No alterations or modifications to the equipment are permitted except as expressly indicated in Paragraph 23, Alterations; Modifications; Parts; of the Term Lease Master Agreement. Any and all parts removed as a result of alterations or modifications remain the property of IBM Credit, and may not be assigned, transferred, or otherwise disposed of by Lessor [sic] or any third party. Lessee is responsible for storing and safekeeping the removed parts, and for their reinstallation when the machine is restored to its original unaltered condition.

Furthermore this Agreement does not authorize Lessee to sublease parts of this Equipment. Failure to obtain the separate written approval of IBM Credit prior to any reconfiguration of the Equipment which would result in the relocation of removed parts will constitute default. Such

approval will be granted when an Agreement For Sublease of Portions of Equipment is signed by Lessee and accepted by IBM Credit.

F) If Lessee elects to return the equipment upon expiration of the lease, all machines must qualify for IBM maintenance and must be returned complete with all cables, diagnostics, and logic manuals, to a location to be designated by IBM Credit Corporation.

Consent to sublease this equipment does not constitute a release of any commitments Lessee has under any other IBM contracts, including the IBM Volume Procurement Amendment.

Any subsequent relocation or sublease of this equipment including any change of the designated end user and respective address will require the prior written consent of IBM Credit Corporation. Failure to obtain such prior written consent would constitute default.

In or about July, 1990, (before the above-mentioned sublease agreements were entered into between IBM Credit and Computer Associates) Comdisco removed various equipment from a Computer Associates facility in New Jersey, including the 3090 model at issue in this case. This machine was evidently acquired by Comdisco pursuant to a sublease agreement entered into between Computer Associates and Comdisco, which provided in part that the computer system being subleased to Comdisco was to remain the property of the "Owner." [FN4] (A copy of a standard form of the sublease agreement was attached to the complaint as Exhibit E.) In this case the owner was, of course, GLLP.

Without IBM Credit's knowledge, Comdisco sent the equipment to one of its facilities in New Jersey, removed various components, and "shipped the downgraded 3090 system to the approved locations." (S.A.C. at p. 13). Although it is unclear from the complaint, it appears that plaintiffs are alleging that the same equipment that was approved by IBM for sublease by Computer Associates, was actually subleased to Comdisco, and then subsubleased to the approved sublessees. Moreover, it seems, the equipment approved for sublease was sent to the approved sublessees in a downgraded condition.

*5 Comdisco proceeded to sell some of the removed parts-64 megabytes of expanded storage and "one gate

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 7

with boards"-to PacifiCorp. Capital, Inc., who plaintiffs believe in turn sold or leased the components to "Clark County D.P. in Nevada." (S.A.C. at p. 13). Comdisco also sold another removed "expanded storage gate and boards" to Comdisco Deutschland GMBH ("Comdisco Germany"), who plaintiffs believe then leased these parts to the Bundesknapshaft in Germany. (*Id.*). The above activities were engaged in in competition with IBM, IBM Credit, and others.

Comdisco further placed 64 more megabytes of removed expanded storage and a removed thermal conduction module in its inventory in New Jersey, and another removed thermal conduction module in its inventory in Illinois. Plaintiffs do not know what, if anything, was subsequently done with these items.

Furthermore, according to the complaint, "Comdisco leased the removed IBM Credit-owned 3089 power units to United Technologies in California and Brylane, Inc., in Indiana for terms extending beyond the term of the TLMA between IBM Credit and Computer Associates." (*Id.* at pp. 13, 14).

On March 26, 1991, IBM Credit notified Computer Associates that it was in material breach of the TLMA.[FN5] The breaches remained unremedied for fifteen days after notice was sent, thus rendering Computer Associates in default under the TLMA.

The counts remaining for litigation include counts three though nine of the Second Amended Complaint. Count three, brought by IBM Credit and GLLP, alleges conversion against Comdisco; counts four and five, also brought by IBM Credit and GLLP, allege, respectively, trespass to chattels and tortious interference with contractual rights against Comdisco; count six, brought by IBM and IBM Credit, alleges tortious interference with business relations against Comdisco; count seven is brought by IBM Credit and GLLP and alleges breach of contract against Comdisco on the theory that plaintiffs were third party beneficiaries of the sublease agreement entered into between Computer Associates and Comdisco; count eight, brought by IBM and IBM Credit, alleges unfair competition against Comdisco; and count nine, brought by all three plaintiffs, alleges unjust enrichment against Comdisco.

*CHOICE OF LAW*

As a preliminary matter it is necessary to address the question of which state's local law will govern resolution of the various substantive issues in this case. Counts three through six, and eight, allege torts against Comdisco, count seven alleges breach of contract, and count nine alleges unjust enrichment. Although different choice of law rules apply depending on the cause of action, I conclude that Illinois local law should be applied to the substantive issues generated by all counts of the complaint.[FN6]

In *Travelers Indemnity Company v. Lake,* Del.Supr., 594 A.2d 38 (1991), the Delaware Supreme Court replaced the lex loci delicti choice of law rule in tort cases with the "most significant relationship" test of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1). *Travelers Indemnity,* 594 A.2d at 40.

**\*6** Section 145 of the Restatement provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in section 6.

(2) Contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICT OF
LAWS, § 145 (1971).

Section 6 of the Restatement provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 8

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF
LAWS, § 6 (1971).

In *Travelers Indemnity* the plaintiff had been seriously hurt when a truck he was driving was hit by an unknown motorist in Quebec, Canada. *Traveler's Indemnity, 594 A.2d at 40.* The plaintiff, a Delaware resident, had auto insurance coverage with Traveler's which included recompense of up to $300,000 for accidents with uninsured motorists. *Id.* The insurance contract provided that the insurance company owed Lake damages he would be "legally entitled to recover" from the uninsured motorist. *Id.* The parties agreed that if Quebec law were to be applied, the amount recoverable would have been limited to $29,400, and that if Delaware law were to be applied, the plaintiff could recover up to $300,000. *Id.*

In applying § 145, the court first noted that the "relevant Quebec statutory scheme envisions a system of no-fault insurance limiting a negligent driver's liability to a predetermined amount of damages." *Id.* at 47. The court went on to note that there was no compelling issue of Quebec public policy, and that the only connection with Quebec was that the accident occurred there. *Id.* at 48. The court found that Delaware had the most significant relationship to the issues presented for several reasons, including: the plaintiff was a Delaware resident; the defendant obviously conducted substantial business in Delaware; the uninsured motorist coverage provision of the insurance policy arose from Delaware law and involved issues of substantial importance to all Delaware citizens; and Delaware does not generally endorse a no-fault system of tort law. *Id.*

*7 As noted above, counts three, four, five, six, and eight of the complaint in the case at bar allege intentional torts against Comdisco. Therefore the inquiry is which of the states involved has the most significant relationship with the issues to be addressed in these counts.

As a preliminary matter, there does not seem to be any sort of easily defined policy consideration at work in this case to the same extent there was in *Travelers Indemnity*. In that case Delaware was deemed to have the "most significant relationship" to the issues involved in large part because of the important public policies embodied in the Delaware law providing that all Delaware motorists were to have uninsured motorist coverage. *See 18 Del.C. § 3902.* The policy considerations at work in this case seem to be of a more general nature, such as those providing that persons or companies doing business in this and all states do so in a fair and lawful manner. Since such considerations are likely to be of equal importance to all the states implicated in this case, public policy concerns seem unlikely to provide any meaningful guidance in determining which state's local law is to be applied.

The following is a list of *contacts* (ref. § 145(2)) that each of the implicated states has to the facts of this case:

*DELAWARE*

IBM Credit incorporated here

Comdisco incorporated here

Computer Associates incorporated here (note that this defendant has been dismissed from the action)

Greenwich Liberty is a Delaware limited partnership

Presumably all companies involved do business here

*NEW YORK*

IBM incorporated here

IBM has principal place of business here

Computer Associates has principal place of business here

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 9

(note again that this defendant has been dismissed from the action)

Presumably all companies involved do business here

### CONNECTICUT

IBM Credit has principal place of business here

TLMA entered into here

Presumably all companies involved do business here

### NEW JERSEY

Comdisco alleged to have removed the 3090 at issue from a Computer Associates facility here

Comdisco alleged to have downgraded/reconfigured the 3090 here

Comdisco alleged to have placed some components in its inventory here

Presumably all companies involved do business here

### ILLINOIS

Comdisco's principal place of business here; this would be where allegedly improper contracts would have been negotiated from and entered into, and where unlawful profits, if any, would have been realized

Comdisco alleged to have placed some components in its inventory here

Sublease agreement between Comp. Ass. and Comdisco entered into here

Presumably all companies involved do business here

### CALIFORNIA

Components allegedly improperly sold to a company here

Presumably all companies involved do business here

### INDIANA

Components allegedly improperly sub-subleased to a company here

*8 Presumably all companies involved do business here

### NEVADA

Components allegedly improperly sold to a company who in turn sold or leased the components to a company here

Presumably all companies involved do business here

It would seem that Delaware, New Jersey, Connecticut and Illinois have the most significant contacts with the tort allegations in this case. The most problematic "contacts" to establish are the place where the injury occurred and the place where the conduct causing the injury occurred. It seems that the former is almost impossible to pinpoint for purposes of this case and should therefore be assigned little weight in the balancing of interests.[FN7] The latter contact seems most concretely to have occurred in New Jersey, where the 3090 was physically appropriated and allegedly reconfigured. It seems that the principal wrongs complained of, however, are not so much the physical acts associated with this case as the allegedly wrongful business negotiations and receipt of profits. Thus it would seem that Illinois is the principal state implicated with respect to the place of the conduct causing injury.

It would also seem that some consideration should be given to the state where most of the parties are incorporated or otherwise registered, namely Delaware, on the theory that this state has an interest in deciding controversies between its businesses, as well as an interest in protecting their rights. The comments to section 145 provide, however, that with respect to torts like interference with contractual relations, a corporation's principal place of business is a more important contact than the place of incorporation. RESTATEMENT (SECOND) OF CONFLICT OF LAWS, section 145, comment e. to subsection (2) (1971). Several states are again implicated, including Connecticut, New York and Illinois.

The arrows keep pointing to Illinois. The state where the injury occurred is too difficult to ascertain, and is likely to be several states, not just one. Therefore, according to the comments to section 145, the place where the conduct occurred is to be given great consideration. In this case that appears to be Illinois. Illinois is also the principal place of business of Comdisco, the alleged primary wrongdoer.[FN8] Thus it appears that Illinois has the most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 10

significant relationship to the issues which arise with respect to counts three, four, five, six, and eight of the complaint.

Count seven of the complaint alleges breach of contract against Comdisco on the theory that IBM Credit and GLLP were third party beneficiaries of the Computer Associates/Comdisco Sublease Agreement. The Comdisco Sublease Agreement contains a choice-of-law provision which directs that Illinois law shall govern. (See Second Amended Complaint, Exhibit E, ¶ 15 f). In Delaware the courts generally recognize contractual choice of law provisions. See *Falcon Tankers, Inc. v. Litton Systems, Inc.*, Del.Super., 300 A.2d 231, 235 (1972) (parties' choice of law provision allowed to govern); see also *Derry Finance N.V. v. Christiana Cos.*, 616 F.Supp. 544, 546 (D.Del.1985) (recognizing that Delaware courts allow parties to choose the law that will govern their relationship) *aff'd*, 797 F.2d 1210 (3d Cir.1986). Moreover, plaintiffs and defendant agree that Illinois law should apply with regard to count seven.

**\*9** As previously noted, count nine alleges unjust enrichment against Comdisco. Like claims sounding in tort, Delaware applies a "most significant relationship" test to claims of unjust enrichment. See *Phoenix Canada Oil Co. v. Texaco*, 560 F.Supp. 1372, 1382 (D.Del.1983); *Hurst v. General Dynamics Corp.*, Del.Ch., 583 A.2d 1334, 1338, n. 5 (1990). Applying such analysis to the claim in count nine, it is clear that the unjust enrichment, if any, was enjoyed by Comdisco at its principal place of business in Illinois. I therefore conclude that Illinois is the state with the most significant relationship to the issues in count nine.

### MOTION TO DISMISS

Comdisco's motion to dismiss avers several general reasons why the complaint as a whole should be dismissed, and also several reasons why each particular count fails to state a claim for which relief may be granted. I will address each of the grounds raised in the motion in substantially the same order as they appear in that motion.

### DELAWARE STANDARD FOR MOTION TO DISMISS

Under Delaware law [FN9], all well-pleaded allegations must be accepted as true. *Spence v. Funk*, Del.Supr., 396 A.2d 967, 968 (1978). "The test for sufficiency is a broad one, that is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. If he may recover, the motion must be denied." *Id.* (citations omitted).

### GROUND ONE: COMPLAINT IS PREMATURE

Defendant argues that the entire complaint should be dismissed because it is premature. Defendant avers that the complaint is premature because in order for any of the claims brought against Comdisco to hold up under scrutiny, the activities complained of must be in violation of the TLMA, and Computer Associates must be in default under the TLMA. Comdisco argues that on the contrary, all of its activities were permitted by the TLMA, and Computer Associates is not in default under the TLMA. Therefore, they contend, the complaint is premature because there has been no breach or default, and hence no tort, at this point in time.

In support of its first argument, that there has been no default under the TLMA, Comdisco asserts that the notice of default and opportunity to cure required by ¶ 37 of the TLMA were not provided to Computer Associates. Comdisco concedes that a letter was sent to Computer Associates on March 26, 1991. Defendant argues, however, that the letter was in many ways insufficient notice, and that therefore no default has occurred under the TLMA.

Comdisco cites three cases in support of this proposition, but all three cases are inapposite. In *Medspan Shipping Service Ltd. v. Prudential Lines Inc.*, 541 F.Supp. 1076 (E.D.Pa.1982), the rental agreement between the parties provided that an event of default would include failure to pay rent in a timely fashion and continuation of the failure for ten days following written notice. *Medspan Shipping*, 541 F.Supp. at 1078, 1079. Plaintiff had failed to give any notice or opportunity to cure and then argued that the filing of the complaint constituted sufficient notice of default under the rental agreement. *Id.* at 1079. The court held, however, that filing a complaint does not constitute sufficient notice because it does not afford a party an opportunity to cure in a nonlitigious fashion. *Id.* The plaintiff had also sent the defendant written notice of default just four days before filing an amended complaint, and the court also held that the letter was "ineffectual." *Id.* Likewise in *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076 (D.Del.1990), *aff'd*, 932 F.2d 959

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 11

(3d Cir.1991), also cited by Comdisco, the pertinent party failed to give any notice or opportunity to cure. *Harper,* 743 F.Supp. at 1083. And finally, in *Guerin v. Blair,* Cal.Supr., 204 P.2d 884 (1949), the court held that the plaintiffs had no right to repossess the property being leased because they had not given the lessee any notice of breach or opportunity to cure, although such was required by the lease agreement. *Guerin,* 204 P.2d at 886. These cases are therefore easily distinguishable from the case at bar because in each of them the party asserting rights under a contract pursuant to another's alleged breach had given no notice or, in the case of the letter sent four days before the filing of an amended complaint, patently inadequate notice.

*10 In this case the plaintiffs have pled that notice of default was given, and that the breaching activities remained unremedied for fifteen days following the notice. (S.A.C. at 18). Since all the well-pleaded allegations of the complaint must be accepted as true for purposes of this motion to dismiss, *Spence v. Funk,* 396 A.2d at 968, the complaint will not be dismissed on the ground that the plaintiffs failed to satisfy the TLMA's notice and cure provisions.

Comdisco's second argument why the complaint is premature is that the plaintiffs may not escape the notice and cure requirements of the TLMA by asserting that the sublease agreements obviate the need for notice of default and an opportunity to cure under certain circumstances. Defendant asserts that the sublease agreements constitute an attempt on plaintiff's part to modify the TLMA, and that these modifications are invalid because they are not supported by consideration and in fact violate specific provisions of the TLMA providing for modification. I need not reach the merit of this claim, because this argument is necessarily dependent upon my finding that the TLMA notice and cure provisions were not complied with. In other words, Comdisco is arguing that the notice and cure requirements were not complied with, and, that plaintiffs may not get around their failure to comply with the requirements by arguing that the sublease agreements obviate the need for notice. As stated above, however, since I found that plaintiffs have properly pled that they complied with the TLMA notice and cure provisions, at this point I need not reach the issue of whether the sublease agreements properly or improperly modified the TLMA.

Comdisco's third argument is that all of the conduct it is alleged to have engaged in was permitted by the TLMA. If the conduct was permitted by the TLMA, defendant argues, then no wrongs have been committed and the entire complaint must be dismissed. Defendant's argument must fail because the assertion that all of its alleged conduct is permitted by the TLMA is erroneous. To the contrary, I find that the TLMA not only does not permit the alleged activities, but [in some instances] in fact specifically prohibits it.

It is true, as Comdisco points out, that under Connecticut law, construction of a lease is a question of law for the court. *Robinson v. Weitz,* Conn.Supr., 370 A.2d 1066, 1069 (1976). Moreover,

[w]here rights, duties and obligations are fully stated in a written contract between the parties, the court is obligated to determine the intention of the parties " 'from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used.' " (citations omitted).

*On Site Energy Corp. v. Sperry Rand Corp.,* Conn.App., 498 A.2d 121, 123 (1985), cert. denied, Conn.Supr., 501 A.2d 388 (1985); *see also Robinson v. Weitz,* 370 A.2d at 1069 (" 'controlling factor is the intent expressed in the lease, not the intent which the parties may have had or which the court believes they ought to have had....' ') (citations omitted).

*11 The complained of activities include: reconfiguring the machines without notice, selling components of the machines, selling components of the machines to a company outside the United States, and leasing components for periods beyond the expiration of the lease term.

Reconfiguring the machine without notice is in direct violation of paragraph 23 of the TLMA, which provides in pertinent part that, "Lessee may alter or modify the Equipment only upon written notice to Lessor." The acts of selling components of the machines and leasing components of the machines for periods extending beyond the lease term directly contravene the unambiguous meaning of paragraph 40, which provides in part that "[t]he Equipment under Lease is and shall be the property of Lessor.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Lessee shall have no right, title or interest therein except as set forth in the Lease." FN10 Selling the components also contravenes the plain meaning of the sentence of TLMA paragraph 32 which provides in part that "Lessee shall not assign, transfer or otherwise dispose of the Lease or Equipment, or any interest therein ..." Selling components to companies outside the United States also clearly violates the mandate of paragraph 32, which states in part, "In no event shall Lessee remove the Equipment from the United States." T.L.M.A. ¶ 32.

Defendant relies in large part on an argument that the term "Equipment" as used in the TLMA does not refer to "parts," and that the activities it is alleged to have engaged in involved only parts. Therefore, Comdisco argues, the above enumerated restrictions do not apply to the activities plaintiffs complain of in this lawsuit. Defendant bases this argument primarily on a sentence in the TLMA preamble which states: "The subject matter of the lease shall be machines, field installable upgrades, feature additions or accessories marketed by International Business Machines Corporation (IBM) and shall be referred to as Equipment." In conjunction with this sentence, Comdisco relies on paragraph 23 of the TLMA dealing with alterations and modifications of the leased equipment. Paragraph 23 of the TLMA provides:

23. ALTERATIONS; MODIFICATIONS; PARTS. Lessee may alter or modify the Equipment only upon written notice to Lessor. Any non-IBM alteration is to be removed and the Equipment restored to its normal, unaltered condition at Lessee's expense prior to its return to Lessor. At Lessee's option, any IBM field installable upgrade, feature addition or accessory added to any item of Equipment (Modification) may be removed. If removed, the Equipment is to be restored at Lessee's expense to its normal, unmodified condition. If not removed, such Modification shall, upon return of the Equipment, become without charge, the property of Lessor free of all encumbrances. Restoration will include replacement of any parts removed in connection with the installation of an alteration or Modification. Any part installed in connection with warranty or maintenance service shall be the property of Lessor.

*12 Defendant asserts that this paragraph contemplates that parts of the leased equipment may be removed and need not be returned to Lessor at the end of the lease term. This paragraph, defendant argues, taken in conjunction with the fact that "parts" is absent from the preamble sentence concerning the lease subject matter, confers upon Comdisco the authority to dispose of components, or "parts," removed from the machines, as though it had title to the property.

This argument does not comport with a reasonable interpretation of the TLMA. It is hornbook law that "[t]he words of [a bailment] contract must be given a reasonable construction...." 8 C.J.S., Bailments, § 31. See also Sturman v. Socha, Conn.Supr., 463 A.2d 527, 532 (1983) ("In interpreting contract terms, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words....") It is unreasonable to interpret the preamble sentence concerning the subject matter of the lease as excluding major components of the leased equipment, such as 64 megabytes of expanded storage worth approximately $100,000, or 3089 power units worth approximately $42,000 each.

Moreover, I find that paragraph 23 does not confer upon lessees and sublessees the authority to dispose of these components as though they were the owners of the property. The only reasonable interpretation of paragraph 23 is that it allows lessees and sublessees to reconfigure the leased machines so as to facilitate further subleasing; this way the needs of potential customers may be met and the lessee or sublessee is not saddled with an unalterable and perhaps un-leasable machine. In short, paragraph 23 appears to be a proper attempt on IBM's part to comply with the terms of the 1956 Consent Decree (hereinafter "Consent Decree"), which provided in part that IBM (and its subsidiaries) could not prohibit or in any way subject to control or approval alterations in or attachments to IBM machines. See United States v. IBM, No. 72-344, at § VII(d)(3) (S.D.N.Y.1956). It is not, however, reasonable to interpret paragraph 23 as conferring an owner's property rights upon lessees and sublessees.

Comdisco's proffered interpretation of paragraph 23 is also inconsistent with the unambiguous meaning of the lease as a whole. A bailment contract "is to be construed as a whole, and appropriate effect given to each clause as parts of a single contract." 8 C.J.S., Bailments, § 31. See also Gilden v. Singer Mfg. Co., Conn.Supr., 139 A.2d 611, 612 (1958) ("It is fundamental that [a] contract must be taken as a whole and all its relevant provisions con-

Not Reported in A.2d

Not Reported in A.2d, 1991 WL 269965 (Del.Super.)

(Cite as: Not Reported in A.2d)

Page 13

sidered in connection with each other.") To read paragraph 23 to allow a sublessee to remove major components from the leased machinery and treat them as the sublessee's own property would be inconsistent with other unambiguous terms of the TLMA, and the lease as a whole. Paragraph 40, for example, which clearly states that the leased equipment is and shall be the property of the Lessor, would be rendered meaningless. So too would paragraph 33, which provides in pertinent part that:

*13 Lessee acknowledges and understands that the terms and conditions of the Lease have been fixed to enable Lessor to sell and assign its interest or grant a security interest or interests in the Lease and the Equipment individually or together, in whole or in part, for the purpose of securing loans to Lessor or otherwise.

Comdisco's interpretation would also be in direct conflict with the clear directive of that portion of TLMA paragraph 32 referenced above, which provides that lessee may not assign, transfer or otherwise dispose of the Equipment or any interest therein.[FN11]

Comdisco's fourth argument is that the TLMA should not be interpreted to contravene the Consent Decree. Comdisco is a non-party to the Consent Decree, however, and therefore "cannot attempt to enforce the Decree's provisions against IBM." _Allen-Myland, Inc. v. International Business Machines Corp., 746 F.Supp. 520, 538 (E.D.Pa.1990)_. In any event, I do not find that the TLMA as interpreted above violates the Consent Decree.

For all the above reasons, Comdisco's motion to dismiss the entire complaint on the ground that it is premature is denied.

*GROUND TWO: IBM AND IBM CREDIT LACK STANDING*

Comdisco's second general ground for dismissal is that IBM and IBM Credit lack standing to bring this lawsuit, and that the complaint should therefore be dismissed as to these plaintiffs. I find that IBM does have standing to sue for tortious interference with business relations (count six), and unfair competition (count eight), but not to sue for unjust enrichment (count nine). I further find that IBM Credit does have standing to sue for tortious interference with contractual rights and business relations (counts five and six), and unfair competition (count eight), but not to

sue for conversion (count three), trespass to chattels (count four), or unjust enrichment (count nine).[FN12] Accordingly, because of lack of standing, count three is dismissed as to plaintiff IBM Credit, count four is dismissed as to IBM Credit, and count nine is dismissed as to both IBM and IBM Credit.

"The doctrine of standing requires that a party seeking relief from the court allege some injury in fact to a substantive, legally protected interest belonging to him." _Unger v. Nunda Township Rural Fire Protection District, Ill.App., 482 N.E.2d 123, 126 (1985)_ (citations omitted); _accord, Jenner v. Wissore, Ill.App., 517 N.E.2d 1220, 1226 (1988)_. The central thrust of Comdisco's argument is that IBM And IBM Credit lack standing to sue for any of the claims in this lawsuit because they have no ownership interest in the 3090 and because they were not parties to any of the contracts in issue. Each count of this complaint, although based on one set of facts, involves slightly different legal principles. The issue of standing must therefore be examined as to each count individually.

*Count Three*

Under Illinois law, one of the elements of conversion is an immediate right to possess the article allegedly converted:

*14 The essence of conversion is not the acquisition of the property by the wrongdoer, but a wrongful deprivation of the owner thereof; and one claiming a conversion must show a tortious conversion of the chattel, a right of property in it, and a right to immediate possession, absolute and unconditional and not dependent upon some act to be performed.

_Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc., Ill.App., 276 N.E.2d 89, 90, 91 (1971)_. In this case, only GLLP could have such rights. IBM Credit has pled that as general partner in GLLP it had authority to conduct the business of the partnership and institute legal proceedings on its behalf. However, § 17-701 of the Delaware Revised Uniform Limited Partnership Act[FN13] states that "[a] partner has no interest in specific limited partnership property." _6 Del.C. § 17-701_. Even assuming, as plaintiffs argue, that a right to future (as opposed to immediate) possession is all that is required to maintain an action for conversion, the same result would obtain pursuant to §

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 14

17-701 of the Act. Therefore, although IBM Credit could maintain an action for conversion on behalf of the partnership to protect its partnership interest, it could not maintain such an action on its own behalf because it had no ownership interest in the equipment.

### Count Four

The same holds true for count four, which alleges trespass to chattels. The essence of this tort is interference with a right of possession to personal property, such as that which may be found in the owner of the property. *See generally* 87 C.J.S., Trespass, § 8; *see also Cannon v. Kinney*, 4 Ill. 9, 10 (1841). Again, IBM Credit could maintain an action for trespass to chattels on behalf of the partnership, but without an ownership or possessory interest in the machine could not maintain such an action on its own behalf.

### Count Five

Count five alleges tortious interference with contractual rights. Here, IBM Credit has standing to bring the claim; no possessory or ownership interest in the machine is required. The contracts with which Comdisco is alleged to have interfered are the Sublease Agreements entered into between IBM Credit and Computer Associates, and the TLMA, also entered into between IBM Credit and Computer Associates. As I understand the complaint, IBM Credit entered into the contractual relationship with Computer Associates as general partner of GLLP. IBM Credit thereby bound not only the partnership, but itself as a partner of GLLP. *See* 68 C.J.S., Partnership, § 149 ("Such a contract, if properly executed on behalf of the firm, is the contract of each member thereof, and is binding on the firm and each and all of the partners ..."). By binding itself as partner and thus incurring potential liability on the contract, IBM Credit also conferred upon itself the rights which enure to a party to a contract. In this instance those rights manifest themselves as standing to sue for tortious interference with contract.

### Count Six

*15 Count six of the complaint is entitled "tortious interference with business relations," although it is clear that plaintiffs are bringing a claim for the tort which is variously phrased as "interference with prospective economic advantage" (*Crinkley v. Dow Jones and Co.*, Ill.App., 385

N.E.2d 714, 720 (1979); "tortious interference with prospective advantage" (*Knapp v. McCoy*, 548 F.Supp. 1115, 1117 (N.D.Ill.1982); and "tortious interference with prospective business expectancies" (*Downers Grove Volkswagen v. Wigglesworth*, Ill.App., 546 N.E.2d 33, 36 (1989). Comdisco avers in its motion that neither IBM nor IBM Credit (the only plaintiffs on this count) have standing to bring suit for this tort. Comdisco's claim is premised on the assertion that a necessary element of the tort of tortious interference with business relations is that the defendant's behavior was wrongful, and, that it was wrongful as to these plaintiffs. Defendant maintains that since IBM and IBM Credit did not own the equipment at issue here, then any alleged conversion of the equipment (for example) was not wrongful as to IBM and IBM Credit. Therefore, Comdisco argues, IBM and IBM Credit do not have standing to bring this claim.

Under Illinois law, the elements of intentional interference with business relations are: (1) existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by the defendant; (3) intentional interference causing breach or termination of the relationship or expectancy; and (4) damages. *O'Brien v. State Street Bank & Trust Co.*, Ill.App., 401 N.E.2d 1356, 1357, 1358 (1980). There is no threshold pleading requirement that the defendant's conduct was wrongful, either generally or with regard to plaintiffs specifically.[FN14] Therefore I do not find merit in Comdisco's argument that IBM and IBM Credit do not have standing to bring this claim because the conduct alleged was not wrongful as to them specifically.

### Count Eight

Count eight alleges unfair competition against Comdisco, and defendant alleges in its motion that neither IBM nor IBM Credit (the only plaintiffs to sue on this count) have standing to bring suit for this tort. Defendant's argument is again based on the assertion that plaintiffs have not alleged that there was any conduct on the part of Comdisco that was wrongful as to IBM and IBM Credit.

Generally, "unfair competition, ... can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects." PROSSER & KEETON, Torts, § 130, p. 1014 (5th ed. 1984). Thus the tort of un-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

fair competition is adequately pled when it is averred that the defendant has committed a tort and thereby wrongfully competed with the plaintiff. In order for IBM and IBM Credit to withstand the allegation on a motion to dismiss that they lack standing to bring this claim, they must successfully plead that they have been deprived of customers or other prospects by defendant through defendant's tortious conduct. IBM and IBM Credit have met these pleading requirements and therefore have standing to sue Comdisco for unfair competition.

### Count Nine

**\*16** Count nine alleges unjust enrichment, and all three plaintiffs bring suit under this claim. Defendant argues that IBM and IBM Credit lack standing to sue for unjust enrichment because neither plaintiff has a possessory interest in the machine.

Under Illinois law, a complaint for unjust enrichment must allege that there has been "unjust retention of a benefit, including money, by one party to the detriment of another party, against the fundamental principles of justice, equity, and good conscience." *Kenneke v. First National Bank of Chicago,* Ill.App., 382 N.E.2d 309, 311 (1978). Plaintiffs do not specifically respond to Comdisco's count nine standing argument in their brief, and they therefore do not specifically state what benefit was retained at their expense. Although an ownership interest in the machine is not a required element of this unjust enrichment claim, I find that IBM and IBM Credit do not have a sufficient interest of any sort in the machine to enable them to bring a claim for unjust enrichment. Therefore, count nine is dismissed as to plaintiffs IBM and IBM Credit.

### GROUND THREE: COUNTS THREE THROUGH NINE FAIL TO STATE A CLAIM

### Count Three

Comdisco avers first that count three, alleging conversion, fails to state a claim for which relief may be granted because GLLP does not have an immediate right of possession in the property allegedly converted. Comdisco asserts that, pursuant to the TLMA, Lessor does not have an immediate right to possess the machine before the end of the lease term absent compliance with the notice and cure provisions of paragraph 37 of the TLMA. Defendant further argues, of course, that plaintiffs have failed to provide notice and an opportunity to cure.

Under Illinois law, plaintiff must have an immediate right to possession of the article allegedly converted in order to state a claim for conversion. *See Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.,* 276 N.E.2d at 90, 91. For purposes of this motion to dismiss the relevant inquiry is whether any reasonably conceivable set of circumstances susceptible of proof under the complaint would support a finding that GLLP has an immediate right to possession of the 3090. *See Spence v. Funk,* 396 A.2d at 968. As noted earlier, (*see* discussion *supra,* at pp. 20-22), plaintiffs have adequately pled that the notice and cure requirements of the TLMA were complied with. Accordingly, it is reasonably conceivable that plaintiffs will be able to prove that GLLP has an immediate right to possession of the machine, and the motion to dismiss count three on this ground is denied.

Comdisco alleges second that count three should be dismissed because plaintiffs have failed to plead what defendant contends is a necessary element of a conversion claim-a demand for the property and a refusal to return it.

In the case at bar the facts set out in the complaint show a conversion in the absence of a demand and refusal because the plaintiff has averred not that Comdisco unlawfully retained possession of the equipment, but that it exercised unlawful dominion over the equipment. Plaintiffs allege, for example, that Comdisco sold GLLP's property, which is itself a conversion and clearly something which would obviate the necessity for demand. *See Jensen v. Chicago & Western Indiana R.R. Co.,* Ill.App., 419 N.E.2d 578, 593 (1981) (sale of equipment constituted independent act sufficient to obviate need for demand).

**\*17** Comdisco cites *Hobson's Truck Sales v. Carroll Trucking,* 276 N.E.2d 89, in support of the proposition that demand and refusal must be pled to properly state a claim for conversion. However, in *Hobson's Truck Sales* the court states:

... where some other independent act of conversion can be shown there is no necessity for a demand by the person claiming ownership or right to possession and a refusal by the original taker thereof to deliver it, in order to show a conversion of the property....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 16

*Hobson's Truck Sales,* 276 N.E.2d at 91. Thus *Hobson's* clearly also supports the conclusion that demand and refusal need not be pled under the circumstances of this case as set forth in the complaint. *See also Community Acceptance Corp. v. Falzone,* Ill.App., 98 N.E.2d 788, 790 (1951).

The issue would, therefore, appear to be easily resolved. However, as pointed out in *Monroe County Water Cooperative v. City of Waterloo,* Ill.App., 437 N.E.2d 1237 (1982), Illinois cases appear to be divided on the issue of "whether an allegation of demand and refusal is always necessary to maintain a cause of action for conversion." *Monroe County Water Cooperative,* 437 N.E.2d at 1240.FN15

For example, in *Katz v. Belmont National Bank of Chicago,* Ill.App., 475 N.E.2d 543 (1984), the court states that to properly plead conversion the complaint "must allege ... a demand by plaintiff for possession...." *Katz,* 475 N.E.2d at 545, *reversed on other grounds,* Ill.Supr., 491 N.E.2d 1157 (1986).

In *Katz* the plaintiff represented a class of businessmen who had employed a payroll service company called C.F.I. *Katz,* 475 N.E.2d at 544. The plaintiffs paid money to C.F.I., who kept the money in an account at defendant bank and for a fee, would issue plaintiffs' payroll checks. *Id.* Eventually plaintiffs' employees' payroll checks were dishonored by the defendant bank, C.F.I. declared bankruptcy, and plaintiffs sued defendant bank for conversion. *Id.* at 545. Plaintiff alleged that although C.F.I. had not withdrawn or disposed of the plaintiffs' money, the money was gone from the account and, therefore, defendant bank must have been responsible. *Id.* The trial court granted a motion to dismiss for failure to state a claim upon which relief could be granted, and further denied leave to amend. *Id.* The Court of Appeals reversed; the principal issue, however, revolved around the element of ownership rights in the money, and there was no discussion of demand and refusal other than as included in a perfunctory statement of the elements of conversion. *See id.* at 545, 546.

Moreover, it is obvious in such a case that a demand for the money and a refusal to give it would have to be made before it could be said that a conversion had occurred. Indeed it was the failure to honor the checks that formed the

essence of the plaintiffs' claim. Under these circumstances, it is little wonder the court stated that demand and refusal were necessary elements of a conversion cause of action.

*18 On appeal, the Illinois Supreme Court determined that the plaintiffs did not have an immediate, absolute, and unconditional right to possession of the money as against the bank, and reversed the ruling of the Court of Appeals. *Katz,* 491 N.E.2d at 1159. The court noted that the plaintiffs had such a right only as against C.F.I. *Id.* Before so ruling the Supreme Court set forth the elements of a claim for conversion by quoting what the appellate court had stated were the proper elements. *Id.* at 1158, 1159. In this manner the Supreme Court seemed to adopt the proposition that a claim for conversion had to include a demand by the plaintiff for return of the item, but more likely the court was merely setting forth the framework from which the appellate court had reached its faulty conclusion. Again, too, it is worthy of note that the central focus of the case was ownership rights and right to possession, not demand and refusal. Also, as stated earlier (and perhaps most importantly), under the facts of *Katz,* demand and refusal would be necessary elements of a proper conversion claim.

Although Illinois cases are divided on the issue of whether demand and refusal must be alleged to properly state a claim for conversion, the cases which hold that demand and refusal need not be pled where there is an independent act of conversion (such as sale of the item in question) seem to state the more appropriate rule for the case at bar. In this case plaintiffs have averred that Comdisco sold property belonging to GLLP, and that acts such as this constituted the alleged conversion. Therefore, plaintiffs need not have pled demand and refusal, and the motion to dismiss count three on this ground is denied.

*Count Four*

Comdisco argues first that count four, which alleges trespass to chattels, must be dismissed because, again, GLLP does not have an immediate right to possession in the 3090.FN16 Comdisco again premises this argument on the assertion that the notice and cure requirements of the TLMA have not been complied with. However, as previously discussed, plaintiffs have adequately pled that notice was given and that Computer Associates failed to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

cure. Therefore plaintiffs have adequately pled that GLLP has a right to immediate possession, and the motion to dismiss count four on this ground is denied.

Comdisco argues second that count four must be dismissed because GLLP does not allege actual harm. Given that trespass to chattels is a fairly obscure cause of action, there does not seem to be any clear Illinois authority on this issue. *See, e.g., Powers v. Sturm,* Ill.App., 297 N.E.2d 628, 631, 632 (1973) (sufficient showing of actual damages in trespass case to support trial court's award of punitive damages). Even assuming that actual damages are necessary to properly state a claim for trespass to chattels, however, the complaint does aver harm from the alleged trespass to the extent that items in which GLLP has an immediate right of possession have been sold and otherwise improperly disposed of. Actual damages have therefore been alleged in the amount of the value of the items against which the alleged trespasses have occurred, as well as profits and other amounts. The motion to dismiss count four on the ground that plaintiffs failed to plead actual harm is therefore denied.

*Count Five*

**\*19** Count five of the complaint alleges tortious interference with contractual relations. Comdisco moves first to dismiss count five on the ground that plaintiffs have failed to allege that the TLMA has been terminated. In support of this proposition, Comdisco cites *Dangeles v. Muhlenfeld,* Ill.App., 548 N.E.2d 45 (1989). The court in *Dangeles* set forth the elements of tortious interference with contractual relations: "(1) a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach." *Dangeles,* 548 N.E.2d at 51, 52. The court in *Dangeles* did not state that one of the elements of this cause of action is termination of the contract at issue.

In *Dangeles* the plaintiff was suing the defendant for, among other things, tortious interference with contractual relations for allegedly giving certain lending institutions false information about the plaintiff's company; as a result of defendant's activities plaintiff's company allegedly

"lost the services" of the lending institutions, and "lost the benefit of the employment of certain employees." *Id.* at 47. The defendant moved for summary judgment on this count with regard to one of the lending institutions-Citicorp-and in support of the motion submitted affidavits of employees of Citicorp stating that Citicorp had not terminated its relationship with plaintiff's company. *Id.* at 52. The court upheld the trial court's decision granting partial summary judgment on that count because plaintiffs did not present any evidence to contradict the affidavits. *Id.* The court found that the affidavits negated the existence of any breach of contract by Citicorp. *Id.*

The holding in *Dangeles* does not stand for the proposition that in all tortious interference with contractual relations cases the plaintiff must allege termination of the contract to properly state a claim. In *Dangeles* the breach which was alleged in the complaint was termination of the contract. *Id.* at 47. Therefore, when the plaintiff had no evidence supporting the allegation that Citicorp had terminated the contract, summary judgment had to be granted. In this case the breach which Computer Associates is alleged to have committed is not termination of the lease, but rather violation of various covenants in the lease concerning what can and can not be done with the leased equipment. Accordingly, count five will not be dismissed on the ground that plaintiffs have failed to plead that the contract was terminated.

Comdisco's second argument why count five should be dismissed is that plaintiffs have failed to plead that Comdisco caused Computer Associates to commit breaching acts, and that count therefore fails to state a claim. "[Plaintiff] complains of no act by [Computer Associates] but only that Comdisco procured a breach." Motion to Dismiss, p. 3. The essence of this claim seems to be that plaintiffs allege only that Comdisco caused Computer Associates to be in breach, and not that they caused Computer Associates to commit some positive act of breach.

**\*20** In support of this argument defendant cites *Stofer v. First National Bank of Effingham,* Ill.App., 571 N.E.2d 157 (1991). In *Stofer,* however, the pertinent issue was whether a claim for tortious interference with contractual relations could be maintained against a defendant where the plaintiffs were alleging that the defendant's conduct caused the *plaintiffs* to breach a contract; the court ruled that the tort of tortious interference with contractual rela-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 18

tions requires action toward "a *third party* which results in interference with said contract or prospective relationship." *Stofer,* 571 N.E.2d at 167 (emphasis in original). *Stofer* does not stand for the proposition that the third party must commit some positive act of breach.

Under Illinois law, the elements of tortious interference include the defendant's intentional and unjustified inducement of a breach of the contract, and a subsequent breach by the third party caused by the defendant's wrongful conduct. *Dangeles,* 548 N.E.2d at 52. In this case plaintiffs have pled that the defendant intentionally and unjustifiably caused Computer Associates to be in breach of a contract between itself and plaintiffs. Plaintiffs need not have pled that Computer Associates committed some positive act of breach, and count five will not be dismissed on this ground.

Comdisco's third argument in favor of the dismissal of count five is that no cause of action has been stated because plaintiffs have failed to plead actionable damages. Plaintiffs have pled, however, that they have suffered damages as a result of actions contributing to default under the lease. Such actions as pled include, again, sale of property belonging to GLLP, and the resulting damages as pled include the cost of those items as well as lost profits. Therefore plaintiffs have pled actionable damages, and count five will not be dismissed on this ground.

Comdisco's fourth and final assertion as to why count five fails to state a claim for which relief may be granted is that plaintiffs have failed to allege actual malice, which defendant asserts is a required element of a tortious interference with contract claim where the defendant is entitled to the conditional privilege of lawful competition.

It is true that lawful competition is a recognized privilege in some tortious interference cases, *Prudential Insurance Company of America v. Van Matre,* Ill.App., 511 N.E.2d 740, 744 (1987), *appeal denied,* Ill.Supr., 517 N.E.2d 1095 (1987), and that if it appears from the pleadings that the defendant was privileged, the plaintiffs must also plead that the defendant acted with malice. *H.P.I. Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* Ill.Supr., 545 N.E.2d 672, 677 (1989).[FN17]

The privilege of competition, however, appears to be unavailable when the contract allegedly interfered with is

not terminable at will; some authority even seems to indicate that the privilege is only available in cases of tortious interference with a business expectancy, and not in cases where there is a valid enforceable contract.

**\*21** For example, in *Belden Corp. v. InterNorth, Inc.,* Ill.App., 413 N.E.2d 98 (1980), the court makes a distinction regarding the availability of the privilege in cases of tortious interference with contract, and tortious interference with lesser business relationships (e.g. business expectancies); the latter are more amenable to interference and are afforded less protection under the law:

Unlike the right to receive the benefits of a contract, the right to engage in a business relationship is not absolute, and must be exercised with regard to the rights of others. The rights of others most commonly take the form of lawful competition, which constitutes a privileged interference with another's business....

As noted above, the signal difference between the two torts here considered is the inviolability of the contractual right, and the greater protection given that right.

*Belden,* 413 N.E.2d at 102 (citations omitted). The *Belden* case therefore appears to stand for the proposition that the privilege of competition is available only where the defendant is alleged to have interfered with a business expectancy.

In *Mannion v. Stallings & Co.,* Ill.App., 561 N.E.2d 1134 (1990), the court noted that the *Belden* court had recognized the privilege of lawful competition "where the defendant is interfering with a competitor's prospective business relationship rather than an existing contract." *Mannion,* 561 N.E.2d at 1141. The *Mannion* court seemed by implication to be endorsing this view, or at least acknowledging that authority existed for the proposition.

In *Prudential Insurance Company of America v. Van Matre,* the court noted that "[o]ne type of justification for interference with contractual relations which has been recognized in Illinois is lawful competition." *Prudential,* 511 N.E.2d at 744. The plaintiffs in *Prudential* alleged that the defendant, as an agent with a new insurance company, was a competitor of Prudential's. *Id.* at 745. The court applied an analysis based on Section 768 of the RESTATEMENT (SECOND) OF TORTS (1979), which delineates permissible interference in cases where contracts

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 19

are terminable at will. *Id.* at 744-746. The court concluded that the tortious interference with contract count was properly dismissed because there was no support for the proposition that the means employed by defendant were wrongful. *Id.* at 745. The critical fact seems to be, however, that the contracts in *Prudential* were terminable at will.

Certain secondary authorities also make a distinction for the availability of the privilege between cases where a contract is terminable at will and cases where it is not:

It is ... improper interference to entice away customers who are bound to the plaintiff by contract, or suppliers who are so obligated, or to disrupt an exclusive agency or dealership, or indeed to pursue any competitive scheme that would enhance the defendant's opportunities at the expense of actual existing contract rights in the plaintiff, in the absence of some justification other than competition for future business.

**\*22** Where the contract interfered with is terminable at will, however, the privilege of competition has been recognized. In such a case there is no contract right to have the relation continued, but only an expectancy, which is similar to the expectancy of a business that a customer will continue to do business with it. With such an expectancy of future relations, and prospective advantage, there has been no doubt that a competitor has the privilege of interfering to acquire the business for himself.

PROSSER & KEETON, Torts, § 129, at 987 (5th ed. 1984) (emphasis added, footnotes omitted). Thus, by negative implication, if not by direct statement, it would appear that, according to Prosser, the privilege of lawful competition has not been recognized where, as in this case, the contract (TLMA) is not terminable at will.

The invocation of the competitor's privilege under this count is also inappropriate as a conceptual matter. In the standard competitor's privilege case, the defendant and the plaintiff are competitors for the business of a third party. Typically the plaintiff has entered into a contractual relationship with a client, and the defendant is accused of causing the client to terminate her relationship with the plaintiff and begin doing business with the defendant instead. *See, e.g., Prudential Insurance Company of America v. Van Matre,* 511 N.E.2d 740; *Bowl-Mor Co. v. Brun-*

*swick Corp.,* Del.Ch., 297 A.2d 61 (1972), *appeal dismissed,* Del.Supr., 297 A.2d 67 (1972). In such a case it is readily apparent that the defendant is cloaked with the competitor's privilege and the plaintiff must plead that the defendant competed wrongfully.

In this case, on the other hand, the third party with whom plaintiff had a contractual relationship is Computer Associates. Comdisco, however, was not competing with IBM Credit for the business of Computer Associates. Instead all three parties are competitors with respect to fourth persons. Therefore, the facts relevant to this count do not fit the appropriate competition pattern, either with respect to the configuration of the parties or the activities engaged in.

For these reasons, the privilege of competition is not available to Comdisco with respect to this count, and the plaintiffs therefore need not have pled that Comdisco acted with malice. Accordingly count five will not be dismissed on this ground.

*Count Six*

Count six alleges tortious interference with business relations. Comdisco asserts first that count six fails to state a claim for which relief may be granted because no wrong has been alleged. This issue has been addressed previously (*see* discussion *supra,* at pp. 23-28, 33); count six will not be dismissed on this ground.

Comdisco's second assertion as to why count six should be dismissed is that plaintiffs have failed to allege that they had any negotiations in progress with the customers to whom Comdisco allegedly sold and sub-subleased certain portions of the leased equipment, or that plaintiffs had a reasonable expectation of entering into or continuing business relations with these parties.

**\*23** The portion of count six relevant to Comdisco's assertion in this instance states:

Comdisco was aware of the existence of valid business relationships between IBM and IBM Credit and their prospective customers (*i.e.,* the particular prospective customers to which IBM and IBM Credit attempted to market products and services in competition with IBM Credit's own property in the hands of Comdisco).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

S.A.C., pp. 22, 23 (emphasis in original).

In support of its argument Comdisco cites *Bodenstab v. J.R. Blank & Associates,* 1990 WL 139139 (N.D.Ill.). In *Bodenstab,* plaintiff Compuware filed claims against defendant Blank alleging, in parts relevant to this case, the tort of interference with prospective economic advantage. *Bodenstab,* 1990 WL 139139 at 3. The case was before the court on Compuware's motion for a preliminary injunction. *Id.* at 1.

The District Court held that Compuware did not adequately plead interference with prospective economic advantage so as to establish a likelihood of success on the merits. *Id.* at 6, 7. The court stated:

Compuware fails to allege a business relationship which it reasonably expected to enter into. This tort requires more than a general expectation of doing business.... Indeed, the cases typically address situations where negotiations were in progress and the parties were at the threshold of establishing a contractual relationship. Here, however, Compuware has not established a reasonable expectation of doing business with a third party with which Blank interfered.

*Id.* at 6. *Bodenstab* is distinguishable from the case at bar, however, because in *Bodenstab* Compuware had the burden of establishing the likelihood of success on the merits, which is a requirement for obtaining a preliminary injunction. *Id.* at 3. This is a much more stringent inquiry than that undertaken for purposes of a motion to dismiss for failure to state a claim. Furthermore, *Bodenstab* does not stand for the proposition that to properly state a claim for tortious interference with business relations the plaintiff must plead that negotiations were in progress with a specific prospective customer. And finally, *Bodenstab* is distinguishable from the case at bar because plaintiffs here have pled that they had valid business relations with prospective customers, and thus that they had a reasonable expectancy of doing business with third parties.

*Amerisystems, Inc. v. Keneco Financial Group, Inc.,* 1990 WL 93279 (N.D.Ill.), also cited by defendant, is also distinguishable from the case at bar. In *Amerisystems,* the counterplaintiff sued Amerisystems for intentional interference with prospective economic advantage for advising Keneco's lessees to send their rental payments to Amerisystems instead of Keneco, and for advising Keneco's lenders that Keneco was converting funds. *Amerisystems,* 1990 WL 93279, at 4. The court agreed with counterdefendants' argument that Keneco had failed to state a claim for this tort because Keneco's lenders and lessees were parties to existing agreements with Keneco, and Keneco did not allege that it reasonably expected to enter into future agreements with these or other parties. *Id.* In the case at hand plaintiffs pled that the parties with whom they had valid business relationships were "prospective customers." The reasonable inference to be drawn is that plaintiffs intended to at some point in the future enter into a contract with these parties. It is well settled that "the opportunity to obtain customers is an expectancy protected by the tort of interference with a business expectancy." *Downers Grove Volkswagen v. Wigglesworth,* 546 N.E.2d at 37. *See also Knapp v. McCoy,* 548 F.Supp. at 1117.

*24 Therefore, count six will not be dismissed because plaintiffs failed to allege that they had negotiations in progress with the "prospective customers." Moreover, contrary to Comdisco's position, I find that plaintiffs did aver a reasonable expectation of entering into business relations.

Comdisco's third argument why count six should be dismissed is that a cause of action has not been stated because plaintiffs have not sufficiently pled actual malice. Defendant argues that it is shielded by the privilege of competition with respect to this claim, and that plaintiffs have not overcome the privilege with adequate averments of malice.

If the conduct of a defendant in an interference with prospective economic advantage action was privileged, it is the plaintiff's burden to prove that the defendant's conduct was unjustified or malicious; it also becomes incumbent upon the plaintiff to plead, as part of a prima facie case, that the defendant acted in an unjustified or malicious manner. *Fellhauer v. City of Geneva,* Ill.Supr., 568 N.E.2d 870, 878 (1991).

Again, as with count five, a threshold issue is whether the defendant was protected by the privilege of competition; in this count the issue of privilege is relevant with regard to Comdisco's conduct in disposing of the leased computer components to various third parties.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 21

As discussed earlier, the privilege of competition is available in cases of tortious interference with business relations. *See, e.g., Belden Corp. v. InterNorth Inc., 413 N.E.2d at 102 (1990).*

Moreover, unlike with count five, the privilege of competition appears as a conceptual matter to be applicable to the activity complained of in count six. More specifically, IBM, IBM Credit, and Comdisco are competitors for the business of the types of third parties that Comdisco dealt with in this case. Plaintiffs did not complain in count five that Comdisco competed for and lured away the business of Computer Associates. Plaintiffs are, however, complaining in count six that Comdisco competed with IBM and IBM Credit for and lured away the business of the various third parties.

Therefore, I find that Comdisco was shielded by the conditional privilege of competition with regard to the activity complained of in count six. Pursuant to Illinois law, then, the plaintiff must plead that Comdisco's actions were unjustified or malicious. *Fellhauer, 568 N.E.2d at 878.*[FN18]

According to § 768 of the RESTATEMENT (SECOND) OF TORTS (1979), one may intentionally cause a third party not to enter into a prospective contractual relation with a competitor of the actor if, among other things, the means employed in doing so are not "wrongful." RESTATEMENT (SECOND) OF TORTS, § 768(1)(b) (1979). Section 767 of the RESTATEMENT (SECOND) OF TORTS (1979) provides a list of factors which may be used to determine whether an actor's conduct was improper in an intentional interference case. Both sections of the Restatement were relied upon to some degree by the Illinois courts in *Prudential Insurance Company of America v. Van Matre, 511 N.E.2d 740;* and *Downers Grove Volkswagen v. Wigglesworth, 546 N.E.2d 33.*

**\*25** Two of the factors listed in § 767 of the Second Restatement are particularly instructive for purposes of this case: (a) the nature of the actor's conduct; and (e) (in pertinent part) the social interests in protecting the freedom of action of the actor. Here, if the actions which are complained of are in fact proven by the evidence, I can conceive of little social interest in protecting the freedom of defendant to compete with plaintiffs in this manner. Moreover, the comments to clause (a) indicate that

wrongful means ordinarily include fraudulent misrepresentations, and also that significant consideration should be given to whether the conduct was in violation of recognized business ethics and established customs. Plaintiffs have pled and it may be reasonably inferred from the complaint that the conduct of defendants included fraudulent misrepresentations of authority to enter into various alleged transactions, and further that such conduct was in violation of recognized business ethics and established customs. These allegations constitute sufficient averments of malice to overcome the conditional privilege of competition, and count six will therefore not be dismissed for failure to plead malice.

### Count Seven

Count seven alleges breach of contract against Comdisco on the theory that IBM Credit and GLLP were third party beneficiaries of the sublease agreement between Computer Associates and Comdisco. Comdisco has moved to dismiss count seven for failure to state a claim on the ground that IBM Credit and GLLP were not intended third party beneficiaries of the sublease agreement between Computer Associates and Comdisco. I find that IBM Credit and GLLP were not intended third party beneficiaries of the Computer Associates and Comdisco sublease agreement and accordingly grant the motion to dismiss as to count seven.

Under Illinois law, a third person may sue for breach of a contract to which he is not a party if the contract was entered into for that person's direct benefit. *Midwest Concrete Products Co. v. La Salle National Bank, Ill.App., 418 N.E.2d 988, 989, 990 (1981).* Whether a person is a third party beneficiary is contingent upon the contracting parties' intent, and must be determined on a case-by-case basis. *Id. at 990.* Also, "it is not enough that the parties ... know, expect, or even intend that others will benefit." *Popp v. Dyslin, Ill.App., 500 N.E.2d 1039, 1044 (1986).* Moreover,

... there is a strong presumption that the parties to a contract have not acted for the benefit of anyone other than themselves, and this presumption can be overcome only by language " 'so strong as to amount practically to an express declaration.' " *People ex rel. Hartigan v. Community Hospital, (1989), 189 Ill.App.3d 206, 218, 136 Ill.Dec. 702, 709, 545 N.E.2d 226, 233 (quoting Metro*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 22

*East Sanitary District v. Village of Sauget* (1985), 131 Ill.App.3d 653, 86 Ill.Dec. 760, 475 N.E.2d 1327).

*B.C. v. J.C. Penney Co.,* Ill.App., 562 N.E.2d 533, 539, 540 (1990), *appeal denied,* Ill.Supr., 567 N.E.2d 328 (1991).

*26 In the present case, plaintiffs seem to rely mainly on the various declarations contained in the sublease agreement which acknowledge that ownership rights in the machines will remain with the "Owner" as designated on "Schedule A" to support their claim that they are intended third party beneficiaries under this contract. Most likely the clearest statement in the sublease agreement which would plausibly support plaintiffs' argument that GLLP and IBM Credit were intended third party beneficiaries of the contract is contained in paragraph 14, wherein it is stated: "Sublessee hereby acknowledges that the rights in and to the Machines are expressly subject and subordinate to the rights of the parties in interest named on Schedule A." Schedule A has not been made available to the Court, but it seems reasonable to assume that "Owner" (referenced elsewhere in the contract as being listed on Schedule A, in this case Owner being GLLP) would be one of the "parties in interest." Therefore the issue is whether the fact that Comdisco's rights in the machines are "subject and subordinate to" the rights of GLLP means that GLLP and IBM Credit are third party beneficiaries of the sublease agreement.[FN19]

The parties to this sublease agreement, Computer Associates and Comdisco, probably did not enter into this contract for the direct benefit of GLLP or IBM Credit. *See Midwest Concrete Products Co. v. La Salle National Bank,* 418 N.E.2d at 989, 990. The contract does provide that ownership rights remain with GLLP, but this is not enough to overcome the presumption that the contract was entered into only for the benefit of Computer Associates and Comdisco. *See B.C. v. J.C. Penney Co. Inc.,* 562 N.E.2d at 539. The agreement created no rights in GLLP or IBM Credit, but merely reserved rights that already existed by virtue of GLLP's title in the property. It is clear that GLLP was entitled to receive rental payments from Computer Associates regardless of whether this contract had been entered into. It does not appear from the sublease agreement, therefore, that the contracting parties intended to directly benefit anyone other than themselves. *See Midwest Concrete Products,* 418 N.E.2d 990. Count

seven is therefore dismissed.

### Count Eight

Count eight alleges unfair competition against Comdisco. Comdisco moves to dismiss count eight on the ground that plaintiffs have failed to allege any wrongful conduct on the part of defendant. This issue has been discussed previously (*see* discussion *supra,* at pp. 23-28), and, as noted before, plaintiffs have adequately alleged wrongful conduct on the part of defendant. Count eight will therefore not be dismissed on this ground.

### Count Nine

Count nine alleges unjust enrichment against Comdisco. Defendant has first moved to dismiss count nine for failure to state a claim on the ground that unjust enrichment is not a separate cause of action. However, under Illinois law, unjust enrichment is recognized as a separate cause of action. *See H.P.I. Health Care Services v. Mt. Vernon Hospital, Inc.,* 545 N.E.2d at 679. Count nine will therefore not be dismissed on this ground.

*27 Comdisco's second argument why count nine should be dismissed is that plaintiffs have failed to properly state a claim because they have not alleged that defendant unjustly or wrongfully retained a benefit. As discussed previously, however, plaintiffs have adequately pled that Comdisco's behavior was wrongful, and count nine will therefore not be dismissed on this ground.

Comdisco asserts as its third argument that count nine should be dismissed because a contract remedy is available to plaintiffs against Computer Associates under the TLMA. In support of this argument defendant cites several cases which at first blush appear to stand for such a proposition. However, a closer examination of these cases reveals that their rulings apply to a specific fact pattern which is not present here.

For example, in *Goldstick v. ICM Realty,* 788 F.2d 456 (7th Cir.1986), plaintiffs were attorneys who had been hired by a lessee of real property to obtain a reduction in back taxes owed on the property. *Goldstick,* 788 F.2d at 457, 458. Plaintiffs in fact obtained a sizeable reduction in the back taxes, but were then refused payment for their work in the amount of $290,000. *Id.* at 458, 459. After attempting to reach a settlement on their fees, and after still

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 23

not being paid, plaintiffs finally sued the lessee of the property, the owner/lessor of the property (ICM), and the property managers. *Id.* at 459. ICM moved for summary judgment, the motion was granted, and plaintiffs appealed. *Id.* at 458. One of plaintiff's claims against ICM was breach of contract, on the theory that the lessee with whom plaintiffs negotiated the fee contract was acting as agent for ICM, and that ICM was therefore bound by the contract. *Id.* at 459. The court ruled that summary judgment was improperly granted on this claim because an issue of fact existed with regard to whether ICM was a principal on the fee contract. *Id.* at 460.

Another of plaintiff's claims against ICM was based on a theory of "restitution;" plaintiffs claimed in part that ICM had been unjustly enriched by virtue of the reduction in taxes on the property.[FN20] *Id.* at 466. The court held, however, that if ICM was in fact a principal on the fee contract (an issue for the jury to decide), then plaintiffs had to proceed against ICM for breach of that contract and not on a quasi-contract theory. *Id.* at 467. If, on the other hand, ICM was not a principal on the contract, plaintiffs still could not recover on a restitution theory because an essential element of such recovery is that the plaintiff must have expected to be able to recover the fee from the defendant in the first place; this element, the court held, was absent from the case. *Id.* The court stated:

If [lessee] was merely a tenant of ICM and not an agent, ICM would not have expected to have to make good on a claim by the plaintiffs arising from the performance of their contract with him; and this, as the Illinois cases make abundantly clear, defeats a claim of restitution for the benefits conferred on ICM by that performance.

**\*28** *Id.*

Thus *Goldstick* concerns a situation where the plaintiffs have a contract with another party to perform services, and the services are performed but not paid for by the other party; plaintiffs then seek to recover against a third person not party to the contract on a theory of restitution or unjust enrichment. The distinguishing factor is that in the case at bar GLLP does not seek to recover for services that it rendered. GLLP seeks instead to recover for a different variety of unjust enrichment involving simply the unjust retention of a benefit by defendant at plaintiff's expense.

Defendant also cites *Daley v. G'Sell,* Ill.App., 430 N.E.2d 556 (1981), for the proposition that a plaintiff may not proceed against a party if he has a contract remedy available. In *Daley,* one claim plaintiff brought against defendants was for "restitution" on a theory that defendants were unjustly enriched by uncompensated services plaintiff rendered under an oral brokerage agreement. *Daley,* 430 N.E.2d at 558. This claim was dismissed with prejudice by the trial court. *Id.* at 557. On appeal the court noted that "[w]here there is an obligation or duty and a receipt of a benefit related to such duty, the law may imply from the circumstances or the relation of the parties a promise to pay." *Id.* at 559. The court found that the complaint did not establish such a duty because the contract was between only Daley and G'Sell. *Id.* The court noted it was well settled in Illinois that where work is performed under a contract, the suit must be between the parties to the contract, and that third parties are not liable on the basis of "an implied undertaking" even if they are benefitted by the plaintiff's efforts. *Id.*

The rules which emerge from these cases are couched in broad language and at first glance appear to apply to all unjust enrichment cases. For example, in *Premier Electrical Construction Company v. La Salle National Bank,* Ill.App., 477 N.E.2d 1249 (1984), also cited by defendant, the court states:

Unjust enrichment recovery requires a showing that the defendant has voluntarily accepted a benefit which it would be inequitable for him to retain without payment since the law implies a promise to pay compensation *when value of (sic) services are knowingly accepted ...* [A] claim for unjust enrichment generally cannot stand where there is an allegation of an express contractual agreement.

*Premier,* 477 N.E.2d at 1257, 1258 (emphasis added). Again, however, this case, like the others, involves a fact pattern dissimilar to the case at bar; in *Premier,* a subcontractor sought to recover against the property owner for services rendered. As with the other cases, then, the plaintiff was seeking to recover remuneration from a third party for services rendered pursuant to an express contract.[FN21] Such a fact pattern more clearly denotes a case of quantum meruit, which is a separate subcategory of the law of quasi-contract. *Midcoast Aviation, Inc. v. General Electric Credit Corp.,* 907 F.2d 732, 737 (7th Cir.1990).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 24

The above cases do not apply to the case at bar because GLLP does not complain that services were rendered under a contract and that such services went uncompensated. Nor does GLLP now seek to recover from Comdisco for services rendered.

**\*29** To properly state a claim for unjust enrichment under Illinois law, plaintiff must allege "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." _H.P.I. Health Care v. Mt. Vernon Hospital,_ 545 N.E.2d at 679. Here, as stated several times before, plaintiffs have alleged, among other things, that Comdisco sold property belonging to plaintiff GLLP that it did not have authority to sell. Plaintiffs have thereby adequately stated a cause of action for unjust enrichment, and count nine will not be dismissed.

*CONCLUSION*

For all the foregoing reasons, Comdisco's motion to dismiss is granted in part and denied in part as follows:

Count Three: Motion Granted as to plaintiff IBM Credit

Count Four: Motion Granted as to Plaintiff IBM Credit

Count Five: Motion Denied

Count Six: Motion Denied

Count Seven: Motion Granted

Count Eight: Motion Denied

Count Nine: Motion Granted as to Plaintiffs IBM and IBM Credit.

IT IS SO ORDERED.

FN1. Comdisco did not specifically state that its motion to dismiss was brought pursuant to Superior Court Civil Rule 12(b)(6) or that the motion was one to dismiss for failure to state a claim for which relief may be granted. However, this is the proper characterization of the motion and I will treat it accordingly.

FN2. It should be noted that under certain cir-

cumstances, some parts need to be removed in order to add to or upgrade the machine.

FN3. At some point either prior to or after the lease agreement was entered into, IBM Credit transferred title in the 3090 to GLLP.

FN4. The complaint is silent with regard to whether Computer Associates obtained consent to sublease the machine to Comdisco. A reasonable inference to be drawn from the complaint, however, is that the proper consent was not sought or obtained.

FN5. Plaintiffs did not attach to the complaint a copy of the letter purporting to give notice of default to Computer Associates, but Comdisco did attach a copy to its motion to dismiss. Superior Court Civil Rule 12(b) provides, in pertinent part:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. (Emphasis added.)

Comdisco cites _Lewis v. Straetz,_ Del.Ch., C.A. No. 7859, Hartnett, V.C. (Feb. 12, 1986), for the proposition that the letter itself may be considered for purposes of the motion to dismiss. In _Lewis v. Straetz,_ however, the extraneous documents considered by the court had been attached as exhibits to the defendant's answer, and so were part of the pleadings pursuant to Chancery Court Rule 10(c). _Lewis v. Straetz, supra,_ slip op. at 3, 4. Comdisco also cites _Lewis v. Leaseway Transportation Corp.,_ Del.Ch., C.A. No. 8720, Chandler, V.C. (May 16, 1990), for the same proposition. This case is also unpersuasive, however, because it concerned consideration of a proxy statement, only. _See Lewis v. Leaseway Transportation Corp., supra,_ slip op. at 1, and cases cited therein. And finally, Comdisco cites _Glaser v. Norris,_ Del.Ch., C.A. No. 9538,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 25

Chandler, V.C. (July 13, 1989), *appeal dismissed,* Del.Supr., 571 A.2d 786 (1990). In *Glaser v. Norris,* the court considered a Prospectus that had been attached to a motion pursuant to Chancery Court Rule 10(c). *Glaser v. Norris, supra,* slip op. at 4, n. 3. Chancery Court Rule 10(c), like its Superior Court Rule counterpart, concerns the attachment of documents to pleadings. The letter at issue here was not attached to a pleading. Accordingly, *Glaser* does not persuade me that I must consider the proffered letter for purposes of this motion to dismiss. As I am not prepared at this point to find that the March 26, 1991, letter is dispositive of all the issues in this case, and since the parties have not had a full opportunity to conduct discovery, it appears the more prudent course would be to exclude the letter from consideration for purposes of this motion. Moreover, since I choose to exclude the letter from consideration, the motion at bar will not be converted into a motion for summary judgment.

FN6. At several points throughout this opinion, it will be necessary to construe certain provisions of the TLMA and the IBM Credit/Computer Associates sublease agreements. The TLMA contains a choice of law provision which directs that Connecticut law shall govern the lease. TLMA, ¶ 44. As Delaware courts recognize the parties' right choose which law will govern their relationship (*see* discussion at p. 18 *infra* ), I will apply Connecticut law where specific portions of these agreements must be interpreted.

FN7. The comments following section 145 of the Restatement state:
Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law.... This will also be so when ... there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury, or when ... injury has occurred in two or more states. RESTATEMENT (SECOND) OF CONFLICTS, Section 145, comment e. on subsection (2) (1971). It is later stated in the comments that, [w]hen the injury occurred in two or more states,

or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law.
*Id.*

FN8. It should be noted that Delaware's choice of law principles result in the application of Illinois local law to the substantive issues presented by counts seven and nine as well. Therefore the application of Illinois law to the tort counts has the added benefit of uniformity.

FN9. Although Illinois law governs resolution of the substantive issues presented by counts three through nine, Delaware law will control on the procedural issues. *See Connell v. Delaware Aircraft Industries,* Del.Super., 55 A.2d 637, 640 (1947).

FN10. Defendant also argues that since the TLMA provides that lessee shall have the option to extend the lease term or to purchase the leased equipment, the act of leasing parts of the machine for periods extending beyond the lease term is authorized under the TLMA. However, the pertinent TLMA provisions are clear that these options are available to the lessee only if lessee is not in default under the TLMA. TLMA, ¶¶ 17, 18. As previously noted, plaintiffs have adequately pled that lessee is in default under the TLMA.

FN11. In conjunction with the argument that the TLMA itself confers title in parts removed from the equipment upon lessees and sublessees, Comdisco asserts again that the Sublease Agreements are not proper modifications of the TLMA because they are not supported by consideration. Therefore, defendant contends, the sublease agreements, which very explicitly prohibit some of the types of activities complained of in this case, are not to be given effect. Once again, however, the importance of this argument is dependent upon my finding that the alleged wrong-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 26

ful activities were in fact permitted by the TLMA; since I find the opposite to be true, I need not address at this point whether the sub-lease consents were valid modifications of the TLMA.

FN12. For reasons discussed later in this opinion, count seven is dismissed as to all plaintiffs for reasons unrelated to standing. I will therefore refrain from discussing IBM Credit's standing to sue for breach of contract as a third party beneficiary. *See* discussion *infra*, at pp. 55-57.

FN13. GLLP is a Delaware limited partnership. The Delaware Revised Uniform Limited Partnership Act therefore delineates the statutory parameters of the rights of its partners, including IBM Credit. *See* 6 Del.C., Chapter 17.

FN14. A "wrongfulness" inquiry is pertinent to the extent defendant may have been shielded by the privilege of competition. Since Comdisco raises this allegation in its motion to dismiss, this issue is addressed later in this opinion. *See* discussion *infra* at pp. 52-55.

FN15. It should be noted that in *Monroe County Water Cooperative* the court chose to apply the reasoning of the cases wherein it was held that demand and refusal are unnecessary if futile, and held that since any demand would have been unavailing it was not necessary for demand and refusal to have been alleged. 437 N.E.2d at 1240.

FN16. Plaintiffs counter that Illinois law does not require the plaintiff to have a right to immediate possession in the item which defendant allegedly trespassed upon. However, it seems to be a settled point in Illinois that such right to immediate possession, or "constructive possession," is necessary to maintain an action for trespass to chattels. *See Illinois Bell Telephone Company v. Miner*, Ill.App., 136 N.E.2d 1, 6 (1956) (absolute ownership plus the right to regain possession "at any time" sufficient to support an action for trespass). In *Cannon v. Kinney*, 4 Ill. 9 (1841), the court stated,
To maintain the action of trespass to personal

property, the plaintiff must, at the time the injury is committed, have the actual or constructive possession, and also a general or qualified property therein, which may be either, first, as in the case of the absolute or general owner, having the right to immediate possession; secondly, the qualified owner, coupled with an interest, and also entitled to immediate possession; thirdly, a bailee with a mere naked authority unaccompanied with any interest, except as to recompense for trouble, & c., but who is in actual possession; or, fourthly, actual possession, though without the consent of the real owner, and even adverse. *Cannon v. Kinney*, 4 Ill. at 10, 11. While *Cannon* seems also to say that where a defendant comes into possession of the chattel tortiously an immediate right to possession on the part of the owner is no longer required, *id.* at 11, there is no allegation or evidence currently before me that would indicate that Comdisco acquired possession in a tortious manner.

FN17. The court defined "malicious" as "intentional and without justification." *H.P.I.* 545 N.E.2d at 677. Another court noted that "[t]he term 'malice' [as used in this context] tends to be amorphous and misleading, and is better omitted." *Belden Corp. v. InterNorth, Inc.*, Ill.App., 413 N.E.2d 98, 101, n. 1 (1980).

FN18. As noted at page 32 of this opinion, Comdisco argues in its Brief in Support of its Motion to Dismiss that not only have plaintiffs failed to plead that Comdisco's conduct was wrongful (or malicious), but that they have further failed to plead, as defendant avers they must, that defendant's conduct was wrongful as to IBM and IBM Credit specifically. Accordingly, Comdisco asserts, these plaintiffs lack standing to bring this claim. In support of this argument, Comdisco cites *Prudential Insurance Company of America v. Van Matre, supra*, wherein the plaintiff argued that the means employed by the defendant to interfere with certain contracts were wrongful because they violated an Illinois Department of Insurance Rule which concerned the proper procedure for selling replacement life insurance policies. *Prudential*, 511 N.E.2d at 745. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

court noted that although "[c]onduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper," because the rule was designed to protect policyholders and not insurers, an insurer could not invoke the rule to render interference with terminable at will insurance policies by a former agent improper where the defendant was otherwise lawfully competing. *Id. quoting,* RESTATEMENT (SECOND) OF TORTS, § 767, comment c at 31 (1979).

*Prudential* does not stand for the proposition that the wrongfulness of a defendant's conduct in a tortious interference case must be wrongful as to plaintiffs specifically. Instead, the court in *Prudential* was making a very fact-specific holding with regard to the impact of an insurance rule violation where an insurance company was suing a former agent. Moreover, *Prudential* is distinguishable from the case at bar because the rule or policy at issue in *Prudential* was designed to protect only a certain class of persons, and the plaintiffs were not members of that class. In this case the wrongful behavior that Comdisco is alleged to have engaged in is wrongful generally, not just as to a certain class of persons.

FN19. It should be noted that any rights which IBM Credit might have are necessarily derivative of the rights of the partnership-the "Owner" of the leased machinery.

FN20. The plaintiffs in *Goldstick* had a parallel theory of recovery based on restitution which the court held did present a question of fact for the jury. *See* Goldstick, 788 F.2d at 467.

FN21. It should perhaps be noted that the plaintiff in *Premier* was also seeking to recover from the property owner on a theory that the owner had orally promised recompense for services plaintiff was rendering. *Premier,* 477 N.E.2d at 1251.

Del.Super.,1991.
International Business Machines Corp. v. Comdisco, Inc.
Not Reported in A.2d, 1991 WL 269965 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT N



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2583100 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**
Millett v. Truelink, Inc.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Steven G. MILLETT, Melody J. Millett, on behalf of
themselves and all others similarly situated,
Plaintiffs,
v.
TRUELINK, INC., a Trans Union Company, Defendant.
**No. Civ.05-599 SLR.**

Sept. 7, 2006.

Christopher J. Curtin, of Erisman & Curtin, Wilmington, Delaware, Barry R. Grissom, Overland Park, Kansas, for Plaintiffs, of counsel.
William J. Lafferty, and Jerry C. Harris, Jr., of Morris, Nichols, Arsht, & Tunnell LLP, Wilmington, Delaware, Michael O'Neil, and Paula D. Friedman, of DLA Piper Rudnick Gray Cary U.S. LLP, Chicago, Illinois, for Defendant, of counsel.

MEMORANDUM OPINION
ROBINSON, Chief J.
*1 Presently before the court are defendant's motion to dismiss counts I, II, III, and V of the second amended complaint or for more definite statement (D.I.60), plaintiffs' motion seeking leave to file sur-reply with regard to defendant's motion to dismiss or, in the alternative, to conduct discovery on and to fully brief the choice-of-law issues in this action (D.I.64), and plaintiffs' motion for leave to file third amended complaint (D.I.70). For the reasons stated below, plaintiffs' motion to amend will be granted in part and defendant's motion to dismiss and plaintiffs' motion to file a sur-reply will be denied.<sup>FN1</sup>

> FN1. Plaintiffs contend that they should be permitted to file a sur-reply brief on the choice-of-law issue because defendant has changed its position on the applicable law several times. The court concludes that defendant has consistently maintained that Delaware law applies to this action, but argues that plaintiffs have failed to state a claim under the Delaware Consumer Fraud Act. The court finds that plaintiffs have had ample opportunity to brief the choice-of-law issue in response to defendant's motion to dismiss and in their motion to amend. Accordingly, the court will deny plaintiffs' motion to file a sur-reply.

I. BACKGROUND

The following facts are alleged in plaintiffs' second amended complaint. (D.I.53, Ex. 4) Defendant, a Delaware corporation with its principal place of business in San Obispo, California, is in the business of selling products and services that allow customers to monitor their credit ratings. Sometime on or after September 9, 2001, plaintiffs, Kansas residents, purchased one of defendant's credit-monitoring services known as Credit Monitoring or Online Credit Monitoring through defendant's TrueCredit internet portal. In its advertising, defendant promotes the Credit Monitoring service as one that, among other things, protects against identity theft and immediately alerts customers to changes in their credit reports.

As a part of the purchase, plaintiffs entered into a contract with defendant, which provides that purchasers of the Credit Monitoring service will be entitled to the privileges and services listed in defendant's advertising. The contract further provides that the contract is to be interpreted under Delaware law and that any action filed relating to defendant's services must be brought in the federal or state courts of New Castle County, Delaware.

On September 9, 2004, plaintiffs filed their complaint on behalf of themselves and all others similarly situated in the United States District Court for the District of Kansas. By their complaint, plaintiffs alleged that the Credit Monitoring service failed to perform as promised in the marketing materials and contract. On August 16, 2005, the case was transferred to this court due to the choice-of-venue and choice-of-law provisions in the parties' contract. Plaintiffs subsequently filed, and the court granted, an unopposed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2583100 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

motion for leave to file a second amended complaint. Plaintiffs' second amended complaint alleges breach of contract (count III) and violations of the Delaware Consumer Fraud Act ("DCFA") (count I), Delaware Consumer Contracts Act ("DCCA") (count II), Credit Repair Organizations Act ("CROA") (count IV), and the Credit Reporting Agencies Act ("CRAA") (count V). (D.I.53, Ex. 4)

Defendant filed the instant motion to dismiss on January 13, 2006. (D.I.60) By its motion, defendant contends that plaintiffs' allegations are insufficient to state a claim under the DCFA and CRAA. Defendant further contends that plaintiffs' breach of contract claim and the claims brought pursuant to the DCCA and CRAA should be dismissed because the statutes of limitations on those claims have expired or, alternatively, that plaintiffs should be required to provide more definite statements relating to when the transactions occurred.

**\*2** In response to defendant's motion to dismiss, plaintiffs filed the instant motions for leave to file a sur-reply and for leave to amend, which plaintiffs contend render defendant's motion to dismiss moot. By their proposed third amended complaint, plaintiffs seek to substitute a claim under the California Consumer Legal Remedies Act ("CCLRA") for the DCFA claim, to clarify relevant dates, to allege more facts in relation to their CRAA claim, and to provide more information regarding defendant's failure to perform.

## II. LEGAL STANDARDS

### A. Plaintiffs' Motion To Amend Pursuant To Rule 15(a)

The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co., 921 F.2d 484, 486-87 (3d Cir.1990)* (citations omitted). Despite this liberal approach, courts may deny leave to amend where they find "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party

by virtue of the allowance of the amendment, futility of amendment, etc." *Foman v. Davis, 371 U.S. 178, 182 (1962).* Futility exists and a court may deny a request for leave to amend "where the amendment would not withstand a motion to dismiss." *Centifanti v. Nix, 865 F.2d 1422, 1431 (3d Cir.1989).*

### B. Defendant's Motion To Dismiss Pursuant To Rule 12(b)(6)

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all material allegations of the complaint and construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998).* "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id; see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).* The moving party has the burden of persuasion. *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1403 (3d Cir.1991).*

## III. DISCUSSION

Several of the issues raised in defendant's motion to dismiss can be resolved by plaintiffs' motion for leave to amend. Accordingly, the court will discuss the motions together.

### A. Whether Delaware, California, Or Kansas Law Applies To Plaintiffs' Statutory Consumer Fraud Claim

The parties' contract contains a choice-of-law provision, which provides:
The laws applicable to the interpretation of this membership agreement shall be the laws of the State of Delaware, USA, and applicable federal law, without regard to any conflict of law provisions ... You agree that any and all disputes arising under this Agreement or out of TrueLink's provision of services to you, pursuant to this membership or otherwise, if submitted to a court of law shall be submitted to the state and federal courts of New Castle County, Delaware, USA.

**\*3** (D.I. 71, Ex. A at 6) Plaintiffs contend that their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2583100 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

consumer fraud claim sounds in tort and, therefore, the choice-of-law provision, which does not cover tort claims, is inapplicable to that claim. The Delaware courts, however, emphasizing the need for certainty in contractual rights and relations, have recently rejected plaintiffs' argument that different states' laws should be applied to claims sounding in tort and contractual claims. In *Abry Partners V, L.P. v. F & W Acquisition, LLC,* 891 A.2d 1032 (Del. Ch.2006), the court, confronted with a choice-of-law provision similar to the one in this case, stated:[The] division is not sensible. As § 201 of the Restatement (Second) of the Conflict of Laws states: "the effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by the law selected by application of the rules of §§ 187-188." In turn, § 187 allows the law of the state chosen by the parties to govern contractual rights and duties unless the chosen state lacks a substantial relationship to the parties or transaction or applying the law of the chosen state will offend a fundamental policy of a state with a material greater interest.

*Abry Partners,* 891 A.2d at 1047. Accordingly, Delaware law will apply unless the court finds that (1) Delaware lacks a substantial relationship to the parties or the transaction or (2) the application of Delaware law would offend the public policy of the state whose law would apply in the absence of an effective choice-of-law provision. The court concludes that Delaware has a substantial relationship to the parties by means of defendant's incorporation in the state, *Edelist v. MBNA Am. Bank,* 790 A.2d 1249, 1256 (Del.Super.2001), and, therefore, the court must consider whether the policy of a state with a material greater interest is offended by the application of Delaware law.

Restatement section 148 [FN2] provides several factors a court must consider in determining which state's law applies to a plaintiff's fraud claim:

> FN2. Section 187 provides that the court is to look to the factors listed in section 188 in determining which state's law applies. However, because section 148 specifically provides factors to consider in determining the applicable law in relation to a fraud

claim, the court will consider those factors.

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2).

Under the factors of section 148, the law of Kansas will apply if the application of Delaware law offends public policy. It is clear that plaintiffs received and acted in reliance on defendant's representations in Kansas. Furthermore, plaintiffs rendered their performance, i.e. payment, in Kansas. Also, plaintiffs reside in Kansas, and plaintiffs' residence is more important than defendant's for the purpose of determining which state's laws apply. Restatement (Second) of Conflict of Laws § 148, comment i. Finally, while defendant made its representations in California, this is the only factor that favors the application of California law. Accordingly, the court will apply Kansas law if the application of Delaware law would offend public policy.

**\*4** The court concludes that the application of Delaware law in this situation offends public policy. The DCFA applies only to unlawful practices that occurred or were performed partly or wholly within the State of Delaware. *Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203 (Del. Ch.1988). By maintaining its principal place of business in California and inserting a Delaware choice-of-law provision, defendant has attempted to insulate itself from liability against all statutory consumer fraud claims, except perhaps those brought by Delaware residents. Such a result is against Kansas public policy. See K.S.A. § 50-625 ("a consumer may not waive or agree to fore-

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 2583100 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

go rights or benefits under the [Kansas Consumer Protection Act]"); _Stone St. Servs., Inc. v. Daniels, 2000 WL 1909373, at *4-5 (E.D.Pa.2000)_ (discussing the non-waiver provision of the KCPA); _see also Corral v. Rollins Protective Servs. Co., 732 P.2d 1260, 1271-72 (Kan.1987)_ (concluding that the defendant could not attempt to limit its liability under the KCPA). Accordingly, the law of the State of Kansas applies to plaintiffs' consumer fraud claim.

### B. Whether The Court Should Grant Plaintiffs Leave To Amend Their Complaint

Having concluded that Kansas law applies to plaintiffs' consumer fraud claim, the court will not grant plaintiffs leave to amend their complaint to add a claim under the CCLRA, because such an amendment would be futile. Instead, for the same reasons as discussed below, the court will grant plaintiffs leave to amend their complaint to add a claim under the Kansas Consumer Protection Act.

The court will grant plaintiffs leave to make the other proposed amendments to their second amended complaint. There has been no showing that plaintiffs have acted in bad faith or with a dilatory motive. Additionally, while plaintiffs have had many chances to allege their claims correctly, the court concludes that, at this juncture, it is better to allow plaintiffs one more amendment than to dismiss certain of plaintiffs' claims on technicalities. Finally, the court notes that defendant will experience some prejudice as a result of plaintiffs' third amendment, but does not find this prejudice to be undue, particularly since defendant has had notice of these claims as early as the filing of the original complaint. Accordingly, the court will grant in part plaintiffs' motion to amend.

### C. Whether Plaintiffs Have Stated A Claim Under The Credit Reporting Agencies Act

In order to establish a claim under section 1681e(b) of the CRAA, a plaintiff must allege that: "(1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was

caused by the inclusion of the inaccurate entry." _Philbin v. Trans Union Corp., 101 F.3d 957, 963 (3d Cir.1996)_; 15 U.S.C. § 1681e(b). Defendant contends that plaintiffs have failed to state a claim under the CRAA because they have failed to identify any inaccuracy in their consumer credit reports that resulted from defendant's failure to follow reasonable procedures.

*5 Drawing all reasonable inferences in plaintiffs' favor, the court concludes that plaintiffs have sufficiently alleged a claim under the CRAA in their third amended complaint. Plaintiffs allege that inaccurate information was included in a credit report as a result of defendant's failure to follow reasonable procedures and that, because of this inaccuracy, plaintiffs were denied credit. (D.I. 71, Ex. D at 24-25) Accordingly, the court will deny defendant's motion to dismiss as to plaintiffs' claim under the CRAA.

### D. Whether The Statutes Of Limitations On Plaintiffs' Breach Of Contract and Credit Reporting Agencies Act Claims Have Expired

Defendant contends that plaintiffs' claims under the CRAA and for breach of contract must be dismissed because the statutes of limitations on the claims have expired.[FN3] Under Delaware law, the statute of limitations on claims for breach of contract is three years. 10 Del. C. § 8106. In their third amended complaint, plaintiffs allege that they purchased the Credit Monitoring services and, therefore, entered into a contract with defendant on or about August 2, 2003. The statute of limitations runs from the time of breach, which could not have occurred until on or after August 2, 2003. Accepting August 2, 2003, as the earliest date on which plaintiffs' claim could have accrued, the statute of limitations on plaintiffs' breach of contract claim would have expired, at the earliest, on August 2, 2006. Plaintiffs filed their complaint, which included a claim for breach of contract, on September 9, 2004 and, therefore, the statute of limitations on plaintiffs' breach of contract claim has not expired.[FN4]

> FN3. The court need not address defendant's argument that the statute of limitations has expired on plaintiffs' DCCA claim because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2583100 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

that claim is not included in plaintiffs' third amended complaint.

FN4. The court anticipates defendant's argument that, while the breach of contract and CRAA claims were included in the original complaint, they were not included in the first amended complaint. (D .I. 61, Ex. A & B) The second amended complaint, which re-included the breach of contract and CRAA claims, relates back to the date of the original complaint because the claims "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2).

Similarly, based on the allegations contained within plaintiffs' third amended complaint, the statute of limitations on plaintiffs' claim brought pursuant to the CRAA has not expired. The CRAA provides:
An action to enforce any liability created under this title ... may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of-
(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or
(2) 5 years after the date on which the violation that is the basis for such liability occurs.

15 U.S.C. § 1681p. Accepting August 2, 2003 as the earliest date on which plaintiffs' CRAA claim could have accrued, the statute of limitations on plaintiffs' claim would have expired, at the earliest, on August 2, 2005, nearly eleven months after plaintiffs filed their complaint.[FN5]

FN5. The court declines, at this time, to comment on the statute of limitations in relation to the claims of the putative class.

Defendant contends that, even if the statute of limitations has not expired, plaintiffs should be required to provide a more definite statement as to when the breaches of contract took place. The court concludes, however, that plaintiffs' allegations are sufficient under the notice-pleading standard "to calculate the limitations period and to identify possible defenses to

this action." (D.I. 61 at 8) Accordingly, the court will deny defendant's request for a more definite statement.

IV. CONCLUSION

*6 For the reasons discussed, plaintiffs' motion to amend (D.I.70) will be granted in part and defendant's motion to dismiss (D.I.60) and plaintiffs' motion to file a sur-reply (D.I.64) will be denied.

An appropriate order shall issue.

ORDER

At Wilmington this 7th day of September 2006, for the reasons stated in the memorandum opinion issued this same date;

IT IS ORDERED that:
1. Defendant's motion to dismiss counts I, II, III, and V of the second amended complaint or for more definite statement (D.I.60) is denied.
2. Plaintiffs' motion seeking leave to file sur-reply with regard to defendant's motion to dismiss or, in the alternative, to conduct discovery on and to fully brief the choice-of-law issues in this action (D.I.64) is denied.
3. Plaintiffs' motion for leave to file third amended complaint (D.I.70) is granted in part.
4. Plaintiffs may file a fourth amended complaint no later than September 22, 2006 to include a claim under the Kansas Consumer Protection Act.

D.Del.,2006.
Millett v. Truelink, Inc.
Not Reported in F.Supp.2d, 2006 WL 2583100 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT O

# Table C-5.
## U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2006

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| TOTAL | 218,613 | 9.5 | 48,834 | 6.5 | 130,872 | 9.5 | 35,585 | 29.7 | 3,322 | 22.2 |
| DC | 1,954 | 9.3 | 867 | 8.3 | 1,010 | 10.0 | 36 | 17.3 | 41 | 34.5 |
| 1ST | 5,602 | 9.3 | 1,944 | 7.4 | 2,574 | 8.7 | 918 | 14.7 | 166 | 23.0 |
| ME | 425 | 7.7 | 172 | 5.6 | 210 | 7.0 | 30 | 16.0 | 13 | 14.0 |
| MA | 2,815 | 10.2 | 1,286 | 8.2 | 1,061 | 9.4 | 376 | 14.1 | 92 | 27.7 |
| NH | 431 | 9.2 | 120 | 5.9 | 122 | 6.5 | 182 | 15.4 | 7 | - |
| RI | 489 | 8.0 | 78 | 4.5 | 225 | 8.1 | 171 | 11.0 | 15 | 17.0 |
| PR | 1,442 | 12.6 | 288 | 10.4 | 956 | 10.9 | 159 | 19.2 | 39 | 25.0 |
| 2ND | 18,129 | 9.4 | 5,836 | 8.2 | 9,564 | 9.1 | 2,415 | 15.6 | 314 | 28.5 |
| CT | 1,860 | 11.5 | 1,244 | 9.6 | 498 | 15.4 | 59 | 24.0 | 59 | 29.4 |
| NY,N | 1,021 | 12.4 | 221 | 6.3 | 502 | 9.8 | 262 | 17.8 | 36 | 27.0 |
| NY,E | 5,229 | 10.2 | 891 | 6.1 | 3,388 | 9.8 | 863 | 17.1 | 87 | 33.5 |
| NY,S | 8,631 | 8.9 | 3,159 | 8.6 | 4,307 | 8.9 | 1,052 | 12.4 | 113 | 23.0 |
| NY,W | 1,089 | 12.9 | 296 | 8.9 | 604 | 11.8 | 178 | 21.0 | 11 | 63.0 |
| VT | 299 | 7.0 | 25 | 4.0 | 265 | 7.7 | - | - | 8 | - |
| 3RD | 24,837 | 5.8 | 4,576 | 5.9 | 16,756 | 3.9 | 3,148 | 13.0 | 357 | 22.2 |
| DE | 1,071 | 15.4 | 159 | 11.8 | 713 | 13.4 | 150 | 18.4 | 49 | 29.0 |
| NJ | 5,240 | 8.4 | 1,649 | 6.6 | 2,010 | 5.4 | 1,510 | 14.1 | 71 | 30.7 |
| PA,E | 14,152 | 1.2 | 1,291 | 4.7 | 11,417 | 1.0 | 1,316 | 11.7 | 128 | 18.0 |
| PA,M | 1,751 | 6.6 | 614 | 4.4 | 1,015 | 6.7 | 70 | 18.0 | 52 | 20.4 |
| PA,W | 2,357 | 8.0 | 825 | 6.1 | 1,392 | 9.5 | 85 | 22.0 | 55 | 26.0 |
| VI | 266 | 20.5 | 38 | 5.7 | 209 | 21.3 | 17 | 23.5 | 2 | - |
| 4TH | 32,426 | 9.7 | 3,653 | 6.8 | 27,400 | 9.8 | 1,162 | 10.3 | 211 | 18.6 |
| MD | 2,744 | 7.9 | 1,346 | 7.5 | 1,113 | 6.3 | 239 | 13.0 | 46 | 21.0 |
| NC,E | 915 | 12.4 | 368 | 11.2 | 535 | 13.7 | 1 | - | 11 | 27.0 |
| NC,M | 782 | 12.5 | 201 | 7.1 | 382 | 13.8 | 189 | 14.0 | 10 | 19.5 |
| NC,W | 740 | 10.3 | 285 | 9.0 | 392 | 9.0 | 57 | 11.2 | 6 | - |
| SC | 21,887 | 9.0 | 357 | 6.5 | 21,300 | 9.0 | 182 | 13.0 | 48 | 21.0 |
| VA,E | 2,909 | 4.4 | 744 | 4.0 | 1,662 | 4.7 | 456 | 7.0 | 47 | 9.6 |
| VA,W | 774 | 9.1 | 159 | 8.2 | 579 | 9.7 | 16 | 11.0 | 20 | 12.0 |
| WV,N | 417 | 12.8 | 157 | 9.7 | 234 | 13.6 | 15 | 15.0 | 11 | 20.0 |
| WV,S | 1,258 | 11.9 | 36 | 4.0 | 1,203 | 11.3 | 7 | - | 12 | 16.0 |

## Table C-5. (March 31, 2006—Continued)

| Circuit and District | Total Cases | | No Court Action | | Before Pretrial | | Court Action During or After Pretrial | | Trial | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **5TH** | **20,820** | **8.6** | **5,489** | **6.8** | **13,193** | **8.4** | **1,750** | **12.2** | **388** | **19.7** |
| LA,E | 2,035 | 10.4 | 74 | 4.4 | 1,175 | 7.9 | 739 | 14.3 | 47 | 20.0 |
| LA,M | 1,141 | 6.5 | 537 | 6.9 | 580 | 10.4 | 13 | 25.0 | 11 | 23.0 |
| LA,W | 1,734 | 12.7 | 624 | 10.7 | 1,039 | 12.8 | 36 | 19.0 | 35 | 21.0 |
| MS,N | 844 | 12.3 | 162 | 6.6 | 567 | 11.4 | 84 | 18.4 | 31 | 18.4 |
| MS,S | 3,888 | 6.3 | 1,779 | 6.3 | 2,050 | 6.7 | 24 | 23.0 | 35 | 21.0 |
| TX,N | 2,764 | 8.4 | 158 | 6.9 | 2,539 | 8.6 | 3 | - | 64 | 21.8 |
| TX,E | 1,723 | 10.8 | 353 | 4.0 | 1,283 | 11.7 | 52 | 13.5 | 35 | 14.5 |
| TX,S | 4,321 | 9.0 | 1,251 | 6.7 | 2,218 | 9.5 | 776 | 11.7 | 76 | 19.8 |
| TX,W | 2,370 | 9.3 | 551 | 7.0 | 1,742 | 10.0 | 23 | 9.0 | 54 | 18.0 |
| **6TH** | **33,125** | **24.9** | **4,018** | **5.1** | **10,489** | **9.0** | **18,330** | **101.3** | **288** | **23.0** |
| KY,E | 1,881 | 9.9 | 174 | 5.1 | 1,673 | 10.1 | 22 | 18.0 | 12 | 27.0 |
| KY,W | 1,261 | 9.8 | 265 | 7.4 | 877 | 9.9 | 110 | 18.9 | 9 | - |
| MI,E | 18,760 | 101.2 | 681 | 4.4 | 1,382 | 6.3 | 16,630 | 101.4 | 67 | 23.0 |
| MI,W | 840 | 8.5 | 129 | 3.1 | 692 | 9.5 | 13 | 20.0 | 6 | - |
| OH,N | 4,346 | 7.3 | 1,031 | 4.3 | 2,550 | 7.7 | 730 | 10.6 | 35 | 17.3 |
| OH,S | 2,385 | 11.9 | 1,009 | 9.8 | 959 | 12.9 | 370 | 15.5 | 47 | 27.3 |
| TN,E | 1,277 | 11.6 | 233 | 7.9 | 586 | 9.6 | 423 | 16.7 | 35 | 24.0 |
| TN,M | 1,365 | 10.0 | 225 | 7.8 | 1,091 | 11.1 | 12 | 15.0 | 37 | 22.0 |
| TN,W | 1,010 | 10.3 | 271 | 6.7 | 679 | 11.1 | 20 | 20.0 | 40 | 24.5 |
| **7TH** | **13,281** | **7.8** | **3,942** | **5.9** | **7,693** | **7.2** | **1,424** | **12.6** | **222** | **23.0** |
| IL,N | 6,745 | 6.1 | 2,449 | 5.6 | 3,724 | 6.4 | 476 | 12.1 | 96 | 25.5 |
| IL,C | 747 | 8.1 | 302 | 8.5 | 418 | 7.0 | 9 | - | 18 | 22.0 |
| IL,S | 817 | 8.9 | 212 | 7.5 | 566 | 9.8 | 22 | 20.0 | 17 | 24.0 |
| IN,N | 1,336 | 10.9 | 260 | 5.7 | 676 | 10.2 | 375 | 14.9 | 25 | 23.4 |
| IN,S | 2,169 | 10.3 | 524 | 5.1 | 1,331 | 10.1 | 287 | 13.5 | 27 | 24.0 |
| WI,E | 982 | 8.7 | 150 | 4.8 | 755 | 8.8 | 59 | 14.7 | 18 | 22.0 |
| WI,W | 485 | 4.8 | 45 | 2.3 | 223 | 3.7 | 196 | 6.4 | 21 | 8.5 |
| **8TH** | **12,517** | **10.8** | **3,988** | **6.0** | **6,244** | **10.6** | **2,003** | **33.1** | **282** | **20.6** |
| AR,E | 1,784 | 12.4 | 422 | 9.4 | 1,304 | 12.4 | 8 | - | 50 | 18.5 |
| AR,W | 813 | 12.4 | 68 | 11.6 | 712 | 12.3 | 4 | - | 29 | 14.7 |
| IA,N | 413 | 10.5 | 54 | 5.0 | 341 | 10.9 | 2 | - | 16 | 22.0 |
| IA,S | 652 | 10.2 | 142 | 6.6 | 401 | 10.8 | 90 | 17.2 | 19 | 21.7 |
| MN | 3,693 | 12.3 | 1,365 | 3.9 | 458 | 7.1 | 1,826 | 37.9 | 44 | 24.7 |
| MO,E | 2,065 | 7.4 | 693 | 7.3 | 1,333 | 6.1 | 2 | - | 37 | 21.7 |
| MO,W | 1,930 | 8.3 | 952 | 7.7 | 922 | 9.9 | 24 | 18.0 | 32 | 21.0 |
| NE | 667 | 9.5 | 34 | 1.0 | 570 | 8.7 | 32 | 18.0 | 31 | 18.4 |
| ND | 211 | 8.4 | 68 | 4.3 | 132 | 9.6 | 1 | - | 10 | 18.5 |
| SD | 289 | 9.5 | 190 | 7.2 | 71 | 11.0 | 14 | 23.0 | 14 | 21.5 |

## Table C-5. (March 31, 2006—Continued)

| | Total Cases | | No Court Action | | Court Action | | | | | |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| Circuit and District | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
|---|---|---|---|---|---|---|---|---|---|---|
| **9TH** | **28,802** | **9.6** | **10,389** | **7.9** | **16,086** | **9.8** | **1,827** | **13.6** | **500** | **25.0** |
| AK | 272 | 9.8 | 32 | 6.0 | 235 | 9.0 | 1 | - | 4 | - |
| AZ | 2,133 | 11.2 | 896 | 10.6 | 1,176 | 11.7 | 8 | - | 53 | 29.7 |
| CA,N | 4,487 | 9.2 | 2,114 | 6.9 | 884 | 7.8 | 1,431 | 12.7 | 58 | 27.5 |
| CA,E | 2,171 | 10.9 | 866 | 8.2 | 1,258 | 12.7 | 16 | 20.0 | 31 | 26.0 |
| CA,C | 9,297 | 7.8 | 3,733 | 7.6 | 5,321 | 8.4 | 100 | 18.8 | 143 | 23.9 |
| CA,S | 1,776 | 7.9 | 139 | 2.4 | 1,619 | 7.7 | 1 | - | 17 | 26.0 |
| HI | 647 | 9.6 | 309 | 9.0 | 252 | 7.3 | 64 | 14.7 | 22 | 30.0 |
| ID | 448 | 11.9 | 68 | 3.2 | 324 | 11.4 | 47 | 20.0 | 9 | - |
| MT | 445 | 12.3 | 127 | 11.0 | 234 | 10.0 | 69 | 17.7 | 15 | 27.0 |
| NV | 1,564 | 9.8 | 483 | 8.8 | 1,054 | 9.0 | 3 | - | 24 | 28.0 |
| OR | 1,954 | 10.1 | 640 | 8.9 | 1,225 | 11.3 | 20 | 14.5 | 69 | 20.5 |
| WA,E | 558 | 9.2 | 169 | 6.5 | 345 | 9.8 | 32 | 16.5 | 12 | 16.0 |
| WA,W | 2,973 | 9.8 | 795 | 5.1 | 2,119 | 11.0 | 21 | 18.0 | 38 | 19.3 |
| GUAM | 46 | 19.5 | 8 | - | 20 | 13.0 | 13 | 25.0 | 5 | - |
| NMI | 31 | 8.4 | 10 | 5.0 | 20 | 10.0 | 1 | - | - | - |
| **10TH** | **7,952** | **9.7** | **1,212** | **6.0** | **5,245** | **9.7** | **1,283** | **12.7** | **212** | **20.0** |
| CO | 2,001 | 8.5 | 50 | 4.0 | 1,786 | 7.2 | 116 | 19.4 | 49 | 28.4 |
| KS | 1,092 | 9.6 | 327 | 7.9 | 625 | 8.2 | 107 | 18.7 | 33 | 20.0 |
| NM | 1,192 | 10.4 | 115 | 7.3 | 533 | 8.7 | 499 | 12.5 | 45 | 18.0 |
| OK,N | 738 | 12.8 | 65 | 4.5 | 631 | 12.1 | 19 | 19.0 | 23 | 19.0 |
| OK,E | 397 | 8.2 | 127 | 7.1 | 231 | 9.4 | 26 | 8.4 | 13 | 16.5 |
| OK,W | 1,208 | 9.5 | 371 | 6.5 | 433 | 8.5 | 379 | 10.6 | 25 | 15.4 |
| UT | 1,086 | 11.6 | 73 | 5.2 | 985 | 11.3 | 12 | 15.0 | 16 | 27.0 |
| WY | 238 | 9.6 | 84 | 5.8 | 21 | 8.0 | 125 | 10.2 | 8 | - |
| **11TH** | **19,168** | **8.9** | **2,920** | **6.2** | **14,618** | **8.2** | **1,289** | **13.6** | **341** | **19.0** |
| AL,N | 2,389 | 10.1 | 827 | 8.7 | 1,489 | 10.2 | 26 | 18.4 | 47 | 19.0 |
| AL,M | 778 | 10.8 | 256 | 7.9 | 450 | 10.8 | 46 | 14.0 | 26 | 15.5 |
| AL,S | 617 | 8.8 | 78 | 7.5 | 504 | 8.8 | 21 | 16.0 | 14 | 17.0 |
| FL,N | 735 | 8.3 | 185 | 7.2 | 538 | 8.8 | 5 | - | 7 | - |
| FL,M | 4,783 | 8.7 | 606 | 5.7 | 4,020 | 8.7 | 85 | 16.7 | 72 | 19.4 |
| FL,S | 5,281 | 6.2 | 53 | 2.9 | 4,778 | 5.2 | 363 | 9.2 | 87 | 15.2 |
| GA,N | 3,341 | 9.1 | 650 | 6.0 | 1,915 | 9.6 | 712 | 13.5 | 64 | 24.8 |
| GA,M | 709 | 11.4 | 148 | 8.0 | 530 | 11.4 | 13 | 16.0 | 18 | 22.0 |
| GA,S | 535 | 9.5 | 117 | 5.7 | 394 | 9.8 | 18 | 29.7 | 6 | - |

NOTE: MEDIAN TIME INTERVALS NOT COMPUTED WHEN FEWER THAN 10 CASES REPORTED. THIS TABLE EXCLUDES LAND CONDEMNATIONS, PRISONER PETITIONS, DEPORTATION REVIEWS, RECOVERY OF OVERPAYMENTS, AND ENFORCEMENT OF JUDGMENTS. FOR FISCAL YEARS PRIOR TO 2001, THIS TABLE INCLUDED DATA ON RECOVERY OF OVERPAYMENTS AND ENFORCEMENT OF JUDGMENTS.